## Re: S.K. v. Obstetric & Gynecologic Associates

**Troy L. Booher** <tbooher@zbappeals.com>                                    Wed, Dec 6, 2023 at 3:19 PM
To: Daniel Bidegaray <daniel@bidegaraylawfirm.com>, Nicholas Rowley <ncr@tl4j.com>
Cc: "Beth E. Kennedy" <bkennedy@zbappeals.com>, Jon Specht <jon@tl4j.com>, Mike Abourezk <mike@abourezk.com>,
Ricardo Echeverria <recheverria@shernoff.com>

Daniel,

I enjoyed my conversation with Nick over the weekend. I am happy I left a favorable impression. I'm not sure it matters much to you, but while my appointment at the law school has not expired, I have not taught for a while, and am unlikely to teach again. I wanted to be clear about that part of my resume since you mentioned it.

Given the history and posture of this case, as well as the various ongoing disputes, it is understandable that the doctors and Clinic would want to know more before signing off on my presenting the oral argument. I am happy to be part of the zoom call in a few weeks that Nick proposed, and I am also happy to respond to many of your questions.

Please note, however, that I can respond only to the questions that are within the scope of my prior representation of the insureds — the doctors and Clinic — and consistent with my possible future representation of them. The scope of my prior representation was to assist their trial counsel in post-trial proceedings and represent them on appeal. I have not been retained to provide legal advice on any disputes between MMIC and the doctors and Clinic. Nor can I get involved in those disputes. MMIC has its own counsel for those disputes, and the doctors and Clinic have you to counsel them in those disputes.

Initially, I want to assure the doctors and Clinic that our loyalties are and have been to them in our representation in this case. We were hired to represent them, not MMIC. And if they decide to let us represent them going forward, then our loyalties will remain with — and only with — them. We will act in their interest within the scope of our retention, which is to prosecute the appeal and to convince the court to order a new trial.

**EXHIBIT**

**B**

Before addressing the numbered questions you pose, I would like to address your inquires about our work for Constellation. We did represent UMIA in the Saltz case on appeal. We have not withdrawn, but we also have had no involvement since the appeal. I am not familiar with the Sacred Heart case you reference in your email.

We actively represent insureds of Constellation in eight cases. We also represent plaintiffs in a Utah case who are adverse to a Constellation insured. We also represent plaintiffs in five different personal injury cases that do not involve a Constellation insured.  So we do not exclusively represent defendants. In fact, a few years ago, we were lead counsel in an appeal that resulted in the Utah Supreme Court's declaring the affidavit of merit requirement in Utah's Health Care Act to be unconstitutional.

While I do expect that Constellation will ask us to represent its insureds in the future when appellate issues arise, I do not consider this to compromise our ability to represent those insureds. Nor does it compromise my ability to represent the doctors and Clinic before the Iowa Supreme Court in this case. And to address your question about Nick Ghiselli, I have a professional relationship with him that will not compromise my ability to represent the doctors or the Clinic.

Below are our answers to the questions you pose, without providing legal views on the disputes between the insureds and the insurer.

1. I believe it was Nicole, or Cathy Larsen, who first contacted me, but Nicole was the primary contact. I'm not sure whether it was the same day as the verdict, but if not, it was very soon after the verdict. Most communications with MMIC went through the Shuttleworth firm.

2. I understood from Shuttleworth attorneys that MMIC was going to post the entire bond. I believe that information came to them from Jim Craig, but I am not certain. I also know that later we were charged with trying to get a stay without posting the entire bond. I do not know who made that decision. But once they made that decision, we had to work to try to secure stays without the posting of the entire bond.

3. I took no position on whether the Clinic and its doctors should declare bankruptcy. The Clinic and doctors had personal counsel to assess whether that was the right decision. Once that decision was made, we were charged with working with bankruptcy counsel to ensure our efforts to secure a stay did not compromise their work and assessing how the bankruptcy might compromise the appeal.

4. On the merits of the appeal, I think there is a good chance the court will order a new trial, and a very slight chance the court will remit the damages in light of the sizable economic damages award. I would say the chance of a new trial is much better than the chance of a full affirmance.

In my view, the pamphlet argument is the most straightforward path to reversal because it comes with the presumption of prejudice, and it was used improperly (mentioning the FDA) by plaintiff's counsel. Most of plaintiff's arguments in the briefing go to trustworthiness, not necessity, so they are off point.

The next most straightforward path is the specification that presumes Dr. Goodman knew about the low blood pressure. There is no evidence she knew. And merely being in charge is not enough. This issue also carries a presumption of prejudice.

I also think the arguments that the specifications were unnecessarily slanted against the doctors and the Clinic is strong when these specifications are compared to neutral ones. But this issue likely does not presume prejudice.

The misconduct is also a ground for reversal, but it seems less likely and requires a demonstration of prejudice. There is no presumption of prejudice. Plaintiff does not address much of the misconduct in its brief, but the sizable economic damages award makes the prejudice argument more difficult, particularly where the trial judge found no prejudice after having witnessed the misconduct.

The remittitur argument is not very strong given the sizable economic damages award, even though the overall size of the verdict is likely to shock many justices.

The apportionment argument is very strong, but does not result in a new trial.

5. I agree that an insurer cannot put its financial interest ahead of the insured, but otherwise take no position on what happened here.

6. I understand the cooperation clause to require cooperation, but I have no view on when the conduct of an insurer or an insured relieves an insured of that duty.

I hope these responses help you with your discussion with the doctors.

Thank you,

Troy