# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### EASTERN DISTRICT

| | |
|---|---|
| MMIC INSURANCE INC.,<br><br>    Plaintiff,<br><br>v.<br><br>OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.,<br><br>    Defendant. | CASE NO. 3:23-cv-00039-SMR-SBJ<br><br>**PLAINTIFF'S APPENDIX IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

COMES NOW, Plaintiff MMIC Insurance Inc., by and through the undersigned counsel,

pursuant to L.R. 56(a)(4), and hereby submits its Appendix in Support of its Motion for Summary

Judgment.

| Exhibit | Document Title | Page |
|:---:|:---|:---:|
| 1 | Insurance Policy | App. 003—045 |
| 2 | Jury Trial Transcript Vol. 12, at 107—228 (3/16/2022) | App. 046—062 |
| 3 | Booher Appearance (9/13/2022) | App. 063—065 |
| 4 | Attorney Fieger Correspondence (10/6/2022) | App. 066 |
| 5 | Dr. Jill Goodman 2004 Examination (1/16/2023) | App. 067—073 |
| 6 | Dismissal of Bankruptcy Case (3/29/2023) | App. 074—086 |
| 7 | Entry of Stay pending Bankruptcy Appeal (4/3/2023) | App. 087 |
| 8 | Malloy Correspondence (4/7/2023) | App. 088 |
| 9 | Dismissal of Bankruptcy Appeal (5/23/2023) | App. 089—090 |
| 10 | Rowley/Fieger Webinar (3/30/2022) | App. 091 |
| 11 | Rowley Email (6/1/2023) | App. 092—095 |
| 12 | Return of Service (Execution) (6/7/2023) | App. 096—097 |
| 13 | Execution Transcript | App. 098—135 |
| 14 | Body Camera—Execution | App. 136 |
| 15 | Bad Faith Petition—Clinic | App. 137—154 |
| 16 | Rowley Appearance (22-1317) (11/28/2023) | App. 155—156 |
| 17 | Motion to Stay Appeal (11/28/2023) | App. 157—164 |
| 18 | Booher Appearance II (11/28/2023) | App. 165—167 |
| 19 | Objection to Zimmerman Booher (11/28/2023) | App. 168—170 |

| | | |
|---|---|---|
| 20 | Shuttleworth & Ingersoll Withdrawal (11/28/2023) | App. 171—173 |
| 21 | Zimmerman Booher Withdrawal (11/29/2023) | App. 174—176 |
| 22 | Order Granting Stay (11/29/2023) | App.177—179 |
| 23 | Motion to Intervene (11/30/2023) | App. 180—196 |
| 24 | Motion to Lift Stay (11/30/2023) | App. 197—216 |
| 25 | Resistance to Motion to Intervene (12/21/2023) | App. 217—228 |
| 26 | News Articles (various) | App. 229—240 |
| 27 | Email Chain (12-30-2023) | App. 241—243 |

**Certificate of Service**

The undersigned certifies that the foregoing instrument was served upon counsel of the parties to this action on January 5, 2024, by CM/ECF.

*/s/ Adam D. Zenor*

Copy to:

Nicholas C. Rowley
Dominic F. Pechota
Jonathan M. Specht
TRIAL LAWYERS FOR JUSTICE, PC
421 West Water Street, Third Floor
PO Box 228
Decorah, IA 52101
nr@tl4j.com
dominic@tl4j.com
jon@tl4j.com

ATTORNEYS FOR OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.

ZENOR KUEHNER, PLC

By: */s/ Adam D. Zenor*
  Adam D. Zenor, AT0009698

By: */s/ Derek R. LaBrie*
  Derek R. LaBrie, AT0014157

111 East Grand Avenue, Suite 400
Des Moines, IA 50309
Phone: 515/650-9005
Fax: 515/206-2654
adam@zenorkuehner.com
derek@zenorkuehner.com

MEISSNER TIERNEY FISHER & NICHOLS, SC

By: */s/ Mark D. Malloy*
  Mark D. Malloy, *Pro Hac Vice*

111 East Kilbourn Avenue, 19th Floor
Milwaukee, Wisconsin 53202
Phone: 414/273-1300
Fax: 414/273-5840
mdm@mtfn.com

ATTORNEYS FOR MMIC INSURANCE, INC.

PLAINTIFF'S APPENDIX-002



February 20, 2020

This is a true and exact copy of the original policy.

Name:          Obstetric & Gynecologic Assoc Of Iowa City and Coralville PC
Policy:         600194
Policy Dates:  01/01/2019 to 01/01/2020

State of

_M̲i̲n̲n̲e̲s̲o̲t̲a̲_____

County of

_H̲e̲n̲n̲e̲p̲i̲n̲_____

I certify that this is a true and correct copy of a document in the possession of

_Dan Cal_____

Dated:  _2-20-20_____

_____
(Signature of notarial officer)

LUCAS R BENSHOOF
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2025

_Notary Public_____
Title (and Rank)

My commission expires:
_01-31-2025_____

7701 FRANCE AVENUE SOUTH    SUITE 500    MINNEAPOLIS, MINNESOTA 55435-5288    MMICgroup.com

PLAINTIFF'S APPENDIX-003                    MMIC 000001

PLAINTIFF'S APPENDIX-004

MMIC 000002



## PHYSICIAN DECLARATIONS

**Issuing Company:** MMIC Insurance, Inc.

**POLICYHOLDER:**
Obstetric & Gynecologic Assoc Of Iowa City and Coralville PC
2769 Heartland Drive
Suite 201
Coralville, IA 52241

**POLICY NUMBER:** 600194

**POLICY PERIOD:** 01/01/2019 to 01/01/2020 *12:01 a.m. standard time at the address of the Policyholder.*

### MEDICAL PROFESSIONAL LIABILITY INSURANCE CLAIMS-MADE AND REPORTED

|  | Limits of Liability | Deductible |
|---|---|---|
| Each Medical Incident Limit | $6,000,000 | $0 |
| Individual Insured Aggregate Limit | $8,000,000 | $0 |
| Insured Entity Aggregate Limit | $8,000,000 | $0 |
| Aggregate Deductible |  | $0 |

| Additional Benefits | Limit | Deductible |
|---|---|---|
| Licensure Proceeding - Each Complaint Limit | $25,000 | $0 |
| Licensure Proceeding - Aggregate Limit | $25,000 | $0 |
| Insured Expenses - Each Day Limit | $1,000 | $0 |
| Each Patient Medical Expense Limit | $10,000 | $0 |
| Aggregate Medical Expense Limit | $50,000 | $0 |

### CYBER SOLUTIONS / MEDEFENSE PLUS

Refer to endorsement for coverages and limits

**Total Policy Premium** (does not include any surcharges):

Forms and Endorsements forming part of this policy at issuance:

| Form Name | Form ID | Edition Date |
|---|---|---|
| Declarations | DEC | 09/2018 |
| Schedule of Insureds | SCHED | 09/2018 |
| Common Conditions | COMCON | 09/2018 |
| Medical Professional Liability Insurance Claims-Made and Reported | MPLC | 09/2018 |
| Cyber Solutions/Medefense Plus Endorsement - Privacy Breach Response | CSMPPBR | 09/2017 |
| Iowa Amendatory Endorsement | IAAM | 09/2017 |
| Patient Medical Expense Coverage Endorsement - Claims-Made | PMECC | 09/2017 |

PLAINTIFF'S APPENDIX-005     MMIC 000003

President

Issue Date: 12/21/2018

PLAINTIFF'S APPENDIX-006      MMIC 000004



7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

Policy Number: 600194

Effective Date: 01/01/2019

## Schedule of Insureds

| Insured Entity | Prior Acts Date | Excess Prior Acts Date | | Exceptions |
|---|---|---|---|---|
| Obstetric & Gynecologic Assoc Of Iowa City and Coralville PC | 09/30/1976 | 09/30/1976 | | |

| Individual Insured | Prior Acts Date | Excess Prior Acts Date | Specialty Class Code | Exceptions |
|---|---|---|---|---|
| Jill C. Goodman, MD | 08/01/2010 | 08/01/2010 | 80153 | |

Issue Date: 12/21/2018

* Limits of Liability are Each Medical Incident/Aggregate Limit

| a - part-time practice | b - exclusions - refer to endorsement | c - suspension - refer to endorsement | d - limitation - refer to endorsement | e - moonlighting - refer to endorsement |
|---|---|---|---|---|

SCHED ed. 09/2018

MMIC Insurance, Inc.

Page 1 of 1

PLAINTIFF'S APPENDIX-007       MMIC 000005



## COMMON CONDITIONS

In this policy the words we, our or us refer to the insurance company identified in the Declarations. The words you or your refer to the *policyholder* identified in the Declarations. The meaning of words or phrases bolded and italicized are found in the definition sections of your policy.

A.  **APPLICATION**

By accepting this policy the *policyholder*, on behalf of all *insureds*, agrees that:

1.  All of the information and statements made in the application for this policy or any applicable underlying policy are accurate and complete,
2.  We issued this policy in reliance on the accuracy and completeness of the representations,
3.  The applications are part of this policy, and
4.  A misrepresentation or omission of material information will render this policy void.

B.  **CANCELLATION**

1.  Cancellation by the *policyholder*
    The *policyholder* can cancel this policy at any time. For the cancellation to be effective, the *policyholder* must mail a written notice to us, advising us of the effective date of the cancellation and ensure that we receive the notice before the requested termination date.

2.  Cancellation by us
    We can cancel this policy by providing written notice to the *policyholder* at the address shown in the Declarations or endorsement to this policy:

    (a).  10 days before the effective date of cancellation, if we cancel for non-payment of premium, or
    (b).  60 days before the effective date of the cancellation, if we cancel for any other reason.

3.  The cancellation will be effective and the policy will end on the date and time shown on the notice.

4.  If we cancel this policy, any refund of premium will be pro rata. If the *policyholder* cancels this policy, earned premium will be computed under the customary short-rate tables and procedures.

5.  Premium adjustments may be made either on the effective date of the cancellation or as soon as practicable after the cancellation becomes effective. The effectiveness of the cancellation is not dependent on the payment date of any unearned premium period.

6.  Proof of mailing to the address shown in the Declarations or endorsement will be sufficient proof of notice. Delivery to us or to the *policyholder* at the address shown in the Declarations or endorsement is the equivalent of mailing.

C.  **CHANGES**

The provisions of this policy cannot be altered, modified or waived except through a written endorsement issued by us and attached to this policy.

D.  **COMPLIANCE**

This policy will be interpreted under that state law where it is delivered. The terms of this policy will be automatically amended to comply with the requirements of controlling state law.

E.  **CONCEALMENT, MISREPRESENTATION AND FRAUD**

No coverage is provided to any *insured* who conceals or misrepresents a fact or circumstance concerning:

1.  Any application,
2.  This policy, or
3.  Any *claim*.

PLAINTIFF'S APPENDIX-008          MMIC 000006

F. GOVERNMENT ACCESS TO RECORDS

In order to comply with the requirements of sections 952 of the omnibus reconciliation act of 1980, it is agreed that, upon written request, we will allow the secretary of Health and Human Services and the comptroller general access to the policy and necessary books, documents and records to verify the cost of the policy, to the extent required by law. The access described in this paragraph will be provided for up to four years after the termination date of this policy.

G. IMMUNITY AND TORT CAPS

This policy does not apply to any *claim* against an *insured* for which the *insured* is immune from liability due to the provisions of any statute or immune from liability above any specific statutory limits cap on the maximum liability of the *insured*. Any *insured* accepting coverage under this policy does not waive those statutory immunities or tort liability damage caps. We will not be liable for *damages* in excess of statutory monetary limits or tort liability damage caps unless the limitation is found by a court not to apply.

H. INSPECTIONS AND SURVEYS

1. We have the right, but are not obligated to:

   (a). Review the *insured's* books and records,
   (b). Inspect the *insured's* premises, and
   (c). Conduct other risk control or risk prevention activities.

2. Any inspections, surveys, reports or recommendations are for risk management purposes only. We do not warrant the safety of the *insured's* premises or the quality of the *insured's* services.

I. LIMITATION OF LEGAL ACTION

No legal action may be brought against us unless there has been full compliance by the *insured* with all of the terms and conditions of this policy. We cannot be named in any legal action unless and until the *damages* the *insured* is legally required to pay have been determined by a judgment following an actual trial or by written agreement among the claimant, the *insured* and us.

J. PARTICIPATION

This policy is a participation policy to the extent that the *policyholder* may be entitled to receive a distribution. Distributions will be made at the discretion of our Board of Directors and are subject to any terms the Board of Directors and applicable law may impose.

K. PREMIUM

Premiums for this policy are payable to us or an agent authorized by us to receive payment. The premium must be paid prior to the inception date of the policy or when otherwise due. Any additional premium that is assessed due to a change in the policy while it is in effect is payable to us or an agent before the change goes into effect or when otherwise due.

L. RIGHTS AND OBLIGATIONS OF THE POLICYHOLDER

It is agreed that the *policyholder* has the right and obligation to act on behalf of all other *insureds* in:

1. Requesting and agreeing to changes to the policy,
2. Requesting cancellation and receiving our notice of cancellation,
3. Paying the premium and receiving any refund,
4. Maintaining and providing the documents and information we request in order to establish the premium or investigate or defend a *claim*, and
5. Paying the deductible on behalf of any *insured*.

M. THE INSURED'S OBLIGATIONS

1. The *insured* must fully cooperate with us in the investigation of *claims*, the negotiation of settlements, and the conduct of litigation. The *insured* is obligated to attend hearings and trials and assist in the presentation of evidence. The *insured* must also cooperate with us in pursuing any right of contribution or subrogation against a person or organization that is or may be liable to the *insured*. The *insured* will make any assignment necessary to assist in enforcing any right to contribution or subrogation.

2. The *insured* must not, except at the *insured's* own expense, make any payment, admit any liability or incur any obligation other than reasonable medical expenses.

PLAINTIFF'S APPENDIX-009          MMIC 000007

## N. TRANSFER OF INTEREST

The *insured* cannot transfer or assign this policy.

_____  
President

_____  
Secretary

PLAINTIFF'S APPENDIX-010       MMIC 000008



7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

## Medical Professional Liability Insurance Claims-Made and Reported

### TABLE OF CONTENTS

SECTION ONE – INSURING AGREEMENT.................................................................................................. 1
SECTION TWO – DETERMINING WHEN A CLAIM IS FIRST MADE AND REPORTED.......................... 1
SECTION THREE – EXCLUSIONS............................................................................................................... 1
  A.    Billing........................................................................................................................................ 1
  B.    Contract.................................................................................................................................... 1
  C.    Criminal or Knowingly Wrongful Acts..................................................................................... 1
  D.    Employees............................................................................................................................... 1
  E.    Employment Practices............................................................................................................. 1
  F.    Prior Known Incidents............................................................................................................. 2
  G.    Unfair Competition And Restraint Of Trade........................................................................... 2
  H.    Violation Of Law...................................................................................................................... 2

SECTION FOUR – DEFINITIONS.................................................................................................................. 2
  A.    Claim........................................................................................................................................ 2
  B.    Damages.................................................................................................................................. 2
  C.    Extended Reporting Period..................................................................................................... 2
  D.    Individual Insured.................................................................................................................... 2
  E.    Insured.................................................................................................................................... 2
  F.    Insured Entity.......................................................................................................................... 2
  G.    Leased Health Care Provider.................................................................................................. 2
  H.    Legal Expenses....................................................................................................................... 2
  I.    Locum Tenens......................................................................................................................... 2
  J.    Medical Incident...................................................................................................................... 2
  K.    Peer Review Service............................................................................................................... 2
  L.    Policyholder............................................................................................................................. 2
  M.    Policy Period............................................................................................................................ 2
  N.    Prior Acts Date........................................................................................................................ 2
  O.    Professional Services.............................................................................................................. 3
  P.    Related Medical Incidents....................................................................................................... 3

SECTION FIVE – INSUREDS........................................................................................................................ 3
SECTION SIX – LIMITS OF LIABILITY........................................................................................................ 3
SECTION SEVEN – DEDUCTIBLE................................................................................................................ 3
SECTION EIGHT – ADDITIONAL BENEFITS............................................................................................... 4
  A.    Licensure Proceedings........................................................................................................... 4
  B.    Insured Expenses.................................................................................................................... 4

SECTION NINE – EXTENDED REPORTING PERIOD................................................................................... 4
  A.    Effect of an Extended Reporting Period.................................................................................. 4
  B.    Automatic Limited Extended Reporting Period........................................................................ 4
  C.    Optional Extended Reporting Period....................................................................................... 4
  D.    Waiver of Extended Reporting Period Premium...................................................................... 4
  E.    Limits of Liability and Deductible............................................................................................ 5

SECTION TEN – CONDITIONS..................................................................................................................... 5
  A.    Consent to Settle.................................................................................................................... 5
  B.    Territory................................................................................................................................... 5
  C.    Notice of a Claim..................................................................................................................... 5
  D.    Notice of a Medical Incident.................................................................................................... 5
  E.    Other Insurance or Risk Transfer Agreements....................................................................... 6

PLAINTIFF'S APPENDIX-011        MMIC 000009

## MEDICAL PROFESSIONAL LIABILITY INSURANCE CLAIMS-MADE AND REPORTED

This insurance applies to *claims* that are first made and reported during the *policy period* or any applicable *extended reporting period*.

**SECTION ONE - INSURING AGREEMENT**

A.  We will pay *damages* an *insured* is legally required to pay as a result of a *medical incident* that happens on or after the applicable *prior acts date* and before the expiration date of this insurance. To fall within this insuring agreement the *claim* must be first made against the *insured* and reported to us during the *policy period* or any applicable *extended reporting period*.

B.  We will pay *legal expenses* we incur in the investigation or defense of a *claim* covered by this insurance.

C.  We have the right to control the defense of and retain an attorney to defend any *claim* covered by this insurance. We have the right to settle any *claim* subject only to the *policyholder's* right to consent as described in SECTION TEN - CONDITIONS.

D.  We have no obligation to pay *damages* or *legal expenses* after the applicable limit of liability found in the Declarations has been paid.

**SECTION TWO - DETERMINING WHEN A CLAIM IS FIRST MADE AND REPORTED**

A.  A *claim* will be considered to have been first made on the date any *insured* receives notice of a *claim*.

B.  A *claim* will be considered to have been first reported on the earlier of:

1.  The date we receive written notice of a *claim*, or
2.  The date we receive notice of a *medical incident* as described in SECTION TEN – CONDITIONS.

C.  All *claims* arising out of the same *medical incident* and *related medical incidents* will be considered to have been first made and reported when the first *claim* arising out of the *medical incident* or *related medical incidents* was made and reported.

**SECTION THREE - EXCLUSIONS**

A.  BILLING

This insurance does not apply to any *claim* arising out of any *insured's* billing practices.

B.  CONTRACT

This insurance does not apply to any *claim* arising out of:

1.  The failure of any *insured* to perform any contract; or
2.  Any liability in which an *insured* agreed, under an oral or written contract or agreement, to indemnify any party.

This exclusion does not apply to any liability the *insured* would have absent the oral or written contract or agreement.

C.  CRIMINAL OR KNOWINGLY WRONGFUL ACTS

This insurance does not apply to any *claim* arising out of a criminal, willful, malicious, fraudulent, dishonest or knowingly wrongful act committed by or with the knowledge of the *insured*.

D.  EMPLOYEES

This insurance does not apply to any *claim* brought by a current or former employee of any *insured*. This exclusion does not apply to injury sustained by a patient who is a current or former employee resulting from medical care or treatment. This exclusion does not apply to any *claim* arising out of a *peer review service*.

E.  EMPLOYMENT PRACTICES

This insurance does not apply to any *claim* arising out of an employment-related practice, policy, act or omission, including the hiring, termination, demotion, evaluation, discipline, defamation, harassment, humiliation or discrimination of a prospective, current or former employee of any *insured*. This exclusion does not apply to any *claim* arising out of a *peer review service*.

PLAINTIFF'S APPENDIX-012          MMIC 000010

F.     PRIOR KNOWN INCIDENTS

This insurance does not apply to any *claim* arising out of:

1.     A *medical incident* any *insured* knew or reasonably should have known about prior to the effective date of this insurance that was likely to result in a *claim*, or
2.     Any *claim* covered by a policy in effect prior to the effective date of this insurance.

G.     UNFAIR COMPETITION AND RESTRAINT OF TRADE

This insurance does not apply to any *claim* arising out of unfair competition, restraint of trade or other business dispute.

H.     VIOLATION OF LAW

This insurance does not apply to any *claim* arising out of the violation of any local, state or federal statute, rule or regulation.

**SECTION FOUR - DEFINITIONS**

A.     *Claim* means a demand for money or services resulting from a *medical incident*.

B.     *Damages* means amounts that an *insured* is legally obligated to pay to compensate another for injury or damage resulting from a *medical incident*.

C.     *Extended reporting period* means the additional time provided after the expiration of the *policy period* for reporting *claims* resulting from a *medical incident* that happened on or after the applicable *prior acts date* and before the end of the *policy period*.

D.     *Individual insured* means a person identified in a schedule or endorsement to this insurance as an *individual insured*.

E.     *Insured* means any entity or individual qualifying as an *insured* under SECTION FIVE – INSUREDS.

F.     *Insured entity* means an organization, corporation, partnership, professional association or limited liability company identified in a schedule or endorsement to this insurance as an *insured entity*.

G.     *Leased health care provider* means an individual working for the *policyholder* or an *insured entity* pursuant to a contract or agreement with a staffing agency or other entity.

H.     *Legal expenses* means:

1.     Fees charged by an attorney retained by us to investigate or defend a *claim* covered by this insurance
2.     Fees and expenses incurred by us in the investigation, adjustment, defense and appeal of a *claim* covered by this insurance
3.     Premiums for any appeal bond, attachment bond or similar bond for the amount of a judgment within the applicable limit of liability
4.     All costs, other than attorneys' fees, taxed against an *insured* as a result of a *claim* covered by this insurance
5.     The interest on the amount of covered *damages* that is within our limit of liability that accrues after entry of the judgment and before we have paid or offered to pay the covered *damages* which do not exceed the applicable limit of liability
6.     Prejudgment interest awarded against an *insured* on the portion of a judgment we pay

*Legal expenses* do not include salary or wages paid to our employees or the employees of an *insured*.

I.     *Locum tenens* means a health care provider who is temporarily serving as a substitute for an *individual insured* under a written contract or agreement.

J.     *Medical incident* means an adverse or unanticipated outcome resulting from *professional services* that were, or should have been, provided by an *insured* or by a person for whom the *insured* is liable.

K.     *Peer review service* means evaluating the professional qualifications, clinical performance or competency of another under the auspices of a formal review board or committee.

L.     *Policyholder* means the individual or entity identified as the *policyholder* in the Declarations.

M.     *Policy period* means the time beginning on the effective date of the policy and ending on the expiration date found in the Declarations, the date the policy is cancelled, or the coverage termination date of any *insured*, whichever is earlier.

N.     *Prior acts date* means the date listed as such in a schedule or endorsement.

PLAINTIFF'S APPENDIX-013           MMIC 000011

O.   *Professional services* means medical care or treatment provided to a patient, a medical opinion rendered by an *insured*, decisions made that require the specialized skill, training or judgment of a health care professional, or *peer review service*.

P.   *Related medical incidents* means all *medical incidents* arising out of the same or similar circumstances or medical treatment.

## SECTION FIVE - INSUREDS

A.   The following individuals and entities qualify as *insureds* under this insurance:

    1.   The *policyholder*, if identified as an *insured* in a schedule or endorsement
    2.   An *insured entity*
    3.   An *individual insured*
    4.   An *insured's* employees or volunteers for liability resulting from *professional services* while acting within the scope of their duties for an *insured entity* or *individual insured*
    5.   A *locum tenens*, if an *insured entity* or *individual insured* agreed in a written contract or agreement to provide professional liability insurance for the *locum tenens*

B.   The following are not *insureds* under this insurance unless identified in a schedule or endorsement to this insurance as an *individual insured*: nurse anesthetists, nurse midwives, heart-lung perfusionists, podiatrists, *leased health care providers*, interns, externs, residents and dental, osteopathic, chiropractic or medical doctors.

## SECTION SIX - LIMITS OF LIABILITY

A.   The Each Medical Incident Limit of Liability is the most we will pay as *damages* covered by this insurance on behalf of:

    1.   An *individual insured*, and all employees and volunteers of the *individual insured*, for all *claims* arising out of injury to any one person as a result of a *medical incident* or *related medical incidents*, or
    2.   An *insured entity*, and all employees and volunteers of the *insured entity*, for all *claims* arising out of injury to any one person as a result of a *medical incident* or *related medical incidents*.

  The limit of liability applies regardless of the number of claimants seeking *damages* arising out of injury to any one person.

B.   The Individual Insured Aggregate Limit of Liability is the most we will pay as *damages* covered by this insurance on behalf of any one *individual insured* and the employees and volunteers of that *individual insured* for all *claims* as a result of all *medical incidents*.

C.   The Insured Entity Aggregate Limit of Liability is the most we will pay as *damages* covered by this insurance on behalf of an *insured entity* and all employees and volunteers of that *insured entity* for all *claims* as a result of all *medical incidents*.

D.   *Individual insureds* share the applicable limit of liability with their employees and volunteers. An *insured entity* shares the applicable limit of liability with their employees and volunteers.

E.   *Individual insureds* and *insured entities* do not share any limits of liability with each other under this insurance. If an employee or volunteer also qualifies as an *individual insured*, the most we will pay as *damages* on behalf of that employee or volunteer is the limit afforded to an *individual insured*.

F.   The limit of liability includes the applicable deductible.

G.   An individual who qualifies as an *insured* under this insurance as a *locum tenens* will share the applicable limit of liability with the *individual insured* they are replacing.

H.   *Legal Expenses* are paid in addition to the limits of liability in this section.

## SECTION SEVEN - DEDUCTIBLE

A.   The Each Medical Incident Deductible is the amount the *policyholder* must pay as *damages* for injury to any one person as a result of a *medical incident* or *related medical incidents*.

B.   The Aggregate Deductible is the amount the *policyholder* must pay as *damages* arising out of all *medical incidents*.

C.   Subject to the *policyholder's* right to consent, we may, at our discretion, pay *damages* within the deductible amount to effect settlement of any *claim* or to satisfy a judgment against an *insured*. In the event that we make a payment within

PLAINTIFF'S APPENDIX-014          MMIC 000012

the deductible amount, the *policyholder* agrees to reimburse us for the full amount of the payment that was made, within 30 days of receiving our request for reimbursement.

D.    The deductible does not apply to the Additional Benefits.

## SECTION EIGHT - ADDITIONAL BENEFITS

A.    LICENSURE PROCEEDINGS

We will pay fees charged by an attorney, retained by us, to represent an *individual insured*, or an *insured's* employee, to respond to a formal complaint from a governmental body responsible for the licensure of health care professionals. The complaint must be first made against the *insured* and reported to us in writing during the *policy period*.

1.    The Each Complaint Limit is the most we will pay as fees incurred in responding to one complaint against an *insured*

2.    The Aggregate Limit is the most we will pay as fees incurred in responding to all complaints against an *insured*

B.    INSURED EXPENSES

We will pay reasonable expenses, including lost income, that an *insured* incurs in complying with our specific request to attend a deposition or appear at a trial or similar formal proceeding.

The Each Day Limit is the most we will pay for expenses incurred by an *insured* on any one day.

## SECTION NINE - EXTENDED REPORTING PERIOD

A.    EFFECT OF AN EXTENDED REPORTING PERIOD

An *extended reporting period* does not alter or extend the *policy period* but does extend the period for reporting a *claim* that would have been covered by this insurance if the *claim* had been first made against the *insured* and reported to us prior to the coverage termination date. An *extended reporting period* does not apply to a *claim* that is covered by a policy that goes into effect after the termination date of this insurance.

B.    AUTOMATIC LIMITED EXTENDED REPORTING PERIOD

If coverage provided by this insurance terminates or expires for an *insured*, we will provide an automatic *extended reporting period* at no charge. This limited *extended reporting period* starts on the coverage termination date and ends at the earlier of 30 days or the date the *insured* obtains coverage elsewhere. *Claims* reported during the automatic limited *extended reporting period* are subject to the limit of liability and deductible that apply under the terminated insurance. The automatic limited *extended reporting period* does not apply if this insurance is cancelled for non-payment of premium, or we issue an optional *extended reporting period*.

C.    OPTIONAL EXTENDED REPORTING PERIOD

If this insurance is non-renewed or cancelled for any reason other than non-payment of premium, the *policyholder* has the right to purchase an *extended reporting period* that would apply to all *insureds*. If the coverage provided by this insurance ends for any *individual insured*, the *individual insured* has the right to purchase an *extended reporting period*.

This *extended reporting period* will be provided by an endorsement we issue for an additional premium. The right to purchase an *extended reporting period* must be exercised within 30 days of the termination of coverage by providing:

1.    Written notice to us, and

2.    Payment of the premium when due.

The premium for the *extended reporting period* will be considered fully earned on the effective date of the *extended reporting period*. We will determine the duration of, and the premium for, the *extended reporting period* in accordance with the rules and rates in place on the effective date of the *extended reporting period*. The premium for the *extended reporting period* must be paid within 30 days of the date the coverage is terminated. If the premium is paid in full, the *extended reporting period* cannot be cancelled.

D.    WAIVER OF EXTENDED REPORTING PERIOD PREMIUM

The written request for a premium waiver for an *extended reporting period* must be received by us within 30 days of the date the *individual insured's* coverage terminates.

PLAINTIFF'S APPENDIX-015                MMIC 000013

1. DEATH

   If an *individual insured* dies during the *policy period*, we will issue an *extended reporting period* for no additional premium.

2. DISABILITY

   If an *individual insured* becomes totally and permanently disabled during the *policy period*, we will issue an *extended reporting period* for no additional premium if the *individual insured* provides a written report of an independent medical examination and any other records or documents establishing that, as a result of mental illness, physical injury or disease, the *individual insured* has been incapable of performing the material and substantial functions of their profession for a period of not less than six months and the disability is permanent.

3. AGE AND YEARS INSURED

   If an *individual insured* chooses during the *policy period* to terminate coverage, we will issue an *extended reporting period* to that *individual insured* for no additional premium if one of the following applies:

   (a). The *individual insured* has been continuously insured by us for a minimum of 15 years and is at least 60 years old, or

   (b). The *individual insured* has been continuously insured by us for a minimum of 10 years and is at least 62 years old.

4. RETIREMENT

   If an *individual insured* chooses during the *policy period* to retire permanently from the practice of medicine and terminate coverage we will issue an *extended reporting period* to that *individual insured*, for no additional premium, if the *individual insured* has been continuously insured by us for a minimum of one year.

E. LIMITS OF LIABILITY AND DEDUCTIBLE

The limits of liability and the applicable deductible that apply to a *claim* reported during an *extended reporting period* will be described in the *extended reporting period* endorsement.

## SECTION TEN - CONDITIONS

The Common Conditions apply to this insurance. In addition, the following apply:

A. CONSENT TO SETTLE

We will not settle a *claim* brought against an *insured* without the prior written consent of the *policyholder*. The *policyholder* agrees that consent will not be unreasonably withheld. The *policyholder* agrees that it would be unreasonable to withhold consent if:

1. The *insured* is not available to assist in the defense, or
2. A verdict or judgment has been entered against the *insured*.

B. TERRITORY

This insurance applies to *medical incidents* occurring anywhere in the world. However, no coverage is provided for, and we will not defend any *claim* brought against an *insured* outside of the United States of America, its territories or possessions.

C. NOTICE OF A CLAIM

The *insured* must promptly provide written notice to us of a *claim* first made during the *policy period*, but in no event later than the time provided by an applicable *extended reporting period*. The notice must include the time, place and nature of the *medical incident* and identify any injured persons.

D. NOTICE OF A MEDICAL INCIDENT

The *insured* must provide written notice to us of all *medical incidents* likely to result in a *claim*. This includes requests for medical records related to a *medical incident* likely to result in a *claim*.

The notice provided of a *medical incident* must describe the adverse or unanticipated outcome and must include the time, place, medical treatment provided and identify any injured persons. We will issue a written acknowledgment of the notice of a *medical incident*. Any *claim* resulting from the *medical incident* will be treated as if it had been first made against the *insured* and reported to us under the policy in effect at the time of the notice.

PLAINTIFF'S APPENDIX-016        MMIC 000014

E.     OTHER INSURANCE OR RISK TRANSFER AGREEMENTS

If any other insurance, including risk transfer agreement, self-insurance, indemnification agreement, trust agreement or patient compensation fund, provides coverage to an *insured* for *damages* covered by this insurance, the insurance we provide will be excess and we will not make any payment of *damages* or *legal expenses* unless and until the limits of liability of any other insurance have been exhausted.

It is the intent of this provision to ensure that the coverage afforded by this insurance is excess to any other insurance whether designated to be primary, excess, contingent or on any other basis. We will pay our share of any *damages* that exceed the *damages* covered by all other insurance. This provision does not apply to excess insurance purchased by the *insured* that lists this policy as scheduled underlying insurance.

President

Secretary

PLAINTIFF'S APPENDIX-017        MMIC 000015



7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

Policy Number: 600194

Effective Date: 01/01/2019

## Cyber Solutions®/Medefense® Plus Endorsement - Privacy Breach Response
## (Claims-Made and Reported Coverage)

*DEFENSE COSTS* PAID UNDER THIS ENDORSEMENT WILL ERODE THE LIMITS OF LIABILITY

### CYBER SOLUTIONS®/MEDEFENSE® PLUS SCHEDULE OF LIMITS

1. **Cyber Solutions Limits** (all *insureds* combined):

| | | | |
|---|---|---|---|
| A. | Multimedia Liability | $1,000,000 | each *claim*/aggregate |
| B. | Security and Privacy Liability | $1,000,000 | each *claim*/aggregate |
| C. | Privacy Regulatory Defense and Penalties | $1,000,000 | each *claim*/aggregate |
| D. | PCI DSS Assessment | $1,000,000 | each *claim*/aggregate |
| E. | Privacy Breach Response Coverage | | |
| | 1. Privacy Breach Response Costs | $1,000,000 | each *claim*/aggregate |
| | Proactive Privacy Breach Response Costs Sublimit | $100,000 | each *claim*/aggregate |
| | 2. Patient Notification & Patient Support and Credit Monitoring | Refer to item 2. below | |
| | Voluntary Notification Expenses Sublimit | Refer to item 2. below | |
| F. | Network Asset Protection | $1,000,000 | each *claim*/aggregate |
| G. | Cyber Extortion | $1,000,000 | each *claim*/aggregate |
| H. | Cyber Terrorism | $1,000,000 | each *claim*/aggregate |
| I. | BrandGuard® | $1,000,000 | each *claim*/aggregate |
| J. | Cyber Crime | $100,000 | each *claim*/aggregate |

2. **Cyber Solutions Patient Notification Expenses & Patient Support and Credit Monitoring Limit for Coverage Agreement E.2.** (all *insureds* combined): 100,000 *Notified Individuals*

   **Voluntary Notification Expenses Sublimit** (all *insureds* combined): 100,000 *Notified Individuals*

3. **Medefense Plus Limits**
   (each *insured entity* and *insured healthcare professional*):

| | | | |
|---|---|---|---|
| K. | Medefense Plus Regulatory Proceedings Coverage | $50,000 | each *claim*/aggregate |

4. **Combined Annual Aggregate Limit** (all *insureds* combined): $1,000,000

PLAINTIFF'S APPENDIX-018          MMIC 000016


## NOTICE

This Endorsement provides Cyber Solutions and Medefense Plus insurance on a Claims-Made and Reported basis.

Read the entire Endorsement carefully to determine *your* rights and duties and what is and is not covered. The terms, conditions, exclusions, and limits of liability set forth in this Endorsement apply only to Cyber Solutions and Medefense Plus insurance.

The Cyber Solutions and Medefense Plus limits of liability are specified in the Schedule of Limits ("Schedule") shown above. Such limits are in addition to, and will not erode, the limits provided elsewhere under the Policy. *Defense costs* paid under this Endorsement will erode the limits set forth in the Schedule.

Throughout this Endorsement, the words "we," "us," "our" refer to the Company that issued the Policy and this Endorsement. Other words and phrases that appear in bold-face and italicized print have special meaning. Refer to **SECTION TEN – DEFINITIONS** of this Endorsement.

### SECTION ONE – COVERAGE AGREEMENTS

A.  Multimedia Liability: Subject to the limits shown in the Schedule, we agree to pay *loss*, including liability *assumed under contract*, which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* for an actual or alleged *multimedia peril*, provided that:

    1.  Such *claim* is first made during the *endorsement period*; and

    2.  Such *claim* is reported to us during the *endorsement period*.

B.  Security and Privacy Liability: Subject to the limits shown in the Schedule, we agree to pay *loss*, including liability *assumed under contract*, which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* for a *security and privacy wrongful act*, provided that:

    1.  Such *claim* is first made during the *endorsement period*; and

    2.  Such *claim* is reported to us during the *endorsement period*.

C.  Privacy Regulatory Defense and Penalties: Subject to the limits shown in the Schedule, we agree to pay *regulatory fines and penalties* (to the extent insurable by law) and *regulatory compensatory awards* which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* resulting from a *security breach* or *privacy breach*, provided that:

    1.  Such *claim* is first made during the *endorsement period*; and

    2.  Such *claim* is reported to us during the *endorsement period*.

D.  PCI DSS Assessment: Subject to the limits shown in the Schedule, we agree to pay *PCI DSS assessments* which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* for a *security breach* or *privacy breach*, provided that:

    1.  Such *claim* is first made during the *endorsement period*; and

    2.  Such *claim* is reported to us during the *endorsement period*.

E.  Privacy Breach Response Coverage:

    1.  Privacy Breach Response Costs: Subject to the limits shown in the Schedule, we agree to pay *privacy breach response costs* which *you* incur as a direct result of an *adverse media report*, *security breach* or *privacy breach*, provided that:

        (a).  The *adverse media report*, *security breach* or *privacy breach* is first discovered by an *insured* during the *endorsement period*; and

PLAINTIFF'S APPENDIX-019          MMIC 000017


(b). The *adverse media report, security breach* or *privacy breach* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *adverse media report, security breach* or *privacy breach*.

2. Patient Notification Expenses and Patient Support and Credit Monitoring Expenses: Subject to the limits shown in the Schedule, we agree to pay *patient notification expenses* and *patient support and credit monitoring expenses* which *you* incur as a direct result of a *security breach* or *privacy breach*, provided that:

(a). The *security breach* or *privacy breach* is first discovered by an *insured* during the *endorsement period*; and

(b). The *security breach* or *privacy breach* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *security breach* or *privacy breach*.

F. Network Asset Protection:

1. Data Recovery: Subject to the limits shown in the Schedule, we agree to pay *digital assets loss* and *special expenses* which *you* incur as a direct result of a *covered cause of loss* that causes damage to, or alteration, corruption, distortion, theft, misuse or destruction of, *your digital assets*, provided that:

(a). The *covered cause of loss* is first discovered by an *insured* during the *endorsement period*;

(b). The *covered cause of loss* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *covered cause of loss*; and

(c). *You* provide clear evidence that the *digital assets loss* and *special expenses* directly resulted from the *covered cause of loss*.

We will pay *digital assets loss* and/or *special expenses* for a period of up to twelve (12) months following the discovery of the damage, alteration, corruption, distortion, theft, misuse or destruction of *your digital assets*.

2. Non-Physical Business Interruption and Extra Expense: Subject to the limits shown in the Schedule, we agree to pay *income loss, interruption expenses* and *special expenses* which *you* incur during the *period of restoration*, but after the *waiting period*, as a direct result of a *covered cause of loss* that causes a total or partial interruption, degradation in service or failure of *your computer system*, provided that:

(a). The *covered cause of loss* is first discovered by an *insured* during the *endorsement period*;

(b). The *covered cause of loss* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *covered cause of loss*; and

(c). *You* provide clear evidence that the *income loss, interruption expenses* and *special expenses* directly resulted from the *covered cause of loss*.

G. Cyber Extortion: Subject to the limits shown in the Schedule, we agree to pay *cyber extortion expenses* and *cyber extortion monies* which *you* incur as a direct result of a *cyber extortion threat*, provided that:

1. Such *cyber extortion threat* is first made during the *endorsement period*;

2. The *cyber extortion threat* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *cyber extortion threat*; and

3. *You* provide clear evidence that the *cyber extortion expenses* and *cyber extortion monies* directly resulted from the *cyber extortion threat*.

We will not pay *cyber extortion expenses* or *cyber extortion monies* that are incurred without our prior consultation and written authorization. *You* must make every reasonable effort to notify local law enforcement authorities and the Federal

PLAINTIFF'S APPENDIX-020          MMIC 000018


Bureau of Investigation or any similar equivalent foreign agency before surrendering any *cyber extortion monies* in response to a *cyber extortion threat*.

H.   Cyber Terrorism:   Subject to the limits shown in the Schedule, we agree to pay *income loss*, *interruption expenses* and *special expenses* which *you* incur during the *period of restoration*, but after the *waiting period*, as a direct result of an *act of cyber terrorism* that causes a total or partial interruption, degradation in service or failure of *your computer system*, provided that:

1.   The *act of cyber terrorism* is first discovered by an *insured* during the *endorsement period*;

2.   The *act of cyber terrorism* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *act of cyber terrorism*; and

3.   *You* provide clear evidence that the *income loss*, *interruption expenses* and *special expenses* directly resulted from the *act of cyber terrorism*.

I.   BrandGuard®:   Subject to the limits shown in the Schedule, we agree to reimburse *you* for provable and ascertainable *brand loss* which *you* sustain during the *period of indemnity*, but after the *waiting period*, as a direct result of an *adverse media report* or *notification*, provided that:

1.   The *brand loss* is first discovered by an *insured* during the *endorsement period*;

2.   The *brand loss* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *brand loss*; and

3.   *You* provide clear evidence that the *brand loss* directly resulted from the *adverse media report* or *notification*.

J.   Cyber Crime:

1.   Financial Fraud:   Subject to the limits shown in the Schedule, we agree to pay *financial fraud loss* which *you* sustain as a direct result of *financial fraud*, provided that:

(a).   The *financial fraud* is first discovered by an *insured* during the *endorsement period*;

(b).   The *financial fraud* is reported to us no later than sixty (60) days from the *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *financial fraud*; and

(c).   *Your* bank or credit card company has refused to reverse or prevent a payment transaction, or to indemnify *you* for the *financial fraud loss*, and *you* provide us with written confirmation of such refusal.

2.   Telecommunications Fraud:   Subject to the limits shown in the Schedule, we agree to pay *telecommunications fraud loss* which *you* sustain as a direct result of *telecommunications fraud*, provided that:

(a).   The *telecommunications fraud* is first discovered by an *insured* during the *endorsement period*; and

(b).   The *telecommunications fraud* is reported to us no later than sixty (60) days from the date*your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *telecommunications fraud*.

3.   Phishing Attack:   Subject to the limits shown in the Schedule, we agree to pay *phishing attack loss* which *you* sustain as a direct result of a *phishing attack* provided that:

(a).   The *phishing attack* is first discovered by an *insured* during the *endorsement period*; and

(b).   The *phishing attack* is reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *phishing attack*.

PLAINTIFF'S APPENDIX-021                MMIC 000019


K.  Medefense Plus Regulatory Proceedings Coverage: Subject to the limits set forth in the Schedule, we agree to reimburse an *insured* for *defense costs* and *shadow audit expenses* the *insured* incurs, and *regulatory fines and penalties* (to the extent insurable by law) imposed against the *insured*, because of a *claim* for *wrongful acts*, including a *claim* resulting from *voluntary self-disclosure*, provided that:

  1.  Such *claim* is first made during the *endorsement period*; and
  2.  Such *claim* is reported to us during the *endorsement period*.

We have no duty to defend under the Medefense Plus Regulatory Proceedings Coverage Agreement, but only to reimburse covered *defense costs*, *shadow audit expenses*, and *regulatory fines and penalties* incurred by the *insured*. The *insured* will have complete freedom of choice with respect to the selection of the licensed attorney who provides legal services in connection with any *claim* covered under this Coverage Agreement. Attorney rates will be capped at a maximum of $300 per hour. All counsel must comply with our reasonable defense counsel guidelines.

## SECTION TWO – DEFENSE, INVESTIGATION, AND SETTLEMENT

We will have the right and duty to defend any *claim* covered under Coverage Agreement A, Coverage Agreement B, Coverage Agreement C, or Coverage Agreement D of this Endorsement, even if the allegations of the *claim* are groundless, false or fraudulent. However, we shall not be obligated to pay or defend any *claim* after the applicable limit of liability hereunder has been exhausted. We have the right to appoint counsel to defend any such *claim*.

We may investigate or settle any *claim* at our discretion. The limits of liability will be reduced and may be completely exhausted by payment of *defense costs*. We will not be obligated to pay or defend any *claim* after the limits of liability hereunder have been exhausted.

No *insured* will incur any *defense costs* or other expenses, or settle any *claim*, assume any contractual obligation, admit liability, voluntarily make any payment, or otherwise consent to any settlement or judgment with respect to any *claim* without our prior written consent, which will not be unreasonably withheld. We will not be liable for any *defense costs* or other expenses, or settlement or judgment to which we have not consented.

## SECTION THREE – EXCLUSIONS

The insurance provided under this Endorsement does not apply to:

A.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any *multimedia peril, security and privacy wrongful act, security breach, privacy breach, adverse media report, covered cause of loss, cyber extortion threat, act of cyber terrorism, notification, financial fraud, telecommunications fraud, phishing attack,* or *wrongful act*:

  1.  Which was the subject of written notice given to us or to any other insurer prior to the effective date of the first Cyber Solutions Endorsement issued to *you* and continuously renewed thereafter;
  2.  Which was the subject of any written demand made against an *insured*, or a civil, administrative or arbitration proceeding commenced against an *insured*, prior to the effective date of the first Cyber Solutions Endorsement issued to *you* and continuously renewed thereafter, or that involved the same or substantially the same fact, circumstance, or situation underlying or alleged in such prior demand or proceeding;
  3.  That was identified in any summary or statement of *claims* or potential *claims* submitted in connection with *your* application for insurance with us; or
  4.  Which an *insured* had knowledge of prior to the effective date of the first Cyber Solutions Endorsement issued to *you* and continuously renewed thereafter.

B.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste. For purposes of this exclusion, "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including mold, smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products and waste, and any electric, magnetic or electromagnetic field of any frequency. "Waste" includes, but is not limited to, material that is or is to be recycled, reconditioned or reclaimed.

PLAINTIFF'S APPENDIX-022          MMIC 000020


C.      Any *claim* for liability assumed by an *insured* under any oral or written contract or agreement, except where such liability would apply apart from such contract or agreement and is otherwise covered by this Endorsement. With respect to any *multimedia peril*, *security breach* or *privacy breach*, this exclusion does not apply to any *claim* alleging liability *assumed under contract*.

D.      Any *claim* for breach of any express, implied, actual or constructive contract, warranty, guarantee, or promise, except where such liability would apply apart from such contract, warranty, guarantee or promise and is otherwise covered by this Endorsement. This exclusion does not apply to any *claim* alleging breach of *your* privacy policy or any *claim* for liability *assumed by contract*.

E.      Any business, joint venture or enterprise which is not identified in a schedule or endorsement to the Policy.

F.      Any conduct, act, error or omission of any person serving in any capacity other than as *your* principal, partner, officer, director or employee.

G.      Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any of the following, if committed by an *insured*, whether acting alone or in collusion with other persons:

1.      Any willful, deliberately dishonest, malicious, or fraudulent act or omission;
2.      Any intentional violation of the law or *your* privacy policy; or
3.      The gaining in fact of any profit, remuneration or financial advantage to which an *insured* was not legally entitled.

Notwithstanding the foregoing, the insurance afforded by this Endorsement will apply to *defense costs* incurred in defending any such *claim* until such time as there is a judgment or other final adjudication adverse to the *insured* establishing such willful, dishonest, fraudulent, or malicious conduct. We will have the right to recover *defense costs* incurred in defending such *claim* from those parties found to have committed such willful, dishonest, fraudulent, or malicious conduct.

This exclusion shall not apply to:

1.      Any *insured* that did not commit, participate in, or have knowledge of the conduct described in this exclusion; or
2.      With respect to Coverage Agreement F (Network Asset Protection), a *claim* resulting from employee sabotage.

H.      Any *claim* for violation of the False Claims Act or any similar federal or state law, rule, or regulation concerning *billing errors* or fraudulent billing practices or abuse. This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement K of this Endorsement.

I.      Any *claim* for infringement of any patent or the misappropriation, theft, copying, display, or publication of any trade secret.

J.      Any *claim* for unfair competition, price fixing, deceptive trade practices, restraint of trade, or violation of any anti-trust laws.

K.      Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

1.      Any employment or employment-related matters, including, but not limited to, employer-employee relations, policies, acts or omissions;
2.      Any actual or alleged refusal to employ any person or any other actual or alleged misconduct with respect to employees; or
3.      Any actual or alleged obligations of an *insured* under any workers' compensation, unemployment insurance, social security, disability benefits or other similar law.

This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement B of this Endorsement, which is brought by *your* past, present or future employee alleging a *security and privacy wrongful act*.

L.      Any *claim* for *bodily injury* or *property damage*.

PLAINTIFF'S APPENDIX-023          MMIC 000021


M.    Any *claim* for harassment or discrimination because of, or relating to, race, creed, color, age, sex, sexual orientation or preference, national origin, religion, handicap, disability, political affiliation, marital status, or any other basis prohibited by federal, state or local law.

N.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

1.    Satellite failures;

2.    Electrical or mechanical failures and/or interruption including, but not limited to, electrical disturbance, spike, brownout, or blackout; or

3.    Outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under *your* direct operational control and such *claim* is otherwise covered under Coverage Agreement F or Coverage Agreement H of this Endorsement.

O.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving an *insured's* insolvency or bankruptcy, the insolvency or bankruptcy of any other individual or entity, or the failure, inability or unwillingness to make payments because of the insolvency, liquidation, or bankruptcy of any individual or entity.

P.    Any *claim* brought by or on behalf of:

1.    Any *insured* against another *insured*;

2.    Any entity which is owned, in whole or in part, by an *insured*, or any entity directly or indirectly controlled, operated or managed by an *insured*;

3.    Any entity which is a parent, affiliate or subsidiary of any entity, business or joint venture in which an *insured* is a partner; or

4.    Any individual who is a partner of any entity, business or joint venture in which an *insured* is also a partner.

This exclusion does not apply to:

1.    An otherwise covered *claim* under Coverage Agreement B of this Endorsement, which is brought by *your* past, present or future employee alleging a *security and privacy wrongful act*; or

2.    An otherwise covered *claim* under Coverage Agreement K of this Endorsement that is brought by an *insured* as a *qui tam plaintiff* against another *insured*.

Q.    Any *claim* for violation of any of United States of America's economic or trade sanctions, including, but not limited to, sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

R.    Any *claim* for the actual or alleged failure to render professional services.

S.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the wear and tear, drop in performance, progressive deterioration, or aging of *your* electronic equipment or *computer hardware*.

T.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the failure of overhead transmission and distribution lines.

U.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the gradual deterioration of subterranean insulation.

V.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure or any other physical event, however caused.

W.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the gradual deterioration or wear and tear of, or latent damage to, *your computer system*.

X.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services.

Y.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving cost guarantees, cost representations, contract price or cost estimates being exceeded.

PLAINTIFF'S APPENDIX-024          MMIC 000022


Z.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving unauthorized trading. For purposes of this exclusion, "unauthorized trading" means trading, which at the time of the trade is:

    1.   In excess of permitted financial limits; or

    2.   Outside of permitted product lines.

AA.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

    1.   The actual or alleged purchase or sale of *securities*, or an offer or solicitation of an offer to purchase or sell *securities*;

    2.   The actual or alleged loss of value of any *securities*; or

    3.   Any actual or alleged violation of any *securities* law such as the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002 or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including "Blue Sky" laws, whether such law is statutory, regulatory or common law.

BB.   Any *claim* for violation of the Organized Crime Control Act of 1970 (commonly known as 'Racketeer Influenced And Corrupt Organizations Act' or 'RICO'), as amended, or any regulation promulgated under the foregoing statutes, or any similar federal, state, local or foreign laws, whether such law is statutory, regulatory or common law.

CC.   Any *claim* which is brought by the Federal Trade Commission, the Federal Communications Commission or any other federal, state or local governmental entity, in such entity's regulatory or official capacity. This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement C or Coverage Agreement K of this Endorsement.

DD.   Any *claim* alleging:

    1.   The violation of any pension, healthcare, welfare, profit sharing or mutual or investment plans, funds or trusts; or

    2.   The violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments and/or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling or order issued pursuant thereto.

EE.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

    1.   Strikes or similar labor actions, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;

    2.   The confiscation, nationalization, requisition or destruction of, or damage to, property by or under the order of any government or public or local authority; or

    3.   Any action taken in controlling, preventing, suppressing or in any way relating to (1) or (2) above.

This exclusion does not apply to an *act of cyber terrorism*.

FF.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving an *insured's* commercial decision to cease providing a particular product or service, but only if an *insured* is contractually obligated to continue providing such products or services.

GG.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

    1.   Gambling or pornography;

    2.   Prizes, awards or coupons; or

    3.   The sale or provision of prohibited, restricted or regulated items such as alcoholic beverages, tobacco or drugs.

HH.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the use of programs that are not *operational programs* or *delivered programs*.

PLAINTIFF'S APPENDIX-025          MMIC 000023



7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

II.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any *insured's* intentional use of illegal or unlicensed programs that are in violation of the provisions or laws referring to software protection.

JJ.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the confiscation, commandeering, requisition, destruction of, or damage to *computer hardware* by order of a government de jure or de facto or by any public authority for whatever reason.

KK.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

LL.    Any *criminal proceeding*.

MM.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the actual or alleged violation of the Telephone Consumer Protection Act (47 U.S.C. § 227), the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101-6108), or the CAN-SPAM Act (15 U.S.C. §§ 7701-7713), each as amended, or any regulations promulgated under the foregoing statutes, or any similar federal, state, local or foreign laws, whether such laws are statutory, regulatory or common law, including any anti-spam law or other law concerning the use of telephonic or electronic communications for solicitation purposes, or any allegations of invasion or violation of any rights to privacy derived therefrom. This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement B or Coverage Agreement C of this Endorsement which alleges a violation of the CAN-SPAM Act, as amended, or any regulations promulgated thereunder, or any similar federal, state, local or foreign law, whether such law is statutory, regulatory or common law, but only if such violation arises out of a *security breach*.

NN.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

1.    Any violation of the *PCI Data Security Standard* or any payment card company rules; or
2.    The failure to implement, maintain or comply with any security measures or standards related to payment card *data*, including any fine or penalty imposed by a payment card company on a merchant bank or payment processor that *you* have paid or agreed to reimburse or indemnify.

This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement D of this Endorsement.

OO.    With respect to Coverage Agreement F.1. of this Endorsement:

1.    Any amount incurred in restoring, updating or replacing *digital assets* to a level beyond that which existed prior to the *covered cause of loss*;
2.    Physical damage to the *computer hardware* or *data* center, other than accidental physical damage or destruction of *electronic media*, so that stored *digital assets* are no longer machine-readable;
3.    Contractual penalties or consequential damages;
4.    Any liability to third parties for whatever reason, including legal costs and expenses of any type;
5.    Fines or penalties imposed by law;
6.    The economic or market value of *digital assets*;
7.    Costs or expenses incurred to identify, patch or remediate software program errors or *computer system* vulnerabilities;
8.    Costs to upgrade, redesign, reconfigure or maintain the *your computer system* to a level of functionality beyond that which existed prior to the *covered cause of loss*; or
9.    Any losses paid under Coverage Agreement F.2 of this Endorsement.

PP.    With respect to Coverage Agreement F.2. of this Endorsement:

1.    Any amount incurred in updating or replacing *digital assets* to a level beyond that which existed prior to the *covered cause of loss*;
2.    Contractual penalties or consequential damages;
3.    Any liability to third parties for whatever reason, including legal costs and expenses of any type;

PLAINTIFF'S APPENDIX-026                    MMIC 000024



7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

4. Fines or penalties imposed by law;

5. Costs or expenses incurred to identify, patch or remediate software program errors or *computer system* vulnerabilities;

6. Loss of goodwill or reputational harm;

7. Costs to upgrade, redesign, reconfigure or maintain *your computer system* to a level of functionality beyond that which existed prior to the *covered cause of loss*; or

8. Any losses paid under Coverage Agreement F.1 of this Endorsement.

QQ. With respect to Coverage Agreement I of this Endorsement:

1. Any amount incurred by *you* in an effort to re-establish *your reputation*, including *public relations expenses*;

2. Any amount incurred in any *claim* that is insured by any other insurance, except excess insurance;

3. Any amount incurred in connection with an *adverse media report* that also affects or refers in similar terms to a general security issue, an industry or *your* specific competitors without any specific allegations regarding a *privacy breach* or *security breach* by an Insured, a *BPO service provider*, an *outsourced IT service provider*, or by others acting on *your* behalf and for whom *you* are legally responsible;

4. Any civil or regulatory liability to third parties for whatever reason, including legal costs and expenses of any type;

5. Contractual penalties or consequential damages;

6. *Privacy breach response costs, patient notification expenses* or *patient support and credit monitoring expenses* paid under Coverage Agreement E of this Endorsement; or

7. Fines or penalties imposed by law or regulation.

RR. With respect to Coverage Agreement J of this Endorsement:

1. Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any actual or alleged unauthorized acquisition, access, use or disclosure of *private information* that is held or transmitted in any form;

2. Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the seizure, confiscation, nationalization, requisition, or destruction of an *insured telecommunications system* by, or under the order of, any government or public authority;

3. Any amounts that have been wholly or partially reversed by a credit card company or financial institution.

Exclusion RR.1. does not apply to *financial fraud* which directly results from the use of *private information*.

SS. With respect to Coverage Agreement J.1 (Financial Fraud):

1. Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any fraudulent instruction, if the sender, or any person or organization acting in collusion with the sender, ever had authorized access to *your* password, PIN or other security code;

2. Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the giving or surrendering of *money, securities,* or *other property* in any exchange for or purchase of goods, products or services:

(a). That are not yet delivered, whether or not fraudulent;

(b). That fail to conform to advertised quality or performance; or

(c). That fail to conform to the quality or performance expected from the standpoint of an *insured*.

3. Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving potential income, including interest and dividends, not realized by *you* or *your* customers.

Exclusion SS.1. does not apply to a fraudulent instruction transmitted by *your* employee, if the fraudulent instruction was transmitted as a result of that employee receiving intentionally misleading or deceptive telephonic or electronic communications from a *third party* who is falsely purporting to be *you* or *your* client, vendor, or employee.

PLAINTIFF'S APPENDIX-027      MMIC 000025



TT.     With respect to Coverage Agreement K of this Endorsement:

1.  Any amounts incurred in connection with a *shadow audit* not previously approved by us;
2.  Any amounts intended to serve as *restitution*;
3.  Any amounts incurred by a consulting professional whose services were not previously approved by us; or
4.  Any *claim* based upon, arising from, or in any way involving *billing errors* for medical services, items or products which are not provided or prescribed by an *insured* on *your* behalf.

## SECTION FOUR – LIMITS OF LIABILITY

### A.     LIMITS PER COVERAGE AGREEMENT

1.  The Limits shown in item 1 of the Schedule for Coverage Agreements A, B, C, D, E.1, F, G, H, I, and J establish the most we will pay for each *claim* and in the aggregate under each Coverage Agreement, including *defense costs* where applicable, regardless of the number of *claims*, claimants, or *insureds*. All amounts paid under Coverage Agreements A, B, C, D, E.1, F, G, H, I and J of this Endorsement will reduce and may completely exhaust the Combined Annual Aggregate Limit shown in item 4 of the Schedule.

2.  The Limit shown in item 2 of the Schedule is the most we will pay under Coverage Agreement E.2. for *patient notification expenses* and *patient support and credit monitoring expenses* incurred in providing or attempting to provide *notification* of any one *privacy breach* or *security breach* discovered during the *endorsement period* and in the aggregate for all *privacy breaches* or *security breaches* discovered during the *endorsement period*, including any amounts paid under the *voluntary notification expenses sublimit*. Such Limit is shared by all *insureds* and is the exclusive limit applicable to *patient notification expenses* and *patient support and credit monitoring expenses*. If the Limit shown in item 2 of the Schedule is exhausted, our obligation to pay *patient notification expenses* and *patient support and credit monitoring expenses* will be deemed completely fulfilled and extinguished, and any *patient notification expenses* or *patient support and credit monitoring expenses* that exceed such Limit will be borne by the *insureds*. The Limit shown in item 2 of the Schedule will be deemed to be separate from, and will not reduce, the Combined Annual Aggregate Limit shown in item 3 of the Schedule.

3.  The Medefense Plus Limits shown in Item 3 of the Schedule establish the most we will pay for each *claim* and in the aggregate under the Medefense Plus Coverage Agreement (Coverage Agreement K) of this Endorsement, including *defense costs*. All amounts paid under Coverage Agreement K of this Endorsement will reduce and may completely exhaust the Combined Annual Aggregate Limit shown in item 4 of the Schedule.

### B.     COMBINED ANNUAL AGGREGATE LIMIT

1.  The Combined Annual Aggregate Limit shown in item 4 of Schedule is the most we will pay for all *claims* made during the *endorsement period* under Coverage Agreements A, B, C, D, E.1, F, G, H, I, J and K combined. The Combined Annual Aggregate Limit includes *defense costs*, where applicable. The Combined Annual Aggregate Limit is shared by all *insureds*.

2.  If the Combined Annual Aggregate Limit is exhausted by payment of *loss, defense costs, shadow audit expenses, PCI DSS assessments, regulatory compensatory awards, regulatory fines and penalties, privacy breach response costs, digital assets loss, special expenses, income loss, interruption expenses, cyber extortion expenses, cyber extortion monies, brand loss, financial fraud loss, telecommunications fraud loss, phishing attack loss*, or any combination thereof, then our obligations under Coverage Agreements A, B, C, D, E.1, F, G, H, I, J and K of this Endorsement will be deemed completely fulfilled and extinguished.

### C.     RELATED CLAIMS

1.  All related *claims* will be considered a single *claim*. Such *claim* shall be deemed to have been first made on the date the earliest of the related *claims* is first made and shall be deemed to have been first reported to us on the date the earliest of the related *claims* is first reported to us. Appeals and any post-trial proceedings shall be considered part of the original *claim*. *Claims* will be deemed related if they are logically or causally connected

PLAINTIFF'S APPENDIX-028                    MMIC 000026


by any common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions.

2.  If a *claim* is covered under more than one Coverage Agreement of this Endorsement, then only one "each *claim*" limit will apply. We will allocate *claims* paid, if any, against the appropriate limit of liability.

## SECTION FIVE – NOTICE PROVISIONS

### A.  NOTICE OF CLAIM

1.  As a condition precedent to coverage under Coverage Agreement A, B, C, D or K of this Endorsement, the *insured* must give us written notice of any *claim* during the *endorsement period*.

2.  As a condition precedent to coverage under Coverage Agreement E, F, G, H, I or J of this Endorsement, *you* must give us written notice of any *claim* no later than 60 days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the event or incident giving rise to such *claim*.

3.  All *insureds* must provide us with copies of all documentation comprising the *claim* as well as any authorization, cooperation, or assistance as we may require.

4.  We will not be obligated to pay any amounts incurred prior to notice of a *claim* to us or amounts incurred without our prior written consent.

### B.  NOTICE OF POTENTIAL CLAIM

If, during the *endorsement period*, *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of any facts or circumstances which could give rise to a *claim* covered under this Endorsement, and if such Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel provides us with written notice during the *endorsement period* of:

1.  The details regarding such facts or circumstances;
2.  The nature of the loss incurred;
3.  The identity of the potential claimant(s) and *insured(s)* involved;
4.  The manner in which *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the facts or circumstances; and
5.  The consequences which have resulted or may result therefrom,

then any *claim* arising out of such reported facts or circumstances will be deemed to be a *claim* first made on the date notice complying with the foregoing requirements is first received by us.

## SECTION SIX – LOSS DETERMINATION

### A.  DATA RECOVERY

For any and all coverage provided under Coverage Agreement F.1. of this Endorsement, *digital assets loss* will be determined as follows:

1.  If the impacted *digital asset* was purchased from a *third party*, we will pay only the lesser of the original purchase price of the *digital asset* or the reasonable and necessary *digital assets loss*.
2.  If it is determined that the *digital assets* cannot be replaced, restored or recreated, then we will only reimburse the actual and necessary *digital assets loss* incurred up to such determination.

### B.  NON-PHYSICAL BUSINESS INTERRUPTION AND EXTRA EXPENSE AND CYBER TERRORISM

For any and all coverage provided under Coverage Agreement F.2. or Coverage Agreement H of this Endorsement, *income loss* will be determined as the reduction of *your* income during the *period of restoration*, which is:

1.  *Your* net income (net profit or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of a total or partial interruption, degradation in service or failure of *your*

PLAINTIFF'S APPENDIX-029          MMIC 000027



*computer system* caused directly by a *covered cause of loss* or an *act of cyber terrorism*, whichever applies. The income projection will take into account the prior experience of *your* business preceding the date of the *covered cause of loss* or the *act of cyber terrorism* and the probable experience had no *covered cause of loss* or *act of cyber terrorism* occurred. Income will include the amount paid or payable to *you* for goods, products or services sold, delivered or rendered in the normal course of *your* business. The income projection will be reduced by the extent to which *you* use substitute methods, facilities or personnel to maintain *your* revenue stream. We will take into consideration *your* documentation of the trends in *your* business and variations in, or other circumstances affecting, *your* business before or after the *covered cause of loss* or the *act of cyber terrorism*, which would have affected *your* business had no *covered cause of loss* or *act of cyber terrorism* occurred; and

2.  Any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the *period of restoration*.

C.  **BRANDGUARD**

For any and all coverage provided under Coverage Agreement I of this Endorsement, *brand loss* will be calculated by taking into account the prior experience of *your* business preceding the date of the *adverse media report* or *notification*, whichever applies, and the probable experience had no *adverse media report* been published or *notification* occurred. Income will include the amount paid or payable to *you* for goods, products or services sold, delivered or rendered in the normal course of *your* business. The income projection will be reduced by the extent to which *you* use substitute methods, facilities, or personnel to maintain *your* revenue stream. We will take into consideration *your* documentation of the trends in *your* business and variations in, or other circumstances affecting, *your* business before or after the *adverse media report* or *notification*, which would have affected *your* business had no *adverse media report* been published or *notification* occurred. Any fixed operating expenses (including ordinary payroll) incurred will be considered in calculating *brand loss*, but only to the extent that such operating expenses must continue during the *period of indemnity*.

## SECTION SEVEN – MEDEFENSE PLUS SPECIAL CONDITIONS

A.  **VOLUNTARY SELF-DISCLOSURE**

In the event any *defense costs, shadow audit expenses* or *regulatory fines and penalties* covered under Coverage Agreement K of this Endorsement arise out of *voluntary self-disclosure*, the *insured* must establish that the circumstances giving rise to the *voluntary self-disclosure* became known to the *insured* fortuitously and subsequent to the original inception date of this coverage.

B.  **SHADOW AUDITS**

The *insured* shall not have a *shadow audit* performed without our prior approval of the *shadow audit* and its expense. Only *shadow audit expenses* from previously approved *shadow audits* will be reimbursed under this Endorsement. We will not unreasonably withhold such approval.

C.  **REGULATORY FINES AND PENALTIES REIMBURSEMENT**

We will reimburse the *insured* for *regulatory fines and penalties* which are the subject of final adjudication by an administrative tribunal or court, or are the subject of a settlement agreement or stipulated judgment to which we have given our prior written consent. The *insured* shall not admit or assume any liability for *regulatory fines and penalties*, enter into any settlement agreement, or stipulate to any judgment for *regulatory fines and penalties* without our prior written consent. Only those settlements or stipulated judgments for *regulatory fines and penalties* to which we have consented in writing shall be reimbursable under this Endorsement. We will not unreasonably withhold consent.

## SECTION EIGHT – REPORTING PERIOD COVERAGE

A.  In the event the Policy non-renews or terminates for any reason other than non-payment of premium, we will provide, at no additional charge, an Automatic Reporting Period of sixty (60) days within which *claims* may be reported. The Automatic Reporting Period begins on the effective date of Policy non-renewal or termination, whichever is earlier. Such Automatic Reporting Period shall apply only to:

1.  *Claims* under Coverage Agreement A, B, C, D, or K of this Endorsement which:

PLAINTIFF'S APPENDIX-030          MMIC 000028


    (a).    Arise out of actual or alleged *multimedia perils, security and privacy wrongful acts, security breaches, privacy breaches,* or *wrongful acts* that occur before the end of the *endorsement period;*

    (b).    Are first made during the *endorsement period;* and

    (c).    Are reported to us during the automatic reporting period.

2.    *Claims* under Coverage Agreement E, F, H, I or J of this Endorsement which:

    (a).    Arise out of *adverse media reports, security breaches, privacy breaches, covered causes of loss, acts of cyber terrorism, financial fraud, telecommunications fraud* or *phishing attacks* that occur before the end of the *endorsement period;* and

    (b).    Are first discovered and reported to us during the automatic reporting period.

3.    *Claims* under Coverage Agreement G of this Endorsement which:

    (a).    Arise out of *cyber extortion threats* that are made during the *endorsement period,* but prior to the expiration, cancellation or termination of the Policy; and

    (b).    Are reported to us during the automatic reporting period.

B.    In the event the Policy non-renews or terminates for any reason other than non-payment of premium, *you* will have the right to purchase an Extended Reporting Period within which *claims* may be made and reported. If purchased, the Extended Reporting Period begins on the effective date of Policy non-renewal or termination, and shall apply only to:

1.    *Claims* under Coverage Agreement A, B, C, D, or K of this Endorsement which:

    (a).    Arise out of actual or alleged *multimedia perils, security and privacy wrongful acts, security breaches, privacy breaches,* or *wrongful acts* that occur before the end of the *endorsement period;* and

    (b).    Are first made and reported to us during the Extended Reporting Period.

2.    *Claims* under Coverage Agreement E, F, H, I or J of this Endorsement which:

    (a).    Arise out of *adverse media reports, security breaches, privacy breaches, covered causes of loss, acts of cyber terrorism financial fraud, telecommunications fraud* or *phishing attacks* that occur before the end of the *endorsement period;* and

    (b).    Are first discovered during the Extended Reporting Period; and

    (c).    Are reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *adverse media reports, security breaches, privacy breaches, covered causes of loss, acts of cyber terrorism, financial fraud, telecommunications fraud* or *phishing attacks* giving rise to the *claim.*

3.    *Claims* under Coverage Agreement G of this Endorsement which:

    (a).    Arise out of *cyber extortion threats* that are made during the Extended Reporting Period; and

    (b).    Are reported to us no later than sixty (60) days from the date *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first becomes aware of the *cyber extortion threat.*

As a condition precedent to the right to purchase the Extended Reporting Period, the total premium for the Policy must be paid. The right to purchase the Extended Reporting Period will terminate unless written notice of the intent to purchase the Extended Reporting Period, together with full payment of the premium for the Extended Reporting Period, is received by us within sixty (60) days after the effective date of termination, or, in the event of non-renewal, within sixty (60) days after the Policy expiration date. If such notice and premium payment is not so given to us, there will be no right to purchase the Extended Reporting Period. Once in effect, the Extended Reporting Period may not be canceled, and the entire premium for the Extended Reporting Period becomes fully earned. We will determine the additional prmeium for the Extended Reporting Period in accordance with our rules and rates.

PLAINTIFF'S APPENDIX-031           MMIC 000029



C.   All terms and conditions of this Endorsement, including the limits of liability set forth in the Schedule, will continue to apply during the Extended Reporting Period. The existence of an Extended Reporting Period will not increase or reinstate the limits of liability.

D.   If similar insurance is in force during the Automatic Reporting Period or the Extended Reporting Period, the coverage provided by this Endorsement shall be excess over any such valid and collectible insurance.

## SECTION NINE – OTHER INSURANCE

The coverage provided by this Endorsement is excess insurance over any other valid and collectible insurance available, including any self-insured retention or deductible portion thereof, whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such insurance specifically applies as excess insurance over the insurance provided under this Endorsement.

## SECTION TEN - NON-STACKING OF LIMITS

If *claim* is covered, in whole or in part, under this Endorsement and any other Cyber Solutions Endorsement issued by us, then the most we will pay for such *claim* shall be the single largest applicable Limit of Liability available under any one of those Endorsements. In no event shall this condition be construed to increase the Limits of Liability set forth in the Schedule.

## SECTION ELEVEN – DEFINITIONS

With respect to the coverage provided by this Endorsement, certain words are shown in bold and italics and are defined as follows. If a term is defined below and in *your* Policy, the definition below applies only to the coverage provided by this Endorsement.

*Acquiring bank* means a bank or financial institution that accepts credit and/or debit card payments (including credit cards, debits cards, stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

*Act of cyber terrorism* means the premeditated use of information technology to organize and execute attacks, or the threat thereof, against computers, *computer systems*, networks or the internet by any person or group, whether acting alone, on behalf of, or in connection with, any organization or government, which is committed for political, religious, or ideological purposes, with the intention to influence any government, put the public in fear, or cause destruction or harm to critical infrastructure or *data*.

*Adverse media report* means any unpredictable report or communication of an actual or potential *security breach* or *privacy breach*, which:

A.   Has been publicized through any media channel including, but not limited to, television, *print media*, radio or electronic networks, the internet, or electronic mail; and

B.   Threatens material damage to *your reputation* or brands.

*Assumed under contract* means liability for *loss* resulting from a *multimedia peril*, *security breach* or *privacy breach* where such liability has been assumed by an *insured* in the form of a written hold harmless or indemnity agreement, provided that such agreement was executed prior to the date the *multimedia peril*, *security breach*, or *privacy breach* occurred.

*Billing error* means the actual or alleged presenting of, or causing or allowing to be presented, any erroneous billings by an *insured* to a government health benefit payer or program or *commercial health insurance payer*, from which the *insured* seeks, or has received, payment or reimbursement for medical services, items or products provided or prescribed by an *insured*.

*Billing errors proceeding* means any of the following brought against an *insured*, but only if alleging *billing errors*:

A.   A *qui tam action*; or

B.   A written demand made against an *insured* by or on behalf of a *government entity* or *commercial health insurance payer*.

PLAINTIFF'S APPENDIX-032            MMIC 000030


*Billing errors proceeding* does not include:

A.  A customary or routine audit or billing inquiry conducted by a *government entity* or *commercial health insurance payer*, including any request for documentation to support a submission for payment or reimbursement;

B.  A *criminal proceeding*; or

C.  A subpoena for records, testimony, or other documentation which does not allege a *billing error*.

All actions taken by a *government entity* or *commercial health insurance payer* arising out of the same or a similar *billing error* will be deemed to constitute a single *billing errors proceeding*, regardless of the number and identity of claimants, the number and identity of *insureds* involved, or whether further action arising out of the same or a similar *billing error* is taken during the effective period of a subsequent policy issued by us.

*Bodily injury* means physical injury, sickness, disease, pain or death, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or emotional distress sustained by a person at any time.

*BPO service provider* means any *third-party* independent contractor that provides business process outsourcing services for *your* benefit under a written contract with *you*, including, but not limited to, call center services, fulfillment services, and logistical support.

*Brand loss* means *your* income as could have been reasonably projected immediately prior to *notification* or, in the event of an *adverse media report*, immediately prior to the publication of an *adverse media report*, but which has been lost as a direct result of such *notification* or *adverse media report*, less the variable costs (including the cost of raw materials and all other costs) that would have been incurred during the same period, but were saved as a result. *Brand loss* will be determined in accordance with Section Six, C, of this Endorsement.

*Card association* means Visa International, Mastercard, Discover, JCB American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

*Claim* means:

A.  With respect to Coverage Agreement A (Multimedia Liability) and Coverage Agreement B (Security and Privacy Liability):

    1.  Any written demand for monetary or non-monetary relief made against an *insured*;

    2.  Any civil proceeding or arbitration proceeding initiated against an *insured*, commenced by the service of a summons, complaint or similar pleading or notice; or

    3.  Any written request to toll or waive a statute of limitations relating to a potential *claim* against an *insured*, including any appeal therefrom.

    A *claim* under Coverage Agreement A or Coverage Agreement B will be deemed to be first made when *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first receives notice of any of A(1) through A(3) above.

B.  With respect to Coverage Agreement C (Privacy Regulatory Defense and Penalties), a *government investigation* commenced against an *insured* by letter, notice, complaint or order of investigation. A *claim* under Coverage Agreement C will be deemed to be first made when *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first receives notice of the *government investigation*.

C.  With respect to Coverage Agreement D (PCI DSS Assessment), a written demand made against an *insured* by an *acquiring bank* or *card association* for a *PCI DSS assessment* due to the *insured's* non-compliance with the *PCI Data Security Standard*. A *claim* under Coverage Agreement D will be deemed to be first made when *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first receives notice of such written demand.

D.  With respect to Coverage Agreement E.1. (Privacy Breach Response Costs, Patient), a written report by an *insured* to us of an *adverse media report*, *security breach* or *privacy breach*. A *claim* under Coverage Agreement E.1. will be deemed to be first made when such written report is received by us.

PLAINTIFF'S APPENDIX-033          MMIC 000031


E.      With respect to Coverage Agreement E.2. (Patient Notification Expenses and Patient Support and Credit Monitoring Expenses), a written report by an *insured* to us of a *security breach* or *privacy breach*. A *claim* under Coverage Agreement E.2. will be deemed to be first made when such written report is received by us.

F.      With respect to Coverage Agreement F (Network Asset Protection), a written report by an *insured* to us of a *covered cause of loss*.

G.      With respect to Coverage Agreement G (Cyber Extortion), a written report by an *insured* to us of a *cyber extortion threat*.

H.      With respect to Coverage Agreement H (Cyber Terrorism), a written report by an *insured* to us of an *act of cyber terrorism*.

I.      With respect to Coverage Agreement I (BrandGuard), a written report by an *insured* to us of *brand loss* directly caused by an *adverse media report* or *notification*.

J.      With respect to Coverage Agreement J (Cyber Crime), a written report by an *insured* to us of *financial fraud*, *telecommunications fraud* or a *phishing attack*.

K.      With respect to Coverage Agreement K (Medefense Plus Regulatory Proceeding Coverage), a *regulatory proceeding* commenced against an *insured* by letter, notice, complaint or order of investigation. A *claim* under Coverage Agreement K will be deemed to be first made when *your* Chief Executive Officer, Chief Information Officer, Chief Financial Officer, Chief Operating Officer, Risk Manager or General Counsel first receives notice of the *regulatory proceeding*.

*Commercial health insurance payer* means any private health insurance company that primarily arranges for the payment or reimbursement of medical services, items or products. *Commercial health insurance payer* does not include any commercial general liability carrier, workers' compensation carrier, or automobile liability carrier.

*Computer hardware* means the physical components of any *computer system*, including CPU's, memory, storage devices, storage media, input/output devices and other peripheral devices and components, including, but not limited to, cables, connectors, fiber optics, wires, power supply units, keyboards, display monitors and audio speakers.

*Computer program* means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. *Computer program* includes, but is not limited to, communication systems, networking systems, operating systems, and related *computer programs* used to create, maintain process, retrieve, store, and/or transmit electronic *data*.

*Computer system* means interconnected electronic, wireless or web systems, or similar systems (including all *computer hardware* and software) used to process and store *data* or information in an analogue, digital, electronic or wireless format including, but not limited to, *computer programs*, electronic *data*, operating systems, *firmware*, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic *data*), and electronic backup equipment.

*Computer virus* means a program that possesses the ability to create replicas of itself (commonly known as an "auto-reproduction" program) within other programs or operating system areas, and which is capable of spreading copies of itself, wholly or in part, to other *computer systems*.

*Covered cause of loss* means, and is limited to, the following:

A.      Accidental Damage or Destruction

     1.      Accidental physical damage or destruction of *electronic media*, so that stored *digital assets* are no longer machine-readable;

     2.      Accidental damage or destruction of *computer hardware*, so that stored *data* is no longer machine-readable;

     3.      Failure in power supply or under/over voltage, but only if such power supply, including back-up generators, is under *your* direct operational control;

     4.      *Programming error* of *delivered programs*; or

     5.      Electrostatic build-up and static electricity.

B.      Administrative or Operational Mistakes

     An accidental, unintentional, or negligent act, error or omission by an *insured*, a *BPO service provider* or *outsourced IT service provider* in:

     1.      The entry, or modification of *your* electronic *data*, which causes damage to such *data*; or

     2.      The creation, handling, development, modification or maintenance of *your digital assets*; or

PLAINTIFF'S APPENDIX-034            MMIC 000032



3.      The on-going operation or maintenance of *your computer system*, excluding the design, architecture, or configuration of *your computer system*.

C.      Computer Crime and Computer Attacks

A negligent act, error or omission in the operation of *your computer system* or in the handling of *your digital assets* by an *insured*, a *BPO service provider* or *outsourced IT service provider*, which fails to prevent or hinder any of the following attacks on *your computer system*:

1.      A *denial of service attack*;
2.      *Malicious code*;
3.      *Unauthorized access*; or
4.      *Unauthorized use*.

*Criminal proceeding* means any governmental action for enforcement of criminal laws, including those offenses for which conviction could result in imprisonment and/or criminal fine.

*Cyber extortion expenses* means all reasonable and necessary costs and expenses *you* incur, with our prior written consent, as a direct result of a *cyber extortion threat*, other than *cyber extortion monies*.

*Cyber extortion monies* means any funds or property *you* pay, with our prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a *cyber extortion threat*, in order to terminate such *cyber extortion threat*.

*Cyber extortion threat* means a credible threat or series of related credible threats, including, but not limited to, a demand for *cyber extortion monies*, directed at an *insured* to:

A.      Release, divulge, disseminate, destroy or use the *private information* of a *third party* taken from an *insured* as a result of *unauthorized access* to, or *unauthorized use* of, *your computer system*;

B.      Introduce *malicious code* into *your computer system*;

C.      Corrupt, damage or destroy *your computer system*;

D.      Restrict or hinder access to *your computer system*, including, but not limited to, the threat of a *denial of service attack*; or

E.      Electronically communicate with *your* patients and falsely claim to be *you* or to be acting under *your* direction in order to falsely obtain *private information* of a patient (also known as "pharming," "phishing," or other types of false communications).

*Data* means any and all machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, *private information*, health and medical information, or electronic information subject to back-up procedures, irrespective of the way it is used or rendered.

*Defense costs* means reasonable and necessary legal fees and related costs and expenses incurred in the investigation, defense and appeal of any *claim* under Coverage Agreement A, B, C, D or K. *Defense costs* does not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any *insured* for time spent in cooperating in the defense and investigation of any *claim* or potential *claim* under this Endorsement.

*Delivered programs* means programs, applications, and software where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

*Denial of service attack* means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a *computer system* by sending an excessive volume of electronic *data* to such *computer system* in order to prevent authorized access to such *computer system*.

*Digital assets* means *data* and *computer programs* that exist in a *computer system*. *Digital assets* do not include *computer hardware*.

*Digital assets loss* means reasonable and necessary expenses and costs *you* incur to replace, recreate or restore *digital assets* to the same state and with the same contents immediately before it was damaged, destroyed, altered, misused, or stolen, including expenses for materials and machine time. *Digital assets loss* also includes amounts representing employee work time to replace, recreate, or restore *digital assets*, which shall be determined on a predefined billable hours or per hour basis as based upon *your* schedule of employee billable hours.

PLAINTIFF'S APPENDIX-035          MMIC 000033



7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

*Electronic media* means floppy disks, CD ROMs, flash drives, hard drives, solid state drives, magnetic tapes, magnetic discs, or any other media on which electronic *data* is recorded or stored.

*EMTALA proceeding* means any administrative or civil proceedings instituted against an *insured* by a *government entity* alleging violations of the Emergency Medical Treatment and Labor Act (EMTALA).

*Endorsement period* means the period of coverage beginning on the effective date specified on this Endorsement and ending on the earlier of the termination, expiration or cancellation date of the policy to which this Endorsement attaches. *Endorsement period* does not include any extended reporting period.

*Financial fraud* means any of the following:

A. An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution, directing such institution to debit *your* account and to transfer, pay or deliver *money* or *securities* from *your* account, which instruction purports to have been transmitted by *you* or *your* employee, but was in fact fraudulently transmitted by a *third party* without *your* knowledge or consent;

B. An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution by *your* employee as a result of that employee receiving intentional, misleading or deceptive telephonic or electronic communications from a *third party* falsely purporting to be *you* or *your* client, vendor or employee, and which directs the financial institution to debit *your* account and to transfer, pay or deliver *money* or *securities* from *your* account; or

C. The theft of *money* or *securities* from *your* bank account or corporate credit cards by electronic means.

*Financial fraud loss* means *your* loss of *money* or *securities*, which is directly caused by *financial fraud*. *Financial fraud loss* does not include any amounts reimbursed to *you* by any financial institution.

*Firmware* means the fixed programs that internally control basic low-level operations in a device.

*Government entity* means:

A. Any department, agency, task force or other orgaization created by any United States federal or state law, regulation, rule or executive order;

B. Any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the United States federal government or any state government; or

C. With respect to *billing errors proceedings* only, any organization operating as a Medicare Integrity Program Contractor.

*Government investigation* means a formal investigation instituted against an *insured* by a *government entity*, the subject matter of which is a *privacy breach* or *security breach*.

*HIPAA proceeding* means any administrative or civil proceeding instituted against an *insured* by a *government entity*, the subject matter of which is an *insured's* actual or potential violation of the Health Insurance Portability and Accountability Act (HIPAA) privacy regulations.

*Income loss* means financial loss *you* sustain as determined in accordance with the provisions of Coverage Agreement F.2. or Coverage Agreement H of this Endorsement.

*Insured* means:

A. An *insured healthcare professional*;

B. An *insured entity*;

C. An officer, director, administrator, medical director, or member of any formal accreditation or review board or committee of an *insured entity*;

D. A volunteer or full-time, part-time, seasonal or temporary employee of an *insured healthcare professional* or *insured entity*, but only while acting within the scope of that person's duties as such; and

E. A natural person independent contractor, but only while acting within the scope of that person's duties on behalf of an *insured healthcare professional* or *insured entity*.

PLAINTIFF'S APPENDIX-036              MMIC 000034



*Insured entity* means any organization, corporation, partnership, professional association or limited liability company identified on the Declarations Page or on a schedule or endorsement attached to the Policy.

*Insured healthcare professional* means any healthcare professional scheduled individually on the Declarations Page or on a schedule or endorsement attached to the Policy.

*Insured telecommunications system* means any telephone or fax network or system that *you* own, rent, lease, license, or borrow.

*Interruption expenses* means those expenses, excluding *special expenses*, which *you* incur in accordance with the provisions of Coverage Agreement F.2. or Coverage Agreement H of this Endorsement, to:

A. Avoid or minimize the suspension of *your* business as a result of a total or partial interruption, degradation in service, or failure of *your computer system* caused directly by a *covered cause of loss* or an *act of cyber terrorism*, which *you* would not have incurred had no *covered cause of loss* or *act of cyber terrorism* occurred, including, but not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of *third party* services, or additional staff expenditures or labor costs; and

B. Minimize or avoid a *covered cause of loss* or an *act of cyber terrorism* and continue *your* business.

The amount of *interruption expenses* recoverable under paragraph A. above shall in no case exceed the amount by which the covered *income loss* is reduced by such incurred expenses.

*Loss* means the amount that an *insured* is legally obligated to pay as a result of a *claim* under Coverage Agreement A or Coverage Agreement B of this Endorsement, including damages and judgments (including prejudgment and post-judgment interest awarded against an *insured* on that part of any judgment paid or to be paid by us), legal fees and costs awarded pursuant to such judgments, and settlements negotiated with our consent.

*Loss* does not include:

A. Taxes;
B. Any amount which an *insured* is not legally obligated pay;
C. Amounts owed under contract;
D. An *insured's* future profits or royalties or any return, withdrawal, *restitution* or reduction of an *insured's* professional fees, profits or other charges;
E. Punitive, liquidated or exemplary damages or the multiplied portion of multiplied damages;
F. Fines, sanctions or penalties;
G. Any matters that are deemed uninsurable under applicable law;
H. The costs to comply with orders granting injunctive or non-monetary relief, including specific performance or any agreement to provide such relief;
I. Disgorgement of any remuneration or financial advantage to which *you* were not legally entitled; or
J. Settlements negotiated without our consent.

*Malicious code* means software intentionally designed to insert itself into and damage a *computer system* without the owner's informed consent by a variety of forms including, but not limited to, viruses, worms, Trojan horses, spyware, dishonest adware, and crimeware.

*Money* means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including, but not limited to, currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

*Multimedia peril* means the release of, or display of, any *electronic media* on *your* internet site or *print media* for which *you* are responsible, which directly results in any of the following:

A. Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement or trade libel;
B. Invasion, infringement or interference with an individual's right of privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of name, person or likeness, or public disclosure of private facts;
C. Plagiarism, piracy or misappropriation of ideas under an implied contract;

PLAINTIFF'S APPENDIX-037     MMIC 000035


D.  Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or

E.  Domain name infringement, improper deep linking, or framing.

*Notification* means written notice to affected individuals in the event of a *security breach* or a *privacy breach*.

*Notified individual(s)* means any natural person(s) to whom notice is given or attempted to be given in accordance with Coverage Agreement E.2.

*Operational programs* means programs and software that are ready for operational use, having been fully developed, tested, and accepted by an *insured*.

*Other property* means any tangible property, other than *money* or *securities*, which has intrinsic value.

*Outsourced IT service provider* means a *third party* independent contractor that provides information technology services for *your* benefit, under a written contract with *you* to provide such services. *Outsourced IT service provider* services include, but are not limited to, hosting, security management, co-location, and *data* storage.

*Patient notification expenses* means reasonable and necessary expenses *you* incur, with our prior written consent, to comply with governmental privacy legislation mandating *notification* or to provide *voluntary notification*, subject to the *voluntary notification expenses sublimit*. *Patient notification expenses* does not include *privacy breach response costs*.

*Patient support and credit monitoring expenses* means reasonable and necessary expenses *you* incur, with our prior written consent, to provide support activity to *notified individuals* in the event of a *security breach* or *privacy breach*, including call centers, credit file monitoring services and identity theft education and assistance for up to a period of twelve (12) months from the date of enrollment in such services. *Patient support and credit monitoring expenses* does not include *privacy breach response costs*.

*PCI Data Security Standard* (known as "PCI DSS") means the *data* security standards published by the Payment Card Industry Security Standards Council, in effect now or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder *data*.

*PCI DSS assessment* means a monetary fine or penalty assessed against an *insured* by an *acquiring bank* or *card association* as a result of a *security breach* or *privacy breach*.

*Period of indemnity* means the period beginning with the earlier of the date of *notification* or the first publication of an *adverse media report* (whichever applies), and ending on the earlier of:

A.  The date that gross revenues are restored to the level they had been prior to *notification* or the first *adverse media report* (whichever applies); or

B.  One hundred eighty (180) consecutive days after the notice of *brand loss* is received by us.

*Period of restoration* means the period of time beginning on the date when the interruption, degradation or failure of *your computer system* began and ending on the earlier of:

A.  The date when *your computer system* is restored or could have been repaired or restored to the same condition, functionality, and level of service that existed prior to the *covered caused of loss* or the *act of cyber terrorism* with reasonable diligence, plus up to thirty (30) additional consecutive days after the restoration of *your computer system* to allow for restoration of *your* business; or

B.  One hundred twenty (120) consecutive days after the notice of *covered cause of loss* or *act of cyber terrorism* is received by us.

*Personally identifiable information* means information in *your* care, custody or control that can be used to determine, distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual.

*Phishing attack* means the use of fraudulent electronic communications or malicious websites to impersonate *you*, *your* brand, or any of *your* products or services, in order to solicit *private information*.

PLAINTIFF'S APPENDIX-038                    MMIC 000036


*Phishing attack loss* means:

A.  Expenses *you* incur, with our prior written consent, to create and issue a specific press release or to establish a specific website to advise *your* patients or prospective patients of a *phishing attack*; and

B.  The cost of reimbursing *your* existing patients for their losses arising directly from a *phishing attack*.

*Print media* means newspapers, newsletters, magazines, brochures, books and literary works in any form, or other types of publications and advertising materials, including packaging, photographs, and digital images.

*Privacy breach* means any of the below, whether actual or alleged, but only if committed or allegedly committed by an *insured* or by others acting on *your* behalf for whom *you* are legally responsible, including *BPO service providers* and *outsourced IT service providers*:

A.  A common law breach of confidentiality, invasion, infringement, interference, or violation of any right to privacy, including, but not limited to, a breach of *your* privacy policy, breach of a person's right of publicity, false light, intrusion upon a person's seclusion, failure to properly handle, manage, store, destroy or otherwise control a person's *private information* in any format, or the intrusion or misappropriation of a person's name or likeness for commercial gain; or

B.  Any breach or violation of U.S. federal, state or local privacy statutes or regulations, as they currently exist and as amended, associated with confidentiality, access, control, and use of *personally identifiable information*, including, but not limited to:

   1.  The Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) (HIPAA) (Pub. L. 104-191), including Title II which requires protection of confidentiality and security of electronic protected health information, and the rules and regulations promulgated thereunder as they currently exist and as amended, including related state medical privacy laws, as they currently exist and as amended;

   2.  The Gramm-Leach-Bliley Act of 1999 (GLBA), also known as the Financial Services Modernization Act of 1999 (Pub. L. 106-102), including sections concerning security protection and standards for customer records maintained by financial services companies, and the rules and regulations promulgated thereunder, as they currently exist and as amended;

   3.  The State Attorneys General and the Federal Trade Commission's enforcement actions regarding security and privacy of consumer information;

   4.  Governmental privacy protection regulations or laws, as they currently exist now or in the future, which require commercial internet sites or on-line services that collect personal information or medical information (as defined by such laws or acts) to post privacy policies and adopt specific privacy controls or to notify those impacted by identity or *data* theft, abuse or misuse;

   5.  Federal and state consumer credit reporting laws, such as the Federal Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) (FCRA);

   6.  The EU Data Protection Directive or other similar privacy laws worldwide;

   7.  The Health Information Technology for Economic and Clinical Health Act (HITECH Act) enacted under Title XIII of the American Recovery and Reinvestment Act (ARRA) of 2009 (Pub. L. 111-5); or

   8.  The Family Educational Rights and Privacy Act of 1974 (FERPA) and similar state laws.

A series of continuing *privacy breaches*, related or repeated *privacy breaches*, or multiple *privacy breaches* resulting from the same facts or circumstances shall be considered a single *privacy breach* and shall be deemed to have occurred at the time the first of such *privacy breaches* occurred.

*Privacy breach response costs* means:

A.  Reasonable and necessary legal expenses, computer forensic and investigation fees, and related advertising expenses incurred by *you*, with our prior written consent, as a direct result of a *security breach* or *privacy breach*;

B.  Reasonable and necessary fees and expenses incurred by *you*, with our prior written consent, for the employment of a public relations consultant, if such action is reasonably necessary to avert or mitigate any material damage to *your reputation* or brands, which results or reasonably will result from an *adverse media report*; and

C.  *Proactive privacy breach response costs* incurred by *you* with our prior written consent, subject to the *proactive privacy breach response costs sublimit*.

PLAINTIFF'S APPENDIX-039        MMIC 000037



*Privacy breach response costs* does not include *patient notification expenses* or *patient support and credit monitoring expenses*.

*Private information* means:

1.  Proprietary or confidential information owned by a *third party* that is in the care, custody or control of an *insured* or is used by an *insured* with the consent of such *third party*;
2.  *Personally identifiable information*; and
3.  Any information that is linked or linkable to a specific individual and that is subject to any privacy regulations.

*Proactive privacy breach response costs* means reasonable and necessary *public relations expenses you* incur in response to an actual or potential *security breach* or *privacy breach*, but prior to the publication of an *adverse media report*, in an effort to avert or mitigate the potential impact of an *adverse media report*. *Proactive privacy breach response costs* must be incurred with our prior written consent.

*Proactive privacy breach response costs sublimit* means the maximum amount that we will pay for *proactive privacy breach response costs*. The *proactive privacy breach response costs sublimit* is included within, and will erode, the limits of liability applicable to Coverage Agreement E.1. of this Endorsement.

*Programming error* means an error that occurs during the development or encoding of a *computer program*, software, or application, which would, when in operation, result in a malfunction or incorrect operation of a *computer system*.

*Property damage* means injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured. *Data* is not considered tangible property.

*Public relations expenses* means reasonable and necessary expenses *you* incur to re-establish *your reputation* which was damaged as a direct result of an *adverse media report*.

*Qui tam action* means civil proceedings brought against an *insured* by a *qui tam plaintiff* as a relator for a *government entity*.

*Qui tam plaintiff* means a private plaintiff under the False Claims Act or any equivalent state law.

*Regulatory compensatory award* means a sum of *money* an *insured* is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a *third party*, due to an adverse judgment or settlement arising out of a *government investigation*. *Regulatory compensatory award* does not include any criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

*Regulatory fines and penalties* means those amounts specifically designated by a *government entity* as civil or administrative fines and penalties, which an *insured* is legally obligated to pay as a result of a *government investigation* or *regulatory proceeding*.

*Regulatory fines and penalties* does not include:

A.  Any criminal fines or penalties of any nature whatsoever;
B.  Any fines or penalties imposed against an *insured* for failure to comply with or follow the *PCI Data Security Standard* or any payment card company rules; or
C.  Any interest assessed on *regulatory fines and penalties*.

*Regulatory proceeding* means, and is limited to, any of the following instituted against an *insured*:

A.  A *billing errors proceeding*;
B.  An *EMTALA proceeding*;
C.  A *Stark proceeding*; or
D.  A *HIPAA proceeding*.

A *regulatory proceeding* will be deemed to be instituted when an *insured* receives formal written notice of any of the foregoing.

*Restitution* means repayment of fees, reimbursements, profits, charges or other benefit payments that are received by an *insured* from a governmental health benefit payer or program, or a carrier or intermediary making payments as part of, or in connection with, any such program, or a *commercial health insurance payer*, or any patient, to which such *insured* was not legally entitled by reason of a *billing error*, the return of which is sought in a *billing errors proceeding*.

PLAINTIFF'S APPENDIX-040                    MMIC 000038



*Security* or *Securities* means negotiable or non-negotiable instruments or contracts representing *money* or *other property*, but does not include *money*.

*Security and privacy wrongful act* means any of the following acts, whether actual or alleged, but only if committed or alleged committed by an *insured*:

A.    The failure to prevent or hinder a *security breach*, which in turn results in:

     1.    The alteration, copying, corruption, destruction or deletion of, or damage to, electronic *data* stored on *your computer system*;

     2.    Theft, loss or unauthorized disclosure of electronic or non-electronic *private information* that is in an *insured's* care, custody or control;

     3.    Theft, loss or unauthorized disclosure of electronic or non-electronic *private information* that is in the care, custody or control of a *BPO service provider* or *outsourced IT service provider* that is holding, processing or transferring such *private information* on *your* behalf; provided, however, that the theft, loss or unauthorized disclosure occurs while *your* written contract with such *BPO service provider* or *outsourced IT service provider* is in effect; or

     4.    *Unauthorized use* of or *unauthorized access* to a *computer system* other than *your computer system*;

B.    The failure to timely disclose a *security breach* affecting *personally identifiable information*, or the failure to dispose of *personally identifiable information* within the required time period, in violation of privacy regulations in effect now or in the future;

C.    The failure to prevent the transmission of *malicious code* or *computer virus* from *your computer system* to the *computer system* of a *third party*;

D.    A *privacy breach*;

E.    The failure to prevent or hinder participation by *your computer system* in a *denial of service attack* directed against internet sites or the *computer system* of any *third party*; or

F.    Loss of *your* employee's *personally identifiable information*.

*Security breach* means any of the following, whether a specifically targeted attack or a generally distributed attack:

A.    *Unauthorized access* to, or *unauthorized use* of, *your computer system*, including *unauthorized access* or *unauthorized use* resulting from the theft of a password from *your computer system* or from an *insured*;

B.    A *denial of service attack* against *your computer system*; or

C.    Infection of *your computer system* by *malicious code* or the transmission of *malicious code* from *your computer system*,

A series of continuing *security breaches*, related or repeated *security breaches*, or multiple *security breaches* resulting from a continuing failure of computer security shall be considered a single *security breach* and shall be deemed to have occurred at the time the first of such *security breaches* occurred.

*Shadow audit* means an audit performed by a qualified professional, which examines the same billing records and related documents as those subject to an ongoing *billing errors proceeding*, with the intent of providing an *insured* with a private expert opinion. Such *shadow audits* are subject to our prior approval.

*Shadow audit expenses* means the fees for the services of a qualified audit professional and associated expenses incurred by an *insured* in the course of a *shadow audit*.

*Special expenses* means reasonable and necessary costs and expenses *you* incur to:

A.    Prevent, preserve, minimize, or mitigate any further damage to *your digital assets*, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts;

B.    Preserve critical evidence of any criminal or malicious wrongdoing;

C.    Purchase replacement licenses for *computer programs* because the copy protection system or access control software was damaged or destroyed by a *covered cause of loss* or an *act of cyber terrorism*; or

D.    Notify *your* patients of a total or partial interruption, degradation in service, or failure of *your computer system* resulting from a *covered cause of loss* or *act of cyber terrorism*.

*Stark proceeding* means administrative or civil proceedings instituted against an *insured* by a *government entity* alleging violation of any federal, state or local anti-kickback or self-referral laws by an *insured*. *Stark proceeding* does not include:

PLAINTIFF'S APPENDIX-041           MMIC 000039



7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

A.     A *criminal proceeding*; or

B.     A subpoena for records, testimony, or other documentation which does not allege a violation of any federal, state or local anti-kickback law or self-referral laws by an *insured*.

*Telecommunications fraud* means the intentional, unauthorized and fraudulent gaining of access to outgoing telephone service through infiltration and manipulation of an *insured telecommunications system*.

*Telecommunications fraud loss* means the charges *you* incur for unauthorized calls directly resulting from *telecommunications fraud*.

*Third party* means any entity, company, organization or person who does not qualify as an *insured*.

*Unauthorized access* means the gaining of access to a *computer system* by an unauthorized person or persons.

*Unauthorized use* means the use of a *computer system* by unauthorized persons or by authorized persons in an unauthorized manner.

*Voluntary notification* means written notice to any individual of a *privacy breach* or *security breach* where there is no specific legal requirement in the applicable jurisdiction mandating such notice.

*Voluntary notification expenses sublimit* means the maximum amount that we will pay for *patient notification expenses* incurred as a result of *voluntary notification*. The *voluntary notification expenses sublimit* is included within, and will erode, the limits of liability applicable to Coverage Agreement E of this Endorsement.

*Voluntary self-disclosure* means an *insured* discloses information, without inquiry, to any *government entity* or *commercial health insurance payer*, which may serve as grounds for a *regulatory proceeding* against such *insured*. Such information must have become known to the *insured* fortuitously and subsequent to the original inception date of this Cyber Solutions /Medefense Plus insurance.

*Waiting period* means:

A.     With respect to Coverage Agreement F.2. and Coverage Agreement H of this Endorsement, the 8-hour period which must elapse before *income loss, interruption expenses* and *special expenses* may be payable. The *waiting period* applies to each *period of restoration*.

B.     With respect to Coverage Agreement I of this Endorsement, the two-week period which must elapse after *notification*, or in the event of an *adverse media report*, after publication of the first *adverse media report*, before *brand loss* may be payable. The *waiting period* applies to each *period of indemnity*.

*Wrongful act* means:

A.     A *billing error*; or

B.     An act, error or omission that gives rise to an *EMTALA proceeding, Stark proceeding or HIPAA proceeding* .

*You* and *your* means any *insured healthcare professional* or *insured entity*.

*Your computer system* means:

A.     A *computer system* operated by and owned by, or leased to, *you*;

B.     With respect to Coverage Agreement B (Security and Privacy Liability) only, a *computer system* operated by a *BPO service provider* or *outsourced IT service provider* and used for the sole purpose of providing hosted computer application services to *you* or for processing, maintaining, hosting, or storing *your* electronic *data*, pursuant to a written contract with *you* to provide such services.

*Your reputation* means the estimation of trust that patients, customers or clients have in doing business with *you* or in purchasing *your* products or services.

President

Issue Date: 12/21/2018

PLAINTIFF'S APPENDIX-042          MMIC 000040

 

7701 France Avenue South, Suite 500
Minneapolis, Minnesota 55435-5288
p. 800.328.5532, f. 952.838.6808
MMICgroup.com

Policy Number: 600194

Effective Date: 01/01/2019

## Iowa Amendatory Endorsement

The Common Conditions of the policy are amended as follows:

Paragraph B. CANCELLATION sub paragraph 2. Cancellation by us is deleted and replaced with the following:

2.  Cancellation by us
    (a).  If this policy has been in effect for less than 60 days and has not been renewed, we can cancel this policy by providing written notice to the *policyholder* at the address shown in the Declarations or endorsement to this policy:
        (i).    10 days before the effective date of cancellation, if we cancel for non-payment of premium; or
        (ii).   60 days before the effective date of the cancellation, if we cancel for any other reason.

    (b).  If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may only cancel this policy, by providing written notice to the *policyholder* at the address shown in the Declarations or endorsement to this policy, for one or more of the following reasons:
        (i).    10 days before the effective date of cancellation, if we cancel for non-payment of premium;
        (ii).   60 days before the effective date of the cancellation, if we cancel for any of the following reasons:
            (1).    Misrepresentation or fraud made by or with the knowledge of the *insured* in obtaining the policy or contract, when renewing the policy or contract or in presenting a claim under the policy or contract;
            (2).    Actions by the *insured* which substantially increase or change the risk insured;
            (3).    Determination by the Commissioner that the continuation of the policy will jeopardize our insolvency or will constitute a violation of the law of Iowa or any other state; or
            (4).    The *insured* has acted in a manner which the *insured* knew or should have known was in violation or breach of a policy or contract condition

The following is added to B. CANCELLATION:

This policy may be cancelled at any time if we lose our reinsurance coverage which provides coverage for a significant portion of the underlying risk insured and if the Commissioner determines that cancellation because of loss of reinsurance coverage is justified, the Commissioner shall consider all of the following factors:

(a).  The volatility of the premiums charged for reinsurance in the market;
(b).  The number of reinsurers in the market;
(c).  The variance in the premiums for reinsurance offered by the reinsurers in the market;
(d).  The attempt by us to obtain alternate reinsurance;
(e).  Any other factors deemed necessary by the Commissioner.

President

Issue Date: 12/21/2018

IAAM ed. 09/2017

MMIC Insurance, Inc.

Page 1 of 1

PLAINTIFF'S APPENDIX-043     MMIC 000041



Policy Number: 600194                                                    Effective Date: 01/01/2019

## Patient Medical Expense Coverage Endorsement - Claims-Made

The Medical Professional Liability Insurance is amended as follows:

SECTION FOUR- DEFINITIONS is amended to include:

> *Medical expenses* means the reasonable and necessary out of pocket expenses incurred by a patient for medical care. *Medical expenses* do not include any expenses charged by an *insured*.

SECTION EIGHT- ADDITIONAL BENEFITS is amended to include:

PATIENT MEDICAL EXPENSE COVERAGE

We will reimburse a patient for *medical expenses* as a result of *professional services* that result in an unanticipated injury or outcome.

1. To fall within this coverage, the following requirements must be met:
   (a). We must receive a written request from the *policyholder* to reimburse the *medical expenses*,
   (b). The *professional services* must have been provided during the policy period,
   (c). The request must be received by us during the *policy period*,
   (d). The *medical expenses* must be incurred within one year of the *professional service* being provided, and
   (e). There is not a *claim* for *damages*.

2. Limit
   (a). The Each Patient Medical Expense Limit is the most we will pay as reimbursement for *medical expenses* incurred by one patient
   (b). The Aggregate Medical Expense Limit is the most we will pay as reimbursement for *medical expenses* incurred by all patients
   (c). These limits apply in addition to the limits of liability stated on the Declarations page

President _(signature)_

Issue Date: 12/21/2018

PLAINTIFF'S APPENDIX-044                    MMIC 000042

PLAINTIFF'S APPENDIX-045               MMIC 000043

IN THE IOWA DISTRICT COURT IN AND FOR JOHNSON COUNTY

S.K., a legally                  )
incapacitated Minor by and       )
through his Conservator,         )
THOMAS T. TARBOX, Esq.;          )        NO. LACV081421
                                 )
     Plaintiff,                 )
                                 )
 vs.                             )        TRANSCRIPT OF
                                 )          PROCEEDINGS
MERCY HOSPITAL, IOWA CITY,       )
IOWA, d/b/a MERCY HOSPITAL       )
d/b/a MERCY IOWA CITY, and       )        Jury Trial
OBSTETRIC AND GYNECOLOGIC        )       March 16, 2022
ASSOCIATES OF IOWA CITY AND      )       Volume 12 of 15
CORALVILLE, P.C.,                )
                                          1 - 230, inclusive
    Defendants.

The above-entitled matter came on for jury trial before the Honorable Kevin McKeever, Sixth Judicial District Court Judge, at the Johnson County Courthouse, Iowa City, Iowa, commencing at 9:08 a.m. the 16th day of March, 2022.  (Meyer, Goodman)

*Katherine L. Novak, RPR, CSR, CRR*
*Official Court Reporter*
*kathy.novak@iowacourts.gov*

**A-P-P-E-A-R-A-N-C-E-S**

FOR PLAINTIFF:
GEOFFREY N. FIEGER (Pro Hac Vice)
Fieger, Fieger, Kenney & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI  48075
(248) 355-5555
g.fieger@fiegerlaw.com

MATTHEW M. PATTERSON (Pro Hac Vice)
JACK BEAM (Pro Hac Vice)
Beam Legal Team, LLC
954 West Washington Boulevard, Suite 215
Chicago, IL  60607
(312) 733-0930
mpatterson@beamlegalteam.com

FREDERICK W. JAMES
The James Law Firm, P.C.
2600 Grande Avenue, Suite 213
Des Moines, IA  50312
(515) 246-8484
frederick@jameslawfirm.com


FOR DEFENDANT OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA
CITY AND CORALVILLE, P.C.:
JENNIFER E. RINDEN, VINCENT S. GEIS,
 and ROBERT HOUGHTON
Shuttleworth & Ingersoll, P.L.C.
US Bank Building
115 3rd Street SE,  Suite 500
P.O. Box 2107
Cedar Rapids, Iowa  52406
(319) 365-9461
jer@shuttleworthlaw.com
vsg@shuttleworthlaw.com
rdh@shuttleworthlaw.com

FOR MERCY HOSPITAL, IOWA CITY, IOWA d/b/a MERCY HOSPITAL
d/b/a MERCY IOWA CITY:
JESSICA TUCKER GLICK and CAROLYN RUSSELL WALLACE
Phelan Tucker Law L.L.P.
321 East Market Street
P.O. Box 2150
Iowa City, Iowa   52244
(319) 354-6962
glick@phelantuckerlaw.com
wallace@phelantuckerlaw.com

And then oxygen was placed as well. So the theory being that if you give oxygen to the mother, then that increases the baby's level of oxygen.

Q. At this point, after these maneuvers had been done and terbutaline given, epidural placed, was there any change in the strips?

A. Yes. So those maneuvers worked. So, you know, that's the thing, we never know which way we're going to go, which is why, you know, I said get the OR ready, because if it goes the other way, then I'm ready. Since they worked, I didn't need the OR. So they -- the maneuvers changed the tracing from a Category 2 back to a Category 1.

Q. And can you give us a sense of what time you're talking about now.

A. I think that was right before -- around 3:00 o'clock.

Q. Now, at this point did you leave the room?

A. I did.

Q. And the jury has heard that you were out of the room from approximately 3:00 o'clock until Nurse Harl called for you sometime around 3:50 p.m.

A. Uh-huh.

Q. Can you tell the jury what was going on in this time frame?

PLAINTIFF'S APPENDIX-048

that's where I do that bigger vaginal exam where I have to, kind of, put my hands around the baby's head.

Q. And what happened during this vaginal exam?

A. Right. So that's when -- during that exam, then when I got to the left side I felt this depression in the baby's skull that was behind and below the ear, so on this back side, essentially. And it was something that I've never felt before, I've never felt before and I've never felt since, and it was alarming to me.

Q. What did you do next?

A. So then, again, I knew it was time to get the baby out. The heart rate was down, and so I went ahead with the forceps placement.

Q. I want to stop you there.

MS. RINDEN: Your Honor, may I approach.

THE COURT: You may.

Q. Dr. Goodman, I'm going to show you -- we've got some forceps here for a demonstrative exhibit. I'd like to just --

MS. RINDEN: May I approach the witness.

THE COURT: You may.

Q. Okay. I'm going to hand them to you and let me ask you a couple questions.

A. Okay.

Q. First of all, what type of forceps is that?

PLAINTIFF'S APPENDIX-049

place. And then I said, okay, I'm ready and we're going to help you now. And so at that point I started my pull. And that's when this forceps slipped. I could feel them slip on the back of my hands, like they were kind of coming apart, you can feel that. And they just looked like they were slipping, so I stopped. So I didn't complete the pull.

I stopped. I took the forceps out. I know that the one doctor said you can reposition while inside, and you can, but I think it's safer to take the forceps completely out and do it again. So she finished that contraction. In between the contractions, we did it again. But this time when I went for my lock, I didn't get that nice easy lock, it just wasn't quite locking, and that's not uncommon. And, again, a lot of times that's due to what we call asynclitic, the baby is a little bit to one side or the other. So they didn't lock, so that's when I abandoned. I took them off and I was done.

Q. All right. Now, a couple more points and then I'm going to have you sit down. But while we're still up here, I want to be sure the jury can see you're holding the forceps on these two finger rests with your right hand -- you're right-handed; is that right?

A. Yes.

Q. Okay. So once the forceps are locked, you have

your fingers on either side of the rest.

A.    Uh-huh.

Q.    And your left hand is what, guiding in the shaft area?

A.    Yeah.  So it just sort of depends, you know, the position of the baby, the position of the mom whether you grasp on the top or underneath, but kind of whatever is more comfortable.

Q.    All right.  You took them off.  Now just after you took them off, then you put them back in, unable to get them to lock?

A.    Right.  So then they just come out, just, kind of, like they went in, essentially.

Q.    All right.  I'm going to have you go ahead and sit back down.

Dr. Goodman --

A.    Yes.

Q.    -- after feeling the indentation you've described in baby Kromphardt -- on baby Kromphardt's head, why did you determine it was appropriate to go ahead and place forceps?  Can you explain to the jury?

A.    Yeah.  There was a couple of reasons.  So, one, I knew that the forceps were not going to go anywhere near where that indentation was.  The forceps were going to be placed on the cheek, the baby was looking up.  I was able

PLAINTIFF'S APPENDIX-051

to palpate the entire time where the forceps were going, and I knew it was nowhere near that indentation.  That's one reason.

The second reason was the heart rate was down and I wanted to get the baby out, and I thought forceps, again, was my best option.

Q.   We heard from another witness earlier in this trial that when a baby is in the OP position forceps are the instrument of choice for an assisted delivery.

A.   Right.

Q.   Has that been your experience, Dr. Goodman?

A.   That has.

Q.   All right.  What happened next?

A.   Right.  So, again, heart rate was down -- you know, these things are all happening all at once.  Right?  So we're talking just a couple minutes here.  But the heart rate's down, I try the forceps, the forceps slips, unable to try.  I try to put it on again, but I'm unable to pull because the forceps don't lock.  So I abandoned the forceps.  At this point, you know, the baby is near crowning, and so I opted to use that vacuum to get the baby out, which I placed and pulled for 20 seconds, and the baby was delivered.

Q.   All right.

MS. RINDEN:  Your Honor, may I approach again.

PLAINTIFF'S APPENDIX-052

Q.   All right.  Now, I want to go back to the use or the attempt at forceps.

A.   Yes.

Q.   You have sat in this courtroom and listened to a variety of people describe your use of forceps in this case, Dr. Goodman.

A.   Yes.

Q.   Has anyone described it accurately, as far as you are concerned?

A.   No.  Again, I mean, I was the one that did the delivery, did the placement.  So, no, I don't think it has been described accurately.

Q.   All right.  Mr. Kromphardt has described a pushing back on a stool or an almost falling backwards action.  Can you explain to the jury, did that happen?

A.   That did not happen.  I was standing at the time.

Q.   And, Doctor, did you get a meaningful pull at any time with the forceps?

A.   I did not.

Q.   Can you explain to the jury what you mean.

A.   So as we talked about when I put the forceps on the first time, and they went on and they went on easy, which is good, and so I was ready to do a pull.  As I mentioned, I think Kathleen pushed and then with that second push, I was ready to start pulling.  As I started my

pull, I could feel the forceps slipping, so I stopped.  I stopped, I took the forceps off.  I had to wait for another contraction -- or in between contractions to put the forceps back on, and then that time I didn't pull because the forceps never got to the safe locked position.

So, in my mind, I have no idea how a non-pull on forceps could cause a fracture.  And the fact that I palpated this indented mark where it is shown to be where the fracture was prior to placing the forceps.

Q.   Doctor, after the attempted forceps which did not work as you've described, you decided to proceed with the vacuum.  The jury has heard that described by certain experts as a sequential or double-instrumentation use of devices.  Is that what you were trained to do at the University of Iowa?

A.   Yes.  I mean, sequential devices is utilized in nonroutine situations, so when you need them.  In this case, I don't think it qualified, technically, as a sequential use of devices as I didn't really get to use the forceps.  I used the vacuum.  I used the vacuum for 20 seconds, I was in the green range and the baby came out.

Q.   Does ACOG provide for the sequential use of instruments?

MR. FIEGER:  Objection.

THE COURT:  What's the objection?

Q.   Can you read what it says for us?

A.   "Deep indentation on left temporal skull below ear."

Q.   Okay.  And, Doctor, again, this record was filled out in close proximity to SXXXX's delivery.  It is dated and timed AXXXXX XXth, 2018.  What is the time on the record by your signature?

A.   My time was 1645, or 4:45 p.m.

Q.   Okay.  Dr. Goodman, I want to show you what has been entered into evidence by Plaintiffs.  Let me see. It's a photograph of baby SXXXX shortly after delivery. Looks like it's part of Exhibit 16 for the jury.

MS. RINDEN:  Judge, I'd like to go ahead and put that up -- okay.

Q.   You've seen this picture, Dr. Goodman?

A.   Yes.

MS. RINDEN:  Your Honor, may I approach.

THE COURT:  You may.

MS. RINDEN:  Thank you.

Q.   Just so that we're clear, this area behind SXXXX's ear has been described as being where the forceps was located.  Is that accurate, Dr. Goodman?

A.   That's not accurate.

Q.   Please explain.

A.   So as I mentioned, the baby was looking up.  And

You never wrote, like you could have, "I felt it before."
Isn't that true?

A.   I wrote what happened and I told you what
happened.

Q.   And then, later on, the second version you were
asked during the deposition years after the events, you've
had a lot of time to think about it, and you were asked if
you could remember if you felt it before or after.  And as
you correctly pointed out to the Court and jury, you
testified "I can't remember when I first felt it."  Those
were your words, weren't they?

A.   That was in relation to rotation or forceps
placement if you read the question.

Q.   And then in this trial, just a few moments ago,
you told the Court and jury -- this is the third version --
that you've been thinking about it a lot, and it happened
before you put the forceps on; is that correct?

A.   What I was saying is that I was thinking about it
a lot and I don't think I felt it when I tried to rotate, I
think it was only when I was putting the forceps on.

Q.   And then it may have been a slip of the tongue,
but you wrote it down in the record, you told the Court and
jury that what you felt was below the ear when the fracture
is above his ear, didn't you?

A.   What I was stating is how I'm feeling the baby's

Q.   Since it's associated and you read this with increased rates of neonatal complications and should not be routinely performed, at least you warned Kathleen and her husband about the fact that you were going to use sequential instruments, didn't you?

A.   So number one --

Q.   Please answer my question.  Didn't you warn them?

A.   I did not speak specifically about sequential devices.

Q.   So you did not warn them?

A.   I warned them of the risks which are similar for vacuum and forceps, and I did not actually do a sequential use.  I did an attempted sequential use but was unable to get a purchase with the forceps so essentially I did a vacuum delivery that lasted 20 seconds.

Q.   And the Iowa Children's Hospital is not only wrong about the forceps fracture that would have been caused -- if it was caused, it was caused by you, wasn't it?

A.   I didn't cause a forceps fracture.

Q.   If it was caused by forceps, that would have been you -- if they are correct in their thousands of pages and diagnoses that this is a forceps fracture, it would have been you who did it; isn't that correct?

A.   I did not cause a forceps fracture.

PLAINTIFF'S APPENDIX-057

Q.   So you're not willing to acknowledge that you would have been the one who did it?

MS. RINDEN:  Well, objection.  403. Argumentative.

THE COURT:  Sustained.

Q.   If they're wrong -- are they wrong about the fact that the Mityvac caused SXXXXX injury to his brain?

A.   SXXXXX had a Mityvac placed on his scalp for 20 seconds with a correct, safe pull, pressure.  In my opinion, and in all of the assisted deliveries that I have done that have this same normal range, that there is not major catastrophe related to the Mityvac.

Q.   So the Mityvac when it warns against do not initiate a vacuum if any of the following conditions exist: Failed vacuum or forceps attempt; and then right below, and you handed it out to the jury, it says:  Adverse events. Fetal injuries:  Head trauma, bruises, contusions, lacerations, scalp edema, skull fracture, cephalohematoma, subgaleal hematoma, subdural hemorrhage, parenchymal hemorrhage, intracranial hemorrhage.  It's a coincidence, you're saying to the Court and jury, that SXXXXX has all of these after you used a vacuum after an attempted forceps delivery, it's all coincidence; right?

A.   What I'm saying is that I have explained exactly what I had done, and I don't believe that what I did,

especially in light of the fact that I felt the depression on this baby's skull before the forceps were ever placed, not in a place where the forceps were, that these things were a cause of what happened to SXXXX, and that they found in the neonatal period.

Q. And that's exactly what I'm asking you. So it's all a coincidence that they warn against it, you did it, he's got them, but it's all a coincidence and it had nothing to do with you; right?

A. I think coincidence is a strong word. What I think is there was a depressed skull fracture that SXXXX suffered during his labor before we delivered him, so that in turn caused all these other things. I mean, I've done many, many assisted deliveries, and the most that the babies generally have is what we call a cephalohematoma. You have to suck up a little bit of their skull into this vacuum so that you have purchase, and they get a bruise. And that's very, very typical, and we see that almost on every single vacuum delivery we do.

Q. As a matter of fact, the Mityvac package insert also says exactly where you're to apply the Mityvac on the flexion point, doesn't it?

A. That's what it says on that package insert.

Q. Now, you were asked in your deposition years after the events what the flexion point was, and you said

If you know the answer, you can answer.

THE WITNESS:  I don't know that that's true.

Q.  You claim you don't know what actually happened to him; isn't that true?

A.  How he got his fracture; is that what you're asking me, sir?

Q.  Yes.

A.  Yeah, I don't know how he got his fracture.

Q.  You told Mrs. Kromphardt to tell the Iowa University Hospital doctors that you felt the indentation before you put the forceps on; isn't that true?

A.  Yes.  That's right.  I wanted to make sure they had all of the information in case there was some sort of genetic something or bone malformation or -- you know, I had no idea what this was and I wanted to make sure that they were giving them the correct information so that if something was going on they could find it out.

Q.  Isn't it true that no reasonable doctor would ever put forceps on a baby's head if they felt an indent when they didn't know what was going on, and they find out before they put the forceps on; isn't that true?

A.  Again, I didn't put the forceps where the indentation was.

Q.  And no reasonable doctor would do that because, one, they don't know what it is; and, two, it could cause

further injury; isn't that true?

MS. RINDEN:  Objection.  Argumentative.  403.

MS. GLICK:  Calls for a legal conclusion.

THE COURT:  No.  You can answer.

Q.   Isn't that true?

A.   Can you repeat the question?

Q.   No reasonable doctor would put forceps on a baby's head after feeling an indentation in the head that they don't -- that they had never felt before because you could cause further injury to the baby's head; isn't that true?

A.   I don't believe so.

Q.   No reasonable doctor would put a Mityvac on a baby's head when you had felt an indentation that you didn't know and there had been two forceps failures; isn't that true?

A.   No.

Q.   The doctors at Iowa University Hospital have rejected your claim that that indentation was congenital or there before, haven't they?

A.   No.

MS. RINDEN:  Objection.  403.  Argumentative.  Foundation.

THE COURT:  So it's sustained because the compound question probably needs to be broken up into two

**C E R T I F I C A T E**

The undersigned, one of the Official Shorthand Reporters in and for the Sixth Judicial District of Iowa, hereby certifies:

That I acted as such reporter in the cause mentioned on the title page of this transcript and took down in machine shorthand the testimony offered and proceedings had on said trial.

That the foregoing pages of typewritten matter are a full, true, and complete transcript of proceedings had in this cause and that said transcript contains all of the testimony offered and proceedings had at the times herein shown.

DATED this 6th day of July, 2022.


/s/ Katherine L. Novak
Katherine L. Novak, CSR, RPR
Certified Shorthand Reporter and
Registered Professional Reporter

# IN THE SUPREME COURT OF IOWA
## Johnson County No. LACV081421

CLERK OF SUPREME COURT

SEP 13, 2022

ELECTRONICALLY FILED

| | |
|---|---|
| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX, Esq.; <br><br> Plaintiff-Appellee, <br><br> vs. <br><br> OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C. <br><br> Defendant-Appellant. | Supreme Court No. 22-1317 <br><br> **APPEARANCE ON BEHALF OF DEFENDANT-APPELLANT** |

Troy L. Booher enters his appearance on behalf of Defendant-Appellant

Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C.

/s/Troy L. Booher
TROY L. BOOHER  (*admitted Pro Hac Vice)*
for
ZIMMERMAN BOOHER
Felt Building, Fourth Floor
341 South Main Street
Salt Lake City, UT 84111
PHONE:     (801) 924-0200
FAX:         (385) 420-5576
E-MAIL:    tbooher@zbappeals.com

&

JENNIFER E. RINDEN          AT0006606
ROBERT D. HOUGHTON        AT0003739
VINCENT S. GEIS             AT0013055
NANCY J. PENNER            AT0006146

1

PLAINTIFF′S APPENDIX-063

for

SHUTTLEWORTH & INGERSOLL, P.L.C.
500 U.S. Bank Bldg., P.O. Box 2107
Cedar Rapids, IA 52406
PHONE:   (319) 365-9461
FAX:   (319) 365-8443
E-MAIL:   jer@shuttleworthlaw.com
   rdh@shuttleworthlaw.com
   vsg@shuttleworthlaw.com
   njp@shuttleworthlaw.com

ATTORNEYS FOR OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.

Certificate of filing and service

The undersigned certifies this Appearance was electronically filed and served on the 13th day of September, 2022, upon the following persons and upon the Clerk of the Supreme Court using the Electronic Document Management System, which will send notification of electronic filing:

Frederick W. James
The James Law Firm, P.C.
2600 Grand Avenue
Suite 213
Des Moines, IA 50312

Ryan Koopmans
Koopmans Law Group, LLC
Waukee, IA 50263

Clerk of the Iowa Supreme Court
Iowa Judicial Branch Building
1111 East Court Avenue, 4th Floor
Des Moines, IA  50319

The undersigned further certifies that this appearance was served on Sept. 13, 2022 on the following by e-mailing one (1) copy to the following addresses:

2

Jack M. Beam
Ryan P Timoney
Matthew M. Patterson
Beam Legal Team, LLC
954 W. Washington Blvd.
Suite 215
Chicago, IL 60607

jbeam@beamlegalteam.com
rtimoney@beamlegalteam.com
mpatterson@beamlegalteam.com

Geoffrey N. Fieger
Fieger Law
19390 W. 10 Mile Road
Southfield, MI 48075
g.fieger@fiegerlaw.com

/s/ Haley Fauconniere

3

PLAINTIFF'S APPENDIX-065

# FIEGER, FIEGER, KENNEY & HARRINGTON
### A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW SINCE 1950

**19390 WEST TEN MILE ROAD**
**SOUTHFIELD, MICHIGAN 48075-2463**
TELEPHONE (248) 355-5555
FAX (248) 355-5148
WEBSITE: www.fiegerlaw.com
EMAIL: info@fiegerlaw.com

GEOFFREY NELS FIEGER
MI, FL, AZ AND WI BAR

JAMES J. HARRINGTON, IV

BERNARD J. FIEGER (1922-1988)
MI AND NY BAR

JEREMIAH JOSEPH KENNEY
MI AND OH BAR        (1949-2005)

October 6, 2022

**VIA. EMAIL ONLY**
Jennifer E. Rinden
Bob Houghton
Nancy Penner
Shuttleworth & Ingersoll, P.L.C.
500 U.S. Bank Bldg., P.O. Box 2107
Cedar Rapids, IA 52406
jer@shuttleworthlaw.com

> RE:   **Kromphardt v. OBGYN Associates, et al.**
> **Case No.: LACV 081421**

Dear Bob:

Thank you for your call today, it was nice speaking to you.

There is an issue I want to make clear with you. There will be no appeal in this case. The doctor and the hospital, as part of their assignment of claims against MMIC, will stipulate to the dismissal of the appeal with prejudice. Having breached its contract with the insured by way of bad faith, MMIC may not conduct an involuntary appeal on behalf of the doctor and the PC. You (and whoever you wish to consult with in terms of legal authority) can confirm the above.

Also, as you are aware, I am executing on the $12 million policy. It would be easier if you just had MMIC write the check together with costs and interest. Please.

Finally, as I informed you. I am more than willing to negotiate with you, or anyone else, in terms of resolving the entire dispute. That negotiation will involve monies to be paid over the $12 million, up to the amount of the judgment against your clients (in excess of $78 million). As we agreed, let's keep the lines of communication open. It seems to me that it is in everyone's best interest that this matter is resolved amicably, without the additional lawsuits that are sure to be filed. I remain,

Very truly yours,

Geoffrey N. Fieger

GNF/smt

{01344295.DOCX}

(2004 EXAMINATION OF JILL GOODMAN, M.D.)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

- - - - - - - - - - - - - X
In the Matter of:                     :
                                      : No. 22-01174-als11
Obstetrics and                        :
Gynecologic Associates                : 2004 EXAM OF
of Iowa City and                      : JILL GOODMAN, M.D.
Coralville, P.C.,                     :
                                      :
        Debtor(s)                     :
- - - - - - - - - - - - - X

        THE VIDEOTAPED 2004 EXAMINATION OF
JILL GOODMAN, M.D., taken before Angela L. Maddux,
Certified Shorthand Reporter and Notary Public
for the State of Iowa, commencing at 10:07 a.m.,
Monday, January 16, 2023, at Obstetrics and
Gynecologic Associates of Iowa City and
Coralville, P.C., 2769 Heartland Drive,
Coralville, Iowa.

MADDUX REPORTING
(319) 610-9513

PLAINTIFF'S APPENDIX-067          Exhibit F

(2004 EXAMINATION OF JILL GOODMAN, M.D.)

A P P E A R A N C E S

On behalf of Jill           KRISTINA M. STANGER
Goodman, M.D.:              Attorney at Law
                            Nyemaster Goode
                            700 Walnut
                            Suite 1600
                            Des Moines, IA 50309

On behalf of Debtor:        JOHN "JACK" R. O'CONNOR
                            Attorney at Law
                            Levenfeld Pearlstein
                            2 North LaSalle Street
                            Suite 1300
                            Chicago, IL 60602

On behalf of                JIM CRAIG
Dr. Goodman and Clinic:     Attorney at Law
                            Lederer, Weston, Craig
                            118 Third Avenue SE
                            Suite 700
                            Cedar Rapids, IA 52401

On behalf of Hills          MATTHEW G. BARND
Bank:                       Attorney at Law
                            Bradley & Riley
                            2007 First Avenue SE
                            Cedar Rapids IA 52406-2804

MADDUX REPORTING

(319) 610-9513

PLAINTIFF'S APPENDIX-068          Exhibit F

On behalf of the Creditor, SK:

MATTHEW PATTERSON
Attorney at Law
Beam Legal
954 W Washington Blvd
Suite 215
Chicago, IL 60607

BRITTANY VOTRUBA
Paralegal

ROBERT C. GAINER
Attorney at Law
Cutler Law Firm
1307 50th Street
West Des Moines, IA 50266

FRED JAMES
Attorney at Law
RSH Legal
2600 Grand Avenue
Suite 213
Des Moines, IA 50312

*   *   *

PLAINTIFF'S APPENDIX-069          Exhibit F

(2004 EXAMINATION OF JILL GOODMAN, M.D.)

Q.   Dr. Goodman, as far as you and what your partners want, to where you understand, you would be willing to dismiss the appeal right now if that meant that we could resolve SK's claim as to your PC; correct?

A.   I mean, it just seems like there's all these other little arms that I don't understand completely.  So I would just say that we would like to have this all be done and continue working.  That's what we would like to have.

I don't know about how all those pieces work, and what we get to choose and what we don't get to choose.  That's all on the attorneys' side.  I just want to know -- we just want to do our jobs.

Q.   Okay.  And if, as part of this resolution so that you can go on to do your jobs, that includes dismissing the appeal, that part of it doesn't offend you personally?

A.   I mean, it just means that the case can't go on to appeal, right?

Q.   That would be the end of the case.

A.   That would be the end of the case.  I mean, I would like to see justice served for sure.  I mean, I don't think justice was served.

PLAINTIFF'S APPENDIX-070                    Exhibit F

(2004 EXAMINATION OF JILL GOODMAN, M.D.)

But at the end of the day, this legal nightmare that we've been in has been horrible.

Q. So, it is your desire and your partners' desire as you understand it to end this legal nightmare, if possible?

A. That would be great.

Q. With or without MMIC's cooperation?

A. I don't know how it works. I would just love it to be done.

Q. We talked a lot today about the bad faith claim. Do you understand what the bad faith claim is?

A. I do not at all.

Q. Do you understand that under Iowa law, if an insurer like MMIC refuses to protect the interest of its insured here, you, in the practice under liability policy, that you as the practice, the insured, can sue the insurer for the damages that result from that, if any?

MS. STANGER: I will object to the form of the question as it calls for legal analysis and conclusion.

A. I don't know how it works.

Q. Do you understand there is such a claim that the PC has against MMIC?

PLAINTIFF'S APPENDIX-071                    Exhibit F

it relates to the underlying court case.

MR. PATTERSON:  The question is what is the proposal.

A.   I don't remember what was talked about. I guess if that helps.  I don't know the proposal.

MS. STANGER:  Thank you, Dr. Goodman.

BY MR. PATTERSON:

Q.   Did MMIC or any representatives from MMIC ever recommend to you and the clinic that you go into bankruptcy?

A.   No.

Q.   Has anybody from MMIC communicated to you, either directly or through any attorney, that they want to obtain the bad faith claim?

A.   Not to me.  I haven't talked to them about that.

Q.   Do you know if as early as May of 2022, MMIC, through the attorneys or directly to you, proposed anything about a loan for bankruptcy, an assignment of the bad faith claim or anything like that?

A.   Not to me.

Q.   When did you learn that MMIC would not post a bond to stop execution on appeal?

PLAINTIFF'S APPENDIX-072                    Exhibit F

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the Certified Shorthand Reporter in the foregoing matter at the time and place indicated herein; that I took in shorthand the proceedings had at said time and place; that said shorthand notes were reduced to the foregoing printed transcript under my supervision and direction, and that the foregoing pages are a full and correct transcript of the shorthand notes so taken; that said examination was not submitted for review.

I further certify that I am neither attorney nor counsel for, or related to or employed by any of the parties in the foregoing matter, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of January, 2023.


    /s/ Angela L. Maddux
CERTIFIED SHORTHAND REPORTER.

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:

Obstetric and Gynecologic Associates          Case No.  22-01174-als11
of Iowa City and Coralville, P.C.

        Debtor(s)

### MEMORANDUM OF DECISION
(date entered on docket:  March 29, 2023)

Before the Court is a Motion to Dismiss filed on behalf of S.K., an incapacitated Minor by and through his Conservator ("Conservator"), an objection by Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C. ("Debtor") and a Response filed by Minnesota Mutual Insurance Company ("MMIC").  The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334.[1]  For the reasons that follow, the Court finds the Debtor's bankruptcy filing lacks the required element of good faith under a totality of the circumstances and dismissal of the case is in the best interests of creditors and the estate.

### FINDINGS OF FACT

In 2019 a medical malpractice suit[2] was filed in state court against the Debtor and other defendants.  The Debtor had malpractice insurance coverage under a policy issued by MMIC.[3] Prior to trial, offers were extended by the plaintiffs' attorneys to resolve the pending dispute for the policy limits of $12 million in exchange for a full release for the Debtor and Defendant Dr. Jill Goodman.[4]  MMIC apparently refused to negotiate or make any settlement offer to the plaintiffs, which was expressly contrary to the position taken by the Debtor, its insured.[5]  The case was tried March 2022 and resulted in a verdict in favor of plaintiffs and a judgment against the Debtor and other defendants of approximately $97 million.[6]  Post-trial motions eventually reduced the damage

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U S C  § 101, et seq
[2] *Kromphardt et. al v. Mercy Hospital et. al*, LACV081421 (Johnson County)
[3] Conservator Exhibit G
[4] Supplement to Motion to Dismiss, ECF 257, Exhibit SK-K
[5] Transcript ECF 282; Page 32, Lines 12-22
[6] Conservator Exhibit E

PLAINTIFF′S APPENDIX-074

award to $75,642,549 against the Debtor, the only remaining defendant.[7]   Debtor appealed the verdict and requested that a stay be imposed pending appeal without posting the required bond or allowing a bond in a reduced amount.  On October 4, 2022 the Iowa Supreme Court denied these requests.[8]

A series of emails submitted to the Court detail the parties' pre-bankruptcy postures and the ongoing efforts to resolve the dispute and judgment.[9]  Allegedly, MMIC again refused to make an offer of settlement or to engage in settlement negotiations.  Eventually, Debtor's counsel was informed that collection efforts, including execution against the Debtor's assets, would be pursued unless its settlement demands were met.[10]  These included:  payment of the policy limits; dismissal of the state court appeal; assignment of all potential causes of action; and Debtor's cooperation in any suits related to legal malpractice.  According to the record the Debtor was interested in negotiating settlement both before the trial and before filing for bankruptcy.[11]

When settlement did not occur, the Conservator issued a general execution on October 10, 2022 to levy against the Debtor's assets, and also identifying MMIC as surety for the Debtor.[12]  The sheriff arrived at the Clinic on October 19, 2022.[13]  On October 31, 2022 the Debtor filed a voluntary chapter 11 bankruptcy petition believing this was its only option to protect its assets, remain in business and serve its patients.  The Debtor's Chapter 11 petition was executed by Dr. Jill C. Goodman, one of its principals.[14]  The required schedules were filed later and were signed by Jeffrey T. Varsalone, one of the Debtor's bankruptcy professionals.[15]

Within days of its petition the Debtor filed a Motion for Relief from Stay to allow the pending appeal to continue before the Iowa Supreme Court and a Joint Motion with MMIC[16] to escrow the $12 million policy proceeds.  The Conservator objected to both.  The Court granted the stay relief.[17]  The request to escrow funds was withdrawn before decision.[18]  Meanwhile, in state

---

[7] Conservator Exhibit F
[8] Supplement to Motion to Dismiss, ECF 257, Exhibit SK-L
[9] Supplement to Motion to Dismiss, ECF 257, Exhibits SK-K, SK-P
[10] Debtor's Objection to Motion to Dismiss, ECF 268, Exhibit 9, pages 1-2
[11] Transcript ECF 282; Pages 32-33, lines 20-25, 1-2
[12] Conservator Exhibit R
[13] Debtor Exhibit 2
[14] Debtor's Chapter 11 Petition, ECF 1
[15] Conservator Exhibit AA
[16] Motion (JOINT) for Authority to Place Insurance Proceeds in Escrow, ECF No 18; and Motion for Relief from Stay, ECF 19
[17] Minute Order Granting Motion For Relief From Stay, ECF 231
[18] Minute Order Regarding Joint Motion for Authority to Place Insurance Proceeds in Escrow, ECF 230

PLAINTIFF′S APPENDIX-075

court, the Conservator filed an order to show cause against MMIC for payout of the policy proceeds.   In response, the Debtor filed an emergency motion for sanctions, seeking both compensatory and punitive damages, against the Conservator for violation of the automatic stay.[19]

The Debtor's Motion was denied and MMIC was found to be without standing, both decisions have been appealed.[20]

On January 20, 2023 the Conservator filed the pending Motion alleging bad faith as cause for the Debtor's chapter 11 case to be dismissed or converted asserting the following grounds:

1) Debtor does not believe the bankruptcy filing is beneficial to the creditor body, had non-bankruptcy options and does not understand the costs and burdens associated with its chapter 11 case;
2) The bankruptcy filing is a litigation tactic to avoid payment of the bond;
3) Debtor is financially healthy;
4) There is no potential for reorganization;
5) The case involves a two-party dispute;
6) There is an appearance of impropriety between MMIC and the Debtor.

Later, the Conservator filed a "support document" that expanded upon the facts underlying its original Motion to Dismiss.[21]   In response to this filing the Debtor sought a continuance for the following reasons:  the supplemental document was longer and more detailed than the original Motion, that it had inadequate time to prepare a response, and a new issue involving financial condition and insolvency had been raised.  The Court denied the Motion to Continue and  ordered that the solvency issue be bifurcated and heard separately on a later date.[22]  The Debtor then filed an objection to the support document.[23]

At the hearing, the Conservator called Eric Brewer as a witness to testify on the financial condition of the clinic.  The Debtor objected raising a *Daubert*[24] issue to Brewer's qualification as an expert and the information he relied upon in reaching his conclusions.  The Court sustained the objection to allow the Debtor time to submit a formal *Daubert* objection and argument.[25]  At the conclusion of the hearing the Motion to Dismiss was placed under advisement.

The financial condition and solvency issues were scheduled for hearing on April 5, 2023.

---

[19] Motion for Sanctions for Violation of Automatic Stay 11 U S C  § 362(k), ECF 72
[20] In Re: *Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C.*, 3:22-cv-00080-SMR-SBJ (IASD)
[21] Supplement to Motion to Dismiss, ECF 257
[22] Minute Order Denying Motion to Continue, ECF 260
[23] Debtor's Objection, ECF 290
[24] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U S  579 (1993)
[25] Motion to Exclude Opinions and Testimony of Eric Brewer, CPA, ECF 288

PLAINTIFF′S APPENDIX-076

## LEGAL STANDARDS

Bankruptcy Code §1112(b)(1) provides that: "[O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause. . . ." Multiple examples of "cause" are identified within the statute.[26] There is an implied element of good faith in the filing of any bankruptcy petition. Many courts, including the Eighth Circuit, have recognized that bad faith is "cause" for dismissal or conversion under the statute.[27] "Once lack of good faith is raised as an issue of cause for dismissal, the debtor bears the burden of proving that the filing was made in good faith."[28]

"The use of the term 'bad faith' in many cases is unfortunate. It carries with it a connotation that someone had a sinister purpose and has subjectively attempted to abuse the bankruptcy process . . . ."[29] A finding of malevolent intent or other similar subjective conduct are not required to establish a lack of good faith. Rather, the determination rests on whether a debtor's filing is an effort to "*unreasonably deter* [or attempts to] harass creditors . . .*[rather than]* an attempt to effect *a speedy, efficient reorganization on a feasible basis.*"[30] Concluding that bad faith exists for purposes of dismissal under the bankruptcy code requires a difficult distinction between permissible and impermissible motives.[31]

"There is no single test for determining when a debtor has filed in bad faith. Rather, courts consider the totality of the circumstances, including . . . "the court's evaluation of the debtor's financial condition, motives, and the local financial realities."[32] Various factors have developed to guide this analysis.[33] Such lists are helpful, but are not exhaustive. There are a multitude of

---

[26] 11 U S C  §§ 1112(b)(4)(A-P)

[27] *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.),* 235 F 3d 375, 379 (8th Cir  2000) citing *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),* 200 F 3d 154, 162 (3d Cir 1999); *Trident Assoc. Ltd. P'Ship v. Metro Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F 3d 127, 130-31 (6th Cir  1995); *Marsch v. Marsch (In re Marsch)*, 36 F 3d 825, 828 (9th Cir  1994); *Carolin Corp v. Miller*, 886 F 2d 693, 700 (4th Cir  1989); *In re Phoenix Piccadilly, Ltd* , 849 F 2d 1393, 1394 (11th Cir  1988); *In re Little Creek Dev. Co.,* 779 F 2d 1068, 1071-72 (5th Cir  1986)

[28] *Stage I Land Co. v. United States Hous. & Urban Dev. Dep't,* 71 B R  225, 229 (D  Minn  1986); see also *In re Setzer*, 47 Bankr  340, 345 (Bankr  E D  N Y  1985) (citing *Marine Harbor Properties, Inc. v. Manufacturers' Trust Co* , 317 U S  78, 85, 87 L  Ed  64, 63 S  Ct  93 (1942))

[29] *Muskogee Envtl. Conservation Co. v. Scriminger (In re Muskogee Evntl. Conservation Co.),* 236 B R  57, 68 (Bankr  N D  Okla  1999)

[30] *In re Marsch*, 36 F 3d at 828 (citing *In re Arnold*, 806 F 2d 937, 939 (9th Cir  1986)) (emphasis added)

[31] *In re Kerr*, 908 F 2d 400, 404 (8th Cir  1990)

[32] *Lariat Cos. V. Wigley (In re Wigley)*, 557 B R  671, 675 (B A P  8th Cir  2016) citing *Cedar Shore Resort, Inc.,* 235 F 3d at 379

[33] *Cedar Shore Resort, Inc.*, 235 F 3d at 379 (citing *In re Little Creek Dev. Co.*, 779 F 2d at 1072

4

inquiries that may be related to a thorough examination under the identified standard because, by its very nature, the totality of the circumstances occurs on a case-by-case basis.[34]

## DISCUSSION

The bases for the Motion to Dismiss alleged by the Conservator and the Debtor's objections under the applicable standards can be summarized, and in some instances combined, into a few categories.

### 1. Purpose of Filing

An important inquiry in a good faith analysis is whether the petition was filed with a valid bankruptcy purpose.[35] The Supreme Court has identified two of the basic purposes of Chapter 11 as: (1) "preserving going concerns;" and (2) "maximizing property available to satisfy creditors."[36] To demonstrate a proper purpose, both elements must be established. Although the Debtor mechanically recites these grounds the record reflects alternative motivations that lie outside these acceptable purposes.

Statements made by, or on behalf of, the Debtor establish that it disagrees with the jury's verdict. In explaining the pending appeal, the record specifically includes the following statements: "We want the State Court to proceed because we do not feel like it was justice;"[37] "[W]e want the appeal to move forward because we - - we feel like the judgment was reached in error and we would like the Supreme Court to review it and decide on the merits of the case;"[38] and that the appeal will "vindicate" Dr. Goodman.[39] Both MMIC and the Debtor have represented to the Court that there are a variety of points raised in the appeal that support their conclusion that the Iowa Supreme Court will order a new trial or reduce the verdict.

---

[34] *In re Erkins*, 253 B R  470, 474-75 (Bankr  D  Idaho 2000) (citing *In re Arnold*, 806 F 2d at 939 ("The existence of good faith depends on an amalgam of factors and not upon a specific fact"))  Many cases are cited for general propositions related to the factors and analysis under the totality of the circumstances standard  See *In re Wigley*, 557 B R  671 (affirming the bankruptcy court's denial of a motion to dismiss based upon its determination that a valid purpose existed for debtor's bankruptcy filing)  *Wigley* is cited in this pending matter for purposes of comparing its similarity to the facts involved in this Debtor's case  Reliance upon specific facts in an unrelated case requires careful review  *Id.* at 677  The facts and circumstances before the bankruptcy court in *Wigley* are different than those involving the Debtor here  *In re Wigley*, Case No  14-40541 ECF 198 Order Denying Motion to Dismiss or Convert, Denying Confirmation and Setting Deadlines, entered November 18, 2015, Constantine, J
[35] *United States Tr. v. Stone Fox Capital LLC (In re Stone Fox Capital LLC)*, 572 B R  582, 590 (Bankr  W D  Pa 2017)
[36] *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U S  434, 437, 119 S  Ct 1411, 1414 (1999); accord *Toibb v. Radloff*, 501 U S  157, 163, 115 L  Ed  2d 145, 111 S  Ct  2197 (1991)
[37] Transcript ECF 282; Page 46, Lines 22-23
[38] Transcript ECF 282; Page 83, Lines 2-5
[39] Transcript ECF 114; Pages 66-67, Lines 25 and 1-3

5

Based upon the Debtor post-petition conduct an additional motivation is protecting MMIC from the Conservator's collection efforts while the appeal is pending.  The policy proceeds are one of the single most important sources for payment of the judgment.  As previously stated, the Conservator filed an order to show cause against MMIC in the state court action seeking payment of the policy proceeds.[40]  In response, the Debtor filed an emergency Motion for Sanctions against Conservator for violation of the automatic stay seeking both compensatory and punitive damages.

At the hearing[41] the Debtor withdrew its request for damages and proceeded to argue that: 1) the policy proceeds were property of the estate; 2) the automatic stay prevented any action to collect against the policy or MMIC; and 3) the judgment was not technically final for purposes of payment under the policy.[42]  With no damage request before the court, the Debtor's pending Motion essentially transformed into either a request for declaratory relief or a request to extend the automatic stay for the benefit of MMIC.  After limited evidence and legal argument it was obvious that the Debtor's primary motivation was to obtain the benefit of a stay to protect MMIC and the policy proceeds in the pending state court action.  Most telling is the following exchange:

> COURT: . . . it seems to me . . . what you're essentially asking me to do is extend the automatic stay to any ability of the conservator to collect on its judgment for the time period of the appeal. Isn't that what you're asking me to do?
> COUNSEL: Your Honor, I think that is the practical effect of what's being requested today.[43]

In its bench ruling the Court held:  1) the payable insurance policy proceeds were not "property of the estate" entitled to protection under the automatic stay; 2) Conservator did not violate the automatic stay because the state court action was filed solely against MMIC, a non-debtor; and 3) the judgment was final and enforceable.[44]

This misguided effort to expand the protections of the automatic stay beyond what is generally permissible under the bankruptcy code is an indication that the Debtor's motivation in filing was not in good faith or for a proper purpose.

---

[40] Counsel for MMIC had admitted to being obligated to remit the proceeds  Motion to Dismiss Supplement, ECF 257, Exhibit SK-M
[41] MMIC filed a response and appeared at the hearing in support of the Debtor's position   The Court held that MMIC had no standing in the proceeding   MMIC has appealed that decision
[42] Transcript ECF 114
[43] Transcript ECF 114; Pages 55-56, Lines 22-25, 1-3
[44] Decision is currently being appealed to the District Court for the Southern District of Iowa, In Re: *Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C.*, 3:22-cv-00080-SMR-SBJ

PLAINTIFF′S APPENDIX-079

Of additional concern is the relationship between the Debtor and MMIC in the context of settlement and what has transpired in the bankruptcy filings. After careful consideration, the Court has determined that under the totality of the circumstances standard these facts are relevant to a determination of whether this case meets the element of good faith, not only in filing the petition, but in its planning and how the case is being administered. The record reflects that: 1) MMIC paid pre-petition fees to Debtor's bankruptcy professionals,[45] and it has offered to finance those fees post-petition; 2) MMIC has offered the Debtor favorable terms on its current insurance coverage when no one else would;[46] and 3) MMIC has offered to extend credit to the Debtor in exchange for a security interest in its personal property and perhaps the single most valuable asset – the potential bad faith claim against MMIC.[47] Dr. Goodman's testimony highlights the conflict related to the Conservator's demand for settlement and its implications for MMIC:

> . . . take the bad faith claim, make everything go away but then as soon as we got close to like, okay, maybe we do that, ***the hard part is is like, MMIC's representing us*** so they're paying all these things and now we're like, oh, yeah, you guys can take this bad faith claim and go against the company that's been representing us and paying for my defense . . . [48]

A question arises about whether the bankruptcy was motivated by a proper purpose or to obtain financial advantages from MMIC in exchange for filing bankruptcy to attempt to protect it from making payment under the policy.[49]

The Debtor supplies little evidence to establish its good faith. No detail is provided to demonstrate that maintaining the business as a "going concern" benefits anyone but the principals of the Debtor. The message has clearly been conveyed that the Debtor wishes to continue its business, as usual, and serve its patients and the community. Payment to creditors is an afterthought to those primary goals, at least until the appeal is decided. The record contains no evidence to establish a bankruptcy filing to reorganize or liquidate as a going concern, will in any way (large or small) maximize the estate for the benefit of creditors.

---

[45] Applications to Employ Debtor Professionals, ECF Nos 57 and 58
[46] Transcript ECF 282; Page 49, Lines 5-17; See also Motion to Obtain Secured Credit, ECF 222 Exhibit B
[47] Motion to Obtain Secured Credit, ECF 222 Exhibit B
[48] Transcript ECF 282; Page 46, Lines 12-18 (emphasis added)
[49] No satisfactory explanation has been provided to justify MMIC's involvement in the bankruptcy case   Legitimate questions and concerns arise related to MMIC's willingness to assist the Debtor in paying for its bankruptcy professionals and financing its business operations, all of which appear to fall outside the policy terms and conditions

PLAINTIFF'S APPENDIX-080

The record supports a finding that the Debtor's filing was not undertaken in good faith. Instead, the purpose integral to its decision to seek the protections afforded in bankruptcy was to serve the self-interests of the Debtor and the interests of MMIC.

### 2. 11 U.S.C. §1112(b)(4)(A)

For purposes of this subsection, the term "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[50] The Conservator's Motion raises these issues as a basis for dismissal in addition to the Debtor's bad faith.

The Debtor repeatedly informs the Court that it has and continues to explore whether it should propose reorganization or liquidation.[51] The lack of progress in making this choice is puzzling. These same two options have been available since the judgment was entered and should have been under discussion since before the petition date. Notwithstanding the passage of time and the involvement of multiple professionals, a decision has not been reached on how to advance this "relatively simple" case.[52] The Debtor has asked to further delay a decision by requesting an extension of the exclusivity period.[53] Throughout the life of the case, there has been no justification, for why reaching a decision is so difficult and elusive on the primary purpose of a chapter 11 bankruptcy case: the plan.

The Debtor's objection infers that it is inappropriate to predict the outcome of a plan that has yet to be filed. Not only does this argument render application of § 1112(b)(4)(A) superfluous, but it also is unsupported by any legal analysis.[54] Based upon the bankruptcy code and the Debtor's schedules it is not difficult to surmise that confirmation of a plan of reorganization, or a liquidating plan, under the requirements of §1129 is unlikely. Under the circumstances of this case, the size of the Conservator's claim renders the possibility of reorganization unreasonable, if not entirely, impossible. One court has addressed the eventual outcome when one large creditor holds the majority of the total debt owed.

---

[50] *In re Miell*, 419 B R 357, 366 (Bankr N D Iowa 2009)
[51] Transcript ECF 282; Page 125, Lines 2-7
[52] Transcript, ECF 114; Page 12, Line 11
[53] Motion to Extend Chapter 11 Exclusivity Period, ECF 251
[54] *In re Woodbrook Assocs.*, 19 F 3d 312, 317 (7th Cir 1994) ("A Chapter 11 case can be dismissed at any time Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired Creditors, likewise, need not incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless ") (internal citations omitted); see also *Loop Corp. v. United States Tr.*, 379 F 3d 511, 519 (8th Cir 2004)

PLAINTIFF'S APPENDIX-081

> Given the economic dominance of Albertsons' claim, there appears to be no opportunity for Paolini to craft a plan of reorganization with an accepting impaired class, which precludes any possibility of this Court confirming a plan of organization for Paolini over the objection of Albertsons. As such, Paolini's efforts to reorganize under Chapter 11 of the Bankruptcy Code given his present composition of creditors is doomed to failure. With the certainty of this fate, it is pointless to attempt confirmation of the existing Plan and this Court can now conclude that the reorganization attempts of Paolini are futile.[55]

The above example, in the context of this case, serves to predict that any plan proposed by the Debtor would not meet its goal of being of benefit to all of its creditors. The most basic understanding of any plan that could be drafted results in the Conservator being entitled to nearly all proceeds. Dr. Goodman testified that the Debtor's physical assets are worth $30,000.[56] Using the value of its judgment, the Conservator, which has a claim making up 99.9% of the total creditor claims would be entitled to a distribution of those funds in the amount of approximately $29,900. The remaining creditors would be entitled to share $100 among their total claims. This same mathematical proportion results with any chosen value.

The payment scenario worsens for the creditors when the loan from MMIC to the Debtor is considered. MMIC provided $75,000 to the bankruptcy estate that is secured by its personal property and must be repaid before any distribution to secured creditors from the liquidated assets.[57]

Preserving any value of the Debtor through liquidation as a going concern is also problematic in the implementation. To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy. "Two empirically based economic assumptions underlie the attempt to preserve the value of a failing company: (1) orderly liquidation is likely to produce more value--or to avoid more loss--than piecemeal liquidation; and (2) going-concern value is likely to be higher than liquidation value."[58]

Under the current scenario, the Debtor has offered no credible evidence that its plan to sell the business as a going concern will maximize the value of the estate. No detail has been supplied as to how the Debtor intends to meet the goal of maximizing the value of its estate. Even if the

---

[55] *In re Paolini*, 312 B R 295, 315 (Bankr E D Va 2004)
[56] Transcript ECF 282; Page 106, Lines 16-19
[57] Order on Motion to Obtain Secured Credit, ECF 233
[58] Elizabeth Warren, Bankruptcy Policymaking In an Imperfect World, 92 MICH L REV 336, 350 (1993)

9

Debtor could provide convincing scenarios that it could obtain confirmation of a plan, or liquidation would somehow increase the amount of proceeds available to creditors, the continuing delay and administrative expenses involved in achieving this outcome would likely result in less proceeds to distribute to creditors, not more.

### 3. Two Party Dispute

"Petitions in bankruptcy arising out of a two-party dispute do not per se constitute a bad-faith filing by the debtors."[59]  However, such a circumstance is a relevant factor under the totality of the circumstances.[60]  "[W]here a debtor's reorganization effort involves essentially a two-party dispute which can be resolved in state court, and the filing for relief under Chapter 11 is intended to frustrate or delay the legitimate efforts of creditors to enforce their rights against the debtor, dismissal for cause is warranted." [61]  Both the Debtor and MMIC contend that even if there is a two-party dispute it is between MMIC and the Conservator.[62]  As noted above, actions undertaken by the Debtor have attempted to frustrate or delay the Conservator's attempts to collect the judgment against its assets and from the insurance proceeds under the policy issued by MMIC. MMIC's involvement in this contested matter and the parties' identical argument on this issue are curious.  The evidence is sufficient to support a conclusion that the interests and goals of the Debtor and MMIC are fundamentally aligned against the Conservator which realistically amounts to a two-sided dispute that can and should be resolved in state court.

If a debtor "faces no threat from any of its other purported creditors, [its] financial problems are a two-party dispute suitable for resolution" which supports a finding of bad faith.[63]  Of importance, other than the judgment, the schedules do not include the requested detail about when specific obligations were incurred with the listed creditors which prevents any analysis as to the age of the listed debts.  Dr. Goodman's testimony was that on the petition date no threat of collection enforcement had been undertaken by its other creditors.[64]  Accordingly, it is more than possible that the debts owed were either within normal payment terms or slightly overdue.  There is no indication that long term defaults existed on vendor payments.

---

[59] *In re Stolrow's, Inc.*, 84 B R  167, 171 (B A P  9th Cir  1988)
[60] See *In re Crown Fin.*, 183 B R  719 (Bankr  M D N C  1995)
[61] *Id.* at 723
[62] Transcript ECF 282; Page 129-130, Lines 23-25 and 1; See also Debtor's Objection and MMIC Response to Motion to Dismiss, ECF Nos  263 and 268
[63] *In re State St. Houses, Inc.*, 305 B R  738, 742 (S D  Fla  2003), aff'd, 356 F 3d 1345 (11th Cir  2004)
[64] Transcript ECF 282; Page 31, Lines 5-18

PLAINTIFF′S APPENDIX-083

Courts have also relied upon "[t]he lack of a meaningful number of unsecured creditors in relation to the indebtedness owed to one major creditor [as] a factor in deciding whether the Chapter 11 case was filed in bad faith."[65]  In this case, the Debtor's schedules reflect that, other than the Conservator, it owes relatively modest obligations to a small number of creditors.  Both Schedule D[66] and Dr. Goodman's Affidavit[67] confirm that the Debtor owed no secured debt on the petition date.  Schedule E/F indicates tax claims in the amount of $20,321.87 and unsecured creditor obligations (excluding Conservator's judgment) totaling $190,429.  A simple calculation utilizing the obligation amounts reported by the Debtor reflect that 99.9% of its scheduled debt is owed to the Conservator.

Under the totality of the circumstances this factor weighs in favor of a determination that the Debtor's bankruptcy filing lacked good faith.

### 4.  Other Factors

Having reviewed these factors in the context of the record the Court concludes neither of the following allegations raised by Conservator weigh in favor of Debtor's bad faith.

#### a.  Appeal Bond

Courts are divided in whether filing bankruptcy instead of obtaining a supersedeas bond amounts to a lack of good faith.  Cases that resulted in dismissal include:  *In re Karum Group Inc.*, 66 B.R. 436 (Bankr. W. D. Wash.1986); *In re Wally Findlay Galleries, Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984); *In re Smith*, 58 B.R. 448 (Bankr. W.D. Ky. 1986).  "The cases granting dismissal on bad faith grounds, with the exception of *Karum*, dealt with smaller judgments where the debtor had the ability to satisfy the judgment without losing the ability to stay in business."[68]  Other courts have concluded that dismissal was not warranted where larger judgments which would result in a debtor's inability to operate would be at risk.[69]

Dr. Goodman testified that the Debtor could not obtain a bond in the amount required under state law.[70]  Therefore, when the sheriff had been directed to move forward under an execution

---

[65] *In re Lezdey*, 332 B.R. 217, 222 (Bankr. M.D. Fla. 2005)
[66] Debtor's Schedules, ECF 147
[67] Declaration of Dr. Jill C. Goodman, ECF 45
[68] *In re Boynton*, 184 B.R. 580, 582 (Bankr. S.D. Cal. 1995)
[69] *In re Alton Tel. Printing Co.*, 14 B.R. 238 (Bankr. S.D. Ill. 1981); *In re McLaury*, 25 B.R. 30 (Bankr. N.D. Tex. 1982); *In re Corey*, 46 B.R. 31 (Bankr. D. Haw. 1984)
[70] Transcript ECF 282; Page 40, Lines 5-11

PLAINTIFF'S APPENDIX-084

against the Debtor it believed that all of its equipment and supplies would be immediately seized affecting its ability to operate and would result in the closure of the clinic.

Standing alone, the failure to post a bond in the state court action does not rise to the level of bad faith under the circumstances of this case.

### b. Financial Condition and Insolvency

The Conservator asserts that the Debtor's business was financial healthy because it was conducting business operations and regularly paying its bills at the time it filed its petition in bankruptcy, which constitutes bad faith.

The Court has reviewed the record before it and concludes that evidence as to the financial condition or solvency of the Debtor is not necessary to reach a conclusion under the totality of the circumstances. The amount of the judgment and Dr. Goodman's testimony serves to establish that the Debtor did not have the ability to pay its outstanding obligations on the date of filing.

Having considered the record, further hearing or evidence on the issues of financial condition or insolvency is unnecessary because it would not result in a different outcome on the Motion to Dismiss.

### CONCLUSION

The burden to show cause for dismissal of a Chapter 11 bankruptcy rests on the movant by a preponderance of the evidence.[71] Once a movant has made a *prima facie* showing of bad faith, the burden shifts to the debtor to establish that the bankruptcy was filed in good faith.[72]

Having reviewed all the evidence and the record the Court concludes that the Conservator has established a prima facie case for dismissal.[73] Due to a lack of evidence and legal authority to support its arguments, the Debtor has failed to meet its burden to establish that its bankruptcy was filed in good faith, that the value of its estate is not diminishing and that it can obtain confirmation of a plan. Accordingly, cause exists to dismiss or convert the Debtor's bankruptcy case and the Court is mandated to select one of these options.[74]

---

[71] *In re Muskogee Envtl. Conservation Co.*, 236 B R at 59
[72] See, e g , *In re Nichols*, 223 B R 353, 355 (Bankr N D Okla 1998) (citing *In the Matter of Namer*, 141 B R 603, 606 (Bankr E D La 1992))
[73] "Sufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it may later be proved to be untrue " *Prima Facie*, Black's Law Dictionary (11th ed 2019)
[74] *In re McQuillen Place Co., LLC*, 609 B R 823, 829 (Bankr N D Iowa 2019) (quoting *In re Miell*, 419 B R at 366)

PLAINTIFF'S APPENDIX-085

Converting the case would accrue additional administrative and professional fees beyond those incurred in during the chapter 11 proceeding.  The Debtor's personal property is subject to a security interest held by MMIC and the insurance policy proceeds cannot be used to pay creditors other than the Conservator.  The value or ability to pursue any contingent claims in a chapter 7 case are not a predictable source of funds to pay unsecured creditors.  Allowing a chapter 7 case to proceed in an effort to pay obligations owing to a small number of unsecured creditors which hold insubstantial claims in comparison to the Conservator's is not in their best interests.  Upon dismissal, those creditors will have independent remedies they may elect to exercise, if necessary, to collect their respective outstanding obligations resulting in the possibility of a better outcome for them than converting to a chapter 7 case.

**IT HEREBY ORDERED:**

1.  The Motion to Dismiss is granted;

2.  The Objection to the Motion to Dismiss is overruled;

3.  The case is dismissed, and;

4.  The hearing scheduled for April 5, 2023 is canceled.

/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge

Parties receiving this Memorandum of Decision from the Clerk of Court:
Everyone in this Chapter Case

13

PLAINTIFF'S APPENDIX-086

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

In the Matter of:

Obstetric and Gynecologic Associates                    Case No.  22-01174-als11
of Iowa City and Coralville, P.C.

     Debtor(s)

**Motion to Stay Pending Appeal - Expedited Consideration Requested (#303)
Ex Parte Application for Expedited Hearing (#304)**

**ORDER**
(date entered on docket: April 3, 2023)

Having reviewed the documents filed at docket numbers 303 and 304 it is hereby **ORDERED:**

1. The request for stay pending appeal is granted pending hearing and further Court Order related to the pending Motion.

2. The Conservator is stayed from undertaking any collection efforts against the assets of the Debtor.

3. The Debtor is stayed from taking any action to dispose of, securitize, monetize or assign any causes of action it may have, including, but not limited to any bad faith claims involving MMIC or legal malpractice claims against any counsel.

4. A hearing will be conducted on May 8, 2023 at 1:30 p.m. and scheduled by separate notice.

                              /s/ Anita L. Shodeen
                              Anita L. Shodeen
                              U.S. Bankruptcy Judge

Parties receiving this order from the Clerk of Court:
☒ Electronic Filers in this Chapter Case
☐ Everyone in this Chapter Case
☐ Others:



**MARK D. MALLOY**

ATTORNEY AT LAW

MDM@MTFN.COM

April 7, 2023

**_VIA FEDERAL EXPRESS_**

Matthew M. Patterson
Beam Legal Team LLC
954 W. Washington Boulevard
Suite 215
Chicago, IL  60607

        RE:      _Kromphardt v. OBGYN Associates, et al_
                 Case No. LACV 081421

Dear Mr. Patterson:

     Enclosed please find Check No. 100029172 in payment of the combined limits of the MMIC Policy.  As we have previously stated, by acceptance of this check, you and your clients acknowledge that MMIC reserves all contractual, common law and statutory rights under Iowa law, including but not limited to the right of reimbursement under Iowa Code § 625A.15 and any other provision of Iowa Code.  As noted in my prior conversations with Attorney Fieger and you, MMIC expects that you and your clients will repay this amount in the event of a successful appeal of the underlying action in _S.K., et al. v. Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C.,_ Iowa Supreme Court Case No. 22-1317.  You have previously indicated that you would not do that, and thus MMIC reserves all rights.

     If you have any questions or concerns, please feel free to contact me.


                Very truly yours,

                Mark D. Malloy


cc:    Geoffrey N. Fieger (via email - g.fieger@fiegerlaw.com)
       Frederick W. James (via email – FREDERICK@JAMESLAWFIRM.COM)
       Robert Gainer (via email – rgailner@cutlerfirm.com)
       Ryan Koopmans (via email – ryan@koopsmangroup.com)
       Thomas T. Tarbox, Esq. (via email – TOM@THOMASTARBOXLAW.COM)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 3:22-cv-00080-SMR-SBJ |
| | ) | Consolidated Case No. 3:22-cv-00084- |
| OBSTETRIC AND GYNECOLOGIC | ) | SHL-SBJ |
| ASSOCIATES OF IOWA CITY AND | ) | |
| CORALVILLE, P.C., | ) | ORDER GRANTING MOTION TO |
| | ) | VOLUNTARILY DISMISS |
| Debtor/Appellant. | ) | |
| | ) | |
| MMIC INSURANCE, INC. | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| THOMAS TARBOX, Conservator for S.K., | ) | |
| | ) | |
| Appellee. | ) | |

Before the Court is a Motion to Voluntarily Dismiss filed by Appellant Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C. ("Debtor"). It seeks to dismiss its appeal of an order entered by the United States Bankruptcy Court for the Southern District of Iowa entered on November 29, 2022 denying a motion to enforce an automatic stay. [ECF No. 41]. Debtor's appeal was consolidated with a related appeal filed on December 16, 2022. *See In re Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C*, No. 3:22-cv-00084-SHL-SBJ, ECF No. 1 (S.D. Iowa Dec. 16, 2022).

The Motion is brought pursuant to Bankruptcy Rule 8023(b) which provides that an appeal may be voluntarily dismissed by an appellant "on terms agreed to by the parties or fixed by the district court." Fed. R. Bankr. P. 8023(b). Debtor represents that it has decided to dismiss its appeal for business reasons and in exercise of its business judgment and asks the Court to dismiss the appeal without prejudice on that basis. Appellant MMIC Insurance, Inc. filed a response requesting that the Court vacate the order of the Bankruptcy Court along with dismissal of the

1

appeal.  [ECF No. 42].  Appellee Thomas Tarbox objects to MMIC's request for vacatur, arguing such action is improper as an equitable remedy because the mootness was not by "happenstance" but "MMIC had a lot do with it."  [ECF No. 43 at 2].  According to Tarbox, the appeal is moot because "the bankruptcy court dismissed the underlying bankruptcy [action], and the bankruptcy court did so because the Debtor filed the action in bad faith to protect MMIC."  *Id*.

The motion to dismiss the appeal is GRANTED.  MMIC's request to vacate the bankruptcy court's ruling is denied.  MMIC has not demonstrated its entitlement to the equitable remedy of vacatur.  *See Moore v. Thurston*, 928 F.3d 753, 758 (8th Cir. 2019) (explaining that "vacatur is an equitable remedy, not an automatic right").

IT IS SO ORDERED.

Dated this 23rd day of May, 2023.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT

-2-

PLAINTIFF'S APPENDIX-090

  

KHAIL PARRIS · ERIC WILSON · NATHAN BRUNER

## $9,700,000 For Non-Surgical 2MM Disc Herniation - Khail Parris, Eric Wilson, & Nathan Bruner

APRIL 4, 2022 12:30 PM   |   f  𝕏  in

On October 21, 2016, defendant Banda stopped to eat lunch with some coworkers when he gets a call that he needed to get back to the company yard because an employee passed out...

W A T C H  ⏵ N   D E M A N D

R E F E R   A   C A S E  ⊕

 

GEOFFREY FIEGER · NICK ROWLEY

## Kromphardt V. Mercy Hospital - $97,400,000 Med Mal/Birth Trauma Verdict - Geoffrey Fieger, Webinar Hosted By Nick Rowley

MARCH 30, 2022 12:30 PM   |   f  𝕏  in

On March 21, 2022, a Johnson County Iowa jury unanimously found in favor of minor-Plaintiff, Scotty, awarding over $97.4 million dollars in damages in a birth trauma medical m...

W A T C H  ⏵ N   D E M A N D

R E F E R   A   C A S E  ⊕

PLAINTIFF'S APPENDIX-091

**Subject:** Re: Kromphardt Mediation - June 1, 2023
**Date:** Friday, June 2, 2023 at 9:17:14 AM Central Daylight Time
**From:** Nicholas Rowley
**To:** Mark D. Malloy
**CC:** Dominic Pechota, Daniel Bidegaray, Mike Abourezk, Jack Beam, Keri Paralegal, Matt Patterson, Robert Gainer, Ryan Koopmans, Jeanne Yoo, Brittany Votruba, Frederick James, Adam Zenor, Nicholas Rowley

Mark,

Thank you for sending this.  I have huge respect and admiration for Judge Bennett.  It does seem that there was a lot of confusion yesterday.  I'll tell you one thing, I do not get in my jet and fly to mediations to attend in person.  I don't attend mediations in person.  I showed up here for the doctors and to show that I am serious about resolving this case and serious about going the distance.  I expected this mediation to be a waste of time and did not believe MMIC was coming to the table with any real money because that is how I have seen MMIC behave over the past 15 years.  So, I did not leave surprised.  But, I did leave with my clients knowing that I am there for them and that MMIC was not there to take things seriously.  I left with a lot of progress being made between my clients and the Plaintiff and it being pretty clear that we are Iowans who need to be on the same team to protect everybody from further harm by the out of State insurance corporation MMIC.

Regarding what transpired, Judge Bennett spent about 15 minutes in our room at the very beginning, right after I shook your hands and said hello first thing in the morning.  After that Judge Bennett did not come back until the very end.  We were never told mediation was over and we did not leave.  I went and found Judge Bennett and spent approximately a half hour in the room with the Plaintiffs discussing how we could work together and dismiss the appeal and move forward with an action together against MMIC/Constellation/Defense Counsel.  That is what we are working towards, just making sure we do it the right way.  I do not think we all agree that the case is going to end up with a new trial.  I think we believe there is a more likely than not chance that it does so we had our discussions with that as a foundational premise of our discussions.  The problem with a new trial is that

EXHIBIT A

PLAINTIFF'S APPENDIX-092

it puts the doctors through hell all over again.  I do not believe this is a defensible case at trial, which is consistent with what MMIC's experts told MMIC at the beginning before MMIC went expert shopping.  I believe we have a perfected bad faith, breach of fiduciary duty, fraud, and punitive damages claim that I can pursue on behalf of the individual doctors and we are preparing that lawsuit.  I guarantee one thing and one thing only, which is that it will be the most clear and egregious complaint filed against an insurer in Iowa against an insurer in Iowa history and that I will get in front of a jury.  A new trial causes further harm to the doctors.  MMIC should have got a release before paying the $12 million.  We were told that MMIC offered the Plaintiff $6 million of the $12 million MMIC has paid and that MMIC is saying it is going to get it's $12 million back.  This is a "non offer" as far as we are concerned.  When it comes to the bad faith claim you are talking to me.  When it comes to the Judgment you are talking to the Plaintiffs.  Know this though, my clients will not independently settle any bad faith claim unless the Plaintiff is taken care of and paid to their satisfaction because failing to settle with the Plaintiff keeps this litigation going and causes further harm to my clients.  I have had this case reviewed by many and I mean many experts in bad faith litigation.  I have been told over and over again that a bad faith does not get this good.  I am confident that we will win hundreds of millions and potentially a billion dollars against MMIC/Constellation/Defense counsel.  I am happy to talk but MMIC needs it's reinsurance involved and need to be prepared to take care of that little brain damaged boy and to make things right with it's insureds whose lives have been devastated by MMIC's decisions in this case which go beyond bad faith.  If you think we should all get on a zoom call keeping this within the mediation privilege I am happy to do so.  I do believe that the optics of this case will be changing very soon and that after the unprecedented motions are filed that we intend to file, that the chances of MMIC getting a new trial will go down to less than 10%. My clients do not want a new trial.  They have no comfort letter from MMIC.  Things could very well end up worse for them.

Pardon any typos,

Respectfully,

EXHIBIT A

PLAINTIFF'S APPENDIX-093

Nick Rowley

On Jun 2, 2023, at 4:45 AM, Mark D. Malloy <mdm@mtfn.com> wrote:

***SETTLEMENT COMMUNICATION SUBJECT TO FRCP 408***

All:

Adam Zenor and I spoke with Fred James after the mediation yesterday.  In addition, I spoke with Matt Patterson by phone last night.  There appear to have been severe miscommunications in yesterday's mediation, and I wanted to provide everyone the perspective of what went on in MMIC's room.  In our view, the mediation lasted approximately 6 ½ hours, starting at 9:00 and ending approximately 3:30 p.m.  MMIC spent approximately 45 minutes to an hour with Judge Bennett.  During that time, two demands were communicated to us – a ▆▆▆ demand from Plaintiff, and a demand from the doctors that MMIC make an initial offer of ▆▆▆ The only other information provided was that all parties – Plaintiff, MMIC, and the doctors – felt that the appeal would be successful.  Given that information, we directed Judge Bennett to ask two questions:

1. If we all agree on the strength of the appeal, what was the basis for the ▆▆▆ demand?
2. As to the bad faith claim, who are we negotiating with – the doctors or the Plaintiff?

We never received an answer to either of those questions.  We next spoke with Judge Bennett over two hours later, at approximately 3:10 p.m.  We were told that our prior offer of ▆▆▆ was communicated to Plaintiffs, and that "the mediation was over."  We were further told that Judge Bennett had no answers to the above questions, and that he had spent two hours speaking with Mr. Rowley but received no response to our inquiries.  We questioned Judge Bennett why any offer was communicated, as we did not authorize any offer to be made, but rather asked that he get answers to the above questions.  We also asked if he had told the Plaintiffs to leave the mediation.  After several minutes, Judge Bennett informed us that Plaintiffs had, in fact, left the mediation.  He then stated "I really ▆▆▆ up."

We learned later that, from both Fred and Judge Bennett, that the mediation was communicated as "over" to Plaintiffs approximately two hours before he entered our room, that Plaintiffs had been told they could leave the mediation and had in fact left the mediation at that time, and that Mr. Rowley had spent the past hour in Plaintiffs room discussing "next steps" in the litigation.  While Adam was speaking to Fred in the front of the hotel, Judge Bennett approached him again and apologized for the events of the day.

EXHIBIT A

PLAINTIFF'S APPENDIX-094

As I told Matt last night, I think this was an unfortunate missed opportunity to discuss reasonable resolution of the respective claims.  I just wanted everyone to get a sense of what occurred in our room, as we were truly shocked to learn that the mediation was over, that a settlement offer was extended to Plaintiffs and that we had no answers to the questions for which we sought answers.

If anyone wants to discuss this matter further, feel free to give me a call.

**Mark D. Malloy** | Attorney at Law
<image001.jpg>
111 EAST KILBOURN AVENUE, 19th FLOOR
MILWAUKEE, WI 53202
**P** 414.273.1300 | **M** 414.704.0814 | **F** 414.273.5840
**website** | **bio** | **vCard** | **LinkedIn** | **map** | **email**

EXHIBIT A

PLAINTIFF'S APPENDIX-095

# Return of Service

JOHNSON COUNTY SHERIFFS OFFICE • PO BOX 2540, 511 S CAPITOL ST, IOWA CITY, IA 52244-2540 • (319) 356-6030

## IN THE IOWA DISTRICT COURT FOR JOHNSON COUNTY

| | | |
|---|---|---|
| **STATE OF IOWA** | ) | |
| | ) **SS** | Docket No 23-02072 |
| **JOHNSON COUNTY** | ) | Court No LACV081421 |
| | | Reference No |
| | | Received 06/05/2023 |

CREDITOR : S.K. THROUGH TARBOX, THOMAS T.-CONSERVATOR

vs.

DEBTOR : OBSTETRIC AND GYNECOLOGICAL ASSOCIATES OF IC &CORALVILLE, P.C.

| Requestor(s) | Address | Phone |
|---|---|---|
| PATTERSON,MATTHEW M. | 954 W. WASHINGTON BLVD, STE 215, CHICAGO, IL 60607 | (312) 733-0930 |

MAKE DEMAND FOR PAYMENT, GARNISH, EXECUTE AND LEVY ALL ASSETS, GARNISH, EXECUTE AND LEVY ALL ADDITIONAL CHOSE/CAUSES OF ACTION, MAKE A DEMAND FOR INFORMATION REGARDING ANY AND ALL BANK ACCOUNTS, ACCOUNTS RECEIVABLE, MEDICARE/MEDICAID ACCOUNT DUE, DEBTOR ACCOUNTS, LIST OF DEBTORS, AND/OR OTHER ASSETS

### SERVED PARTY

| | | |
|---|---|---|
| Name | OBSTETRIC AND GYNECOLOGICAL ASSOCIATES OF IC &CORALVILLE, | Party Type GARNISHEE |
| Address | 2769 HEARTLAND DR STE 201, CORALVILLE, IA, 52241 | |

### SERVICE INFORMATION

| Document(s) | |
|---|---|
| GENERAL EXECUTION | |
| INTERROGATORIES | |
| OTHER | |

| | | | |
|---|---|---|---|
| Type of Service | BUSINESS-OFFICER/OWNER/MANAGER | Status | SERVED |
| By Serving | TONI ROEMERMAN - AND DOCTOR WENZEL | Race | |
| Relationship | DIRECTOR OF CLINICAL SERVICES & HR - AND DR WENZEL | Sex | |
| Location | 2769 HEARTLAND DRIVE CORALVILLE IOWA | Birth Date | |
| Comments | ATTACHED ARE THE QUESTION I READ AND EXECUTED ON AT THE CLINIC. DOC 147 WAS PROVIDED (EXPLAINED 74.1 AND 74.2) TO THE CLINIC ALONG WITH THE GENERL EXECUTION EFILED 6/2/2023. THIS WAS ALSO RECORDED ON BODY CAMERA. THE OB CLINIC ALSO FACETIMED WITH THEIR ATTORNEY WHO I SPOKE WITH AND EXPLINED WHY I WAS THERE (NICK ROWLEY) | | |

| | Date | Time | Officer | Notes |
|---|---|---|---|---|
| Service ▶ | 06/07/2023 | 10:20 | 5268 • DAVID BROLL | PLEASE SEE ATTACHED QUESTION THAT WERE ASKED |

I certify under penalty of perjury that the foregoing is true and correct. Brad Kunkel, Sheriff, Johnson County, Iowa

_Broll_ 52-68

Deputy Sheriff or Designee

6/7/2023
Date

PLAINTIFF'S APPENDIX-096

June 7, 2023

Case No. LACV081421

1.  Demand payment in the amount of $66,615,232.02

   Answer – Don't have it

2.  The Sheriff is executing on the assets provided to me in DOC #147 of the bankruptcy forms on page 10 specifically 74.1 and 74.2 of that document.

   I read this to them – nothing to give me

   \* This was written when I got back to the office.

3.  The Sheriff is also executing on assets in legal claim by all additional choses/causes of action that the defendant (OB Clinic) has against any individual and/or entity, including but not limited to any choses/causes of action the P.C has for legal malpractice of fraud against Shuttleworth & Ingersoll PLC, Lederer Weston and Craig PLC, Levenfeld Pearlstein LLC and/or Neymaster Goode, PC.  I read this to them – nothing to give me

   \* This was written when I got back to the office

4.  Does this office (OB Clinic) have any different or new bank accounts at this present time since it has been acquired and/or affiliated with Mercy.

   Answer – No new accounts

   Deputy – David Bell

   Clinic Staff – refused to sign

PLAINTIFF'S APPENDIX-097

| | | |
|---|---|---|
| Sheriff Werner: | 00:01 | ... yeah. |
| Sheriff Broll: | 00:01 | [inaudible 00:00:01]. |
| Sheriff Werner: | 00:12 | My biggest problem with bringing it- |
| Sheriff Broll: | 00:13 | That you need to turn it- |
| Sheriff Werner: | 00:13 | ... I forget to turn it off. (laughs). |
| Speaker X: | 00:15 | Can you help us [inaudible 00:00:21]? |
| | 00:21 | You'll have to see [inaudible 00:00:32]. |
| Sheriff Broll: | 00:37 | Ah, excuse me. |
| Receptionist: | 00:38 | Yes, [inaudible 00:00:38]? |
| Sheriff Broll: | 00:38 | Ah, Lieutenant Broll with [inaudible 00:00:40] Sheriff's Office. Is there a supervisor working? |
| Receptionist: | 00:42 | [inaudible 00:00:44]. |
| Sheriff Werner: | 00:44 | Actually, it's Toni we need to speak with. |
| Sheriff Broll: | 00:45 | Is it Toni? |
| Receptionist: | 00:45 | Yeah, I'll get Toni. |
| Speaker X: | 00:45 | Maybe just a s- s- salad. |
| Sheriff Werner: | 00:45 | I've still got the card. |
| Sheriff Broll: | 00:45 | Oh, yeah. |
| Speaker X: | 00:45 | So I'm gonna check [inaudible 00:00:55]. Okay. |
| Sheriff Werner: | 00:45 | God-damn it. Why do I have to sit and talk with these guys again? |
| Sheriff Broll: | 00:45 | Yeah. |
| Speaker X: | 00:45 | [inaudible 00:01:13]. [inaudible 00:01:15]. July the 7th [inaudible 00:01:16] 25 or 11th. [inaudible 00:01:24]. [inaudible 00:01:26]. [inaudible 00:01:29]. 2297. [inaudible 00:01:34]. [inaudible 00:01:36] 25 [inaudible 00:01:37]. |

PLAINTIFF'S APPENDIX-098

| Sheriff Broll: | 00:45 | She's coming. |
|---|---|---|
| Sheriff Werner: | 00:45 | Oh, okay. |
| Speaker X: | 00:45 | Yeah, okay. |
| Sheriff Broll: | 00:45 | Excuse me. |
| Sheriff Werner: | 00:45 | Excuse me. |
| Speaker X: | 00:45 | Okay. |
| Sheriff Broll: | 00:45 | Hi. |
| Sheriff Werner: | 01:50 | Thank you. |
| Receptionist: | 01:50 | You're welcome. |
| Sheriff Broll: | 01:52 | I think we spoke last time, didn't we? |
| Toni Roemerman: | 01:53 | We did, yeah. |
| Sheriff Broll: | 01:55 | How are you doing? |
| Toni Roemerman: | 01:56 | I'm good. |
| Sheriff Broll: | 01:56 | Since then I guess. |
| Toni Roemerman: | 01:58 | Yeah. (laughs). |
| Sheriff Werner: | 01:59 | Hello again. |
| Toni Roemerman: | 02:01 | Uh-oh. |
| Sheriff Werner: | 02:01 | (laughs). |
| Sheriff Broll: | 02:01 | What's wrong? |
| Toni Roemerman: | 02:01 | Nothing. |
| Sheriff Broll: | 02:01 | [inaudible 00:02:02]. |
| Toni Roemerman: | 02:02 | Yeah, I'm gonna grab one of the doctors real quick. |
| Sheriff Broll: | 02:04 | Okay. |

PLAINTIFF'S APPENDIX-099

| Sheriff Werner: | 02:06 | Okay, perfect. |
| Speaker X: | 02:18 | Floor one. |
| | 02:18 | [inaudible 00:02:24]. |
| Sheriff Broll: | 02:35 | I hope it's not the doctor that delivered my kid. |
| Sheriff Werner: | 02:42 | (Laughs). It won't matter. |
| Sheriff Broll: | 02:43 | No, it won't, but still. This probably wasn't around when you had kids, this clinic? |
| Sheriff Werner: | 02:53 | No. I don't think so. |
| Speaker X: | 02:53 | Yes. [inaudible 00:03:00] right away. |
| Sheriff Werner: | 03:02 | I've actually delivered one. |
| Dr. Wenzel: | 03:03 | Hi. |
| Sheriff Broll: | 03:03 | Here? Hi. |
| Sheriff Werner: | 03:07 | Hey. |
| Sheriff Broll: | 03:07 | How are you? |
| Dr. Wenzel: | 03:08 | I'm Doctor Wenzel. What's going on? |
| Sheriff Broll: | 03:09 | Nice to meet you? |
| Sheriff Werner: | 03:10 | Doc? |
| Sheriff Broll: | 03:10 | Ah, Lieutenant Broll with the sheriff's office. |
| Dr. Wenzel: | 03:12 | Uh-huh. |
| Sheriff Broll: | 03:12 | Um, so a new general execution was issues by the courts. So I'm here to just do my job. |
| Dr. Wenzel: | 03:21 | So what, what does that entail? 'Cause we were under the, the understanding this wasn't gonna happen again. |
| Sheriff Broll: | 03:27 | Uh- |
| Dr. Wenzel: | 03:28 | We're closing our business because of this, which is super-sad. |

PLAINTIFF'S APPENDIX-100

| | | |
|---|---|---|
| Sheriff Werner: | 03:31 | Yeah. |
| Sheriff Broll: | 03:31 | Mmm, and I- |
| Dr. Wenzel: | 03:31 | You know? |
| Sheriff Werner: | 03:31 | Yeah. |
| Sheriff Broll: | 03:32 | ... I think you delivered my child. |
| Dr. Wenzel: | 03:33 | Yeah, there you go. |
| Sheriff Broll: | 03:33 | (laughs). |
| Dr. Wenzel: | 03:33 | I mean, we do some good things, right? |
| Sheriff Broll: | 03:33 | (laughs). Yeah, yes. |
| Dr. Wenzel: | 03:33 | Yeah. |
| Sheriff Werner: | 03:36 | Yeah. |
| Dr. Wenzel: | 03:37 | We do a lot of good things. |
| Sheriff Werner: | 03:38 | We're, we're stuck in the middle. |
| Dr. Wenzel: | 03:39 | I know, but like- |
| Sheriff Broll: | 03:40 | Yeah. |
| Sheriff Werner: | 03:40 | So- |
| Dr. Wenzel: | 03:40 | ... what are you supposed to take? |
| Sheriff Broll: | 03:42 | So, so today- |
| Toni Roemerman: | 03:43 | Let me shut this door. |
| Sheriff Broll: | 03:44 | Yeah, do you mind to close it? |
| Dr. Wenzel: | 03:44 | Mmm. |
| Sheriff Broll: | 03:46 | So, um, today, I'm, I'm, here for four quick and easy things. Um, first and foremost, is I'm here to demand payment of the $6 million, 650- |

PLAINTIFF'S APPENDIX-101

| | | |
|---|---|---|
| Dr. Wenzel: | 04:03 | Do you have the checkbook? |
| Toni Roemerman: | 04:05 | Yeah. |
| Dr. Wenzel: | 04:05 | (laughs). |
| Toni Roemerman: | 04:05 | Yeah. |
| Sheriff Broll: | 04:05 | (laughs) ... thousand- |
| Dr. Wenzel: | 04:05 | It's back in my office. |
| Sheriff Werner: | 04:05 | She'll write a check. |
| Toni Roemerman: | 04:05 | Yeah. |
| Sheriff Broll: | 04:05 | See? |
| Sheriff Werner: | 04:05 | (laughs). |
| Toni Roemerman: | 04:05 | Yeah. |
| Dr. Wenzel: | 04:05 | Yeah, they were hiding it in my office. |
| Sheriff Broll: | 04:07 | Yeah. |
| Toni Roemerman: | 04:07 | Yeah. |
| Sheriff Werner: | 04:07 | (laughs). |
| Dr. Wenzel: | 04:07 | (laughs). |
| Sheriff Broll: | 04:09 | So, so I'm here to demand that payment. |
| Dr. Wenzel: | 04:12 | Okay. |
| Sheriff Broll: | 04:12 | I'm s- I'm assuming you- |
| Dr. Wenzel: | 04:12 | We don't have it to give. |
| Toni Roemerman: | 04:13 | We don't have it. |
| Sheriff Broll: | 04:14 | ... you can't have that. |
| Dr. Wenzel: | 04:14 | That's right. Yeah. |

PLAINTIFF'S APPENDIX-102

| | | |
|---|---|---|
| Sheriff Werner: | 04:15 | We expected that. (laughs). |
| Sheriff Broll: | 04:15 | Yeah. |
| Sheriff Werner: | 04:18 | Actually, if you had written me a check, you'd be picking me up off the floor. |
| Dr. Wenzel: | 04:21 | (laughs). |
| Sheriff Werner: | 04:21 | (laughs). |
| Dr. Wenzel: | 04:21 | Right. |
| Sheriff Broll: | 04:23 | Um, the 2nd thing is more or less, the next two are, are just gonna be two pretty simple easy things. Um, the sheriff is executing on the ass- assets provided to me in Document N47, of the bankruptcy forms on page 10, specifically 74.1 and 74.2 of the documents. |
| Dr. Wenzel: | 04:46 | Do you know what that means? |
| Toni Roemerman: | 04:47 | What does that mean? |
| Sheriff Broll: | 04:52 | That would be these two documents are the causes of action. I believe they are lawsuits. |
| Dr. Wenzel: | 05:00 | Mm-hmm. This is so stupid annoying. |
| Toni Roemerman: | 05:14 | Mm-hmm. |
| Dr. Wenzel: | 05:15 | They're trying to get back their claim. |
| Toni Roemerman: | 05:15 | Mm-hmm. |
| Sheriff Broll: | 05:15 | Again- |
| Toni Roemerman: | 05:15 | Yeah. |
| Sheriff Broll: | 05:18 | ... we're stuck in the middle of it. |
| Dr. Wenzel: | 05:20 | I don't think we have those documents here, do we? |
| Toni Roemerman: | 05:22 | I don't have those. |
| Dr. Wenzel: | 05:23 | Yeah. |
| Sheriff Broll: | 05:24 | I, I don't think you're going to- |

PLAINTIFF'S APPENDIX-103

| Dr. Wenzel: | 05:25 | Oh yeah. |
| Sheriff Broll: | 05:25 | ... provide me with this- |
| Dr. Wenzel: | 05:30 | Right. |
| Sheriff Broll: | 05:30 | ... and my- |
| Dr. Wenzel: | 05:30 | No. |
| Sheriff Broll: | 05:30 | ... next one. Because- |
| Dr. Wenzel: | 05:30 | Right. |
| Toni Roemerman: | 05:30 | Yeah. |
| Dr. Wenzel: | 05:30 | And what's the next one? |
| Sheriff Broll: | 05:30 | This is um- |
| Dr. Wenzel: | 05:34 | Actually, I don't think we have a document on that. Yeah, I don't think- |
| Dr. Goodman: | 05:37 | Hello? |
| Dr. Wenzel: | 05:38 | So they want the bad faith claim documents. But we didn't even have those documents. |
| Sheriff Broll: | 05:42 | So this- |
| Dr. Wenzel: | 05:43 | Was the service filed? |
| Dr. Goodman: | 05:44 | Not yet. |
| Toni Roemerman: | 05:44 | Uh-uh. |
| Dr. Wenzel: | 05:44 | It hasn't even been filed, has it? |
| Sheriff Broll: | 05:45 | Yeah, this is the- |
| Dr. Goodman: | 05:45 | No. We, we don't even, like- |
| Dr. Wenzel: | 05:49 | Okay, so this is my partner who knows more about it. |
| Sheriff Broll: | 05:50 | Yep. |

PLAINTIFF'S APPENDIX-104

| | | |
|---|---|---|
| Dr. Wenzel: | 05:51 | But John- |
| Dr. Goodman: | 05:51 | Yeah, I mean, there, I mean, there is, like we don't, there's not like a document that says (laughs) there is a bad faith claim. I mean, I, that's- |
| Dr. Wenzel: | 05:59 | It's a discussion on having one- |
| Dr. Goodman: | 06:00 | ... something an attorney would be- |
| Dr. Wenzel: | 06:00 | ... but we don't have one. |
| Dr. Goodman: | 06:01 | It's just like a nebulous thing. |
| Dr. Wenzel: | 06:02 | Yeah. And there's not even a claim made yet, is there? |
| Dr. Goodman: | 06:05 | Uh-uh, there is no- |
| Dr. Wenzel: | 06:06 | Yeah, so there isn't one. |
| Dr. Goodman: | 06:07 | ... [inaudible 00:06:07] claimed or anything. |
| Sheriff Broll: | 06:08 | Okay. |
| Toni Roemerman: | 06:08 | Yeah. |
| Dr. Goodman: | 06:10 | So that's what they're there for? |
| Dr. Wenzel: | 06:12 | Well that. And what's the 4th thing? |
| Sheriff Broll: | 06:12 | Well, the- |
| Dr. Wenzel: | 06:14 | They're nice. |
| Toni Roemerman: | 06:14 | (laughs). |
| Sheriff Broll: | 06:15 | ... the (laughs). |
| Dr. Wenzel: | 06:15 | I delivered his baby. |
| Sheriff Broll: | 06:19 | Yes, I love you so. |
| Sheriff Werner: | 06:19 | (laughs). |
| Dr. Wenzel: | 06:19 | (laughs). |

PLAINTIFF'S APPENDIX-105

| Toni Roemerman: | 06:19 | (laughs). |
|---|---|---|
| Sheriff Broll: | 06:19 | Um- |
| Dr. Wenzel: | 06:19 | You look kind of familiar too. So I don't know. |
| Sheriff Werner: | 06:19 | (laughs). |
| Sheriff Broll: | 06:19 | The- |
| Sheriff Werner: | 06:19 | (laughs). |
| Dr. Wenzel: | 06:19 | You probably helped me at my house. |
| Sheriff Broll: | 06:19 | Yeah. |
| Sheriff Werner: | 06:22 | I, I probably have once or twice. |
| Dr. Wenzel: | 06:24 | Yeah. |
| Sheriff Werner: | 06:24 | You look, you look familiar. |
| Dr. Wenzel: | 06:25 | Yeah, well. |
| Sheriff Broll: | 06:26 | Ah, the 3rd thing is the sheriff is also executing on assets and legal claim by and all, additional chooser's causes of action that the defendant, The OB Clinic has against any individual and or entity, including, but not limited to the chooser's causes of actions the PC has for legal malpractice of fraud against Shutherworth and- |
| Sheriff Werner: | 06:51 | (laughs). |
| Sheriff Broll: | 06:53 | ... Ingersoll- |
| Dr. Wenzel: | 06:53 | It's all the same stuff. |
| Sheriff Broll: | 06:54 | ... PLC- |
| Toni Roemerman: | 06:54 | Mm-hmm. |
| Dr. Wenzel: | 06:54 | We don't have that. |
| Sheriff Broll: | 06:56 | ... Paladera, Western and Craig PLC, Levenfeld Perlstein LLC, and or Nimaster Good- |
| Dr. Wenzel: | 07:02 | Am I- |

PLAINTIFF'S APPENDIX-106

| Sheriff Broll: | 07:03 | ... PLC- |
|---|---|---|
| Dr. Wenzel: | 07:06 | ... correct, Jill, these don't exist even? |
| Dr. Goodman: | 07:08 | Yeah, so I mean, like I, I unders- They're asking, I mean- |
| Dr. Wenzel: | 07:12 | They want the rights to settle. |
| Dr. Goodman: | 07:14 | ... [inaudible 00:07:14] sheriff, like- |
| Dr. Wenzel: | 07:14 | Yeah. |
| Dr. Goodman: | 07:15 | ... it's a lawyer thing. Like there's no physical thing like that. Like there's, you know, if we were to sue our insurance company, they are saying, they want that claim. But, but we haven't sued our insurance company, and we don't like have a claim on a piece of paper we can give them. I mean, the attorneys can deal with all of this. I mean, we don't even know what- |
| Sheriff Broll: | 07:34 | That's what I expected of this. |
| Dr. Goodman: | 07:35 | ... what the hell it is. |
| Dr. Wenzel: | 07:36 | Mm-hmm. Yeah, w- and I don't even think those papers exist, because they're all theories, not- |
| Dr. Goodman: | 07:43 | Right, right- |
| Dr. Wenzel: | 07:43 | ... anything on paper. |
| Dr. Goodman: | 07:46 | ... that's correct. |
| Dr. Wenzel: | 07:46 | Nothing- |
| Dr. Goodman: | 07:46 | Nothing was ever- |
| Dr. Wenzel: | 07:46 | ... has been filed. |
| Dr. Goodman: | 07:46 | ... written down on paper. |
| Toni Roemerman: | 07:46 | Right. |
| Dr. Wenzel: | 07:46 | Does it act like it's been filed? |
| Sheriff Broll: | 07:48 | Well, this, my, and again, my understanding of this, is this was filed December 13, '22. |

PLAINTIFF'S APPENDIX-107

| Dr. Wenzel: | 07:57 | Yeah, that was. |
| Sheriff Broll: | 07:58 | ... in a, in a bankruptcy. |
| Dr. Wenzel: | 08:00 | Mm-hmm. |
| Sheriff Broll: | 08:00 | That, that was- |
| Dr. Goodman: | 08:00 | Uh-huh. |
| Sheriff Broll: | 08:00 | ... filed. Um, and my understanding is- |
| Dr. Wenzel: | 08:04 | So they tried to get that then. |
| Sheriff Broll: | 08:07 | ... these ... Yeah, and this is what I'm essentially here for. |
| Toni Roemerman: | 08:10 | Yeah. |
| Dr. Wenzel: | 08:11 | Yeah, so the- |
| Sheriff Broll: | 08:11 | Under my instructions- |
| Dr. Wenzel: | 08:11 | Can I get a picture of that? Can we have that? No? |
| Sheriff Broll: | 08:15 | Um- |
| Dr. Wenzel: | 08:15 | Can we make a copy of it? |
| Sheriff Broll: | 08:17 | I don't see why not. |
| Dr. Wenzel: | 08:18 | I mean, we need to know- |
| Toni Roemerman: | 08:19 | [inaudible 00:08:20] arrest her for it. |
| Dr. Wenzel: | 08:20 | ... what you want, right? |
| Toni Roemerman: | 08:20 | Right. |
| Sheriff Broll: | 08:20 | Sure, sure. We can do that. Can I- |
| Dr. Wenzel: | 08:22 | Okay. |
| Sheriff Broll: | 08:22 | ... just get through the last one as well? |
| Dr. Wenzel: | 08:23 | Yes. Yeah. |

PLAINTIFF'S APPENDIX-108

| Sheriff Broll: | 08:24 | Um, does this off- office, The OB Clinic, have any different or new bank accounts at this present time sitis- since it has been acquired and/or affiliated with Mercy? |
| Toni Roemerman: | 08:39 | We're not affiliated with Mercy yet. |
| Dr. Wenzel: | 08:41 | Yeah, we aren't. |
| Dr. Goodman: | 08:42 | Right, we're not affiliated with Mercy- |
| Sheriff Broll: | 08:48 | So, so no new- |
| Dr. Wenzel: | 08:48 | No. |
| Toni Roemerman: | 08:48 | No. |
| Sheriff Broll: | 08:48 | ... bank accounts? |
| Dr. Wenzel: | 08:48 | No. |
| Sheriff Broll: | 08:48 | Okay. |
| Dr. Wenzel: | 08:49 | We're not, yeah, not even affiliated with them yet, so. |
| Toni Roemerman: | 08:50 | No. (laughs). |
| Dr. Wenzel: | 08:50 | We'd like to be. |
| Toni Roemerman: | 08:50 | (laughs). |
| Sheriff Werner: | 08:50 | (laughs). |
| Dr. Wenzel: | 08:50 | Because- |
| Toni Roemerman: | 08:50 | But not just, not yet. |
| Dr. Wenzel: | 08:50 | ... they forced us out of practice. |
| Toni Roemerman: | 08:54 | Yeah. |
| Dr. Wenzel: | 08:54 | Because we ... Sheesh! |
| Sheriff Broll: | 08:55 | Okay. |
| Dr. Wenzel: | 08:55 | The world is wrong, right? |

PLAINTIFF'S APPENDIX-109

| | | |
|---|---|---|
| Sheriff Broll: | 08:55 | Um- |
| Dr. Wenzel: | 08:56 | The world is wrong. Nobody is gonna deliver babies. |
| Sheriff Broll: | 08:59 | Yeah. |
| Dr. Wenzel: | 08:59 | Anymore. (laughs). |
| Sheriff Werner: | 09:01 | (laughs). Well, somebody's gonna- |
| Sheriff Broll: | 09:01 | So just so you're- |
| Dr. Wenzel: | 09:02 | Some, somebody's gonna deliver them out in a field. |
| Sheriff Werner: | 09:03 | Otherwise, they'll deliver themselves. |
| Dr. Wenzel: | 09:06 | Yeah, that's right. (laughs). |
| Sheriff Werner: | 09:06 | Actually, I, I've delivered one out in the field. |
| Dr. Wenzel: | 09:07 | Oh, there you go- |
| Sheriff Werner: | 09:08 | (laughs). |
| Sheriff Broll: | 09:08 | Just- |
| Dr. Wenzel: | 09:08 | ... huh? |
| Sheriff Broll: | 09:09 | Just so you're aware, this is what I'm going to file with the courts. |
| Dr. Wenzel: | 09:12 | Okay. |
| Sheriff Broll: | 09:13 | Essentially, don't have it, no new accounts. |
| Dr. Wenzel: | 09:17 | Right. |
| Sheriff Broll: | 09:18 | Okay? Um, I'm gonna sign it. If one of you two wanna sign it, fine. If not, I understand as well. And- |
| Dr. Goodman: | 09:26 | Do you wanna just let him sign it? |
| Toni Roemerman: | 09:27 | Yeah. Let him. |
| Sheriff Broll: | 09:27 | And then, okay, yeah. |

PLAINTIFF'S APPENDIX-110

| Toni Roemerman: | 09:29 | We're not signing it. |
| Dr. Wenzel: | 09:33 | Is, is Jamie on there too? Jill? Is Jamie on the phone too or not? |
| Dr. Goodman: | 09:40 | No. |
| Dr. Wenzel: | 09:41 | Okay. |
| Dr. Goodman: | 09:41 | Sorry, I didn't call her. |
| Dr. Wenzel: | 09:42 | I just heard something in the background, I thought. |
| Sheriff Broll: | 09:44 | And that's all I have. |
| Dr. Goodman: | 09:44 | Mmm. |
| Dr. Wenzel: | 09:45 | And- |
| Sheriff Broll: | 09:46 | That's it. |
| Dr. Wenzel: | 09:46 | Okay. And it's okay- |
| Sheriff Broll: | 09:46 | And- |
| Dr. Wenzel: | 09:47 | ... we refuse to sign? |
| Sheriff Broll: | 09:48 | Yeah. Yeah. |
| Dr. Wenzel: | 09:49 | Okay. |
| Sheriff Broll: | 09:49 | I just put that on there, um. |
| Dr. Wenzel: | 09:52 | (laughs). They wanted the $66 million too, by the way. |
| Toni Roemerman: | 09:54 | (laughs). |
| Sheriff Broll: | 09:54 | Do you have a staple puller? |
| Dr. Goodman: | 09:56 | (laughs), yeah. |
| Toni Roemerman: | 09:56 | Mm-hmm. |
| Dr. Goodman: | 09:56 | We have that. |
| Dr. Wenzel: | 09:56 | (laughs). |

PLAINTIFF'S APPENDIX-111

| | | |
|---|---|---|
| Toni Roemerman: | 09:59 | All right, let these guys out of here. Just be- |
| Dr. Wenzel: | 10:00 | That's okay. |
| Sheriff Broll: | 10:00 | Yeah, and we're- |
| Sheriff Werner: | 10:00 | Yes, we are. |
| Dr. Wenzel: | 10:00 | I've got a big question- |
| Sheriff Broll: | 10:00 | ... we're just the messengers. |
| Dr. Wenzel: | 10:00 | ... do you have to do a lot of this stuff? |
| Sheriff Broll: | 10:00 | Just- |
| Sheriff Werner: | 10:06 | We do do a lot of this stuff- |
| Sheriff Broll: | 10:07 | Yeah. |
| Dr. Wenzel: | 10:07 | Yeah. |
| Sheriff Werner: | 10:07 | ... yeah. |
| Sheriff Broll: | 10:07 | Just so you're aware, as is your partner on the phone too- |
| Dr. Wenzel: | 10:10 | Yeah. |
| Sheriff Broll: | 10:10 | ... um, so if you wanted to copy that real quick? |
| Toni Roemerman: | 10:18 | Mm-hmm. |
| Dr. Wenzel: | 10:19 | Now she's off. |
| Sheriff Broll: | 10:22 | So under this, it was issued by the courts June 2nd. Um, these are essentially sent over from um, the Beam Team. I think, that's the- |
| Dr. Wenzel: | 10:39 | Mm-hmm. |
| Sheriff Broll: | 10:39 | ... plaintiffs. So we essentially just went over it one, two, three and four. |
| Dr. Wenzel: | 10:44 | Mm-hmm. |

PLAINTIFF'S APPENDIX-112

| | | |
|---|---|---|
| Sheriff Broll: | 10:44 | Um, in this, so at some point, I don't know if you work Monday through Friday, or h- how your- |
| Dr. Wenzel: | 10:52 | Copy the whole thing. |
| Sheriff Broll: | 10:52 | ... schedule goes. Um, I'll be coming back to essentially execute on five, six, seven and eight. |
| Dr. Wenzel: | 11:00 | When do you think that's gonna be? |
| Sheriff Broll: | 11:02 | That I don't know. And this is, this is a- |
| Dr. Wenzel: | 11:05 | Like a threat, kind of? |
| Sheriff Broll: | 11:05 | ... this is, again- |
| Sheriff Werner: | 11:05 | (laughs). |
| Dr. Wenzel: | 11:05 | Is it? |
| Sheriff Broll: | 11:05 | ... we're- |
| Dr. Wenzel: | 11:05 | Kind of? No? |
| Sheriff Broll: | 11:05 | ... we're ... No, it's ... No. |
| Sheriff Werner: | 11:05 | No. W- we're just- |
| Sheriff Broll: | 11:06 | This is where- |
| Sheriff Werner: | 11:08 | ... trying to give you a heads-up. |
| Dr. Wenzel: | 11:08 | Oh, thanks. |
| Sheriff Broll: | 11:12 | ... I'm hoping the attorneys get this all figured out. |
| Dr. Wenzel: | 11:15 | Right, right. |
| Sheriff Broll: | 11:15 | And it's all- |
| Dr. Wenzel: | 11:16 | Well, and partly they're trying to put pressure on the silly insurance company that's not paying- |
| Sheriff Broll: | 11:19 | Yeah, so I don't have- |
| Dr. Wenzel: | 11:20 | So- |

PLAINTIFF'S APPENDIX-113

Sheriff Broll:          11:20          So I don't-

Dr. Wenzel:          11:21          Yeah, I got it.

Sheriff Broll:          11:21          ... to come back.

Dr. Wenzel:          11:21          Yeah, I appreciate that.

Sheriff Broll:          11:21          To give you this.

Dr. Wenzel:          11:21          That's good. Good to know.

Sheriff Broll:          11:21          Um.

Dr. Wenzel:          11:24          I didn't know if you were like supposed to tell us that, or you were just being nice to tell us that, so I was just curious.

Sheriff Broll:          11:27          N- n- no, no, these are-

Dr. Wenzel:          11:31          They're listed officially, that, that you don't have to get them today, 'cause they probably know we don't have them.

Sheriff Broll:          11:36          Well, some of this is um, if you look at-

Dr. Wenzel:          11:44          Are we on video and everything too?

Sheriff Broll:          11:45          Yeah, on video-

Sheriff Werner:          11:45          Mm-hmm.

Sheriff Broll:          11:45          ... yeah.

Dr. Wenzel:          11:45          Oh, I wish I would've known.

Sheriff Werner:          11:45          Everything, everything we do-

Sheriff Broll:          11:45          (laughs). Yeah.

Sheriff Werner:          11:45          ... has to be.

Dr. Wenzel:          11:50          Okay. I wish I would've known that, 'cause I wouldn't have been so sassy.

Sheriff Broll:          11:55          So like-

Dr. Wenzel:          11:55          (laughs).

PLAINTIFF'S APPENDIX-114

| | | |
|---|---|---|
| Sheriff Broll: | 11:55 | (laughs). No, you're fine, you're fine. (laughs). You are way too nice. |
| Dr. Wenzel: | 11:55 | I love you too. |
| Sheriff Werner: | 11:55 | You haven't been anywhere near sassy. |
| Dr. Wenzel: | 11:56 | (laughs). Okay. |
| Sheriff Broll: | 11:56 | Yeah. |
| Sheriff Werner: | 11:56 | (laughs). |
| Dr. Wenzel: | 11:57 | It's just like, we're trying to do good things for people, and this is- |
| Sheriff Broll: | 12:00 | Yeah. |
| Dr. Wenzel: | 12:00 | ... what happens. |
| Sheriff Broll: | 12:00 | And I- |
| Dr. Wenzel: | 12:02 | You know? I delivered thousands of healthy babies. |
| Sheriff Broll: | 12:03 | ... I totally- |
| Dr. Wenzel: | 12:03 | I'm gonna say to that them. |
| Sheriff Werner: | 12:05 | I always say- |
| Dr. Wenzel: | 12:06 | Thousands and thousands. |
| Sheriff Werner: | 12:06 | ... no good deed goes unpunished. |
| Sheriff Broll: | 12:12 | I think it was you and um ... I don't think she even works here anymore. Clevenger? |
| Dr. Wenzel: | 12:15 | Oh, yeah. Yeah. She quit because of this. |
| Sheriff Broll: | 12:17 | Yeah, I think she delivered my first one. |
| Dr. Wenzel: | 12:19 | Yeah. |
| Sheriff Broll: | 12:20 | Um, so like this is six. It's, it's take a cash till, cash levee. So that would mean- |

PLAINTIFF'S APPENDIX-115

| | | |
|---|---|---|
| Dr. Wenzel: | 12:25 | Whatever we have? |
| Sheriff Broll: | 12:26 | ... I, I come in, and I just say, "Turn over what you have." |
| Dr. Wenzel: | 12:29 | The $40 that's in there. |
| Sheriff Broll: | 12:32 | Uh, and- |
| Sheriff Werner: | 12:32 | Yeah. |
| Sheriff Broll: | 12:32 | ... and I'm assuming- |
| Sheriff Werner: | 12:32 | Yeah, it is. |
| Sheriff Broll: | 12:32 | ... and I'm assuming that's just if somebody has something you can make cash every day- |
| Dr. Wenzel: | 12:36 | Yeah. |
| Sheriff Broll: | 12:36 | ... you know? Um, six, so yeah, these are, are things that the sheriff- |
| Dr. Wenzel: | 12:41 | Okay, what else is on there? |
| Sheriff Broll: | 12:42 | Um, that would be personal property of the defendant. So, I mean, I can show you. IT equipment- |
| Dr. Wenzel: | 12:51 | I mean, literally, you'd be taking that stuff? |
| Sheriff Broll: | 12:53 | ... tables, desks, chairs, office furniture- |
| Toni Roemerman: | 12:54 | When is that supposed to happen? |
| Sheriff Broll: | 12:55 | See, it, it's, it's not even scheduled. If this- |
| Toni Roemerman: | 12:57 | Okay. |
| Sheriff Broll: | 12:58 | ... was scheduled, this is gonna be down the road. I'm hoping like I just told her- |
| Toni Roemerman: | 13:02 | Yes, you told me [inaudible 00:13:03]- |
| Sheriff Broll: | 13:03 | ... and I think we talked about it last time. Yeah. That, that would be a huge undertaking- |
| Toni Roemerman: | 13:07 | Mm-hmm. |

PLAINTIFF'S APPENDIX-116

| | | |
|---|---|---|
| Sheriff Broll: | 13:07 | ... for the sheriff's office- |
| Toni Roemerman: | 13:08 | Yeah, all right. |
| Sheriff Broll: | 13:08 | ... to do. |
| Dr. Wenzel: | 13:08 | Mm-hmm. |
| Sheriff Broll: | 13:08 | So- |
| Toni Roemerman: | 13:08 | Yeah. |
| Sheriff Werner: | 13:09 | Yeah. |
| Sheriff Broll: | 13:09 | ... there's a lot of planning. I'm not coming in here and grabbing desks. |
| Toni Roemerman: | 13:13 | Yeah. |
| Sheriff Broll: | 13:13 | That's gonna be a company coming in here- |
| Toni Roemerman: | 13:14 | Okay. |
| Sheriff Broll: | 13:15 | ... to do that. |
| Dr. Wenzel: | 13:15 | And we'll have a warning? |
| Sheriff Werner: | 13:16 | You, you would have a heads-up. |
| Sheriff Broll: | 13:17 | Yeah. |
| Toni Roemerman: | 13:17 | We will have a heads-up? |
| Sheriff Broll: | 13:18 | I'm assuming so- |
| Sheriff Werner: | 13:18 | Oh, naturally, you would. |
| Toni Roemerman: | 13:18 | Okay. |
| Sheriff Broll: | 13:18 | ... because- |
| Toni Roemerman: | 13:20 | Okay. |
| Sheriff Broll: | 13:21 | ... otherwise, what are you gonna do when you have a hundred people show up- |

PLAINTIFF'S APPENDIX-117

| | | |
|---|---|---|
| Toni Roemerman: | 13:24 | Hello? |
| Sheriff Broll: | 13:24 | ... to- |
| Toni Roemerman: | 13:24 | Yeah. |
| Sheriff Broll: | 13:25 | ... to get services- |
| Dr. Wenzel: | 13:27 | Yeah. |
| Sheriff Broll: | 13:27 | ... and then, you know what I mean? |
| Dr. Wenzel: | 13:27 | Yep. |
| Toni Roemerman: | 13:27 | Mm-hmm. |
| Sheriff Broll: | 13:28 | So things of that nature. And then, um, levee garnish on, on bank accounts. |
| Dr. Wenzel: | 13:33 | Okay. |
| Sheriff Broll: | 13:34 | So that's um, again, that's all down the road. |
| Toni Roemerman: | 13:39 | And they have to give us notice on the bank accounts too? A heads-up on that. |
| Sheriff Broll: | 13:41 | Ah, that one, I- |
| Sheriff Werner: | 13:43 | It's- |
| Sheriff Broll: | 13:43 | ... that one I'm gonna say not necessarily. |
| Toni Roemerman: | 13:46 | Mmm. |
| Sheriff Broll: | 13:47 | Um, I mean, that would, that would just be us getting an order to go execute on your bank accounts. |
| Toni Roemerman: | 13:54 | Uh-huh. |
| Sheriff Broll: | 13:55 | But again, like I said, I'm hoping- |
| Sheriff Werner: | 13:57 | Mmm. |
| Sheriff Broll: | 13:57 | ... you have attorneys, the attorneys there, that they can get this wrapped-up. |

PLAINTIFF'S APPENDIX-118

| Sheriff Werner: | 14:01 | Yeah, when it's done, there is a document sent to you. But- |
| Toni Roemerman: | 14:05 | It could be after the fact? |
| Sheriff Werner: | 14:06 | ... it's, it, it's usually during the fact. |
| Toni Roemerman: | 14:09 | Oh, yeah. |
| Dr. Wenzel: | 14:11 | It's, it's to create drama. |
| Toni Roemerman: | 14:13 | Mm-hmm. |
| Dr. Wenzel: | 14:13 | So. |
| Sheriff Broll: | 14:14 | And that's ... And again, that's, that's not our doing. |
| Dr. Wenzel: | 14:18 | Yeah. |
| Toni Roemerman: | 14:18 | Right. |
| Sheriff Broll: | 14:18 | That's we just have- |
| Sheriff Werner: | 14:19 | Right. |
| Dr. Wenzel: | 14:19 | I don't blame them for wanting to be paid. The insurance company ... |
| Sheriff Broll: | 14:22 | Yeah, it sounds like it was a- |
| Toni Roemerman: | 14:23 | They have to pay them. |
| Dr. Wenzel: | 14:23 | They haven't done their job. |
| Toni Roemerman: | 14:23 | Yeah. |
| Sheriff Broll: | 14:25 | ... a pretty, a pretty big mess. I mean, it looks so. |
| Dr. Wenzel: | 14:25 | And that's why there could be a lawsuit. So- |
| Sheriff Broll: | 14:29 | Um, do you, do you work Monday through Friday here? |
| Dr. Wenzel: | 14:32 | Ah- |
| Sheriff Broll: | 14:32 | Are you in- |
| Dr. Wenzel: | 14:32 | ... not in- |

PLAINTIFF'S APPENDIX-119

| Sheriff Broll: | 14:32 | ... and out? |
|---|---|---|
| Dr. Wenzel: | 14:33 | ... every day. We're all in and out, 'cause we're on labor delivery or we're on surgery, or- |
| Sheriff Broll: | 14:37 | Okay. |
| Dr. Wenzel: | 14:37 | ... like yeah. |
| Sheriff Broll: | 14:37 | Or at the- |
| Dr. Wenzel: | 14:39 | But somebody's here usually, almost every day. |
| Sheriff Broll: | 14:40 | Who- |
| Dr. Wenzel: | 14:41 | Yeah, at Mercy. |
| Sheriff Broll: | 14:42 | Who's the best point of contact, I guess, if, if- |
| Dr. Wenzel: | 14:45 | For calls or- |
| Sheriff Broll: | 14:47 | Like say I, I need to come out here and talk to you guys again. Are you- |
| Dr. Wenzel: | 14:52 | Well- |
| Sheriff Broll: | 14:52 | ... here Monday through Friday? |
| Dr. Wenzel: | 14:53 | ... she's here Monday through Friday. Is that- |
| Sheriff Werner: | 14:54 | Okay. |
| Dr. Wenzel: | 14:54 | We'd certainly like a doctor- |
| Toni Roemerman: | 14:55 | Yeah, with a doctor. |
| Dr. Wenzel: | 14:56 | ... here every time too. |
| Toni Roemerman: | 14:57 | Yeah. |
| Dr. Wenzel: | 14:57 | The three. There's three of us. |
| Sheriff Broll: | 14:58 | Sure. So- |
| Dr. Wenzel: | 14:59 | So we would want one of those three here, 'cause we're, we're the owners. |

PLAINTIFF'S APPENDIX-120

| | | |
|---|---|---|
| Sheriff Broll: | 15:03 | Oh, yeah. So- |
| Sheriff Werner: | 15:03 | So we could give like you a call, and you know, say, "Hey-" |
| Toni Roemerman: | 15:07 | Find who's- |
| Sheriff Werner: | 15:07 | "... tomorrow morning, we're gonna-" |
| Sheriff Broll: | 15:09 | Yeah, what doctor is- |
| Sheriff Werner: | 15:09 | "... need" you know? |
| Sheriff Broll: | 15:09 | ... gonna be here? What time are they gonna be here? |
| Dr. Wenzel: | 15:11 | Yeah. |
| Toni Roemerman: | 15:11 | Yeah. |
| Sheriff Broll: | 15:11 | Something like that. |
| Dr. Wenzel: | 15:11 | Okay. |
| Toni Roemerman: | 15:11 | Yes. Yeah. |
| Sheriff Broll: | 15:14 | I'm sorry, I forgot a card. Could I get a card from you, again? And I know George has a card from last time. |
| Sheriff Werner: | 15:19 | Yeah. |
| Sheriff Broll: | 15:19 | And I'm Dave, by the way. |
| Dr. Wenzel: | 15:19 | Okay. |
| Sheriff Broll: | 15:19 | Dave- |
| Dr. Wenzel: | 15:19 | What's your last name? |
| Sheriff Broll: | 15:19 | ... Broll. |
| Dr. Wenzel: | 15:19 | Lori. |
| Sheriff Broll: | 15:23 | B-R-O-L-L. |
| Dr. Wenzel: | 15:24 | Okay, awesome. Nice to see you again. |
| Sheriff Broll: | 15:31 | Alex and Emma- |

PLAINTIFF'S APPENDIX-121

| | | |
|---|---|---|
| Dr. Wenzel: | 15:31 | Oh. |
| Sheriff Broll: | 15:31 | ... are my two kids, so- |
| Sheriff Werner: | 15:31 | (laughs). |
| Dr. Wenzel: | 15:31 | How old are they? |
| Sheriff Broll: | 15:31 | Ah, four and two and a half, so- |
| Toni Roemerman: | 15:31 | Nice. |
| Dr. Wenzel: | 15:32 | That's awesome. Well, we hope you're back for number three. |
| Sheriff Broll: | 15:33 | Yeah, (laughs). |
| Dr. Wenzel: | 15:33 | (laughs). We'll be still be here with a new name. |
| Toni Roemerman: | 15:33 | (laughs). |
| Dr. Wenzel: | 15:33 | And a new- |
| Sheriff Werner: | 15:36 | My kids are grown. |
| Dr. Wenzel: | 15:36 | Oh. |
| Toni Roemerman: | 15:36 | (laughs). |
| Dr. Wenzel: | 15:36 | (laughs). |
| Sheriff Werner: | 15:36 | (laughs). |
| Dr. Wenzel: | 15:36 | What's your name? |
| Toni Roemerman: | 15:36 | You're past that. |
| Sheriff Werner: | 15:39 | George- |
| Dr. Wenzel: | 15:39 | George? |
| Sheriff Werner: | 15:40 | ... Warner. |
| Sheriff Broll: | 15:40 | My- |
| Dr. Wenzel: | 15:40 | Warner? |

Page 25 of 38

PLAINTIFF'S APPENDIX-122

| | | |
|---|---|---|
| Sheriff Broll: | 15:41 | ... my- |
| Sheriff Werner: | 15:41 | Yeah. |
| Dr. Wenzel: | 15:41 | Okay. |
| Sheriff Broll: | 15:42 | ... my son was just downstairs yesterday- |
| Dr. Wenzel: | 15:43 | Aw, [inaudible 00:15:44], that's awesome, yeah. |
| Sheriff Broll: | 15:45 | ... getting his four-year-old shots and stuff like- |
| Dr. Wenzel: | 15:45 | Yeah, they do a good job with that. |
| Sheriff Broll: | 15:45 | ... Dr Paul, so- |
| Dr. Wenzel: | 15:47 | She's my best friend, so. (laughs). |
| Sheriff Broll: | 15:48 | Yeah, yeah, she's a very nice lady. |
| Dr. Wenzel: | 15:49 | She's awesome, yeah. |
| Sheriff Broll: | 15:50 | I love her, I love her. |
| Dr. Wenzel: | 15:50 | Thank you guys. |
| Sheriff Broll: | 15:50 | She's very nice, so- |
| Dr. Wenzel: | 15:50 | I appreciate it. |
| Sheriff Broll: | 15:50 | All right, thank you. |
| Dr. Wenzel: | 15:50 | I'm sorry to have to do this, but be now- |
| Sheriff Werner: | 15:55 | Sorry, yeah. |
| Dr. Wenzel: | 15:55 | ... go back to my other job. |
| Sheriff Broll: | 15:55 | Mmm. |
| Dr. Wenzel: | 15:55 | You know? |
| Sheriff Broll: | 15:55 | We're uh- |
| Dr. Wenzel: | 15:55 | Thanks so much. |

PLAINTIFF'S APPENDIX-123

| | | |
|---|---|---|
| Sheriff Broll: | 15:55 | ... we're just gonna walk out. |
| Toni Roemerman: | 15:55 | Okay. |
| Sheriff Broll: | 15:59 | Um, if something comes up, I'll give you a call, and- |
| Toni Roemerman: | 16:02 | Okay. |
| Sheriff Broll: | 16:03 | ... and we'll go from there, okay? |
| Toni Roemerman: | 16:03 | Okay, all right. |
| Sheriff Broll: | 16:04 | All right- |
| Toni Roemerman: | 16:05 | Okay. |
| Sheriff Broll: | 16:05 | ... thank you. |
| Toni Roemerman: | 16:05 | Thank you. |
| Sheriff Werner: | 16:06 | Good luck. |
| Toni Roemerman: | 16:07 | Thanks. |
| Dr. Wenzel: | 16:08 | Actually, um, our lawyer wants to FaceTime with you. |
| Sheriff Broll: | 16:11 | Okay. |
| Dr. Wenzel: | 16:13 | It could be interesting. |
| Sheriff Werner: | 16:15 | Okay. |
| Dr. Wenzel: | 16:15 | Get in here and shut the door. |
| Sheriff Werner: | 16:16 | We'll come back. |
| Sheriff Broll: | 16:22 | And this might be something that I just say- |
| Nicholas Rowley: | 16:23 | Hi, this is Nick Rowley. I'm sorry I missed your call. |
| Sheriff Broll: | 16:25 | ... "Contact the Beam team on." |
| Dr. Wenzel: | 16:26 | Well- |
| Sheriff Werner: | 16:27 | Hmm. |

PLAINTIFF'S APPENDIX-124

| Dr. Wenzel: | 16:28 | ... we were just all together last week. |
| Sheriff Broll: | 16:30 | That's what I heard. Like last week Thursday- |
| Dr. Wenzel: | 16:32 | Trying to mediate. |
| Sheriff Broll: | 16:32 | ... maybe? |
| Dr. Wenzel: | 16:32 | Yeah. |
| Sheriff Broll: | 16:32 | Yeah. |
| Dr. Wenzel: | 16:32 | Nobody came to terms. Surprise, surprise. |
| Sheriff Broll: | 16:32 | Yeah. |
| Sheriff Werner: | 16:32 | Ah. |
| Nicholas Rowley: | 16:50 | Hi, this is Nick Rowley. I'm sorry- |
| Dr. Wenzel: | 16:52 | Nick, answer the phone if you're there. |
| Nicholas Rowley: | 16:53 | ... missed your call. I'm not- |
| Dr. Wenzel: | 16:54 | He tried to call me six minutes ago. |
| Nicholas Rowley: | 17:04 | Lori, are you there? |
| Dr. Wenzel: | 17:05 | Hi, Nick, yes. |
| Nicholas Rowley: | 17:06 | Hey, is the sheriff there with you? |
| Dr. Wenzel: | 17:08 | Yeah, two of them are here. |
| Nicholas Rowley: | 17:10 | Can, can you FaceTime me? |
| Dr. Wenzel: | 17:10 | Yeah, you bet. |
| Sheriff Werner: | 17:11 | Ah, technology. |
| Dr. Wenzel: | 17:17 | Let's see. Here you go. |
| Sheriff Broll: | 17:21 | Hi sir. Hi. |
| Nicholas Rowley: | 17:24 | How are you? |

PLAINTIFF'S APPENDIX-125

| | | |
|---|---|---|
| Sheriff Broll: | 17:24 | Good, how are you? |
| Sheriff Werner: | 17:25 | Yeah. |
| Nicholas Rowley: | 17:26 | Are you guys able to hear me? |
| Sheriff Werner: | 17:28 | Yes sir. |
| Sheriff Broll: | 17:28 | Yes, yep. |
| Nicholas Rowley: | 17:30 | All right, so I'm in tri- in a jury trial in Georgia, so sorry. First, I appreciate the ... Hey guys, I need 1,000% silence for one second. All right. First of all, I appreciate what you guys do for a living, keeping us safe. And I don't know if you've ever had to do a job like this before. But you know, I imagine it's not fun. Being um- |
| Sheriff Broll: | 17:54 | That's correct. |
| Nicholas Rowley: | 17:57 | You guys seem to be all be breaking up. Are you hearing me clearly? |
| Sheriff Broll: | 18:00 | We, we can hear you. |
| Nicholas Rowley: | 18:02 | Okay, great. Maybe just set the phone down, and I'll- |
| Dr. Wenzel: | 18:04 | It might be my phone, Nick. I probably need a new one. |
| Nicholas Rowley: | 18:08 | Oh my God. That's um incredible. Let's see. So- |
| Dr. Wenzel: | 18:16 | Do you wanna call on a different phone? |
| Nicholas Rowley: | 18:18 | No, no, let's just bring the phone back a little bit maybe. So they are- |
| Sheriff Werner: | 18:21 | Yeah, we can come closer. |
| Nicholas Rowley: | 18:26 | ... also in there. |
| Sheriff Werner: | 18:26 | Yeah. |
| Nicholas Rowley: | 18:26 | And I can try to be helpful. |
| Toni Roemerman: | 18:26 | Just sit it right here. |
| Nicholas Rowley: | 18:27 | Let's see, there, there are two of you there? |

Page 29 of 38

PLAINTIFF'S APPENDIX-126

| Dr. Wenzel: | 18:27 | Yes. |
|---|---|---|
| Sheriff Werner: | 18:28 | Yeah. |
| Nicholas Rowley: | 18:29 | Okay. All right. So I guess you guys have a list of stuff that you're supposed to come and pick up or collect? |
| Sheriff Broll: | 18:38 | We're, we're not collecting anything today, no, sir. |
| Nicholas Rowley: | 18:41 | Okay. Um, well, let me try, let me try to help you. There's no such thing as a bad faith claim that you can collect. This is just these, these lawyers from Michigan, um, trying to, trying to be bullies. And I know that you guys have something, you know, a court order and something to execute on. But there, you know, you can't squeeze blood out of a turnip. There really isn't anything to, to grab. But, I, I think you're able to, to say, "You know what? We showed up and there's nothing, there's no blood to squeeze out of the turnip." |
| | 19:14 | A- and um, (laughs), you know, you've gotta go out to go back to doing the stuff you really need to do, because I imagine you're very busy. But if there is something that I can help you with, and help you, you get, um, I certainly will, because we're here to cooperate with the law in any way that we, you know, any way that we can. But the ... So if you read off to me the list of, of things, maybe I could help you. |
| Sheriff Broll: | 19:40 | Yeah. W- what's his name? |
| Dr. Wenzel: | 19:42 | Ah, Nick Rowley. |
| Sheriff Broll: | 19:42 | Hi Nick, L- Lieutenant Broll here, how are you? |
| Nicholas Rowley: | 19:48 | I'm good, good sir. |
| Sheriff Broll: | 19:49 | Good. I'm gonna step a little closer. Right, the only thing I was here executing on today was demanding payment. Ah, checking to see if the office or the clinic has any new bank accounts at this present time, ah, since it's been acquired in or affiliated with Mercy Hospital. My understanding is that has happened yet. |
| Nicholas Rowley: | 20:14 | Correct. Nor, nor will it happen. |
| Sheriff Broll: | 20:15 | Okay. |
| Nicholas Rowley: | 20:19 | Because this clinic is, this clinic is just an entity. It's just a name- |

PLAINTIFF'S APPENDIX-127

| | | |
|---|---|---|
| Dr. Wenzel: | 20:21 | Yeah, it didn't even happen- |
| Nicholas Rowley: | 20:22 | ... at this point. There is nothing to collect. There is nothing to get. |
| Sheriff Broll: | 20:27 | Sure, sure. Ah, the, the, the 3rd thing, the 2nd thing, I guess, on my list was, that the sheriff's s- executing on the assets provided to me in the document number 147 of the bankruptcy forms on page 10, specifically 74.1 and 74.2 of that document. Which they asked for a copy of, which I provided to them. I, I'm not sure. Do you know about that document? |
| Nicholas Rowley: | 20:53 | I, I know what the document is. In this jury trial in Georgia, I don't have it in front of me. |
| Sheriff Broll: | 20:57 | Y- yeah. And then the, the 3rd thing was, executing- |
| Nicholas Rowley: | 21:00 | Which I don't think any of those things ... The judge threw out the bankruptcy eh, and dismissed it, saying it was fraudulent, because a lot of that shit didn't ... What the lawyers put in there, we are, our insurance, and we, for, you know- |
| Sheriff Broll: | 21:15 | Yeah. |
| Nicholas Rowley: | 21:15 | ... filing a bankruptcy they shouldn't have filed. Th- this is something that the insurance company kind of did. And gave these lawyers to do. And these four good doctors are stuck with it all. So there is really nothing on that list to hand you, yeah? |
| Sheriff Broll: | 21:26 | Yep. And, and I, I didn't expect to get anything ah, from these ladies or the clinic today on that. And or on the assets or legal claims, um, which by cause for the legal malpractice of fraud against Shutherworth, Ingersoll, Paladera, Western and Craig PLC, Levenfeld Perlstein LLC, and Nimaster Good. |
| Nicholas Rowley: | 21:55 | Yeah- |
| Sheriff Broll: | 21:55 | Which there's nothing to collect. |
| Nicholas Rowley: | 21:57 | ... and how that ended up on this list, because we haven't had an opportunity to be heard. Um, that's like trying to get something out of the air. |
| Sheriff Broll: | 22:06 | It, it- |
| Nicholas Rowley: | 22:07 | You know? It just, it's not it doesn't exit. It's basically saying that they have these civil rights against these other people. And I, I |

PLAINTIFF'S APPENDIX-128

don't know how the lawyers manage between the time that we had the mediation last Friday, where, where they, you know, demanded that we dismiss a civil appear- appeal in the Iowa Supreme Court, or they were gonna use the sheriff's to show up, which it seems that that's what they have, what they're doing.

22:32    Um, we said, "W- we can't. As a matter of law. We can't dismiss our, our appeal with the Iowa Supreme Court." And you know, there may be claims against these other people, that we intend to bring. But I don't know how procedurally, they got those things added to a list to now collect. Is, is that a new document or a new filing that they made?

Sheriff Broll:    23:00    Ah, this was um, the general execution was file stamped in the courts, June 2nd, 2:27 PM.

Nicholas Rowley:    23:07    Hold on. June 22nd, so-

Sheriff Broll:    23:08    June, June 2nd, excuse me.

Nicholas Rowley:    23:10    ... it's a filed document without serving us. Without serving me as their lawyer, which is unethical thing to do.

Sheriff Broll:    23:19    Yeah-

Nicholas Rowley:    23:19    So June 2nd.

Sheriff Broll:    23:19    Okay.

Nicholas Rowley:    23:19    [inaudible 00:23:20]-

Dr. Wenzel:    23:19    That's the day after mediation, right?

Nicholas Rowley:    23:21    ... make some notes here.

Toni Roemerman:    23:21    Yeah.

Nicholas Rowley:    23:23    And you can give us a copy of that, right?

Sheriff Broll:    23:24    Sure, yeah, I don't see why not.

Nicholas Rowley:    23:26    That would be very helpful. That's a public document, so-

Sheriff Broll:    23:28    Yep.

Nicholas Rowley:    23:28    ... June 2nd, they filed.

PLAINTIFF'S APPENDIX-129

| Sheriff Broll: | 23:33 | I can give you the case number, if, if you want, as well? |
| Nicholas Rowley: | 23:36 | All right. |
| Sheriff Broll: | 23:36 | It doesn't matter. LACV081. |
| Nicholas Rowley: | 23:40 | Oh, I'm sorry. LACV. |
| Sheriff Broll: | 23:40 | 081. |
| Nicholas Rowley: | 23:40 | Mm-hmm. |
| Sheriff Broll: | 23:44 | 421. |
| Nicholas Rowley: | 23:46 | 421. On the 2nd, they filed. |
| Sheriff Broll: | 23:53 | Yeah, it was, it was e-filed June 2nd at 2:27 PM. |
| Nicholas Rowley: | 23:58 | 2:27 PM. And what did they file? |
| Sheriff Broll: | 24:01 | Yep, that was the general execution that was filed that day. |
| Nicholas Rowley: | 24:05 | General execution. |
| Sheriff Broll: | 24:09 | The one with the new, I'm assuming the new balance and everything on it. |
| Nicholas Rowley: | 24:17 | Did the court grant an order for that? |
| Dr. Wenzel: | 24:19 | Nick, I'm gonna leave, because I have patients. I'm running behind already, okay? |
| Nicholas Rowley: | 24:23 | Yeah- |
| Dr. Wenzel: | 24:23 | But they also- |
| Nicholas Rowley: | 24:25 | ... I'm, I'm, I'm sorry. |
| Dr. Wenzel: | 24:26 | No, is it okay if I leave and you keeping talking to them? |
| Nicholas Rowley: | 24:28 | Yeah, you just get back to your patients. Let me- |
| Dr. Wenzel: | 24:28 | Yeah. |
| Nicholas Rowley: | 24:28 | ... take care of this. |

Page 33 of 38

PLAINTIFF'S APPENDIX-130

| | | |
|---|---|---|
| Dr. Wenzel: | 24:29 | Can I just say though that- |
| Nicholas Rowley: | 24:31 | And I didn't have any notice that this was coming. |
| Dr. Wenzel: | 24:32 | Yeah. |
| Nicholas Rowley: | 24:32 | But I'm not surprised. |
| Dr. Wenzel: | 24:33 | No, that's okay, we're fine. Um- |
| Nicholas Rowley: | 24:34 | Okay. |
| Dr. Wenzel: | 24:35 | ... there's a threat though that he gave us ... No, he didn't threaten us, but he said they're gonna come back at some point and get all of our IT equipment and everything else that's movable. But- |
| Toni Roemerman: | 24:44 | And they said do the bank accounts. |
| Dr. Wenzel: | 24:45 | ... but yeah, and the bank accounts? Okay. But after June 30th, maybe, hopefully, or something? |
| Sheriff Broll: | 24:50 | It's, it's the dictation to sheriff, is what it is. |
| Dr. Wenzel: | 24:51 | But- |
| Nicholas Rowley: | 24:55 | Yeah, d- dictation to sheriff is what it's called? |
| Dr. Wenzel: | 24:58 | I'll just let you go ahead. I gotta- |
| Sheriff Werner: | 24:59 | Yeah. |
| Dr. Wenzel: | 24:59 | ... go see my patients. |
| Sheriff Broll: | 25:00 | Yeah, sure, sounds fine. |
| Dr. Wenzel: | 25:00 | Thank you. |
| Sheriff Broll: | 25:00 | Sounds good. |
| Sheriff Werner: | 25:01 | Thank- |
| Dr. Wenzel: | 25:01 | Thanks. |
| Sheriff Werner: | 25:01 | ... thank you. |

PLAINTIFF'S APPENDIX-131

| Dr. Wenzel: | 25:01 | Yeah. |
|---|---|---|
| Nicholas Rowley: | 25:12 | All right. Okay. So, so you guys are gonna take off now. Is there, is there time when you're gonna be back in July or something? |
| Sheriff Broll: | 25:19 | That, that like, like I told these ladies, um, that I, I spoke to I'm drawing a name, ah, Matt m- Mathew. Their attorney, okay? And I, I'm only, I was, I'm only here for one through four on this. |
| Nicholas Rowley: | 25:43 | Is there anything that compels you to talk to him? |
| Sheriff Broll: | 25:47 | W- what do you mean? |
| Nicholas Rowley: | 25:49 | I mean, is there anything like that says you have to talk to him? |
| Sheriff Broll: | 25:56 | That I have to talk to him? |
| Nicholas Rowley: | 25:59 | Yeah. Yeah, I mean, as compared to just having the document. |
| Sheriff Broll: | 26:00 | Yeah, I g- I guess I'm not, I'm not understanding what you're saying, sir. |
| Nicholas Rowley: | 26:07 | All right, so, so Mathew is a lawyer. |
| Sheriff Broll: | 26:10 | Correct. |
| Nicholas Rowley: | 26:11 | H- he's, he's the, he's the asshole that on Friday demanded we dismiss the, the Iowa ... He's an out-of-state lawyer. |
| Sheriff Broll: | 26:19 | Y- yep, yeah. |
| Nicholas Rowley: | 26:23 | So um, he doesn't understand how things are done in Iowa. I don't know how they're done in, in Detroit where he's from, or, yep, or Chicago where he practices. But um, yeah, that's not the way it's done in Iowa. So you're saying, you know, Mathew telling ... I'm, I'm from Iowa. I was born, born in Storm Lake and raised in Iowa. And just telling Iowa, you know, sheriffs what, what they're supposed to do, I, I think is wrong. |
| | 26:48 | But you guys are here. I thank you for your, you know, as far as saying, "We showed up. We did what we could." You know? And um, yeah, there's, there's nothing in the air to hand you, or blood to- |
| Sheriff Broll: | 27:00 | Mm-hmm. |
| Nicholas Rowley: | 27:00 | ... squeeze out of the turnip. |

PLAINTIFF'S APPENDIX-132

| | | |
|---|---|---|
| Sheriff Broll: | 27:03 | Mm-hmm. And, and I provided Toni- |
| Toni Roemerman: | 27:04 | Toni, yeah. |
| Sheriff Broll: | 27:06 | ... Toni with the ah, general execution, if, if she wants to email that to you now, or- |
| Nicholas Rowley: | 27:10 | Yeah. |
| Sheriff Broll: | 27:12 | ... whatever. Also provided her the other document that I was referencing, if, if you have that, ah, you're in trial, so I'm sure you don't have it with you, so. |
| Nicholas Rowley: | 27:21 | Yeah. Yeah, we can deal with this stuff, you know? We've got this trial going on and whatnot in July. And we'll, we'll be fine, and we could maybe all sit down with court and figure it out. That will give me time to file the stuff that I need to file, because they, they, they filed this without serving it. You know? Which is, you know, an unethical thing to do. But these, these are out-of-state lawyers playing, playing the wrong games in the wrong state. |
| Sheriff Broll: | 27:49 | Okay. D- do you, do you have anything else for me, sir? |
| Nicholas Rowley: | 27:54 | Um, no sir. Just um, you know, why don't you take down my information? 'Cause if there is, you know- |
| Sheriff Broll: | 28:01 | Can I get that from you? |
| Nicholas Rowley: | 28:01 | ... some time that you've got to show up and do this stuff, you can let me know, and I can try to help. I mean, really, if there's something that I can hand over to you, then you can go through me, and I can work to make that happen. |
| Sheriff Broll: | 28:11 | Okay. Yeah, can I, can I get your name then sir? |
| Nicholas Rowley: | 28:16 | Sure, Nicholas, my last name is Rowley, R-O-W-L-E-Y. |
| Sheriff Broll: | 28:24 | Okay. |
| Nicholas Rowley: | 28:25 | And my phone number is 406 820 9200. |
| Sheriff Broll: | 28:36 | Okay. |
| Nicholas Rowley: | 28:38 | And you know, and you don't have to talk to me, just like I don't think you have to talk to, you know, this out-of-state lawyer either. |

PLAINTIFF'S APPENDIX-133

| | | |
|---|---|---|
| Sheriff Broll: | 28:47 | Sure. |
| Nicholas Rowley: | 28:48 | And I've dealt with executions before. I mean, I mean, there's you know, you have what you have from the court. There's um, yeah, it's not like a, a district attorney. Well thank you for doing your job. |
| Sheriff Broll: | 29:14 | Yeah, yeah. Thank you sir. Um, have a good week in trial. And ah, again, h- hopefully you and I don't have to speak again. And hopefully I don't have to come back here again. |
| Nicholas Rowley: | 29:26 | There's nothing to speak about. It's they've never been to this clinic. They don't know what's there. So they're, it, it's like they're sending you to the other side of the rainbow, and telling you, you to look for the pot that isn't there. W- which should be done is, is they need to file a notice for a judgment debtor's exam and bring the clinic, which is ... |
| | 29:48 | Because they don't have a case against the individual doctors. So the, the, it's against the corporation, the clinic, so it's just this entity that exists. And what would they do, is they have to file a motion or get someone representative of the clinic to come into court and do a judgment debtor's exam. They haven't done that. So they're sending you on a wild goose chase. And that's, that's um, that's, that's what this is. So I'm sorry about that. I'm sorry- |
| Sheriff Broll: | 30:19 | [inaudible 00:30:20]. |
| Nicholas Rowley: | 30:20 | ... that, you know, you, you've been um, put through that course of action. And I'm, I'm here to help any way I can, okay? |
| Sheriff Broll: | 30:28 | That sounds good. Thanks Nick. |
| Nicholas Rowley: | 30:30 | All right, thank you. And yeah, if you can give me a heads-up if you're ever coming back or something, gee, I'd, I would appreciate that you would text me. Holler anytime day, weekend, night, anytime. |
| Sheriff Broll: | 30:40 | Yeah, all right. Thank you. |
| Nicholas Rowley: | 30:40 | All right man, thank you. Bye-bye. |
| Sheriff Broll: | 30:45 | Yep, have a good day. All right, we will sneak out of here. |
| Toni Roemerman: | 30:46 | Okay. |

PLAINTIFF'S APPENDIX-134

| | | | |
|---|---|---|---|
| Sheriff Werner: | 30:46 | (laughs). |
| Sheriff Broll: | 30:48 | So um, all right? |
| Toni Roemerman: | 30:52 | All right. |
| Sheriff Broll: | 30:53 | Well thank you. |
| Toni Roemerman: | 30:53 | (laughs). |
| Sheriff Werner: | 30:54 | Thanks, have a wonderful day. |
| Toni Roemerman: | 30:55 | Thanks. You bet. |
| Sheriff Werner: | 30:55 | Watch out, George. |

PLAINTIFF'S APPENDIX-135

EXHIBIT D-2023 06 07 FULL VIDEO OF SERVICE OF
JUDGMENT UPON THE CLINIC

(PLACEHOLDER)



ORIGINAL SENT TO CLERK OF COURT        EXHIBIT D

PLAINTIFF'S APPENDIX-136

IN THE IOWA DISTRICT COURT FOR JOHNSON COUNTY

| | |
|---|---|
| OBSTETRIC AND GYNECOLOGICAL ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C., JILL GOODMAN, MD, LORI WENZEL, MD, AND JAMI SHEPARD, MD,<br><br>      Plaintiff,<br><br>  vs.<br><br>MMIC INSURANCE, INC., CONSTELLATION, INC., NICOLE GRAZIANO, and SHUTTLEWORTH & INGERSOLL, P.L.C.,<br><br>      Defendants. | Case No.:<br><br><br>PETITION AT LAW<br>AND JURY DEMAND |

COME NOW the Plaintiffs, Jill Goodman, MD, Lori Wenzel, MD, and Jami Shepard, MD, and OB-GYN Associates (hereinafter "OB-GYN Associates"), by and through their undersigned counsel, and for their claims against Defendants MMIC Insurance, Inc. (hereinafter "MMIC"), Constellation, Inc. (hereinafter "Constellation"), Nicole Graziano, and Shuttleworth & Ingersoll, P.L.C., d/b/a Shuttleworth & Ingersoll (hereinafter "Shuttleworth") states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiffs Jill Goodman, MD, Lori Wenzel, MD, and Jami Shepard, MD, practice medicine in Johnson County, Iowa. These doctors owned and operated Obstetric and Gynecological Associates of Iowa City and Coralville, P.C., a professional corporation incorporated under the laws of the State of Iowa with its principal place of business in Coralville, Johnson County, Iowa.

1

PLAINTIFF′S APPENDIX-137

2.     MMIC is a Minnesota corporation with its headquarters at 7701 France Ave. S., Minneapolis, MN 55435, and doing significant business in Iowa. MMIC is the wholly owned subsidiary of Constellation.

3.     Constellation is a Minnesota corporation with its headquarters at 7701 France Ave. S., Minneapolis, MN 55435, and doing significant business in Iowa. Constellation is the parent corporation of MMIC.

4.     As MMIC and Constellation are subsidiaries and parent corporations acting functionally as one entity, they are referred to jointly in this Petition as MMIC/Constellation.

5.     Upon information and belief, at all relevant times, Defendant Nicole Graziano was a resident of Polk County, Iowa, an employee of Constellation, and acted within the scope of her employment.

6.     Shuttleworth & Ingersoll, at all times relevant hereto, was a professional corporation organized under the laws of the State of Iowa, with its principal place of business in Cedar Rapids, Linn County, Iowa.

7.     Venue is proper in the Iowa District Court for Johnson County as at all times relevant hereto:

a.     The Plaintiffs were insured by MMIC/Constellation at all relevant times.

b.     The acts upon which this action is based arose from damages sustained by OB-GYN Associates as a result of decisions made to a significant degree by Defendants at a trial that took place in Johnson County, Iowa, and

c.     The underlying lawsuit was venued in Johnson County, Iowa.

8.     The amount in controversy herein exceeds the jurisdictional amount for small claims court.

2

# PLAINTIFF'S APPENDIX-138

## **GENERAL ALLEGATIONS**

9.      The underlying case that gives rise to this action is the *Kromphardt* matter, *S.K. v. OB-GYN Associates, P.C., et al.,* LACV081421, in the Iowa District Court for Johnson County.

10.      The *Kromphardt* matter arose out of allegedly negligent medical care provided during birth to an infant (S.K.), which they claimed caused the child to suffer hypoxia-ischemia, acidosis, trauma, seizures, and permanent brain injury. As a result of these injuries, S.K. claimed he would be permanently disabled and would need extensive care, treatment, and therapies, including full-time attendant care. S.K. has been diagnosed with cerebral palsy, developmental delay, mixed expressive-receptive language disorder, ischemic brain injury, and HIE (hypoxic-ischemic encephalopathy).

11.      Plaintiff OB-GYN Associates was represented in the *Kromphardt* matter by Shuttleworth & Ingersoll. An attorney-client relationship existed between Plaintiff OB-GYN Associates and Shuttleworth & Ingersoll at all times relevant hereto.

12.      Shuttleworth & Ingersoll also represented MMIC/Constellation in the *Kromphardt* litigation.

13.      Defendant Nicole Graziano was the adjuster for MMIC/Constellation in the *Kromphardt* claim.

14.      Before trial, MMIC/Constellation, Nicole Graziano, and Shuttleworth & Ingersoll refused to negotiate with the *Kromphardt* plaintiffs. At no point before trial did Defendants offer a single dollar to the *Kromphardt* plaintiffs to settle their catastrophic claims, thereby exposing OB-GYN Associates to significant risk.

15.      At no time did Shuttleworth & Ingersoll explain to Plaintiffs the risks associated with an excess verdict and the impact such a verdict would have on Plaintiffs. Moreover,

3

PLAINTIFF'S APPENDIX-139

MMIC/Constellation did not explain these risks and consequences to the Plaintiffs. Instead, Defendants went forward with the trial, refusing to negotiate with S.K. despite repeated requests by S.K. expressing interest in resolving the underlying case for amounts within the available liability coverage.

16.     The jury trial and resulting verdict and Judgment in this case were completely avoidable. The case never should have gone to trial. Plaintiffs did not want this case to go to trial. Plaintiffs wanted the case settled. The only reason the case went to trial was the Defendants' collective failure and refusal to settle the case for an amount of money that was within the limits of the available insurance policy.

17.     After a lengthy trial, on March 21, 2022, a Johnson County jury found that Defendants Mercy Hospital and OB-GYN Associates were negligent, that its negligence was a cause of damages to S.K., and that S.K. had sustained damages in the amount of $97,402,549. Specifically, the jury found damages in the amounts of $42,203,818 for future medical and custodial care expenses, $11,698,731 for loss of future earning capacity, $1,050,000 for past loss of function of the mind and body, $20,700,000 for future loss of function of the mind and body, $1,050,000 for past pain and suffering, and $20,700,000 for future pain and suffering.

18.     MMIC/Constellation repeatedly and materially put its financial and political interests ahead of its insureds - OB-GYN Associates and the individually named doctors. It is the Plaintiffs' position that MMIC/Constellation controlled the defense of the underlying claim in bad faith and breached the insurance contract, as will be detailed herein. As further explained, MMIC/Constellation's bad faith defense constitutes a breach of the insurance contract. MMIC/Constellation unreasonably refused to settle and protect OB-GYN Associates and its physicians and refused to pay anything within the policy limits to settle this case. Once a jury

4

PLAINTIFF'S APPENDIX-140

decided the case was worth $97 million, MMIC/Constellation used the jury's verdict to convince Iowa politicians to put a cap on noneconomic damages in place in the State of Iowa. MMIC/Constellation unreasonably chose not to settle and make the lawsuit and verdict go away and then used OB-GYN Associates's financial and reputational demise as propaganda to pass tort reform in Iowa. MMIC/Constellation had been attempting to get a hard noneconomic damages cap put in place in Iowa for many years. MMIC/Constellation worked hard for many years trying to convince Iowa lawmakers to vote to put the cap in place. MMIC/Constellation knew that the story of a $97 million verdict and three female OB/GYN physicians having to file bankruptcy and close their practice because of a large jury verdict, would give MMIC/Constellation what it needed to convince Iowa lawmakers to vote to pass the cap.

19.     Before the underlying trial, S.K. repeatedly requested that MMIC/Constellation attempt to resolve this matter within policy limits. In addition, Mercy Hospital, OB-GYN Associates, and the doctors likewise repeatedly requested that MMIC/Constellation attempt to resolve this matter within the policy limits. Despite these clear and unequivocal requests, MMIC/Constellation repeatedly refused to negotiate or offer anything to resolve the underlying claim before trial despite the clear possibility of a liability finding and the substantial damages resulting from the claim of malpractice.

20.     Following the underlying trial, on October 31, 2022, MMIC/Constellation forced OB-GYN Associates to file for bankruptcy because MMIC/Constellation refused to pay a single dollar of the Judgment and also refused to post a bond. MMIC/Constellation had previously promised to post a bond but refused to do so when the time to pay it came. MMIC/Constellation and the other Defendants coerced Plaintiffs into filing bankruptcy.

PLAINTIFF'S APPENDIX-141

21.     Further, despite requests for a bond or, at a minimum, a letter assuring OB-GYN Associates that MMIC/Constellation would stand behind any excess verdict over policy limits (comfort letter), MMIC/Constellation utilized the "cooperation clause" to prevent Plaintiffs from negotiating a settlement that would protect them from the consequences of the verdict/judgment.

22.     MMIC/Constellation and the other Defendants gave OB-GYN Associates no choice but to file bankruptcy.

23.     MMIC/Constellation orchestrated forcing the clinic into bankruptcy as part of a plan to get tort reform passed in Iowa and to avoid having to either post a bond or provide confirmation that it would cover the verdict if the appeal were unsuccessful (providing a "comfort letter").

24.     MMIC/Constellation found, hired, and paid the bankruptcy lawyers. MMIC/Constellation put its financial interests ahead of OB-GYN Associates and its insured doctors because, based on information and belief, it had a deceitful and fraudulent scheme/plan. MMIC/Constellation's strategy was calculated to protect its financial interests over those of OB-GYN Associates and its insured doctors. MMIC/Constellation's strategy was to buy the bad faith claim from the bankruptcy trustee for enough to cover OB-GYN Associates's bankruptcy-associated expenses after the bankruptcy was filed. This would protect MMIC/Constellation regarding the excess verdict but leave OB-GYN Associates, its doctors, and S.K. with little or nothing. This plan was a scandalous scam by the insurance company Defendants, and it almost succeeded.

25.     MMIC/Constellation was only days away from getting what it wanted when the Bankruptcy Judge stepped in and dismissed the bankruptcy. The Bankruptcy Judge reviewed everything and decided that the Bankruptcy was filed in bad faith. See the Bankruptcy Judge's Order attached hereto as "Exhibit A."

6

PLAINTIFF'S APPENDIX-142

26.     While working to execute its scandalous scheme and plan, MMIC/Constellation simultaneously held seminars and lobbied for the implementation of noneconomic caps in Iowa, involving the governor in the process. MMIC/Constellation told the story of three female OB/GYN physicians who had to file for bankruptcy and close down their clinic because of greedy trial lawyers and out-of-control civil litigation in Iowa. What MMIC/Constellation failed to share in these seminars and meetings with Iowa lawmakers is the fact that MMIC/Constellation was the insurer in the case of the $97 million verdict and all of the other large jury verdicts in Iowa and that each case went to trial because MMIC/Constellation refused to negotiate and settle reasonably.

27.     MMIC/Constellation's propaganda and narrative selectively omitted critical details, focusing on the claim that the $97 million verdict had led to the closure of an Iowa obstetrical clinic, causing doctors to leave the state despite the lack of evidence supporting the claim of doctors leaving Iowa. Importantly, it failed to mention that the jury had determined S.K.'s economic damages to exceed $50 million or that the district court had halved S.K.'s noneconomic damages. Furthermore, it did not disclose that MMIC/Constellation had refused to negotiate in good faith with S.K. or offer even a penny to settle the case. It also omitted that OB-GYN Associates, Mercy Hospital, and the doctors were pleading with MMIC/Constellation to settle, yet it offered no protection to OB-GYN Associates or the doctors even though it knew reasonable medical opinions supported a case in favor of S.K. Instead, it orchestrated the bankruptcy, hired and paid the bankruptcy lawyers in bad faith, and refused to shield OB-GYN Associates or its insured doctors from financial ruin.

28.     Dr. Goodman and her partners were all insured by MMIC/Constellation. They were each owed duties by MMIC/Constellation, which were breached, resulting in millions of dollars in economic and non-economic damages. MMIC/Constellation knew its actions would financially

7

PLAINTIFF'S APPENDIX-143

ruin OB-GYN Associates and the individual doctors' business where they had worked their entire careers. Instead, MMIC/Constellation used OB-GYN Associates as its pawn to get the law passed in Iowa that would limit the Civil Rights of all Iowans injured or killed by Medical Negligence. MMIC/Constellation worked to change Iowa law regarding noneconomic damages – telling Iowans and their lawmakers, at best, half-truths and, at worst, straight-up lies.

29.     MMIC/Constellation knew that when they used this dishonest strategy to limit noneconomic damages, that was primarily helping MMIC/Constellation and injuring the small percentage of medical malpractice plaintiffs who had suffered catastrophic damages and death. MMIC/Constellation also knew that when a patient is catastrophically injured by malpractice and devastating noneconomic damages significantly exceed $1 million, injured Iowans agree to settle these cases within the available policy limits. MMIC/Constellation tracks and documents this data. Only catastrophically injured Iowans are left to bear the burden, while MMIC/Constellation's upper management enjoys the spoils, and they use verdicts to scare doctors into paying the highest premium they can extort out of them while boasting about its growing "billions" in net worth.

30.     Shuttleworth & Ingersoll and MMIC/Constellation refused to settle the Kromphardt claim for a reasonable amount within the policy limits or advocated on behalf of OB-GYN Associates to resolve the underlying case within policy limits.

31.     MMIC/Constellations' conduct exposed OB-GYN Associates to avoidable litigation, financial ruin, and loss of reputation. Shuttleworth & Ingersoll and its lawyers negligently failed to advocate for OB-GYN Associates and inform MMIC/Constellation that it needed to settle the case and protect OB-GYN Associates. MMIC/Constellation and Shuttleworth & Ingersoll breached fiduciary duties, ethical obligations, and contractual duties, thereby exposing OB-GYN Associates to an excess verdict of $97,000,000.

8

PLAINTIFF'S APPENDIX-144

32.     Shuttleworth & Ingersoll and its lawyers get millions of dollars in business annually from MMIC/Constellation and compete with other law firms to get that business. Shuttleworth & Ingersoll did not act in the best interest of OB-GYN Associates and followed MMIC/Constellation's orders to the detriment of their clients.

33.     Neither Shuttleworth & Ingersoll nor MMIC/Constellation explained the risks of an excess verdict/judgment and the consequences OB-GYN Associates and its doctors would face.

34.     Shuttleworth & Ingersoll breached its duty to communicate and share critical information about the case with its clients.

35.     To this day, MMIC/Constellation refuses to provide a comfort letter to OB-GYN Associates, thereby refusing to pay any verdict/Judgment resulting from a new jury trial should the Iowa Supreme Court grant the appeal and remand the case for a new trial. A new jury trial does nothing to protect the Plaintiffs but instead creates a Groundhog Day scenario whereby the next jury verdict and Judgment could be even higher than $97 million.

36.     Defendants have gambled and want to continue to gamble with the financial livelihood, reputations, and mental health of the real human beings who are the insureds and owners of OB-GYN Associates without offering any assurance whatsoever that MMIC/Constellation will stand behind and protect OB-GYN Associates if a second jury trial results in an excess verdict/judgment.

37.     Shuttleworth & Ingersoll's representation of OB-GYN Associates fell below the standard of care of reasonably careful and competent attorneys in the State of Iowa. Shuttleworth & Ingersoll's negligent conduct caused OB-GYN Associates to suffer significant economic and non-economic damages.

9

38.     Defendants gave OB-GYN Associates no choice or financial reassurance for the unreasonable gamble that was taken in this case. OB-GYN Associates was forced to close its doors because the lawyers at Shuttleworth & Ingersoll and its employing insurance company and major source of business, MMIC/Constellation, refused to negotiate or provide any reassurance or financial protection even though it had repeated opportunities to settle within the policy limits.

39.     Shuttleworth & Ingersoll's long-standing financial/business relationship with insurer MMIC/Constellation was put before the attorney-client relationship with the Plaintiffs and the duties that were required of them as Iowa lawyers.

40.     Shuttleworth & Ingersoll and its attorneys breached their fiduciary duties and acted negligently in representing OB-GYN Associates by one or more of the following:

a.      Failing to take reasonable steps to settle the Kromphardt litigation, thereby unreasonably exposing OB-GYN Associates to the risk of a substantial excess judgment;

b.      Putting forth frivolous defenses in the Kromphardt litigation, thereby exposing OB-GYN Associates to the risk of a substantial excess judgment;

c.      Failing to disclose the conflict of interest that existed because of Defendant's business relationship with MMIC/Constellation;

d.      Serving as the lead trial lawyers in such a substantial medical malpractice case against one of America's most successful trial lawyers, Geoffrey Fieger, when more experienced trial counsel or national trial counsel should have been brought into the case (i.e., Shuttleworth & Ingersoll bit off more than it could chew and had no business being lead trial counsel in the case);

e.      Refusing to request that MMIC/Constellation issue a comfort letter;

f.      Never writing to recommend settlement of the Kromphardt litigation; and

g.      Failing to properly communicate and advise OB-GYN Associates of important facts and opinions of expert witnesses.

h.      Failing to properly communicate and advise Plaintiffs about the risks and consequences of an excess verdict.

10

PLAINTIFF'S APPENDIX-146

41.     Shuttleworth & Ingersoll's attorneys' negligence and breach of fiduciary duties included unreasonable, reckless, and negligent evaluations of the value of the Kromphardt's case and negligence in how the case was defended and tried to the jury.

42.     The Kromphardt verdict significantly damaged OB-GYN Associates' reputation. The individual insureds and clients, the three physicians who founded and owned OB-GYN Associates, suffered substantial economic and non-economic damages because of Shuttleworth & Ingersoll lawyers' negligence and breach of fiduciary and ethical duties.

43.     As the Iowa Supreme Court has stated, "This obligation of counsel retained by the insurer is not fulfilled merely by an explanation which amounts to no more than assurances to the insured that his interests are being zealously and faithfully protected by experienced counsel, but rather by laying bare the truth - not only of the potential consequences of a deficiency judgment but of the potential conflict between the interests of the carrier and the insured - in the manner in which the insured would be advised if he consulted private counsel." *Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30 (Iowa 1982), quoting *Lange v. Fidelity & Casualty Co.,* 185 N.W.2d 881, 885-86 (Minn. 1971). Shuttleworth & Ingersoll did not lay bare the truth and communicate the truth to the Plaintiffs.

44.     The evaluation of the potential exposure and risk that was conducted by Shuttleworth & Ingersoll was grossly negligent. The economic damages claims and expert witness testimony offered by Plaintiffs had close to $50 million in economic damages, and the case was set to be tried by Geoffrey Fieger, who has a track record of winning jury verdicts for tens of millions of dollars and over a hundred million dollars. The trial experience of the Shuttleworth & Ingersoll lawyers who tried the case for the defense paled in comparison to that of Mr. Fieger and

11

PLAINTIFF'S APPENDIX-147

his team. Shuttleworth & Ingersoll wrote a report that stated that the risk of exposure to an adverse verdict was less than $10 million.

45.     Plaintiffs request a jury trial against Defendants and will prove that Shuttleworth & Ingersoll had no business trying the underlying birth injury medical malpractice case, that their evaluations of the case pretrial and post-trial were negligent, that their handling of the case was negligent, and that their failure to communicate and share information with their actual Iowa clients caused the disaster that this complaint seeks to remedy.

46.     The Iowa Rules of Professional Conduct make clear that Shuttleworth & Ingersoll had a fiduciary obligation to protect OB-GYN Associates and inform them of the existence of the existing conflict of interest.

47.     As the Iowa Rules of Professional Conduct state, "Where a lawyer has been retained by an insurer to represent the insured pursuant to the insurer's obligations under a liability insurance policy, the lawyer may comply with reasonable cost-containment litigation guidelines proposed by the insurer if such guidelines *do not materially interfere with the lawyer's duty to exercise independent professional judgment to protect the reasonable interests of the insured*, do not regulate the details of the lawyer's performance, and do not materially limit the professional discretion and control of the lawyer…If the lawyer believes that guidelines proposed by the insurer prevent the lawyer from exercising independent professional judgment or from protecting confidential client information, *the lawyer shall identify and explain the conflict of interest to the insurer and insured and also advise the insured of the right to seek independent legal counsel.*" Iowa R. Prof. Cond. 32:1.7, Comment [13a] (emphasis added).

PLAINTIFF′S APPENDIX-148

## COUNT I –BAD FAITH
## (AGAINST DEFENDANTS MMIC/CONSTELLATION AND NICOLE GRAZIANO)

48.     The Plaintiffs re-plead, adopt, and incorporate the paragraphs above.

49.     MMIC/Constellation and Nicole Graziano undertook the responsibility to investigate, act upon, monitor, and otherwise handle the medical malpractice claim of S.K. and their insureds, OB-GYN Associates.

50.     Nicole Graziano has a reputation in Iowa among lawyers who represent medical malpractice victims as being the worst adjuster to deal with when representing Iowa medical malpractice victims and families. In one case that went to trial, resulting in a verdict of more than $12 million where a man had his prostrate removed, rendering him impotent and incontinent, Nicole Graziano took the position that the case was only worth $300,000. Most of the large medical malpractice jury verdicts in Iowa that were used as propaganda to get tort reform passed in Iowa were cases that went to trial because Nicole Graziano refused to make reasonable offers to settle. In this case, Nicole Graziano was the one calling the shots for MMIC/Constellation. She is the one who refused to offer a single dollar to settle the case. She is the one who told Plaintiffs that a bond would be posted. She is the one who coerced Plaintiffs into filing for bankruptcy.

51.     Due to the inherently unequal bargaining power between an insured and an insurer, a special relationship existed, at all times material herein, between OB-GYN Associates and Defendants MMIC, Constellation, and Graziano, warranting protection of the rights of OB-GYN Associates by those Defendants and giving rise to a duty on the part of those Defendants and their agents to act solely in good faith and for the protection of OB-GYN Associates.

13

PLAINTIFF′S APPENDIX-149

52.     This duty of good faith required Defendants to fully, fairly, and promptly investigate, defend, and settle the Kromphardt claim. This duty was breached, resulting in the Plaintiffs suffering many millions of dollars in economic and non-economic damages.

53.     Defendants MMIC/Constellation and Nicole Graziano breached their duty of good faith by failing to conduct a proper investigation, by failing to subject the findings of its investigation to a reasonable evaluation and review, and by failing to settle or even offer to settle the Kromphardt case.

54.     Because of the bad faith and other wrongful conduct of MMIC/Constellation and Nicole Graziano, the case went to trial, and Defendants exposed OB-GYN Associates to an excess judgment, which ultimately caused it to close.

55.     The denial, delay, and refusal to pay reasonable settlement demands by the Kromphardt Plaintiffs were without a reasonable and good faith basis.

56.     Damage to OB-GYN Associates was caused by MMIC/Constellation and Nicole Graziano's breach of their duties of good faith, including, but not limited to, the following:

(a) Past incurring of expenses, including but not limited to the incurring of attorney fees and expenses;

(b) Future incurring of expenses, including but not limited to the incurring of attorney fees and expenses;

(c) Past loss of profits;

(d) Future loss of profits;

(e) and in such other ways as will be shown at trial.

14

PLAINTIFF'S APPENDIX-150

57.     The conduct of Defendants MMIC/Constellation and Nicole Graziano in breaching their duties of good faith was sufficiently willful and wanton so as to entitle Plaintiffs to punitive or exemplary damages.

### COUNT II – LEGAL MALPRACTICE
### (AGAINST SHUTTLEWORTH & INGERSOLL)

58.     Plaintiffs re-plead, adopt, and incorporate the paragraphs above.

59.     In the course of the Kromphardt litigation, an attorney-client relationship existed between the parties, OB-GYN Associates and Shuttleworth & Ingersoll.

60.     In the course of its legal representation of OB-GYN Associates, Shuttleworth & Ingersoll was negligent in one or more of the following particulars:

a.     Failing to conduct a proper investigation;

b.     Failing to subject the findings of its investigation to a reasonable evaluation and review;

c.     Failing to make efforts to reasonably settle the Kromphardt case;

d.      Failing to advise OB-GYN Associates that a conflict of interest existed between their interests in the Kromphardt matter and the interests of MMIC/Constellation;

e.     Failing to competently evaluate the Kromphardt case and communicate important facts and findings to Plaintiffs;

f.     Failing to refer and bring in a trial lawyer who would have been able to try the case against Geoffrey Fieger competently;

g.     Coercing Plaintiffs into Bankruptcy;

h.     Failing to disclose a conflict of interest;

i.     Breaching ethical and fiduciary duties owed to Plaintiffs;

j.     Failing to advise the Plaintiffs of the effect of an excess verdict.

61.     Due to the negligent conduct of Shuttleworth & Ingersoll, the Kromphardt case went to trial, and an excess verdict was entered against OB-GYN Associates.

15

PLAINTIFF'S APPENDIX-151

62.     The conduct of Shuttleworth & Ingersoll in negligently representing OB-GYN Associates was sufficiently willful and wanton so as to entitle OB-GYN Associates to punitive or exemplary damages.

### COUNT III – BREACH OF FIDUCIARY DUTY
### (AGAINST SHUTTLEWORTH & INGERSOLL)

63.     Plaintiffs re-plead, adopt, and incorporate the paragraphs above.

64.     At the time of the events giving rise to the Plaintiffs' Petition, an attorney-client relationship existed between OB-GYN Associates and Shuttleworth & Ingersoll.

65.     At the time of the events giving rise to Plaintiff's Petition, a fiduciary relationship existed between OB-GYN Associates and Shuttleworth & Ingersoll.

66.     As shown throughout this Petition, there was a conflict between the interests of MMIC/Constellation and the interests of OB-GYN Associates.

67.     Shuttleworth & Ingersoll recklessly and intentionally breached their fiduciary obligations by engaging in the conduct described above and throughout this Petition.

68.     Such a breach caused damage to OB-GYN Associates.

69.     The conduct of Shuttleworth & Ingersoll was sufficiently willful and wanton so as to entitle OB-GYN Associates to punitive or exemplary damages.

### COUNT IV – BREACH OF CONTRACT
### (AGAINST SHUTTLEWORTH & INGERSOLL)

70.     Plaintiffs re-plead, adopt, and incorporate the paragraphs above.

71.     Plaintiff OB-GYN Associates and Shuttleworth & Ingersoll were capable of contracting.

72.     A contract (written and unwritten) for attorney-client services existed between Plaintiff OB-GYN Associates and Shuttleworth & Ingersoll.

16

PLAINTIFF′S APPENDIX-152

73.     This contract provided that Shuttleworth & Ingersoll would provide legal representation to Plaintiff OB-GYN Associates.

74.     There was consideration for this contract between Plaintiff OB-GYN Associates and Shuttleworth & Ingersoll.

75.     Plaintiff OB-GYN Associates performed all of their obligations under the contract.

76.     Shuttleworth & Ingersoll breached the contract.

77.     As a result of Defendant's breach, Plaintiff has sustained damages.

### PRAYER FOR DAMAGES

WHEREFORE, for the reasons set out above, Plaintiffs pray for Judgment against Defendants for compensatory damages, which include economic and noneconomic damages in a reasonable and proper amount, for exemplary/punitive damages in an amount which will punish them for their reckless, intentional, and otherwise wrongful conduct and which will dissuade other defendants from such conduct in the future. The Plaintiff prays for a judgment that includes interest as allowed by law, the costs of this action, for attorneys' fees if justified by the law and any contracts, and for such other and further relief as is just and proper in the circumstances.

Respectfully Submitted,

By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley    AT0009516
Dominic F. Pechota    AT0006175
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nr@tl4j.com
Email: dominic@tl4j.com
ATTORNEYS FOR PLAINTIFF

17

# PLAINTIFF'S APPENDIX-153

**DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiff, and hereby demands a jury trial on all issues so triable under Iowa law.

Respectfully Submitted,

By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley    AT0009516
Dominic F. Pechota    AT0006175
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nr@tl4j.com
Email: dominic@tl4j.com
ATTORNEYS FOR PLAINTIFF

18

PLAINTIFF'S APPENDIX-154

# IN THE SUPREME COURT OF IOWA

CLERK OF SUPREME COURT

NOV 28, 2023

ELECTRONICALLY FILED

| | |
|---|---|
| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX,<br><br>    Plaintiffs-Appellees,<br><br>    vs.<br><br>OBSTETRIC & GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.,<br><br>    Defendant-Appellant<br><br>    and<br><br>MERCY HOSPITAL IOWA CITY and JILL CHRISTINE GOODMAN,<br><br>    Defendants. | Case No. 22-1317<br><br>(Johnson Co. No. LACV081421)<br><br>**APPEARANCE OF NICHOLAS ROWLEY** |

COMES NOW, the undersigned, and hereby enters his appearance on behalf of

Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and

Coralville, P.C., in the above-entitled matter.


    Dated this 28th day of November, 2023.

Respectfully Submitted,

By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley        AT0009516
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nr@tl4j.com


ATTORNEYS FOR DEFENDANT-
APPELLANT OBSTETRIC &
GYNECOLOGIC ASSOCIATES OF
IOWA CITY AND CORALVILLE,
P.C. AND DEFENDANT JILL
GOODMAN

| | |
|---|---|
| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX, | Case No. 22-1317 |
| | (Johnson Co. No. LACV081421) |
| Plaintiffs-Appellees, | |
| vs. | |
| | **DEFENDANT-APPELLANTS MOTION TO STAY APPEAL AND ORAL ARGUMENTS** |
| OBSTETRIC & GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C., | |
| Defendant-Appellant | |
| and | **ORAL ARGUMENT DATE: 12/14/23** |
| MERCY HOSPITAL IOWA CITY and JILL CHRISTINE GOODMAN, | |
| Defendants. | |

COMES NOW, Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C., by and through their undersigned counsel, and for their Motion to Stay Appeal and Oral Arguments, state the following:

1. On November 6, 2023, the Court set December 14, 2023, as the date for oral arguments in this appeal.

2. Pursuant to the Court's Order of November 6, 2023, setting oral argument for December 14, 2023, "Changes in the above-stated oral argument date and time will

1

CLERK OF SUPREME COURT

NOV 28, 2023

ELECTRONICALLY FILED

not be made absent a verified showing of a most unusual and compelling circumstance."

3.    Such an unusual and compelling circumstance has now come about which would justify the Court not only re-setting the date for oral arguments in this matter, but also staying the appeal.

4.    Current counsel-of-record for Defendant-Appellant, the law firm of Shuttleworth & Ingersoll, will likely be withdrawing from the case due to a conflict of interest which exists that would prevent them from continuing as counsel of record in this appeal.

5.    Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C. has a pending Civil Lawsuit in Iowa District Court for legal malpractice against their counsel of record in this appeal, the Shuttleworth & Ingersoll law firm, in connection with the district court matter giving rise to this appeal. This civil claim is captioned *Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C., Jill Goodman, MD, Lori Wenzel, MD, and Jami Shepard, MD vs. MMIC Insurance, Inc., Constellation, Inc., Nicole Graziano, and Shuttleworth & Ingersoll, P.L.C.,* in the Iowa District Court for Johnson County, Case Number LACV084850, and was e-filed on November 21, 2023. Said Petition is attached hereto as "Exhibit A". It is hereby requested that the Iowa Supreme Court take judicial notice of the allegations in the petition as well as judicial notice

2

of the existence of the actions and pleading in the Federal Court case MMIC Insurance Inc. v. Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C., Case Number 3:23-CV-00039, in the United States District Court for the Southern District of Iowa, where MMIC has sued Appellants Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C. for declaratory judgment and injunctive relief (See Complaint of MMIC and Defendant's Answer, attached as Exhibt B).

6.     This civil claim against the Shuttleworth & Ingersoll law firm was filed on behalf of the Defendant-Appellant clinic, Defendant Jill Goodman, and two other physicians who are partners with Dr. Goodman at the clinic.

7.     As this Court stated in *Iowa Supreme Court Attorney Disciplinary Bd. v. Stoller,* 879 N.W.2d 199 (Iowa 2016), "Iowa Rule of Professional Conduct 32:1.7(a) provides that an attorney cannot represent a client if there is a concurrent conflict of interest. There are two types of concurrent conflicts of interest. *Iowa R. Prof'l Conduct 32:1.7(a).* A conflict of interest exists under subsection (a)(1) if a lawyer's representation is "directly adverse to another client," while a conflict of interest exists under subsection (a)(2) when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer."

3

8. Shuttleworth & Ingersoll's relationship to the Defendant-Appellant is now directly adverse. Additionally, there is a significant risk that the representation in this appeal of Defendant-Appellant by Shuttleworth & Ingersoll will be materially limited by Shurrleworth's personal interest in defending itself against the legal malpractice claim brought against it by Defendant-Appellant.

9. As the defendants in a legal malpractice lawsuit against them by the party it purports to represent, the Shuttleworth & Ingersoll law firm now has a *per se* materially adverse conflict of interest with Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C. such that the Shuttleworth & Ingersoll law firm can and must be disqualified from this Court from representing the interests of Defendant-Appellate in this appeal.

10. Considering the impending date of oral arguments in this matter (December 14, 2023), Defendant-Appellant respectfully requests that this Court issue an Order staying the Appeal and oral arguments.

11. As a matter of full transparency, the Appellants have had a mediation with the Conservator for Appellees and MMIC Insurance Company with the Hon. Judge Mark Bennet and are negotiating with the Appellees where there is a high probability that a settlement will be reached. If that occurs, because of the Federal Court case filed by MMIC, Appellants will have to litigate that case.

12. Additionally, while the pending civil litigation for legal malpractice by

PLAINTIFF′S APPENDIX-160

Defendant-Appellant against their current counsel of record in this Appeal, the Shuttleworth law firm, provides sufficient grounds for a stay of oral arguments and this Appeal, Defendant-Appellant believes it is necessary and appropriate to inform this Court of the real background story of what has happened in this case.

13.     During the pendency of the underlying litigation, despite a significant risk to the Defendant-Appellant Clinic of a verdict for the Plaintiff in the tens of millions of dollars, and despite the fact that the Clinic and its partner physicians as well as the personal counsel for the partner physicians pleaded with their insurer MMIC to resolve the case within the available policy limits, MMIC unreasonably refused to offer a single dollar to resolve the claim.  MMIC promised the Clinic that it would post a bond in this case and then reneged on it's promise and instead fraudulently induced and pressured the Clinic to file for bankruptcy.  MMIC located and hired and paid the bankruptcy lawyers and orchestrated the bankruptcy.  The Bankruptcy Judge dismissed the case after making specific findings which tell some of the story of MMIC's behavior in this case.  This appeal being decided serves the interests of MMIC and nobody else should the appeal be successful.  A new trial puts the clinic and it's physician owners through another jury trial and the risk of an even larger jury verdict.  MMIC refused to offer a single penny to settle this case before the verdict despite the clinic and its insured physicians begging MMIC to settle the case.

5

14. Instead of even attempting to resolve the underlying case, MMIC forced the Defendant-Appellants (and the Plaintiff-Appellee) to go through a lengthy jury trial. MMIC will likely once again force the Clinic to go through another trial, force the clinic into bankruptcy, refuse to post a bond, and this will be a groundhog day situation where everything happens all over again, with the possibility of it all being worse. This is why it is in the best interests of all parties to resolve this case and pursue a bad faith lawsuit against MMIC. Because MMIC has filed a federal court lawsuit against the Clinic seeking to prevent the Clinic from entering into a settlement with the S.K., that case will have to be litigated. The trial on that case is set for next fall.

15. Time and time again, MMIC has put its own interests (including its interest in promoting legislation to put caps on damages in Iowa medical malpractice claims) ahead of the interests of its insured health care providers and the obligation to fairly compensate Iowa health care patients and families who fall victim to medical negligence. While MMIC's actions with respect to the Clinic in this case are particularly egregious, they are far from isolated. This will be proven in the bad faith litigation and in the Federal Court case.

16. In this case, it is important that the Iowa Supreme Court know what has been going on and know that the actual parties to this case want to reach a settlement, but that MMIC is the tail wagging the dog from behind the dark curtains forcing

6

this case to continue forward. A review of the related pleadings in this case will show this Court what is really going on.

17. In summary, Defendant-Appellant clinic wishes to negotiate with Plaintiff-Appellee and get the underlying case resolved. Plaintiff-Appellee also wants a stay of this Appeal and will join in this request.

18. MMIC is pushing for a new trial, which only serves the interests of MMIC. Expending significiant further judicial resources on this case and putting the Defendant-Appellant Clinic at great risk of being hit with a second verdict that could even be larger is something that can be avoided, but time is needed to effectuate justice in that regard. Staying oral arguments and this Appeal will give the Parties the time they need to work to resolve this matter with finality and conserve valuable judicial resources which would otherwise be expended. WHEREFORE, Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C. prays that the Court stay oral arguments and this Appeal, and for other such relief as the Court deems just and appropriate.

7

Respectfully Submitted,

By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley     AT0009516
Dominic F. Pechota     AT0006175
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nr@tl4j.com
Email: dominic@tl4j.com

ATTORNEYS FOR DEFENDANT-
APPELLANT OBSTETRIC &
GYNECOLOGIC ASSOCIATES OF
IOWA CITY AND CORALVILLE,
P.C. AND DEFENDANT JILL
GOODMAN

8

# IN THE SUPREME COURT OF IOWA
## Johnson County No. LACV081421

CLERK OF SUPREME COURT

NOV 27, 2023

ELECTRONICALLY FILED

| | |
|---|---|
| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX, Esq.      ) ) ) ) | Supreme Court No. 22-1317 |
| Plaintiff-Appellee,      ) ) | Appearance |
| vs.      ) ) | |
| OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.      ) ) ) ) | |
| Defendant-Appellant.      ) ) | |

Troy L. Booher enters his appearance on behalf of Defendant/Appellant Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C. He previously has been admitted Pro Hac Vice, but is now licensed in the state of Iowa.

/s/Troy L. Booher
TROY L. BOOHER     AT0015644
BETH E. KENNEDY     AT0015645
    for
ZIMMERMAN BOOHER
341 South Main Street, Suite 400
Salt Lake City, UT 84111
PHONE:    (801) 924-0200
FAX:    (385) 420-5576
E-MAIL:    tbooher@zbappeals.com
           bkennedy@zbappeals.com

1

ATTORNEYS FOR OBSTETRIC AND
GYNECOLOGIC ASSOCIATES OF
IOWA CITY AND CORALVILLE, P.C.

&

| JENNIFER E. RINDEN | AT0006606 |
| ROBERT D. HOUGHTON | AT0003739 |
| VINCENT S. GEIS | AT0013055 |
| NANCY J. PENNER | AT0006146 |

for
SHUTTLEWORTH & INGERSOL, P.L.C.
500 U.S. Bank Bldg., P.O. Box 2107
Cedar Rapids, IA 52406
PHONE:     (319) 365-9461
FAX:       (319) 365-8443
E-MAIL:    jer@shuttleworthlaw.com
           rdh@shuttleworthlaw.com
           vsg@shuttleworthlaw.com
           njp@shuttleworthlaw.com

**CERTIFICATE OF FILING AND SERVICE**

The undersigned certifies this Appearance was electronically filed and served on the 27th day of November, 2023, upon the following persons and upon the Clerk of the Supreme Court using the Electronic Document Management System, which will send notification of electronic filing:

Frederick W. James
The James Law Firm, P.C.
2600 Grand Avenue Suite 213
Des Moines, IA 50312

Ryan Koopmans
Koopmans Law Group, LLC
500 East Court Ave., Suite 420
Des Moines, IA 50309

Clerk of the Iowa Supreme Court

2

PLAINTIFF′S APPENDIX-166

Iowa Judicial Branch Building
1111 East Court Avenue, 4th Floor
Des Moines, IA  50319


/s/Troy L. Booher

3

## IN THE SUPREME COURT OF IOWA

CLERK OF SUPREME COURT

NOV 28, 2023

ELECTRONICALLY FILED

| | |
|---|---|
| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX,<br><br>    Plaintiffs-Appellees,<br><br>    vs.<br><br>OBSTETRIC & GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.,<br><br>    Defendant-Appellant<br><br>    and<br><br><br>MERCY HOSPITAL IOWA CITY and JILL CHRISTINE GOODMAN,<br><br>    Defendants. | Case No. 22-1317<br><br>(Johnson Co. No. LACV081421)<br><br><br>**DEFENDANT-APPELLANT'S OBJECTION TO APPEARANCES OF TROY L. BOOHER AND BETH E. KENNEDY**<br><br><br>**ORAL ARGUMENT DATE: 12/14/23** |

COMES NOW, Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C., by and through their undersigned counsel, and for their Objection to Appearances of Troy L. Booher and Beth E. Kennedy, state as follows:

1.    Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C., objects to the Appearances filed in this Appeal by Troy L. Booher and Beth E. Kennedy of the Zimmerman Booher law firm, purportedly on their

EXHIBIT G

PLAINTIFF'S APPENDIX-168

behalf.

2.      Defendant-Appellant has not consented to be represented by the Zimmerman Booher law firm, has not met with the attorneys who have filed Appearances purportedly on their behalf, and has never spoken to the attorneys of the Zimmerman Booher law firm.

3.      No attorney-client relationship has been established between Defendant-Appellant and the attorneys of the Zimmerman Booher law firm.

4.      Consent and a signed representation agreement are required to form an attorney-client relationship, and it is a perversion of the sacred relationship between attorney and client for an attorney to enter an Appearance in a case without the consent of the client.

5.      Because the Appearances filed purportedly on their behalf were never consented to by Defendant-Appellant, Defendant-Appellant objects to any attorneys of the Zimmerman Booher law firm making arguments on their behalf in this Appeal.

Respectfully Submitted,

By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley        AT0009516
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nr@tl4j.com
Email: dominic@tl4j.com

ATTORNEYS FOR DEFENDANT-
APPELLANT OBSTETRIC &
GYNECOLOGIC ASSOCIATES OF
IOWA CITY AND CORALVILLE,
P.C. AND DEFENDANT JILL
GOODMAN

PLAINTIFF'S APPENDIX-170

CLERK OF SUPREME COURT

NOV 28, 2023

ELECTRONICALLY FILED

| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX, Esq.;<br><br>Plaintiff-Appellee,<br><br>vs.<br><br>OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.<br><br>Defendant-Appellant. | Supreme Court No. 22-1317<br><br>WITHDRAWAL OF SHUTTLEWORTH & INGERSOLL, P.L.C.; JENNIFER RINDEN; ROBERT HOUGHTON; VINCENT GEIS; and NANCY PENNER ON BEHALF OF DEFENDANT-APPELLANT |
| --- | --- |

Shuttleworth & Ingersoll, P.L.C. and each of its attorneys of record in this case, including Jennifer Rinden, Robert Houghton, Vincent Geis, and Nancy Penner, herein withdraw as counsel on behalf of Defendant-Appellant Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C. (the "P.C.").

Withdrawal is necessary given a lawsuit filed by the P.C. against Shuttleworth & Ingersoll, P.L.C. and others on November 21, 2023. *See Obstetric and Gynecological Associates of Iowa City and Coralville, P.C., Jill Goodman, M.D., Lori Wenzel, M.D. and Jami Shepard, M.D. v. MMIC Insurance, Inc., Constellation, Inc., Nicole Graziano, and Shuttleworth & Ingersoll, P.L.C.*, in the Iowa District Court for Johnson County, LACV084850.

1

The P.C. will continue to be represented by Troy Booher and Beth Kennedy, Zimmerman Booher, who have already appeared in this case and who are admitted to practice in Iowa.

/s/Nancy J. Penner
JENNIFER E. RINDEN        AT0006606
ROBERT D. HOUGHTON        AT0003739
VINCENT S. GEIS           AT0013055
NANCY J. PENNER           AT0006146
        for
SHUTTLEWORTH & INGERSOLL, P.L.C.
500 U.S. Bank Bldg., P.O. Box 2107
Cedar Rapids, IA 52406
PHONE:      (319) 365-9461
FAX:        (319) 365-8443
E-MAIL:     jer@shuttleworthlaw.com
            rdh@shuttleworthlaw.com
            vsg@shuttleworthlaw.com
            njp@shuttleworthlaw.com

       and
TROY L. BOOHER      AT0015644
BETH E. KENNEDY    AT0015645
    for
ZIMMERMAN BOOHER
341 S. Main Street, Fourth Floor
Salt Lake City, UT 84111
Phone: (801) 924-0200
Fax:    (385) 420-5576
tbooher@zbappeals.com
bkennedy@zbappeals.com

ATTORNEYS FOR DEFENDANT-
APPELLANT OBSTETRIC AND
GYNECOLOGIC ASSOCIATES OF
IOWA CITY AND CORALVILLE, P.C.

2

Certificate of filing and service

The undersigned certifies this Withdrawal was electronically filed and served on the 28th day of November, 2023, upon the following persons and upon the Clerk of the Supreme Court using the Electronic Document Management System, which will send notification of electronic filing:

Frederick W. James
The James Law Firm, P.C.
2600 Grand Avenue
Suite 213
Des Moines, IA 50312

Ryan Koopmans
Koopmans Law Group, LLC
Waukee, IA 50263

Clerk of the Iowa Supreme Court
Iowa Judicial Branch Building
1111 East Court Avenue, 4th Floor
Des Moines, IA  50319

/s/ Haley Fauconniere

PLAINTIFF'S APPENDIX-173

# IN THE SUPREME COURT OF IOWA
## Johnson County No. LACV081421

CLERK OF SUPREME COURT

NOV 29, 2023

ELECTRONICALLY FILED

| | |
|---|---|
| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX, Esq. )<br><br>Plaintiff-Appellee, )<br><br>vs. )<br><br>OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C. )<br><br>Defendant-Appellant. ) | Supreme Court No. 22-1317<br><br>**WITHDRAWAL OF ZIMMERMAN BOOHER; TROY L. BOOHER; AND BETH E. KENNEDY ON BEHALF OF DEFENDANT-APPELLANT** |

Zimmerman Booher and each of its attorneys of record in this case, including Troy L. Booher and Beth E. Kennedy, herein withdraw as counsel on behalf of Defendant-Appellant Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C. (the "P.C.").

Even though Zimmerman Booher has been preparing to present oral argument, its withdraw is necessary for the following reason. Zimmerman Booher served as co-counsel with Shuttleworth & Ingersoll, in coordination with the P.C.'s prior personal counsel, during the post-trial motion and appellate phase of this litigation. Until yesterday, the P.C. never objected to Zimmerman Booher's representation directly, through Shuttleworth & Ingersoll, or through the P.C.'s personal counsel.

1

Shuttleworth & Ingersoll withdrew as counsel on November 28, 2023. On that same day, the P.C.'s current personal counsel, Nicholas Rowley, filed an objection to Zimmerman Booher's appearance as counsel and to its presenting oral argument on behalf of the P.C. Zimmerman Booher construes that filing as revoking the P.C.'s consent to represent the P.C. before this Court.

Zimmerman Booher takes no position on the dispute between the insurer and its insureds concerning who has the right to direct this litigation. But because that dispute has not been resolved and because the P.C. has revoked its consent for Zimmerman Booher to present argument before this Court, Zimmerman Booher must withdraw as counsel.

The P.C. will continue to be represented by Nicholas Rowley, Trial Lawyers for Justice P.C., who entered an appearance in this case on November 28, 2023, and is admitted to practice in Iowa.

/s/Troy L. Booher
TROY L. BOOHER      AT0015644
BETH E. KENNEDY     AT0015645
     for
ZIMMERMAN BOOHER
341 South Main Street, Suite 400
Salt Lake City, UT 84111
PHONE:    (801) 924-0200
FAX:      (385) 420-5576
E-MAIL:   tbooher@zbappeals.com
         bkennedy@zbappeals.com
ATTORNEYS FOR OBSTETRIC AND
GYNECOLOGIC ASSOCIATES OF
IOWA CITY AND CORALVILLE, P.C.

2

# CERTIFICATE OF FILING AND SERVICE

The undersigned certifies this Appearance was electronically filed and served on the 29th day of November, 2023, upon the following persons and upon the Clerk of the Supreme Court using the Electronic Document Management System, which will send notification of electronic filing:

Frederick W. James
The James Law Firm, P.C.
2600 Grand Avenue Suite 213
Des Moines, IA 50312

Ryan Koopmans
Koopmans Law Group, LLC
500 East Court Ave., Suite 420
Des Moines, IA 50309

Clerk of the Iowa Supreme Court
Iowa Judicial Branch Building
1111 East Court Avenue, 4th Floor
Des Moines, IA  50319

/s/Troy L. Booher

3

PLAINTIFF′S APPENDIX-176

CLERK OF SUPREME COURT

NOV 29, 2023

ELECTRONICALLY FILED

# IN THE SUPREME COURT OF IOWA

## No. 22–1317

## Johnson County No. LACV081421

## ORDER

**S.K., a legally incapacitated Minor by**
**and through his Conservator,**
**THOMAS T. TARBOX,**
    **Plaintiffs-Appellees,**

**vs.**

**OBSTETRIC & GYNECOLOGIC ASSOCIATES**
**OF IOWA CITY AND CORALVILLE, P.C.,**
    **Defendant-Appellant,**

**and**

**MERCY HOSPITAL IOWA CITY and**
**JILL CHRISTINE GOODMAN,**
    **Defendants.**

---

This matter comes before the court upon the appellant's motion for a stay of the appeal and oral argument. The appellees filed a statement noting they do not resist the motion.

Upon consideration, the court grants the motion for stay and the oral argument previously set for December 14, 2023 is continued. The parties will be notified of the date and time of oral argument at a later date.

Within 60 days of the date of this order, the appellant shall either voluntarily dismiss the appeal or file a statement with this court regarding the status of settlement negotiations.

PLAINTIFF'S APPENDIX-177

Copies to:

Troy Lane Booher
Zimmerman Booher
341 South Main Street, Suite 400
Salt Lake City, UT 84111

Beth Ellen Kennedy
Zimmerman Booher
341 South Main Street, Suite 400
Salt Lake City, UT 84111

Nicholas Charles Rowley
Trial Lawyers For Justice
421 W Water Street  Floor 3
Decorah, IA 52101

Frederick William James
The James Law Firm  P.C.
2600 Grand Avenue  Suite 213
Des Moines, IA 50312

Ryan Gene Koopmans
21219 Napa Valley Dr.
Waukee, IA 50263

Jessica Tucker Glick
321 E. Market Street
Iowa City, IA 52240

Carolyn Russell Wallace
321 E. Market Street
Iowa City, IA 52240

PLAINTIFF′S APPENDIX-178



IOWA APPELLATE COURTS

State of Iowa Courts

**Case Number**      **Case Title**
22-1317              S.K. v. Obstetric & Gynecologic Associates

So Ordered

Susan Larson Christensen, Chief Justice

Electronically signed on 2023-11-29 10:15:26

PLAINTIFF′S APPENDIX-179

ELECTRONICALLY FILED          NOV 30, 2023          CLERK OF SUPREME COURT

# IN THE IOWA SUPREME COURT

| | |
|---|---|
| S.K. a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX, Esq., <br><br> Plaintiffs-Appellees, <br><br> v. <br><br> OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C., <br><br> Defendant-Appellant, <br><br> MERCY HOSPITAL IOWA CITY and JILL CHRISTINE GOODMAN <br><br> Defendants <br><br> and <br><br> MMIC INSURANCE, INC. <br><br> Intervenor | CASE NO. 22-1317 <br><br> JOHNSON COUNTY CASE NO. LACV081421 <br><br><br> **MMIC INSURANCE, INC.'S MOTION TO INTERVENE FOR THE LIMITED PURPOSES OF REQUESTING THE CURRENT STAY BE LIFTED AND RESISTING APPELLANT'S OBJECTION TO APPEARANCES OF ATTORNEYS BOOHER AND KENNEDY** |

COMES NOW Intervenor MMIC Insurance, Inc. ("MMIC"), by and through the undersigned counsel, and respectfully submits this Motion to Intervene for the Limited Purposes of Requesting the Court Lift the Current

Stay and Resisting Appellant's Objection to the Appearances of Attorneys Troy L. Booher and Beth E. Kennedy, and states as follows:

### Introduction

MMIC seeks to intervene in this lawsuit to protect its material and substantial interests relating to the underlying judgment and this appeal. As a result of recent actions taken by the Clinic and its privately retained counsel, Attorney Nicholas Rowley, and for the reasons explained below and in the attached Proposed Motion, MMIC's material, substantial interests will likely be affected by the resolution of this case and are not adequately represented by any current party.

### Factual and Procedural Background

1. MMIC is the liability insurer of Defendant-Appellant Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C. ("the Clinic"). The Clinic was the defendant in an excess verdict in the Iowa District Court for Johnson County that is currently pending this Court's review in this appeal.

2. As liability insurer for the Clinic, MMIC retains a common law right to direct and control the defense of the suit. *Wells Dairy, Inc. v. Travelers Indem. Co. of Ill.*, 266 F. Supp. 2d 964, 967 (N.D. Iowa 2003)

2

("Generally, under Iowa law, '[w]hen an insurer defends an insured, it has control over the defense and settlement.' " (quoting *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 643 (Iowa 2000))).

3. Pursuant to the terms of the insurance contract, MMIC "ha[s] the right to control the defense of and retain an attorney to defend any ***claim*** covered by this insurance." *See MMIC Ins., Inc. v. Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, No. 3:23-cv-00039-SMR-WPK, ECF # 16-2, at 10 (S.D. Iowa Nov. 30, 2023) [hereinafter "Declaratory Judgment Docket"].[1] Further, the Clinic has the obligation to cooperate with MMIC's direction of the defense or forfeit coverage. *See id.* at 7 (Common Conditions ¶ M).

4. To protect its substantial legal and contractual interest in the Clinic's cooperation and MMIC's right to control the course of the defense in this matter, MMIC has a pending declaratory and injunctive relief

---

[1] The undesigned are aware of Iowa R. App. P. 6.1002(1)(f)'s 25-page limitation. Respecting the same, and in light of Attorney Rowley's representation that this Court should take judicial notice of a pending declaratory judgment action before Chief Judge Rose in the United States District Court for the Southern District of Iowa, (*see* Defendant-Appellant[']s Motion to Stay Appeal and Oral Arguments ¶ 5 (Nov. 28, 2023), Intervenor MMIC will reference specific docket entries therein to assist the Court in this Motion. The undersigned would also be able to file the same items in the docket of this Court if the Court would prefer.

3

action in the Federal District Court for the Southern District of Iowa, *MMIC Ins., Inc. v. Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, No. 3:23-cv-00039-SMR-WPK, filed on June 5, 2023. *See* Defendant-Appellant's Motion to Stay Appeal and Oral Arguments, Exh. B (Nov. 28, 2023).

5. The relief sought in that case includes enjoining the Clinic from "interference with the opportunity or nature of the Iowa Supreme Court's decision on the merits" of the instant appeal, "absent MMIC's approval." *See id.* at 11; Declaratory Judgment Docket, ECF # 1, at 11.

6. MMIC has, and continues to, retain counsel and prosecute the instant appeal on behalf of its insured, the Clinic.

7. Indeed, the Clinic has been on notice of retained counsel's—specifically, Attorney Troy L. Booher's—appearance in this matter since at least August 2022. *See* Booher Application for Admission *Pro Hac Vice* (Aug. 12, 2022); Booher Appearance (Sept. 13, 2023).

8. Nevertheless, on November 28, 2023, counsel *not* retained by MMIC, but privately retained by the Clinic, Attorney Nicholas Rowley, entered an appearance in the present appeal.

4

9. Attorney Rowley then filed for a stay of the appeal and oral arguments in this matter, as well as an objection to the appearances of MMIC's retained appellate counsel, Attorneys Troy L. Booher and Beth E. Kennedy, in contravention of MMIC's wishes and direction.

10. On November 29, 2023, this Court granted the requested Stay.

11. The Clinic's and Attorney Rowley's actions are improper and should not be condoned by this Court. Accordingly, to protect its substantial legal and contractual interests, MMIC brings this Motion to Intervene.

### **Argument**

12. A party may intervene in a lawsuit when it has material, substantial interests that may be affected thereby and no current party will adequately represent those interests.

13. It is axiomatic that "intervention is remedial and is to be liberally construed." *Rick v. Boegel*, 205 N.W.2d 713, 717 (Iowa 1973).

14. MMIC has at least the following substantial rights implicated by the instant Stay and Attorney Rowley's appearance and objection to MMIC's retained counsel: (1) the right to appeal a judgment on behalf of the Clinic as a liability insurer; (2) the right to appeal an un-superseded judgment on which the liability insurer has made payment;

PLAINTIFF'S APPENDIX-184

(3) the right to select counsel for the insured in the prosecution of any appeal or in defense of the claim; (4) the right to the Clinic's cooperation in pursuit of the defense of the claim; (5) the future statutory interest that might exist relative to civil restitution; and (6) the effect of contractual obligations contained within the Policy of insurance.

15. In his November 28, 2023, filings, Attorney Rowley directly implicated and involved MMIC in these proceedings and challenged its substantial rights. His actions usurp control of the Clinic's defense in this matter.

16. To provide a basis for his November 28, 2023, filings, Attorney Rowley has attempted to contrive a conflict between the Clinic and MMIC's retained counsel by initiating a bad faith and legal malpractice lawsuit on behalf of the Clinic against MMIC and MMIC's retained counsel. *See* Defendant-Appellant's Motion to Stay Appeal and Oral Arguments ¶ 5 (Nov. 28, 2023).

17. The November 28, 2023, filings also attempt to create a conflict between the Clinic and Attorneys Booher and Kennedy by claiming that the Clinic—after months of acquiescence and consent to their representation—now objects to their appearances in this appeal.

6

18. Premised on Attorney Rowley's late-acquired position and representations to this Court, Attorney Booher withdrew from the matter.

19. Moreover, the Clinic appears to have engaged in settlement discussions with Plaintiffs without MMIC's knowledge or consent, also in contravention of MMIC's legal and contractual rights. *See* Defendant-Appellant's Motion to Stay Appeal and Oral Arguments ¶ 17 (Nov. 28, 2023); Declaratory Judgment Docket, ECF # 16-2, at 7, 10 (Policy, Common Condition ¶ M(1), and Section ONE (C)).

20. Finally, Attorney Rowley's actions do not serve the Clinic's best interests because (1) Attorney Rowley's recent Johnson County litigation is itself predicated on the outcome of this appeal, and (2) Attorney Rowley *disclaimed this action was owned by the Clinic* when Plaintiff attempted to execute on the judgment below in June 2023. *See S.K., by and through Tarbox v. Obstetric & Gynecological Assocs. of Iowa City and Coralville, P.C.*, Johnson Cnty. Case No. LACV081421, Return of Service on Execution (June 3, 2023); Declaratory Judgment Docket, ECF ## 16-4, 16-5, 16-6 (Sherriff's June 2023 Return of

7

Service on Execution, Body Camera Transcript, and Body Camera Video).

21. If the Clinic in fact owns the third party claims, it was subject to execution in June 2023 and Attorney Rowley materially misrepresented that fact to the court and the sheriff in denying ownership of the bad faith and legal malpractice claims. *Cf.* Iowa Code § 719.1 (interference with official acts). If Attorney Rowley was correct in representing to the court and sheriff that the Clinic had no such claims to execute upon in June 2023, then the Clinic's current lawsuit in Johnson County is without basis in fact or law, and no conflict exists in having Attorneys Booher and Kennedy continue representing the Clinic in this appeal.

22. It is, at minimum, unclear *who* owns the bad faith claim, as Plaintiffs claim to own the same and have now also filed a bad faith lawsuit against MMIC in Johnson County (Case No. CVCV084863).

23. MMIC respectfully submits that it has a right to intervention on these facts, for the limited purpose of requesting that this Court lift the instant Stay and resisting the Clinic's Objection to Attorneys Booher and Kennedy, to protect its right to direct the conduct of the litigation in this matter.

8

24. As demonstrated by the Clinic's retention of Attorney Rowley and Attorney Rowley's above actions, no current party to this appeal will adequately represent MMIC's substantial rights.

25. It is within this Court's inherent authority to resolve this matter. For instance, the Court may find that the Clinic is estopped from disclaiming its consent to Attorney Booher's representation given its eleventh-hour objection after over a year of Attorney Booher's appearing in the case and filing substantive briefs on the Clinic's behalf. Indeed, the very insurance agreement with MMIC and the intervening fourteen months demonstrates the Clinic's consent.

26. MMIC, as prospective intervenor, does not ask this Court to opine on the enforceability of and the Clinic's compliance with the insurance policy. These are currently matters before the Federal District Court for the Southern District of Iowa.

27. Instead, MMIC respectfully requests this Court intervene in the protection of its substantial rights and interests during this appeal.

28. Indeed, Attorney Rowley's November 28, 2023 filings appear to be asking this Court to interject itself into the controversy that is currently

9

before the federal court by pretermitting the federal court's ability to rule on the issues before it.

29. This Court should not condone such a conflict with matters pending before another federal court.

30. Moreover, Attorney Rowley's paperwork seeks to end-run this Court's authority by placing his personal agenda in a Johnson County extra-contractual claim over and above this direct appeal. The former is predicated on the very resolution of the latter.

31. Whether by granting this Motion and allowing MMIC to present critical facts and arguments to the Court relative to the impropriety of Attorney Rowley's actions, or by pre-serving the status quo of the appeal before Attorney Rowley's conduct to interfere in this appeal, it is within this Court's inherent authority to allow the appeal to proceed.

32. Contrary to Attorney Rowley's unsubstantiated overtures, *see* Defendant-Appellant's Motion to Stay Appeal and Oral Arguments ¶¶ 13–18 (Nov. 28, 2023), MMIC is not adverse to the Clinic. MMIC wants to fully litigate this appeal on the Clinic's behalf and obtain a reversal of the verdict and judgment below, thereby protecting the Clinic's interests.

10

33. Rather, MMIC is adverse to the Clinic's privately retained counsel, Attorney Rowley, who seeks to put the cart before the proverbial horse by forestalling this appeal based on a conflict of his own contrivance so he can litigate the Clinic's recently filed bad faith and legal malpractice lawsuit in Johnson County.

34. The foregoing is to say nothing about Attorney Rowley's wild allegations and extra-judicial statements while a matter is pending.

35. This Court should not reward Attorney Rowley's attempt to sow confusion and bootstrap a dubious conflict of his own making into a premature halt or resolution of these proceedings, which works only to his own advantage and his client's severe detriment.

36. MMIC attaches its Proposed Motion to Lift the Current Stay and Resistance to the Objection to the Appearances of Attorneys Booher and Kennedy with this Motion to Intervene.

37. If this Court grants the Motion to Intervene, MMIC respectfully requests the ability to refile the Motion to Lift Stay and Resistance as a separate Motion, along with accompanying Exhibits.

WHEREFORE, MMIC Insurance, Inc., respectfully requests this Court grant its Motion to Intervene for the Limited Purposes of Requesting the

11

Court Lift the Current Stay and Resisting Appellant's Objection to the Appearances of Attorneys Booher and Kennedy, or grant such other relief as the Court may deem proper.

Respectfully submitted,

ZENOR KUEHNER, PLC

By: /s/ *Adam D. Zenor*
    Adam D. Zenor, AT0009698

By: /s/ *Derek R. LaBrie*
    Derek R. LaBrie, AT0014157

111 East Grand Avenue, Suite 400
Des Moines, IA 50309
Phone: 515/650-9005
Fax: 515/206-2654
adam@zenorkuehner.com
derek@zenorkuehner.com

MEISSNER TIERNEY FISHER & NICHOLS, S.C.

By: /s/ *Mark D. Malloy*
    Mark D. Malloy,
    *Pro Hac Vice Forthcoming*

111 East Kilbourn Avenue, 19th Floor
Milwaukee, Wisconsin 53202
Phone: 414/273-1300
Fax: 414/273-5840
mdm@mtfn.com

ATTORNEYS FOR MMIC INSURANCE, INC.

## CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies that on November 30, 2023, I electronically filed the foregoing Resistance to Appellant's Voluntary Dismissal with the Clerk of the Supreme Court of Iowa by using the Iowa Electronic Document Management System (EDMS), which will send notice of electronic filing to the following:

Nicholas C. Rowley
TRIAL LAWYERS FOR JUSTICE, PC
421 W. Water Street, Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
nick@tl4j.com

ATTORNEY FOR DEFENDANT-APPELLANT

Frederick W. James
The James Law Firm, P.C.
2600 Grand Avenue, Suite 213
Des Moines, IA 50312

Ryan Koopmans
Koopmans Law Group, LLC
500 East Court Avenue, Suite 420
Des Moines, IA 50309

ATTORNEYS FOR PLAINTIFF-APPELLEE

Per Iowa Rs. App. P. 6.106(1), 6.701, and 6.1002(1), this constitutes service for the purpose of the Iowa Court Rules.

13

November 30, 2023        /s/ Adam D. Zenor
Date            COUNSEL FOR INTERVENOR

14

**CERTIFICATE OF MAILING**

The undersigned hereby certifies that on November 30, 2023, I mailed three (3) copies of MMIC Insurance, Inc.'s Motion to Intervene for the Limited Purpose of Requesting the Current Stay be Lifted and Resisting Appellant's Objection to Appearances of Attorneys Booher and Kennedy, and MMIC Insurance, Inc.'s Motion to Lift Stay of Appeal and Oral Argument and to Overrule Appellant's Objection to the Appearances of Attorneys Booher and Kennedy to the following counsel of record at the address listed below:

Nicholas C. Rowley
TRIAL LAWYERS FOR JUSTICE, PC
421 W. Water Street, Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616

ATTORNEY FOR DEFENDANT-APPELLANT

Frederick W. James
The James Law Firm, P.C.
2600 Grand Avenue, Suite 213
Des Moines, IA 50312

Ryan Koopmans
Koopmans Law Group, LLC
500 East Court Avenue, Suite 420
Des Moines, IA 50309

ATTORNEYS FOR PLAINTIFF-APPELLEE

15

November 30, 2023          */s/ Adam D. Zenor*
Date                       Adam D. Zenor, AT0009698
                           COUNSEL FOR INTERVENOR

PLAINTIFF'S APPENDIX-195

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the typeface requirement and type-volume limitation of the Iowa R. App. P. 6.1007(1) because this brief contains 1,958 words.

2. This document complies with the typeface requirements of Iowa R. App. P. 6.1007(1), (2) and the type-style requirements of Iowa R. App. P. 6.903(1)(e) because this brief has been prepared in a proportionally spaced typeface using Equity Text A, size 14-point font, in plain style except for case names and emphasis.

November 30, 2023
Date

/s/    *Adam D. Zenor*
COUNSEL FOR INTERVENOR

PLAINTIFF'S APPENDIX-196

# IN THE IOWA SUPREME COURT

CLERK OF SUPREME COURT

NOV 30, 2023

ELECTRONICALLY FILED

| | |
|---|---|
| S.K. a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX, Esq.,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.,<br><br>Defendant-Appellant,<br><br>MERCY HOSPITAL IOWA CITY and JILL CHRISTINE GOODMAN<br><br>Defendants<br><br>and<br><br>MMIC INSURANCE, INC.<br><br>Intervenor. | CASE NO. 22-1317<br><br>JOHNSON COUNTY CASE NO. LACV081421<br><br><br>**MMIC INSURANCE, INC.'S MOTION TO LIFT STAY OF APPEAL AND ORAL ARGUMENT AND TO OVERRULE APPELLANT'S OBJECTION TO THE APPEARANCES OF ATTORNEYS BOOHER AND KENNEDY** |

COMES NOW Intervenor MMIC Insurance, Inc. ("MMIC"), by and through the undersigned counsel, and submits its Motion to Lift Stay of Appeal and Oral Argument and to Overrule Appellant's Objection to the Appearances of Attorneys Troy L. Booher and Beth E. Kennedy.

PLAINTIFF′S APPENDIX-197

# INTRODUCTION

1. Appellant's Motion to Stay Appeal and Oral Argument and Objection to the appearances of MMIC's selected attorneys (Attorneys Booher and Kennedy) are the product of Attorney Nicholas Rowley's conflicted representation; violate MMIC's common law and contractual rights as the liability insurer; are premised on claims which Attorney Rowley represented to the Johnson County Sheriff's Office did not exist; and should be summarily rejected by this Court.

2. MMIC respectfully requests (1) the Court lift the Stay entered November 29, 2023; and (2) the appeal be allowed to proceed by Attorney Booher under the implicit and explicit consent of an insured's common law and contractual obligations set forth herein.[1]

## FACTUAL AND PROCEDURAL HISTORY

3. On November 22, 2019, Plaintiff-Appellee filed a medical malpractice lawsuit against Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C.

---

[1] Attorney Booher has no conflict in the litigation, and was not named in Attorney Rowley's and the Clinic's bad faith filing of a legal malpractice action at the eleventh hour. *See* Withdrawal of Attorney Booher (Nov. 29, 2023).

4. MMIC Insurance, Inc. ("MMIC") has defended Appellant without reservation from the inception of this lawsuit, and such defense has continued through appeal.

5. On March 22, 2022, a jury returned a verdict against Appellant.

6. Pursuant to its common law and contractual rights to direct the conduct of the litigation, MMIC selected and retained Shuttleworth & Ingersoll, P.L.C. ("Shuttleworth") and Attorneys Booher and Kennedy to represent Appellant in the underlying suit and during the appeal.[2] *See MMIC Ins. Inc. v. Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, No. 3:23-cv-00039-SMR-WPK, ECF # 16-2, at 10 (S.D. Iowa Nov. 29, 2023) (Insurance Policy (Section ONE (C)) [hereinafter "Declaratory Judgment Docket"].

---

[2] The undesigned are aware of Iowa R. App. P. 6.1002(1)(f)'s 25-page limitation. Respecting the same, and in light of Attorney Rowley's representation that this Court should take judicial notice of a pending declaratory judgment action before Chief Judge Rose in the United States District Court for the Southern District of Iowa, (*see* Defendant-Appellant[']s Motion to Stay Appeal and Oral Arguments ¶ 5 (Nov. 28, 2023), Intervenor MMIC will reference specific docket entries therein to assist the Court in this Motion. The undersigned would also be able to file the same items in the docket of this Court if the Court would prefer.

7. During the pendency of the appeal, and in April 2023, MMIC honored its policy obligations and paid the Clinic's limits of $12 million pending the resolution of the direct appeal before this Court.

8. On November 28, 2023, Attorney Nicholas Rowley, purportedly on behalf of Appellant, filed a Motion to Stay Appeal and Oral Argument and Objection to the appearances of Attorneys Booher and Kennedy. On November 29, 2023, this Court granted the Stay. For the reasons set forth herein, MMIC respectfully requests (a) the Stay be lifted; (b) Appellant's Objection on appellate counsel should be overruled; and (c) Attorney Rowley should be disqualified from representing Appellant in this appeal and sanctioned.

**ARGUMENT**

9. MMIC respectfully requests the stay be lifted and the appeal be permitted to proceed because (I) MMIC is entitled to direct the conduct of litigation as liability insurer; (II) the stay is an improper posturing effort to satisfy Attorney Rowley's agenda and pretermit this Court's authority to hear the pending direct appeal; (III) Attorney Rowley's representations to this Court are not so; and (IV) the Clinic

4

should be estopped from reneging on its consent to Attorney Booher after fourteen months to satisfy Attorney Rowley's agenda.

**I. MMIC is entitled to direct the conduct of litigation.**

10. Attorney Rowley's and/or the Clinic's encumbrances on this direct appeal are prejudicial and in violation of long-standing common law and contractual obligations to the contrary.

11. The insurance policy itself prohibits the Clinic from acting in any way to prejudice the conduct of the litigation.

12. Indeed, the insurance agreement repeats many of these common law assurances: "We have the right to control the defense of and retain an attorney to defend any ***claim*** covered by this insurance." *See* Declaratory Judgment Docket, ECF # 16-2, at 10 (Insurance Policy (Section ONE (C)) (emphasis in original).

13. Further, the insurance agreement prohibits an insured (the Clinic) from admitting liability or incurring expenses without MMIC's authorization. *See id.* at 7 (Policy Common Conditions (M)(2)) ("The ***insured*** must not, except at the ***insured***'s own expense, make any payment, admit any liability or incur any obligation other than reasonable medical expenses." (emphases in original)).

14. The Clinic is further contractually bound by material terms requiring

Appellant's cooperation with the litigation:

The *insured* must fully cooperate with us in the investigation of *claims*, the negotiation of settlements, and the conduct of litigation. The *insured* is obligated to attend hearings and trial and assist in the presentation of evidence. The *insured* must also cooperate with us in pursuing any right of contribution or subrogation against a person or organization that is or may be liable to the *insured*. The *insured* will make any assignment necessary to assist in enforcing any right to contribution or subrogation.

*Id.* (Policy Common Conditions (M)(1)) (emphases in original).

15. Nor may the Clinic negotiate *ex parte* without MMIC's consent. *See id.*

16. These contractual provisions mirror any insured's longstanding common law obligations. *Wells Dairy, Inc. v. Travelers Indem. Co. of Ill.*, 266 F. Supp. 2d 964, 967 (N.D. Iowa 2003) (quoting *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 643 (Iowa 2000)) ("[W]hen an insurer defends an insured, it has control over the defense and settlement."); *Am. Guar. & Liab. Ins. Co. v. Chandler Mfg. Co., Inc.*, 467 N.W.2d 226, 229 (Iowa 1991) ("The purpose of a cooperation clause is to protect insurers and prevent collusion between insureds and injured parties.").

17. Attorney Rowley and the Clinic have now violated each condition precedent to coverage. How this conduct may impact insurance

coverage is currently before the United States District Court for the Southern District of Iowa, *see* Declaratory Judgment Docket, ECF # 16 (Motion for Temporary Restraining Order and Preliminary Injunction) (S.D. Iowa Nov. 29, 2023).

18. In its Motion for Stay, the Clinic—by and through Attorney Rowley—represented to this Court that the parties were undergoing settlement negotiations. Not so.

19. MMIC has not authorized the Clinic to negotiate *ex parte*. Doing so (or having done so) would be at the Clinic's own peril.

20. These common law and contractual obligations exist, and until the federal court resolves the impact of Attorney Rowley's and the Clinic's conduct, MMIC respectfully requests the Court lift the stay because (a) MMIC retains the right to direct the conduct of litigation; (b) the representation that settlement discussions are underway is not so—the appeal is briefed and ready for oral argument; (c) the Stay request is an attempt to posture any extra-contractual claim Attorney Rowley may think his client has, and otherwise end-run the federal court's coverage determination; (d) the Stay was an eleventh-hour attempt to conflict local appellant counsel (Shuttleworth & Ingersoll) and renege on

PLAINTIFF'S APPENDIX-203

implicit and explicit consent to Attorney Booher[3]; and (e) MMIC has substantial interest in this matter including the $12 million policy proceeds subject to the present appeal, its common law and contractual rights in selecting counsel and directing the litigation, and the impact in other cases (i.e., the two cases that Attorney Rowley and Plaintiff-Appellee (Case No. CVCV084863) have separately filed alleging the same bad faith cause of action, both against MMIC and Nicole Graziano individually).

21. In light of the conduct and representations made by the Clinic and Attorney Rowley, and through this Court's inherent authority to govern its docket, MMIC respectfully requests the Court lift the stay and permit the appeal to proceed to oral argument and final disposition.

## II. The Stay is an effort to elsewhere pretermit matters before this Court.

22. Maintaining the stay satisfies Attorney Rowley's agenda of litigating an extra-contractual suit before resolution of the liability determination underlying that very suit.

---

[3] Consent by way of the insuring agreement itself, as well as the implicit acquiescence in his representation over the 15-month course of the appeal— all of which Attorney Booher was present for.

23. Iowa precedent does not permit putting the proverbial cart before the horse. *See Brown v. Liberty Mut. Ins. Co.*, 513 N.W.2d 762, 764 (Iowa 1994) ("[W]e merely encouraged courts to await final [liability] decision whenever feasible."); *see also Cincinnati Ins. Cos. v. Kirk*, 801 N.W.2d 856, 864 (Iowa Ct. App. 2011) (referencing the "discretionary abstention policy that operates to delay the consideration of [bad faith] issues by a court" during the pendency of liability adjudication).

24. As applied, courts routinely reject efforts to stay the determination of underlying liability. The determination of liability must necessarily come before any adjudication of a bad faith claim. Indeed, the latter is premised on the former. *See, e.g.*, *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942) ("Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided."); *see also Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 536 (5th Cir. 2004) (abstaining from deciding an insurer's liability until "after the underlying suit is concluded"); *W. Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.*, 503 N.W.2d 596, 601 (Iowa 1993) (holding that coverage determinations which center around facts to be

found in the underlying suit should wait until the conclusion of the underlying suit).

25. Indeed, a predicate for the bad faith claim is underlying liability—a determination which is now presently before this Court on direct appeal. Attorney Rowley attempts to end-run this Court's reviewing the appeal and wishes to first bring a claim which is necessarily dependent on final resolution of this appeal.

26. The Stay contravenes the great weight of authority by allowing Attorney Rowley to adjudicate his putative bad faith claim prior to resolution in this Court, and disrupts the efficient and proper adjudication of claims.

### III. Attorney Rowley is irreparably conflicted.

27. Additionally, the Stay, and Attorney Rowley's prioritizing a bad faith claim for his personal agenda, are not in the best interest of the Clinic in this appeal.

28. The 'good cause' Attorney Rowley referenced to support his ask for a stay (a lawsuit at the eleventh-hour intent on conflicting appellate counsel) is a circumstance of his own making—and one in which his agenda stands to gain substantially, over and in the face of the best

interests of the Clinic (including jeopardizing coverage, avoiding vindication for Dr. Goodman's care, and permitting execution against his own client[4]).

29. Dr. Goodman testified in her own defense in this case, and wants vindication of her conduct.

30. MMIC believes in the propriety of Dr. Goodman's care and has merely sought to have her conduct reviewed by this Court. It is telling that Attorney Rowley is set on avoiding such review.

31. Indeed, on March 30, 2022, Attorney Rowley presented on this particular case alongside counsel for Plaintiff-Appellee Geoffrey Fieger on a plaintiff bar webinar (*Webinars*, TRIAL LAWYERS UNIV., *available at* https://triallawyersuniversity.com/webinars (Mar. 30, 2022)). *See*

---

[4] On October 31, 2022, the Clinic filed for bankruptcy protection in the Southern District of Iowa. The Bankruptcy Court dismissed the case, which was subsequently appealed. During the pendency of that bankruptcy appeal to the United States District Court for the Southern District of Iowa, a stay on execution against the Clinic was entered. *See In re Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, No. 22-01174-als11, ECF No. 307 (Bankr. S.D. Iowa Apr. 3, 2023) ("The Conservator is stayed from undertaking any collection efforts against the assets of the Debtor."). Attorney Rowley dismissed the bankruptcy appeal (Case No. 4:23-cv-00109-SMR-SBJ, S.D. Iowa), subjecting his client to execution.

Declaratory Judgment Docket, ECF # 16-1, at 15 (screenshot of Rowley-Fieger presentation).

32. Attorney Rowley's representation of the Clinic in this appeal, and the express representations made to this Court in requesting a stay, are improper. MMIC asks this Court to lift the stay.

## IV. The Clinic should be estopped from first objecting to counsel over a year after his appearance in this case.

33. MMIC further requests the Court permit the appeal to proceed with Attorney Booher.

34. Attorney Booher first appeared *pro hac vice* at the outset of the appeal. *See* Appearance of Troy L. Booher (Sept. 13, 2022).

35. Attorney Booher has since been fully licensed to practice law in Iowa, and subsequent to the withdrawal of Shuttleworth & Ingersoll counsel, entered his appearance accordingly. *See* Appearance of Troy L. Booher (Nov. 27, 2023).

36. At no time before November 28, 2023, had the Clinic objected to Attorney Booher's representation.

37. Instead, Attorney Rowley waited until the eleventh hour—days before oral argument—to represent on behalf of the Clinic that it no longer consented to Attorney Booher's representation.

38. Indeed, the insuring agreement between the Clinic and MMIC—unless the Clinic now wishes to disavow the very same—constitutes the Clinic's very consent to Attorney Booher's representation (as it has done the last fourteen months).

39. Attorney Booher has no conflict, was not sued by Attorney Rowley and the Clinic in his Johnson County legal malpractice suit, and has represented to this Court that the sole reason for the withdrawal is the representations of Attorney Rowley.

40. Staying the proceeding, or otherwise last-minute withdrawing consent to otherwise proper counsel who had been planning on presenting oral argument, is incompatible with the insurer's rights and may harm his client (the Clinic).

41. Accordingly, MMIC respectfully requests that Attorney Booher be permitted to proceed with presenting oral argument on this appeal, and that Attorney Rowley's objections be overruled.

42. As above, this Court has inherent jurisdiction to control its docket or otherwise discipline/sanction behavior unbecoming of an Iowa lawyer. *See* Iowa R. Civ. P. 1.413 (requiring counsel's actions must have basis in fact or law).

PLAINTIFF'S APPENDIX-209

## CONCLUSION

43. For the foregoing reasons, MMIC Insurance, Inc. respectfully requests the Court (a) lift the stay entered on November 29, 2023; and (b) permit Attorney Booher to prosecute the appeal as contemplated by the parties for the last fourteen months. MMIC further asks the Court to provide any other such relief as it deems just and equitable under the circumstances.

Respectfully submitted,

ZENOR KUEHNER, PLC

By: /s/ *Adam D. Zenor*
    Adam D. Zenor, AT0009698

By: /s/ *Derek R. LaBrie*
    Derek R. LaBrie, AT0014157

111 East Grand Avenue, Suite 400
Des Moines, IA  50309
Phone:  515/650-9005
Fax:  515/206-2654
adam@zenorkuehner.com
derek@zenorkuehner.com

MEISSNER TIERNEY FISHER & NICHOLS, S.C.

By: /s/ *Mark D. Malloy*
    Mark D. Malloy,
    *Pro Hac Vice Forthcoming*

111 East Kilbourn Avenue, 19th Floor

PLAINTIFF'S APPENDIX-210

Milwaukee, Wisconsin 53202
Phone:  414/273-1300
Fax:  414/273-5840
mdm@mtfn.com

ATTORNEYS FOR MMIC INSURANCE, INC.

# CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies that on November 30, 2023, I electronically filed the foregoing Resistance to Appellant's Voluntary Dismissal with the Clerk of the Supreme Court of Iowa by using the Iowa Electronic Document Management System (EDMS), which will send notice of electronic filing to the following:

> Nicholas C. Rowley
> TRIAL LAWYERS FOR JUSTICE, PC
> 421 W. Water Street, Third Floor
> Decorah, IA 52101
> Phone: (563) 382-5071
> Fax: (888) 801-3616
> nick@tl4j.com
>
> ATTORNEY FOR DEFENDANT-APPELLANT
>
> Frederick W. James
> The James Law Firm, P.C.
> 2600 Grand Avenue, Suite 213
> Des Moines, IA 50312
>
> Ryan Koopmans
> Koopmans Law Group, LLC
> 500 East Court Avenue, Suite 420
> Des Moines, IA 50309
>
> ATTORNEYS FOR PLAINTIFF-APPELLEE

Per Iowa Rs. App. P. 6.106(1) and 6.701, this constitutes service for the purpose of the Iowa Court Rules.

November 30, 2023                     /s/     Adam D. Zenor
Date                                  COUNSEL FOR INTERVENOR

**CERTIFICATE OF MAILING**

The undersigned hereby certifies that on November 30, 2023, I mailed three (3) copies of MMIC Insurance, Inc.'s Motion to Intervene for the Limited Purpose of Requesting the Current Stay be Lifted and Resisting Appellant's Objection to Appearances of Attorneys Booher and Kennedy, and MMIC Insurance, Inc.'s Motion to Lift Stay of Appeal and Oral Argument and to Overrule Appellant's Objection to the Appearances of Attorneys Booher and Kennedy to the following counsel of record at the address listed below:

Nicholas C. Rowley
TRIAL LAWYERS FOR JUSTICE, PC
421 W. Water Street, Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616

ATTORNEY FOR DEFENDANT-APPELLANT

Frederick W. James
The James Law Firm, P.C.
2600 Grand Avenue, Suite 213
Des Moines, IA 50312

Ryan Koopmans
Koopmans Law Group, LLC
500 East Court Avenue, Suite 420
Des Moines, IA 50309

ATTORNEYS FOR PLAINTIFF-APPELLEE

November 30, 2023
Date

/s/ Adam D. Zenor

Adam D. Zenor, AT0009698
COUNSEL FOR INTERVENOR

# CERTIFICATE OF COMPLIANCE

1. This document complies with the typeface requirement and type-volume limitation of the Iowa R. App. P. 6.1007(1) because this brief contains 2,380 words.

2. This document complies with the typeface requirements of Iowa R. App. P. 6.1007(1), (2) and the type-style requirements of Iowa R. App. P. 6.903(1)(e) because this brief has been prepared in a proportionally spaced typeface using Equity Text A, size 14-point font, in plain style except for case names and emphasis.

November 30, 2023
Date

*/s/ Adam D. Zenor*
COUNSEL FOR INTERVENOR

| | |
|---|---|
| S.K., a legally incapacitated Minor by and through his Conservator, THOMAS T. TARBOX,<br><br>    Plaintiffs-Appellees,<br><br>    vs.<br><br>OBSTETRIC & GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE, P.C.,<br><br>    Defendant-Appellant<br><br>    and<br><br>MERCY HOSPITAL IOWA CITY and JILL CHRISTINE GOODMAN,<br><br>    Defendants. | Case No. 22-1317<br><br>(Johnson Co. No. LACV081421)<br><br><br>**DEFENDANT-APPELLANT'S OBJECTION TO MMIC'S MOTION TO INTERVENE** |

Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C. (the "Clinic"), files this opposition to MMIC Insurance Inc. ("MMIC") Motion to Intervene.

## INTRODUCTION

The underlying litigation stems from medical services rendered by the Clinic, which, regrettably, caused alleged harm to S.K. Following these events, the Clinic faced a lawsuit that culminated in a substantial verdict against it.

1

Throughout the trial, the Clinic relied on its insurance provider, MMIC, for legal defense and guidance. However, this reliance turned into despair when MMIC obstinately refused to settle within the $12 million policy limits despite clear opportunities and repeated urgent requests from the Clinic.

The trial's aftermath saw MMIC's continued defiance of its fiduciary duties. Contrary to its assurances, MMIC's refusal to post a bond compounded the Clinic's financial woes and betrayed the trust inherent in the insurer-insured relationship. This betrayal was further intensified by MMIC requiring the Clinic to file for bankruptcy protection. This move was later proved ill-advised as the bankruptcy petition was dismissed. Ultimately, the Clinic, reeling under successive blows, was forced to shutter its doors, leaving its founders – three dedicated obstetricians native to Iowa – in a state of professional and personal turmoil.

This Court granted a 60-day stay of this Appeal to allow the Clinic and the Plaintiff to explore possible settlement. The Clinic has engaged the Plaintiff in those discussions, and 60 days is sufficient time to determine if a possible resolution to all claims related to this matter might be reached. If such an agreement is reached, the Clinic plans to present the agreement to the Federal Court, this Court, or the Iowa District Court for approval. MMIC's reference to the federal court action must be updated; the Federal Court recently rejected MMIC's

2

attempt to obtain a restraining order, among other things. *MMIC v. The Clinic,* Case 3:23-cv-00039-SMR-WPK Document 21 Filed 12/20/23.

Amidst MMIC's backdrop of broken promises and mismanagement, it now seeks to intervene in this Appeal. This move, the Clinic contends, is an attempt to further improperly control and detrimentally manipulate the legal rights of the Clinic, disregarding the obligations and duties owed to the Clinic.

## BACKGROUND

This case examines the balance between an insurer's contractual obligations and fiduciary responsibilities to its insured and the insured's inherent right to self-protection. This is particularly pertinent when the insurer has prioritized its own financial interests over those of its insured. The Clinic opposes MMIC's proposed intervention as it is legally unsound and unjust. This stance is underscored by MMIC's previous actions, which have caused considerable detriment to both the Clinic and its stakeholders.

The Clinic is now entangled in complex legal claims, primarily due to MMIC consistently prioritizing its own financial interests over those of the Clinic. It is a fundamental principle that an insurer must not prioritize its financial interests over its insured's rights. Breaching this principle leads to bad faith, as established in *Henke v. Iowa Home Mut. Cas. Co.*, 250 Iowa 1123 (1959). In *De Dios v. Indemnity Insurance Co. of North America*, 927 N.W.2d 611 (Iowa 2019), this

3

Court scrutinized the conduct of a third-party administrator executing essential insurer functions. The Court observed that a bad faith claim is justifiable when such an administrator adjusts claims with a financial motivation to delay or deny payments. This holds true despite any intricate documentation crafted to construct artificial divisions between the insured and those effectively determining their claims. *Id.*

Despite MMIC's steadfast refusal to contribute financially or participate in a settlement conference before the excess verdict and its subsequent retraction of the commitment to post a bond or safeguard the Clinic both before and after the verdict, MMIC persists in prioritizing its own financial interests over those of the Clinic. Even now, the Clinic requests a "comfort letter," yet MMIC refuses to provide a "comfort letter." Curiously, MMIC asks this Court to allow it to control the Appeal, not allow the Clinic and its shareholders to protect themselves and attempt to settle with S.K. and preclude the Clinic from utilizing Nicholas Rowley to protect its interests.

MMIC relies on provisions in the insurance policy as if it has done nothing wrong. However, when an insurer acts in bad faith regarding settlement negotiations concerning the insured's risk, the insurer has breached the insurance contract and is precluded from enforcing provisions in the insurance policy to its benefit. *Kelly v. Iowa Mut. Ins. Co.,* 620 N.W.2d 637, 645 (Iowa 2000). As MMIC

4

points out in paragraph 12, "a party may intervene in a lawsuit when it has material, substantial interests that may be affected thereby and no party will adequately represent those interests." Here, MMIC is not protecting the Clinic's interests.

This prioritization constitutes a failure to act in the insured's best interests. MMIC's proposed intervention would only exacerbate the already challenging situation, potentially escalating to more pronounced injustice. This response demonstrates why MMIC's intervention is both unnecessary and potentially detrimental and should be rejected.

## ARGUMENT

## I. MMIC'S ACTIONS ADVERSELY IMPACT THE CLINIC'S INTERESTS

MMIC's track record of handling the underlying litigation – characterized by a marked refusal to settle within policy limits despite clear indications of liability and substantial risk – defeats its claim of a protectable interest. Precluding the Clinic and the Plaintiff from exploring the resolution of all claims and allowing intervention by MMIC in this scenario would be unjust. This would set a concerning precedent where insurers, after failing to act in good faith, could intervene in litigation to further their own interests, contrary to those of their insureds.

MMIC's refusal to reasonably negotiate and then its retraction of promises to protect the Clinic from its improper refusal to settle has caused the Clinic's unnecessary exposure to significant financial risk and eventual closure, an outcome that could have been mitigated had MMIC acted in good faith and in alignment with its fiduciary duties.

The Clinic's interests extend beyond mere financial considerations. As a healthcare provider with a longstanding reputation in the Iowa City community, the Clinic's interests encompass its professional integrity, ongoing viability as a healthcare provider, and broader obligations to its patients and community.

MMIC's refusal to manage the litigation responsibly, causing an excessive verdict, directly contradicted these interests. By failing to negotiate a settlement within the policy limits, MMIC exposed the Clinic to unnecessary financial risk and reputational harm. This outcome was not merely a financial debacle but a betrayal of the Clinic's trust in its insurer to protect its interests.

The subsequent actions by MMIC – particularly its broken promise to post a bond and the misguided push into bankruptcy – further heightened the Clinic's difficulties. In her ruling dismissing the bankruptcy, U.S. Bankruptcy Judge Anita L. Shodeen found that the bankruptcy "lacked the required element of good faith" and stated, "*No satisfactory explanation has been provided to justify MMIC's involvement in the bankruptcy case*. Legitimate questions and concerns arise

6

related to MMIC's willingness to assist the Debtor in paying for its bankruptcy professionals and financing its business operations, all of which appear to fall outside the policy terms and conditions." *See* attached Exhibit 1, Memorandum of Decision dated March 29, 2023, *In the Matter of: Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C.,* Case No. 22-01174-als11. These actions indicate a pattern of behavior by MMIC that prioritizes its financial interests over the welfare of its insured, in stark contrast to the fundamental principles of insurance law, which dictate that insurers owe a duty of good faith and fair dealing to their insureds.

## II. MMIC'S FAILURE TO ACT IN GOOD FAITH AND ITS CONSEQUENCES

The concept of good faith is foundational in insurance law. Insurers owe their insureds a duty of good faith and fair dealing, as established in Iowa case law, including the landmark decision in *Kelly v. Iowa Mut. Ins. Co*., 620 N.W.2d 637 (Iowa 2000). MMIC's actions constitute a stark deviation from the duties owed to the Clinic. MMIC's refusal to settle within policy limits, despite the clear potential for a verdict far exceeding those limits, directly contravened its duty of good faith. The Clinic's independent counsel, Jim Craig, repeatedly urged MMIC to settle, recognizing the significant risks involved. MMIC's inaction in the face of these risks directly led to the excessive verdict that has jeopardized the Clinic's existence.

7

MMIC's conduct following the verdict – including its broken promise to post a bond and forcing the Clinic into bankruptcy – further exemplifies its bad faith. Such actions compounded the Clinic's financial distress and betrayed the trust that forms the core of the insurer-insured relationship. This pattern of behavior underscores the inappropriateness of allowing MMIC to intervene in this Appeal.

## III. CONFLICTS OF INTEREST AND LACK OF TRANSPARENCY IN MMIC'S APPROACH

MMIC's handling of this case raises serious concerns regarding conflicts of interest and a lack of transparency. Most notably, MMIC engaged an appellate lawyer who was not initially licensed in Iowa and who has a history of directly representing MMIC and its affiliates in actions against its insureds. This decision indicates MMIC's approach throughout this litigation: prioritizing its interests over those of the Clinic.

Such conflicts of interest are detrimental to the Clinic and the integrity of the legal process. The Iowa Rules of Professional Conduct and established case law emphasize the importance of conflict-free representation, particularly where the interests of the insurer and the insured diverge. MMIC's failure to prioritize the interests of the Clinic further justifies the denial of its motion to intervene.

PLAINTIFF'S APPENDIX-224

## IV. THE CLINIC'S NEED FOR FINALITY AND PROTECTION

Allowing MMIC to intervene and assume control of the litigation would not serve the Clinic's interest. Instead, it would enable MMIC to steer the litigation in a direction that might mitigate its financial exposure at the expense of the Clinic's interests. It could lead to legal strategies prioritizing MMIC's interests, potentially at the cost of an equitable resolution for the Clinic.

The Clinic has a pending claim against MMIC in the Iowa District Court for Johnson County for bad faith conduct in connection with this matter. *See* attached Exhibit 2, Petition at Law and Jury Demand in the matter of *OB-GYN Associates, et al.* v. *MMIC Insurance, et al.* Additionally, MMIC filed a claim against the Clinic in the United States District Court for the Southern District of Iowa, which is also pending. See attached Exhibit 3, Complaint for Declaratory Judgment in the matter of *MMIC Insurance v. OB-GYN Associates.* The Clinic respectfully requests that this Court take judicial notice of all filings in both the related state court bad faith case and federal injunction case.

## V. THE CLINIC ISN'T MMIC'S FIRST HOSTAGE.

MMIC has a long and stark record of engaging in similar bad faith conduct in multiple jurisdictions. In the matter of *Sacred Heart Health Services, et al., v. MMIC, Insurance, Inc., et al.,* Sacred Heart Health Services and Avera Health, along with a hospital and several physicians, sued MMIC in South Dakota federal

9

court for bad faith, deceit, and breach of contract in connection with its conduct during settlement negotiations for 36 medical malpractice claims involving a surgeon who had his medical privileges suspended and fled to Iran. *See* attached Exhibit 4, Complaint in the matter of *Sacred Heart Health Services, et al., v. MMIC, Insurance, Inc., et al.,* 4:20-cv-04149-LLP, in the United States District Court for the District of South Dakota.

In ruling on MMIC's Motion for Summary Judgment in the matter of *Sacred Heart Health Services, et al., v. MMIC, Insurance, Inc., et al.,* United States District Judge Lawrence Piersol found that jury questions existed as to whether MMIC: (1) placed its interest ahead of those of its insureds, (2) breached its duty to settle in good faith, (3) acted in bad faith, (4) committed a material breach of its duty to defend, and (5) willfully concealed evidence. Judge Piersol also found there was evidence in the record to support the submission of punitive damages against MMIC to the jury. *See* Document 169, Memorandum Opinion and Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, *Sacred Heart Health Services, et al., v. MMIC, Insurance, Inc., et al.,* 4:20-cv-04149, in the United States District Court for the District of South Dakota, dated May 31, 2023.

On the same day as the verdict, without consulting the Clinic, MMIC hired appellate lawyer Troy Booher to represent the Clinic. He was simultaneously

10

representing MMIC against MMIC insureds. *See* attached Exhibit 5, Utah Supreme Court ruling in the matter of *UMIA Insurance Inc. v. Saltz*, 515 P.3d 406 (Utah 2022), in which Mr. Booher represented MMIC subsidiary UMIA Insurance on claims by a physician for bad faith representation. (Notably, the Utah Supreme Court found that a jury question existed as to whether the MMIC subsidiary had engaged in bad faith conduct vis-à-vis its insured physician and found that punitive damages were submissible because a reasonable jury could conclude that the MMIC subsidiary was "recklessly indifferent toward" its insured physician's rights. The same head of claims in *Saltz,* Nicholas Ghiselli, was the head of claims in S.K.'s case).

## CONCLUSION

The Clinic strongly urges the Court to deny MMIC's motion to intervene. Granting this motion would potentially set a harmful precedent, unjustly allowing insurers to neglect their duty of good faith and fair dealing. The Clinic deserves a just resolution, free from the conflicting interests of its insurer. Denying MMIC's motion is essential to uphold justice and fairness, principles at the core of Iowa's legal system. The Clinic, as Defendant-Appellant, firmly requests that the Court reject MMIC's Motion to Intervene in its entirety.

If this Court does not allow the Clinic to bring finality to this matter by allowing it to explore possible settlement to protect the Clinic and its principals,

11

then the Clinic asserts that MMIC should only be permitted to intervene if it formally agrees in writing to assume all risk associated with the outcome of the underlying case to the Plaintiff.

WHEREFORE, Defendant-Appellant Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C. respectfully requests that MMIC's Motion to Intervene be denied in its entirety.

Respectfully Submitted,

By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley          AT0009516
Dominic F. Pechota          AT0006175
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nr@tl4j.com
Email: dominic@tl4j.com

ATTORNEYS FOR DEFENDANT-
APPELLANT OBSTETRIC &
GYNECOLOGIC ASSOCIATES OF
IOWA CITY AND CORALVILLE,
P.C. AND DEFENDANT JILL
GOODMAN


# Lawsuit claims insurance company used exceptional case to push for medical malpractice tort reform

Iowa Public Radio | By Natalie Krebs

Published November 28, 2023 at 3:29 PM CST



*Katarina Sostaric / IPR File*

Gov. Kim Reynolds signed a bill into law last February that caps non-economic damages in medical malpractice lawsuits. A new lawsuit filed this month claims an insurance company used an exceptional 2022 case to push lawmakers to support this legislation.

A new lawsuit claims an insurance company involved in a high profile medical malpractice case helped influence Iowa lawmakers to pass tort reform last session.

Iowa Public Radio News
**Morning Edition**

PLAINTIFF'S APPENDIX-229

The civil lawsuit was filed this month by the Obstetric and Gynecological Associates of Iowa City and Coralville, the OB/GYN practice at the center of an exceptional medical malpractice case, and three of its doctors.

In 2022, a Johnson County jury awarded the Kromphardt family $97.4 million following a botched delivery that left their infant with a permanent brain injury.

The lawsuit filed by the OB/GYNs involved in the case claims their medical malpractice insurance company, Minnesota-based MMIC/Constellation, "put its financial and political interests ahead" of its clients when it refused to settle with the family and forced the case to go to trial, which is rare for medical malpractice cases.

The lawsuit also names Nicole Graziano, a claims adjuster for MMIC/Constellation, and Shuttleworth & Ingersoll, the law firm employed by the insurance company to represent the doctors.

Nick Rowley, the attorney representing the OB/GYNs, said MMIC/Constellation knew they would likely lose if the case went to trial, but did so anyways in order to influence Iowa lawmakers to cap non-economic damages on medical malpractice cases.

"This is a playbook that insurance companies have used over and over again," he said. "They refuse to pay on cases. They then have cases go to trial, there's a big jury verdict, and then the insurance company hires and pays lobbyists to go talk to politicians and say, 'Look at these out of control lawsuits that are driving our doctors out of state.'"

In a statement provided to IPR, MMIC/Constellation calls the lawsuit's allegations "simply untrue."

"Because of the implications for those involved, we want to be respectful of the legal process when commenting on active litigation. However, our plan is to file a response and we look forward to having this matter dismissed," the statement said.

"Our company remains committed to defending good medicine, and we stand with the caregivers, healers and helpers who have dedicated themselves to the essential work of enhancing health and life," it said.

Rowley said he's seeking a jury verdict against the insurance company and funds to

PLAINTIFF'S APPENDIX-230

down, which could total more than $1 billion.

"Hopefully, we can pull the wool off of everybody's eyes and really show Iowa and show the courts what's been going on," he said.

Gov. Kim Reynolds signed a new law last session capping non-economic damages in medical malpractice cases at $1 million for independent clinics and $2 million for hospitals.

Supporters of the legislation, including insurance companies and health care providers, said by capping non-economic medical malpractice damages, Iowa can drive down insurance costs and attract more doctors to the state.

Opponents, including trial lawyers, said it's unclear how much of an influence caps have on insurance prices and they violate people's rights by making it harder for them to sue.

Most states have passed some kind of medical malpractice caps on non-economic damages, and many have faced legal challenges. Some state supreme courts, like those in Kansas and Oklahoma, have ruled them unconstitutional, while others, like those in Missouri and Wisconsin, have upheld their laws.

Iowa Public Radio News
**Morning Edition**

PLAINTIFF'S APPENDIX-231

# Lawsuit claims insurer conned Iowa lawmakers into passing tort reform

CLARK KAUFFMAN Iowa Capital Dispatch
Nov 27, 2023



A newly filed lawsuit claims an insurance company engineered a record-setting medical malpractice judgment in Iowa to spur state legislators into passing tort reform legislation.

In March 2022, a Johnson County jury awarded more than $97.4 million to the family of a boy who sustained serious brain damage during his birth at an Iowa City hospital. The award, believed to be the largest medical malpractice judgment in Iowa history, was later reduced to $75.6 million.

The boy's parents, Kathleen and Andrew Kromphardt, had sued Obstetric and Gynecologic Associates of Iowa City and Coralville and others, alleging their son's brain damage was caused by negligence in the hours leading up to his birth in August 2018.

Court filings by parties on both sides of the case suggest that the clinic, the doctors and the family were interested in settling the case out of court for an amount that would be covered by the clinic's insurance policy. The insurance company resisted, however, and rejected proposals to settle the case for any amount, which resulted in the malpractice case going to trial.

This week, the clinic's attorney, Nick Rowley, filed a lawsuit in state court arguing that the insurer, MMIC Insurance/Constellation Inc., and its attorneys, Shuttleworth & Ingersoll of Cedar Rapids, acted in bad faith.

PLAINTIFF'S APPENDIX-232

MMIC, the lawsuit claims, used the lawsuit and the resulting jury award to persuade state lawmakers to pass tort-reform legislation that would save insurance companies millions by capping damages for malpractice that could be paid out to patients and their families.

"Once a jury decided the case was worth $97 million, MMIC/Constellation used the jury's verdict to convince Iowa politicians to put a cap on non-economic damages in place in the state of Iowa," the lawsuit claims. "MMIC/Constellation unreasonably chose not to settle and make the lawsuit and verdict go away, and then used OB-GYN Associates' financial and reputational demise as propaganda to pass tort reform in Iowa. MMIC/Constellation had been attempting to get a hard non-economic damages cap put in place in Iowa for many years ... MMIC/Constellation knew that the story of a $97 million verdict and three female OB/GYN physicians having to file bankruptcy and close their practice because of a large jury verdict, would give MMIC/Constellation what it needed to convince Iowa lawmakers to vote to pass the cap."

The defendants in the case have yet to file a response to the lawsuit but have denied any wrongdoing in related federal-court filings.

Rowley acknowledged Wednesday that the lawsuit speaks not just to the insurance company's actions, but to its motives — but, he said, he doesn't anticipate it will be a difficult case to prove.

"I don't think it's going to be that tough," he said. "A jury is going to see what happened. It's right there, it's right out in the open, because that's how bold they are in Iowa. And wait until I get all their emails and their text messages and everything. We're going to look at everything and leave no stone unturned."

## Lawsuit: Governor and lawmakers were lobbied

The allegations in the lawsuit echo those made in court filings related to the original malpractice lawsuit and the clinic's bankruptcy. In relation to those filings, Rowley claimed the insurer's decision to take the case to trial, rather than settle, was part of

PLAINTIFF'S APPENDIX-233

https //www ottumwacourier com/news/lawsuit claims insurer conned iowa lawmakers into passing tort reform/article 98900cdc 8d70 11ee ae50 4723d2e358a6 html

predetermined strategy of forcing the clinic into bankruptcy, enabling lobbyists and lawmakers to claim tort reform was needed to save medical providers from moving out of Iowa.

The bankruptcy element of the plan was almost successful, Rowley claims, until a federal judge in the bankruptcy case stepped in and dismissed the case as fraudulent.

The newly filed lawsuit claims that in the wake of the record-setting judgment, MMIC/Constellation "held seminars and lobbied for the implementation of non-economic caps in Iowa, involving the governor in the process. MMIC/Constellation told the story of three female OB/GYN physicians who had to file for bankruptcy and close down their clinic because of greedy trial lawyers and out-of-control civil litigation in Iowa. What MMIC/Constellation failed to share in these seminars and meetings with Iowa lawmakers is the fact that MMIC/Constellation was the insurer in the case of the $97 million verdict and all of the other large jury verdicts in Iowa — and that each case went to trial because MMIC/Constellation refused to negotiate and settle reasonably."

House File 161 capped noneconomic damages in lawsuits against health care providers for medical incidents that result in the loss or impairment of a bodily function, disfigurement or death, at $1 million for clinics and individual doctors, and $2 million for hospitals.

Rowley has argued that MMIC/Constellation, in executing the alleged scheme to "bamboozle" state legislators, repeatedly put its own financial and political interests ahead of its policyholder, the clinic, which it used as "a pawn to change Iowa law regarding noneconomic damages – telling Iowans, at best, half-truths and, at worst, straight-up lies … The bad faith runs deep and will prove to be one of the worst cases of bad-faith conduct justifying punitive damages in Iowa state history."

Rowley said Wednesday that the insurance companies have been "playing the long game" and focusing on long-term profits rather than short-term losses. "They sit up there on their high insurance-company thrones, and they see the world through a whole different

PLAINTIFF'S APPENDIX-234

https://www.ottumwacourier.com/news/lawsuit claims insurer conned iowa lawmakers into passing tort reform/article 98900cdc 8d70 11ee ae50 4723d2e358a6 html

lens than the rest of us," Rowley said.

## Judge questioned bankruptcy filing

The lawsuit seeks unspecified damages for bad faith, legal malpractice, breach of fiduciary duty and breach of contract.

The new litigation follows an aborted bankruptcy filing by the clinic last fall. The Kromphardts' attorneys had challenged the filing, arguing it was filed in bad faith to avoid payment of the malpractice award.

On Jan. 20, the conservator in the bankruptcy case filed a motion with the court, alleging the clinic was acting in bad faith by filing for bankruptcy and arguing it was a litigation tactic to avoid payment of a bond that would secure some of the clinic's assets.

In a March 29 decision dismissing the bankruptcy case, U.S. Bankruptcy Judge Anita L. Shodeen expressed concern over "the relationship" between the clinic and its insurer, MMIC. The judge suggested the insurance company may have given the clinic certain financial favors in return for the clinic filing for bankruptcy as part of an effort to shield MMIC from having to make a $12 million policy payout.

She noted that MMIC paid fees to the clinic's bankruptcy professionals and offered the clinic favorable terms on its insurance coverage when no one else would. In addition, the judge stated, MMIC had offered to extend credit to the clinic.

"A question arises about whether the bankruptcy was motivated by a proper purpose or to obtain financial advantages from MMIC in exchange for filing bankruptcy to attempt to protect it from making payment under the policy," Shodeen stated in her decision.

*Iowa Capital Dispatch is part of States Newsroom, a network of news bureaus supported by grants and a coalition of donors as a 501c(3) public charity. Iowa Capital Dispatch maintains editorial independence. Contact Editor Kathie Obradovich for questions: info@iowacapitaldispatch.com. Follow Iowa Capital Dispatch on Facebook and Twitter.*

Trending Video

PLAINTIFF'S APPENDIX-235

CRIME & COURTS

# Insurer accused of manipulating record-breaking $97M malpractice verdict to force tort reform

 **William Morris**
Des Moines Register

Published 5:43 a.m. CT Dec. 4, 2023 | Updated 5:43 a.m. CT Dec. 4, 2023

Two sets of lawyers are bringing competing complaints against the insurance company they accuse of mishandling an Iowa medical malpractice lawsuit that resulted in a record-setting $97 million jury verdict.

Andrew and Kathleen Kromphardt won the massive award in Johnson County against Obstetric and Gynecological Associates of Iowa City and Mercy Hospital after their son suffered serious brain injuries during birth in 2018. The jury award, believed to be the largest malpractice verdict in Iowa history, includes money for anticipated lifelong 24/7 care for the couple's son.

The massive verdict was one factor Iowa legislators cited when they passed laws to cap noneconomic damages in future malpractice cases — an outcome that, according to the clinic's lawyers, may have been the insurance company's goal from the start.

Attorney Nick Rowley, representing the clinic, sued Minnesota-based insurer MMIC on Nov. 21, accusing the company of acting in bad faith in refusing to settle the Kromphardts' case before trial, pressuring the clinic to improperly declare bankruptcy to avoid paying the bill, and using the resulting catastrophic results to lobby Iowa legislators to pass tort reform the company had been seeking for years.

But on Tuesday, attorneys representing the Kromphardts filed their own lawsuit over MMIC's alleged bad faith conduct toward the clinic.

Attorneys for the family say they control the rights to that claim to go toward the roughly $65 million they are still owed by the clinic. Their attorneys say a judge will have to decide who has the right to assert the clinic's claims going forward.

PLAINTIFF'S APPENDIX-236

However the case proceeds, the parties are looking for significant money. The Kromphardts' complaint seeks damages from MMIC of more than $100 million. Rowley's goals are even more ambitious, with the attorney previously telling the Iowa Capital Dispatch he intended to sue the insurer for "more than $1 billion."

MMIC, for its part, is fighting back in multiple courts, including asking a federal judge to grant a restraining order preventing Rowley from further meddling in the Kromphardts' case against the clinic. A spokesperson told the Register the new lawsuits against MMIC contain "assertions that are simply untrue" and the company expects both will be dismissed.

## Two arguments for bad faith by insurer

Even the Kromphardts' lawyers, who have no love for the clinic, allege the doctors there were poorly served by their insurer.

"The arrogance of MMIC is well beyond anything I've ever seen in my 45 years as a lawyer," attorney Jack Beam told the Register. "They never offered a penny (to settle), even though the doctors desperately wanted the case to settle."

The Kromphardts' complaint cites emails between the clinic's attorneys before trial, showing the doctors trying without success to get their insurer to agree to negotiate.

Ultimately, facing an unpayable debt to the Kromphardts worth tens of millions of dollars, the clinic sold itself to Mercy Hospital Iowa City, with its shareholder doctors becoming Mercy employees. The complaint states the shareholders "lost millions of dollars in reasonably expected profits and potential sale of the practice in the future."

Rowley, in his complaint, offers a motive for MMIC's alleged failure to deal in good faith, as well as subsequently pressuring the clinic to declare bankruptcy. The attorney, who has raised similar allegations in other lawsuits against MMIC, believes the insurer was trying, and succeeded, to pressure legislators into passing the tort reforms it wanted.

"This is a badly behaved insurance company that has a long history of bad behavior in Iowa," Rowley said in a statement. "MMIC needs to be held accountable for perverting their duties to insured Iowans, and for it's successful efforts to defraud Iowa lawmakers into passing legislation that fundamentally violates the constitutional rights of Iowa healthcare patients."

# Where is the money, and who gets to sue?

The dueling lawsuits set up an awkward fight between the clinic and the Kromphardts, even before MMIC files any reply in court.

Court filings show that, to satisfy the outstanding jury verdict, the Kromphardts in July sent sheriff's deputies to take legal possession of the clinic's potential causes of action against MMIC, meaning the family gets to bring those claims on the clinics behalf and, if successful, keeping the proceeds.

Matt Patterson, another of the Kromphardts' attorneys, said they intend to argue to the court that they are the ones entitled to bring the clinic's claims against MMIC.

"(We will) intervene in the (clinic's) case and have the issues/cases consolidated for the judge to rule who is prosecuting the cause of the action, which we believe will be ruled on in our favor," he said in an email.

Rowley, via email, said he does not believe the Kromphardts can extinguish the clinic's right to bring its own claims, and that the family's attorneys are "jumping on the train that we have set in motion because we have the case against MMIC that has teeth to it."

Even if a court rules the Kromphardts have sole rights to the clinic's claims, Rowley said, his suit also brings claims on behalf of the three individual doctors who owned it, claims that the Kromphardts do not own — meaning the two sides will still likely have to cooperate against their mutual foe.

"The practical effect is that the (clinic) and the Kromphardt estate will have to work jointly to prosecute the case against MMIC under the law," Patterson said.

## Supreme Court delays case, and MMIC responds

The back-to-back filings have roiled an already sprawling dispute.

In addition to suing MMIC, Rowley's complaint also brings legal malpractice claims against the Shuttleworth & Ingersoll law firm, which defended the clinic at the malpractice trial. The law firm, which did not respond to a request for comment, subsequently withdrew from that case over the resulting conflict of interest — two weeks before the clinic's appeal was to be argued before the Iowa Supreme Court.

PLAINTIFF'S APPENDIX-238

On Tuesday, citing the shakeup of the legal team, Rowley asked the Supreme Court to postpone those oral arguments and allow more time for settlement negotiations. The same day, the court agreed, imposing a 60-day stay on the case.

In response, MMIC filed several motions Thursday asking the Supreme Court to lift the stay and let the case proceed. While the Shuttleworth law firm now has a conflict of interest, the clinic still has other competent appellate attorneys on the case, the company argued.

More importantly, the company says, Rowley has no right to postpone the case, conduct settlement negotiations or do anything else about the case, because the clinic's insurance policy gives MMIC the full right to control its legal defense.

"MMIC believes in the propriety of Dr. (Jill) Goodman's care and has merely sought to have her conduct reviewed by this court," the insurer's attorneys argue. "It is telling that attorney Rowley is set on avoiding such review."

MMIC is also fighting back in federal court. In June, after Rowley was first hired by the clinic and began threatening to negotiate a settlement, the company asked a federal court to rule that it had the exclusive right to manage the clinic's legal defense, and that if the clinic were to dismiss or otherwise interfere with the appeal, it would void its malpractice insurance and abandon any bad faith legal claim against MMIC by doing so.

The federal court has not yet ruled in that case, and after Rowley asked the Iowa Supreme Court to postpone the case, MMIC returned to the federal court Wednesday with an emergency motion for a restraining order to prevent any further "interference" by Rowley.

The motion cites numerous examples of what the company believes are bad faith and conflicts of interest on Rowley's part. MMIC accuses Rowley of filing his lawsuit earlier this month specifically to force the Shuttleworth law firm off the case and delay the malpractice appeal; of colluding with the Kromphardts' attorneys despite, nominally, being opposing parties; and of acting against the clinic's legal interest to further his own grudge against MMIC.

## With multiple pending cases, what next?

The timeline for the expanding dispute to move forward is unclear.

The Iowa Supreme Court has not scheduled a new oral argument date, or responded to MMIC's motion to lift the stay Rowley requested. The Kromphardts have not filed to

PLAINTIFF'S APPENDIX-239

intervene in Rowley's suit against MMIC, and MMIC has not yet filed a response to either of the bad-faith suits against it.

In MMIC's federal case, the court has given Rowley until Dec. 8 to respond to the emergency restraining order request.

*William Morris covers courts for the Des Moines Register. He can be contacted at wrmorris2@registermedia.com, 715-573-8166 or on Twitter at @DMRMorris.*

PLAINTIFF'S APPENDIX-240

| | |
|---|---|
| **Subject:** | Re: Troy Booher |
| **Date:** | Saturday, December 30, 2023 at 11:10:40 AM Central Standard Time |
| **From:** | Nicholas Rowley |
| **To:** | Mark D. Malloy |
| **CC:** | Nicholas.Ghiselli@constellationmutual.com, Adam Zenor, Daniel Bidegaray, Nicholas Rowley |
| **Attachments:** | image001.jpg |

Mr. Malloy,

You are wasting my time with a ridiculous self serving email. Are you licensed in Iowa? I've never heard of you. Please review the ethical rules, code of conduct of lawyers practicing in Iowa, and the applicable case law, make sure to bill MMIC for it, and then you tell me if it's okay for a lawyer to come into a case and never meet or have a single conversation or piece of correspondence with his clients. Tell me if it's okay for a lawyer to represent a Plaintiff and a Defendant at the same time. Not sure what Wisconsin allows, but I am pretty familiar with Iowa law. I have not "recanted" anything. You come across as an insurance lawyer servant using words to try to impress your master who I see you have cc'd on this email. Did you get the insurance company's approval before you sent this email letter? Did your master proof read it?

MMIC breached the insurance contract long ago. In the end we are going to hit MMIC with a record setting verdict, for hundreds of millions of dollars, hopefully more than a billion. We are going to expose MMIC's long history of bad faith in Iowa. Maybe I'll offer to trade my attorneys fees for stock in the Company and get involved to try and teach everybody how to run things the right way and act in good faith.

Regarding Mr. Booher, I have done my job and done it well. I have protected the interests of the doctors and the Clinic. MMIC brought in a lawyer who wasn't even licensed in Iowa who had never handled a case in Iowa, to be the appellate lawyer on the biggest malpractice verdict in Iowa State history. That lawyer never met his own clients! That lawyer, Mr. Booher, apologized the other day during his first meeting with the client and said he would do things differently moving forward. He said he would change his custom and practice. In reviewing the law in Iowa you might learn that Mr. Booher does in fact have a conflict of interest and that it is one that was never disclosed to the clients. That could be grounds for disciplinary action in Iowa if the conflict isn't waived. So, we are fixing that. Your welcome.

Let me be clear about your statement about a "purported" negotiation of a settlement. There is no "purported" negotiation of a settlement. It is actually in the works. We should be filing a motion soon to dismiss the appeal and get good faith approval of the settlement so that the brain injured child, the physicians and group can jointly prosecute a landmark

bad faith and punitive damages case against MMIC.  We will file that motion in the Iowa State Court, Iowa Supreme Court, and the Federal Court.  If you all pull your heads out of the sand you might see what is on the horizon.  I doubt it though, and that's okay.  The longer MMIC and its people keep their heads in the sand the bigger this verdict is going to be.  The bad faith conduct is continuing.  No comfort letter, all the shenanigans, an Iowa jury is going to see all of this.

That all being said, let me try to clarify what I believe I am hearing from you:

1) Despite Mr. Booher agreeing to do a retainer agreement which addresses the scope of his representation and preparing a conflict waiver and Mr. Booher agreeing these things are necessary, you are now saying those things will not be done.  Is that what I am hearing?

2) You have cited a single case, *Brandon vs. W. Bend Mut. Ins. Co.,* which is a case that specifically dealt with the scope of discovery between a plaintiff in an underinsured motorist case and her insurer.  This decision, written by my friend Justice Wiggins and joined by my late friend Justice Cady (we all miss Justice Cady and Justice Wiggins), does not seem to address the situation where an out of State lawyer with no experience in Iowa is pro hac'd into a case in Iowa by an insurer (MMIC) to represent health care providers who are suing that same insurer (MMIC) in the same type of case the out of state lawyer is defending that same insurer in and that lawyer has never met his clients. *Brandon vs. W. Bend Mut. Ins, Co.*, does not address, in any way shape or form, the situation we have here, where Mr. Booher is representing the Plaintiff and Defendant at the same time in substantial similar litigation.  Is there more law you have?  Because at this point I would expect more out of a first year law clerk when it comes to Iowa case analysis.

Right now, the case is stayed, which means it is frozen in time.  That causes no harm, it's like a continuance.  Anybody who says otherwise is being disingenuous.  Mr. Booher is the only person MMIC has provided as an option.  He has agreed that a retainer agreement laying out the scope of his representation and getting the clients to sign a conflict waiver is appropriate.  The only person saying otherwise is somebody who represents MMIC who is not a party to the Appeal, a guy sitting in Milwaukee.

Sincerely,

Nick Rowley

On Dec 29, 2023, at 1:31 PM, Mark D. Malloy <mdm@mtfn.com> wrote:

Mr. Rowley:

PLAINTIFF'S APPENDIX-242

I have your note to Nick Ghiselli of 12/23 and write in response. Your actions on behalf of the Clinic have and continue to violate the Clinic's policy with MMIC and prejudice the litigation. You have a copy of the policy, and MMIC has advised that your actions are improper and violate the policy, including your actions on direct appeal and your purported negotiation of a settlement without MMIC's consent.

While you now finally appear to be recanting your objection to Mr. Booher, that was not a valid objection in the first instance. *Brandon v. W. Bend Mut. Ins. Co.*, 681 N.W.2d 633, 641 (Iowa 2004) ("The insurance policy contractually obligated Brandon to assent to the representation."). Mr. Booher, MMIC's selected counsel, is quality, respected counsel, a point on which you now appear to agree. He was ready to argue the case to conclusion when you moved, without MMIC's consent, to stay the appellate proceedings. The appeal must move forward, and the following should happenimmediately: (1) Mr. Booher should re-appear and complete his representation of the Clinic, and (2) the motion to stay must be withdrawn. Each day that passes where Mr. Booher is unable to argue the appeal due to the improper objection and stay further prejudices MMIC.

Further, the notion of a retainer agreement is unwarranted and not recognized under Iowa law. *See e.g., Brandon*, 681 N.W.2d at 641. The notion of a conflict waiver (at least for Mr. Booher) is similarly unnecessary. *Id.* MMIC will continue to do all it lawfully can to see the appeal heard and fairly decided. MMIC continues to reserve all rights under the policy and Iowa law.

**Mark D. Malloy** | Attorney at Law

MEISSNER TIERNEY
FISHER & NICHOLS

111 EAST KILBOURN AVENUE, 19th FLOOR
MILWAUKEE, WI 53202
**P** 414.273.1300 | **M** 414.704.0814 | **F** 414.273.5840
**website** | **bio** | **vCard** | **LinkedIn** | **map** | **email**