IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| MMIC INSURANCE, INC., | ) | Case No. 3:23-cv-00039-SMR-WPK |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER ON MOTION FOR SUMMARY |
| v. | ) | JUDGMENT |
| | ) | |
| OBSTETRIC AND GYNECOLOGIC | ) | |
| ASSOCIATES OF IOWA CITY AND | ) | |
| CORALVILLE, P.C., | ) | |
| | ) | |
| Defendant. | ) | |

This dispute arises from a medical malpractice insurance policy ("Policy") and its application in the aftermath of an extraordinary jury verdict. What began as a standard professional liability relationship evolved into something markedly different when the insured clinic— Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C. (the "Clinic"), facing a judgment far exceeding policy limits, undertook a series of actions at odds with its contractual obligations. The case presents a straightforward issue of contract interpretation.

The Clinic engaged in settlement negotiations without the consent of Plaintiff MMIC Insurance, Inc. ("MMIC"), rejected previously accepted defense counsel on the eve of appellate argument, and aligned its interests with the underlying plaintiff against its own insurer. These actions must be measured against the clear terms of the insurance contract. The factual record, largely undisputed, allows for a definitive resolution of the matter.

## I.    BACKGROUND

### A.  *Factual Background*[1]

The Policy at issue contains several standard provisions common in professional liability insurance contracts.  It grants MMIC the right to control the defense of covered claims and select counsel for the defense.  The Policy requires the Clinic, as the insured, to fully cooperate with MMIC in the investigation of claims, negotiation of settlements, and the conduct of litigation. Additionally, the Policy prohibits the Clinic from concealing or misrepresenting any facts concerning covered claims, and from making payments, admitting liability, or incurring obligations except at its own expense.  These provisions establish clear contractual boundaries for the respective roles and responsibilities of insurer and insured.

In November 2019, a medical malpractice lawsuit was filed against the Clinic arising from injuries suffered by a child ("S.K.") during childbirth.  Dr. Jill Goodman, the physician who delivered S.K., consistently defended her actions throughout the proceedings.  At trial, Dr. Goodman testified that she had felt an indentation on S.K.'s skull before applying forceps, but repeatedly denied placing the forceps on that indentation.  She maintained that her actions early in the labor improved the delivery process and categorically disagreed with the plaintiff's expert testimony regarding whether her actions fell below the standard of care.  Dr. Goodman steadfastly denied causing any injury to S.K. through her use of forceps, adhering to this position throughout her testimony.

---

[1] These facts are drawn from public documents previously in this case as well as MMIC's Statement of Undisputed Material Facts and MMIC's Appendix in Support of Summary Judgment. [ECF Nos. 22-2, 22-3].  The Clinic admitted all but one of the statements of fact.  [ECF No. 27-2 ¶¶ 40–41] (denying the claim that the Clinic withdrew its consent for Attorney Booher because the Clinic subsequently agreed to the representation).  It did not submit its own disputed facts in support of its resistance to the motion for summary judgment.

The jury nonetheless found the Clinic liable for medical malpractice and awarded damages exceeding $97 million. After post-trial motions, the Clinic's responsibility was determined to be $75 million in damages—substantially exceeding the Policy's limit of $12 million. This excess judgment created a complex dynamic between the Clinic and MMIC regarding litigation strategy and settlement considerations. On August 5, 2022, the Clinic appealed the judgment to the Iowa Supreme Court after the state district court denied its post-trial motions. The Clinic did not post an appeal bond but unsuccessfully sought a stay of execution from the Iowa Supreme Court. This decision left the Clinic potentially vulnerable to execution proceedings during the pendency of the appeal.

To represent the Clinic on appeal, MMIC selected counsel from Shuttleworth & Ingersoll, P.L.C., along with Troy Booher and Beth Kennedy of the Zimmerman Booher law firm. Attorney Booher filed an appearance in the Iowa Supreme Court action on September 13, 2022. The appeal was fully briefed by May 5, 2023, with oral argument scheduled for December 14, 2023. The briefing process proceeded without incident for several months, with no indication of disputes between MMIC and the Clinic regarding counsel or strategy.

On October 31, 2022, the Clinic filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Iowa. During her Bankruptcy Rule 2004 examination on January 16, 2023, Dr. Goodman testified that the bankruptcy filing was voluntarily entered into by the Clinic, explicitly stating that neither MMIC nor any MMIC representative had recommended that course of action. The timing of this filing, coming shortly after the appeal was initiated, suggested an attempt to secure protection from execution while the appeal proceeded. The bankruptcy court ultimately dismissed the action after concluding that the filing was improper, finding the Clinic had not demonstrated financial distress justifying Chapter 11 protection. The

Clinic appealed this dismissal to the district court.  *See In re Obstetric & Gynecologic Assocs. of Iowa City & Coralville*, 3:22-cv-00080-SMR-SBJ (S.D. Iowa 2022).

On April 3, 2023, the bankruptcy court entered an indefinite stay against execution attempts against the Clinic during the pendency of the bankruptcy appeal, providing temporary protection from collection efforts by S.K.  Four days later, MMIC remitted to S.K. the $12 million proceeds of the Policy, fulfilling its contractual obligation up to the policy limits.  This payment did not resolve the matter, however, as the substantial excess judgment remained outstanding.  On April 28, 2023, the Clinic, through newly retained Attorney Nicholas Rowley, voluntarily dismissed its bankruptcy appeal, lifting the stay of execution and exposing the Clinic to enforcement proceedings.  The timing of this dismissal is significant, coming shortly after MMIC's payment to S.K. and raising questions about coordination between the Clinic and the underlying plaintiff.  Although the Clinic had initiated the bankruptcy proceedings voluntarily, MMIC funded the Clinic's bankruptcy costs at its request, demonstrating MMIC's continued support for the Clinic's defense despite the developing tensions.

Shortly before dismissing the bankruptcy appeal, the Clinic privately retained Attorney Rowley and dismissed its other counsel.  The record reflects that just days after the jury's verdict in March 2022, trial counsel for S.K., Geoffrey Fieger, presented alongside Attorney Rowley at an organization called Trial Lawyers University.  This connection between opposing counsel in the underlying case and the Clinic's newly retained counsel raised an appearance of potential coordination that bears directly on questions of the Clinic's adherence to its cooperation obligations under the Policy.

On November 28, 2023, Attorney Rowley filed an appearance with the Iowa Supreme Court in the appeal and simultaneously filed a motion to stay the proceedings, only two weeks

before the scheduled oral argument.  The stated reason was that the law firm of Shuttleworth & Ingersoll would likely be withdrawing due to a conflict of interest.  This purported conflict stemmed from a lawsuit filed by the Clinic against MMIC and Shuttleworth & Ingersoll on November 21, 2023, alleging bad faith denial against MMIC and legal malpractice against the defense attorneys who had represented the Clinic at trial.  The timing of this lawsuit—filed one week before the motion to stay and less than a month before oral argument—suggests it may have been calculated to create the very conflict cited as justification for the stay.

Although Attorney Booher had represented the Clinic in the appeal for more than a year without objection, the Clinic now objected to his continued representation.  This abrupt reversal of position came at a critical juncture in the appellate proceedings, after substantial preparation for oral argument had been completed.  Attorney Booher withdrew the next day, noting in his withdrawal that "until yesterday, the P.C. never objected to Zimmerman Booher's representation directly, through Shuttleworth & Ingersoll, or through the P.C.'s personal counsel."  This chronology underscores the sudden and potentially strategic nature of the Clinic's objection.

On November 30, 2023, MMIC filed a motion to intervene at the Iowa Supreme Court, seeking to reappoint Zimmerman Booher and lift the stay.  This motion represented MMIC's attempt to exercise its contractual right to control the defense and selection of counsel.  The Clinic resisted this motion, expressly stating that a continuance would permit it and S.K. to explore settlement options—despite the Policy's clear provisions giving MMIC the right to control the defense and requiring the Clinic to cooperate with MMIC in negotiating settlements.

The summary judgment record contains substantial evidence of settlement negotiations between the Clinic and S.K. undertaken by Attorney Rowley without MMIC's involvement or consent.  On June 1, 2023, Attorney Rowley informed MMIC's counsel that he had spent time "in

the room with the Plaintiffs [S.K.'s representatives] discussing how we could work together and dismiss the appeal and move forward with an action together against MMIC/Constellation/Defense Counsel." This explicit acknowledgment of direct settlement discussions without MMIC's participation directly implicates the Policy provisions regarding cooperation and control of settlement negotiations.

In its Answer filed on July 17, 2023, the Clinic acknowledged that it "wish[ed] to negotiate a resolution with S.K. and his lawyers" and that "The Clinic wants to have the freedom to explore settlement." This position was reiterated in the Clinic's Motion to Stay filed on November 28, 2023. After the Iowa Supreme Court granted this stay, it ordered the Clinic to either voluntarily dismiss the appeal or report on settlement negotiations within 60 days, creating a procedural mechanism that facilitated the very conduct MMIC objected to as violative of the Policy.

In late December 2023, MMIC informed Attorney Rowley that his actions were improper and breached the policy, "including your actions on direct appeal and your purported negotiations of a settlement without MMIC's consent." Attorney Rowley's response was particularly revealing: "Let me be clear about your statement about a 'purported' negotiation of a settlement. There is no 'purported' negotiation of a settlement. It is actually in the works." He further stated that he would soon file a motion to dismiss the appeal so that S.K. and the Clinic "can jointly prosecute a landmark bad faith and punitive damages case against MMIC." This communication constitutes a direct admission of ongoing settlement negotiations conducted without MMIC's involvement or consent, and reveals an apparent intention to collaborate with S.K. against MMIC.

*B. Procedural Background*

MMIC now moves for summary judgment.  As noted earlier, the Clinic admitted all but one of the facts advanced in support of summary judgment, and provided no disputed material facts of its own.  Nevertheless, in its resistance to the motion, the Clinic requested summary judgment in its favor.  [ECF No. 27-1].  It advanced no argument in support of judgment as a matter of law, to say nothing of filing a statement of undisputed material facts as required by the Local Rules.  The "cross-motion for summary judgment" was a single sentence at the conclusion of its brief.  *Id.* at 16 ("MMIC's Motion for Summary Judgment must be denied in its entirety. OB-GYN Clinic's Cross-Motion for Summary Judgment should be granted.").  The Clinic's request for summary judgment in this manner is improper.

On April 3, 2024, two days prior to oral argument on the summary judgment motion, Thomas T. Tarbox, on behalf of S.K., filed a conditional motion to intervene, asserting that he was a necessary party given the scope of relief sought by MMIC.  [ECF No. 40].  In his supporting brief, S.K. argued that because MMIC was requesting that the Court order S.K. to return $12 million in insurance proceeds, and because S.K. owned the bad-faith claim against MMIC through levy of execution on the Clinic's assets, S.K. was a required party under Federal Rule of Civil Procedure 19.  [ECF No. 40-1].  S.K. noted that he had received the $12 million in insurance proceeds from the Clinic's policy, which MMIC had remitted to S.K. on April 7, 2023.  *Id.*  The Court granted the motion to intervene on April 4, 2024, allowing S.K. to be heard at the hearing and permitting him to file a brief in resistance to the motion for summary judgment after the hearing.

On April 15, 2024, S.K. filed a motion to designate an expert witness and serve expert disclosures.  [ECF No. 50].  In his motion, S.K. argued that to have a full and fair opportunity to

be heard, he should be permitted to designate an expert witness, proposing to serve expert designations by April 29, 2024.  S.K. did not identify the proposed expert or the subject matter of the expert's testimony in the motion.  MMIC opposed the motion, arguing that an intervenor must take the pleadings in a case as he finds them and pointing out that the Clinic had not designated an expert witness.  MMIC also represented that S.K. had admitted in a separate proceeding that his rights were limited to the same claims the Clinic had against MMIC.  [ECF No. 51].

On April 26, 2024, the Court denied S.K.'s motion to designate an expert.  [ECF No. 53]. The Court cited several reasons for the denial, including: (1) S.K.'s failure to identify the proffered expert or the subject matter of the proposed report; (2) S.K.'s failure to explain why he should be permitted to designate an expert outside the deadline of the scheduling order; (3) the Clinic's admission to nearly every fact in MMIC's statement of undisputed material facts; and (4) doubts about whether S.K. had satisfied all requirements for intervention under Rule 24(a), particularly regarding adequacy of representation.  *Id*. at 2.  The Court noted that S.K. did not dispute that his interests were adequately represented by the Clinic and did not address the issue in his motion to intervene.  *Id*. at 3.  Nevertheless, the Court allowed S.K. "an opportunity to be heard on the legal issues before the Court."  *Id*. at 4.

On May 6, 2024, S.K. filed a motion seeking leave to file a statement of facts and accompanying appendix in resistance to MMIC's motion for summary judgment.  [ECF No. 56]. S.K. also requested that the Court reconsider its ruling denying S.K.'s motion to designate an expert.  S.K. reiterated his argument that as a required party under Rule 19, rather than merely a permissive intervenor under Rule 24, he was entitled to a meaningful opportunity to litigate and protect his interests, including the right to introduce evidence into the record.

On May 10, 2024, the Clinic filed a Motion for Judgment on the Pleadings arguing that the Court lacked jurisdiction under the Anti-Injunction Act to enjoin state court proceedings. [ECF No. 67]. The Clinic contended that the Court could not prevent the Iowa Supreme Court from issuing an opinion by ordering the dismissal of a pending appeal, nor could it compel a decision on the merits by forbidding dismissal. It maintained that either action would violate the Anti-Injunction Act because it would transgress the Iowa Supreme Court's exclusive authority to manage its own calendar. The Clinic argued that the fundamental purpose of MMIC's lawsuit was to prevent the settlement of an appeal pending before the Iowa Supreme Court, which was a matter within the exclusive jurisdiction of Iowa's highest court.

On September 19, 2024, the Court entered an order continuing the trial without date pending resolution of the state civil case before the Iowa Supreme Court. [ECF No. 67]. The Court noted that while it did not agree with the Clinic's argument that a decision from the Iowa Supreme Court would "moot" this case and "obviate the need for a trial," the interrelatedness of the issues in both cases made it prudent to continue trial until after the Iowa Supreme Court rendered its decision in the Appeal. The Court also held in abeyance all pending motions, including MMIC's motion for summary judgment, the Clinic's motion for judgment on the pleadings, and S.K.'s combined motion.

Subsequently, on November 8, 2024, the Iowa Supreme Court issued its decision in the underlying appeal, reversing the judgment against the Clinic and remanding for a new trial. *S.K. v. Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, 13 N.W.3d 546, 564–65 (Iowa 2024). The court determined that the district court had erroneously admitted hearsay evidence—specifically, a package insert for the vacuum device used during S.K.'s delivery. *Id.* at 562–64. The insert contained manufacturer warnings about when the device should not be used

and potential adverse effects from its use. The court concluded this evidence did not qualify under recognized hearsay exceptions and its admission was prejudicial to the Clinic, thus requiring reversal. *Id.* at 556–61.

In a concurring opinion, Chief Justice Christensen commented extensively on the conduct of plaintiff's trial counsel, Geoffrey Fieger, describing it as "both uncivil and disrespectful to his opposing counsel and the presiding judge" and identifying numerous instances of improper conduct during closing arguments, including inappropriate vouching for evidence, disparaging the defense, and improperly encouraging the jury to punish the defendants. *Id.* at 565–68 (Christensen, C.J., concurring). With the Iowa Supreme Court having rendered its decision, the Court now addresses MMIC's motion for summary judgment, which has been fully briefed by all parties.

## II.    DISCUSSION

Before addressing the merits of MMIC's motion for summary judgment, the Court must note a significant development that occurred after the conclusion of briefing but prior to this ruling. As detailed in MMIC's Notice of Payment of Proceeds filed on November 22, 2024, S.K. has returned the $12 million in policy proceeds to MMIC. [ECF No. 84]. This payment followed MMIC's request for restitution after the Iowa Supreme Court reversed the underlying judgment and remanded for a new trial.

This development substantially alters—indeed, likely eliminates—S.K.'s interest in intervention. When S.K. moved to intervene on April 3, 2024, his primary assertion was that, as the holder of the policy proceeds and owner of the Clinic's potential bad faith claim through execution, he was a necessary party under Rule 19. The return of those proceeds to MMIC removes the central pillar of S.K.'s intervention argument. As S.K. himself acknowledged in his

motion to intervene, his interest was conditioned on the Court's willingness to entertain MMIC's request for restitution of the policy proceeds. That requested relief is now moot.

Nevertheless, the Court has carefully considered S.K.'s arguments in opposition to summary judgment. Given the significance of the issues presented and the ultimate disposition of MMIC's motion, the Court finds it prudent to address the merits of the motion with the benefit of all perspectives that have been presented to the Court. While S.K's procedural right to participate may have been extinguished by recent events, the substantive arguments he raised remain relevant to the analysis. With this preliminary matter addressed, the Court now turns to the standard governing MMIC's motion for summary judgment.

### A.  Analysis

### 1.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is not to resolve factual disputes or weigh evidence, but to determine whether a trial is necessary. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is warranted.

A factual dispute is genuine "if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The Court's function at the summary judgment stage is not to make credibility determinations or weigh the evidence; rather, the Court must view the facts in the light most

favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the record. *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)).

To defeat a properly supported motion for summary judgment, the nonmovant must establish a genuine issue of material fact on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). While the nonmoving party need not produce evidence in a form that would be admissible at trial to avoid summary judgment, it must do more than simply show "some metaphysical doubt as to the material facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). Instead, the nonmovant must come forward with "specific facts showing that there is a genuine issue for trial." *Id.* This is particularly true where, as here, the nonmovant has admitted virtually all of the movant's statement of undisputed material facts and has failed to present its own statement of disputed facts as required by the Local Rules. When "the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861 (8th Cir. 2015) (quoting *In re Cochrane*, 124 F.3d 978, 981–82 (8th Cir. 1997)).

### 2.  Motion for Judgment on the Pleadings

The Clinic's motion for judgment on the pleadings argues that the Court lacks jurisdiction under the Anti-Injunction Act. [ECF No. 58]. This argument fails for a straightforward reason: the Iowa Supreme Court has already issued its decision in the Appeal that the Clinic claimed would be improperly enjoined. The premise of the Clinic's motion—that a ruling would interfere with ongoing state court proceedings—has been rendered moot by this development. The Anti-

Injunction Act prohibits federal courts from enjoining state court proceedings, but this prohibition is inapplicable when the proceedings in question have concluded.

Furthermore, even if the state appeal were still pending, the Clinic mischaracterizes the nature of this action. MMIC's lawsuit seeks a declaration of contractual rights against the Clinic, not an injunction directing the Iowa Supreme Court how to proceed. The Court has diversity jurisdiction over such contract disputes. The fact that a federal court ruling on contract rights might indirectly affect a party's decisions in state court does not trigger the Anti-Injunction Act, which specifically applies to injunctions that "stay proceedings in a State court." 28 U.S.C. § 2283. The text of the statute does not extend to declaratory judgments regarding the parties' rights and obligations under an insurance contract.

As MMIC correctly argues in its resistance, the Anti-Injunction Act is not jurisdictional in nature. The Eighth Circuit has made this clear in multiple decisions, including *Arkansas Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.*, where the court stated: "Where it applies, the Anti-Injunction Act does not withdraw subject matter jurisdiction from the federal courts." 551 F.3d 812, 818 (8th Cir. 2009). The Supreme Court itself has determined that the Act "is not a jurisdictional statute. It neither confers jurisdiction upon the District Courts nor takes away the jurisdiction otherwise specifically conferred upon them." *Smith v. Apple*, 264 U.S. 274, 278–79 (1924).

Additionally, the chronology of these proceedings undermines the Clinic's argument. As MMIC points out, this federal action was filed on June 5, 2023, while the Clinic did not file its bad faith claim in Johnson County until November 21, 2023. The Eighth Circuit has held that "the Anti-Injunction Act is inapplicable when a federal court has first obtained jurisdiction of a matter in controversy by the institution of suit." *Nat'l City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122, 1127

-13-

(8th Cir. 1982). Since MMIC's federal action predates the Clinic's state court filing by over five months, the Anti-Injunction Act provides no barrier to the Court's exercise of jurisdiction. The motion for judgment on the pleadings is therefore DENIED. [ECF No. 58].

### 3. Motion to Expand the Record

S.K. previously moved for leave to file a statement of facts and accompanying appendix in resistance to MMIC's motion for summary judgment. [ECF No. 56]. S.K. also requested that the Court reconsider its prior order denying S.K.'s motion to designate an expert.

These motions, predicated on S.K.'s asserted interest as a necessary party under Rule 19, have been overtaken by recent events. As noted at the outset, S.K. has now returned the $12 million in policy proceeds to MMIC. This development fundamentally alters S.K.'s relationship to this litigation. The primary basis for S.K.'s claimed status as a necessary party—that MMIC sought an order requiring him to return $12 million in insurance proceeds—no longer exists.

Intervention as of right under Rule 24(a) requires "an interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2); *see also Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 570 (8th Cir. 1998) (requiring "a recognized interest in the subject matter of the litigation") (citation omitted). Similarly, joinder under Rule 19 is appropriate when a person "claims an interest relating to the subject of the action" that would be impaired by the action's disposition. Fed. R. Civ. P. 19(a)(1)(B)(i).

With S.K.'s return of the policy proceeds, the interest that formed the basis of his intervention argument no longer exists. The Court has reviewed S.K.'s legal arguments as advanced in his briefing, but finds no basis to permit expansion of the record where the underlying interest supporting such procedural rights has dissipated. *See Arrow v. Gambler's Supply, Inc.*, 55 F.3d 407, 409 (8th Cir. 1995) (discussing the relationship between a party's interest in litigation

-14-

and procedural rights).  Accordingly, the Court denies S.K.'s motion to expand the record and his request for reconsideration of the Court's earlier order denying the motion to designate an expert. The Court now turns to the merits of MMIC's motion for summary judgment based on the record properly before it.

*B.  Analysis*

4.  Insurance Contract Interpretation Generally

When interpreting an insurance policy, the Court applies Iowa substantive law.  *See Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022).  Under Iowa law, the interpretation of an insurance contract presents a question of law, unless it depends on extrinsic evidence.  *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008).

The cardinal principle of insurance contract interpretation is that an unambiguous policy must be enforced as written.  *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 236 (Iowa 2015).  This principle reflects the broader commitment to honoring the parties' expressed intentions.  The Court does not strain to find ambiguity where none reasonably exists. A genuine ambiguity arises only when, "after the application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty results as to which one of two or more meanings is the proper one."  *Cairns v. Grinnell Mut. Reinsurance Co.*, 398 N.W.2d 821, 824 (Iowa 1987) (citation omitted).

Mere disagreement between parties about interpretation does not, by itself, establish ambiguity.  *Kibbee v. State Farm Fire & Cas. Co.*, 525 N.W.2d 866, 868 (Iowa 1994).  Rather, ambiguity exists only when policy language "is susceptible to two *reasonable* interpretations."  *Id.* (emphasis in original).  When terms remain undefined in a policy, the Court interprets them according to their ordinary meaning.  *Grinnell Mut. Reins. Co. v. Jungling*, 654 N.W.2d 530, 536

(Iowa 2002). This approach respects both the text that the parties adopted and the common understanding that likely informed their agreement.

5. Disputed Policy Provisions

At issue in this case are several provisions of the Policy that MMIC contends the Clinic violated. MMIC identifies three primary categories of alleged violations.

First, MMIC points to provisions granting the insurer the right to control the defense and litigation strategy, including the selection of counsel. According to MMIC, the Clinic violated these provisions by withdrawing consent for Attorney Booher's representation and by initiating a legal malpractice lawsuit against the Defense Attorneys on the eve of oral argument—actions that effectively disrupted MMIC's chosen defense strategy.

Second, MMIC identifies provisions prohibiting the Clinic from independently negotiating settlements or making admissions of liability regarding claims for which coverage is sought. MMIC contends that the Clinic's direct settlement negotiations with S.K., conducted without MMIC's participation or consent, violated these explicit policy restrictions.

Third, MMIC asserts that the Clinic failed to satisfy its contractual duty of cooperation. The Policy explicitly requires the Clinic to "fully cooperate with [MMIC] in the investigation of claims, negotiation of settlements, and the conduct of litigation." MMIC catalogs numerous actions by the Clinic, through Attorney Rowley, that it argues directly contravene this cooperation obligation.

The Court must determine whether these alleged violations occurred and, if so, whether they constitute material breaches of the Policy. To prevail on a claim for breach of policy provisions, MMIC must establish: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that MMIC performed all the terms and conditions required under the contract;

-16-

(4) that the Clinic breached the contract; and (5) that MMIC suffered damages as a result of the breach. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

The party seeking coverage under an insurance policy bears the burden of demonstrating substantial compliance with policy terms. *Bruns v. Hartford Accident & Indem. Co.*, 407 N.W.2d 576, 579 (Iowa 1987). While "proof of strict compliance is not required," the insured must satisfy the standard of "substantial compliance." *Watson v. Nat'l Sur. Corp.*, 468 N.W.2d 448, 451 (Iowa 1991). If substantial compliance cannot be shown, the insured must establish either that: (1) the failure to comply was excused or waived; or (2) the failure was not prejudicial to the insurer. *Am. Guar. & Liab. Ins. Co. v. Chandler Mfg. Co.*, 467 N.W.2d 226, 228 (Iowa 1991).

Under Iowa law, a material breach of a policy condition creates a presumption of prejudice to the insurer. *Met-Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 658 (Iowa 1994). The burden then shifts to the insured to rebut this presumption through satisfactory evidence. *Id.* When a material breach has been established, the non-breaching party is typically relieved of its obligation to continue performing under the contract. *See Dolly Invs., LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 177 (Iowa 2023). With these principles in mind, the Court turns to each of the alleged violations.

a. Right to Select Counsel

Under Iowa law, "[w]hen an insurer defends an insured, it has control over the defense and over settlement." *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 643 (Iowa 2000). This principle is expressly codified in the Policy, which grants MMIC "the right to control the defense of and retain an attorney to defend any claim covered by this insurance." [ECF No. 22-3 at 12].

The record demonstrates that the Clinic materially breached this provision in two ways: First, after permitting Attorney Booher to represent it for over fourteen months in the appeal, the

Clinic abruptly withdrew its consent for his representation merely weeks before oral argument was scheduled. Second, the Clinic sued its trial counsel Shuttleworth & Ingersoll for legal malpractice one week before oral argument was scheduled, creating a conflict of interest that necessitated their withdrawal. These actions significantly disrupted the appellate process, delayed resolution of the appeal, and prejudiced MMIC's rights under the Policy.

Attorney Booher entered an appearance as the Clinic's counsel in the underlying appeal on September 13, 2022, after being admitted *pro hac vice*. [ECF No. 22-2 ¶ 20]. The appeal was fully briefed and scheduled for oral argument before the Iowa Supreme Court. *See Id*. ¶¶ 21–22. For over fourteen months, the Clinic raised no objection to Attorney Booher's representation. However, on November 28, 2023, the Clinic—through Attorney Rowley—filed an objection to Attorney Booher's representation, claiming the Clinic had never consented to it. [ECF No. 22-3 at 168–69].

S.K. contends that this objection was reasonable and not a material breach, noting that "before taking over as lead appellate counsel, Booher had never spoken with anyone from the Clinic, so it's reasonable for the Clinic to question whether he should represent it." [ECF No. 55 at 21]. S.K. further argues that even if this constituted a breach, it was not material because Booher did eventually represent the Clinic and no hearings were conducted without his participation.

MMIC, however, argues this reversal was not an isolated event but part of a calculated strategy to frustrate the appeal process. Just one week earlier, on November 21, 2023, the Clinic had filed a legal malpractice action against its trial counsel, Shuttleworth & Ingersoll, creating a conflict that necessitated their withdrawal from the case. Then, on the same day it objected to Attorney Booher, the Clinic moved to stay the appeal, citing the need for its trial counsel to withdraw due to this newly-created conflict. This timing strongly suggests these actions were

coordinated to disrupt the appeal process and delay oral argument, which had been set for December 14, 2023.

S.K. disputes MMIC's characterization of the malpractice suit as a breach, arguing that "if insured-selected counsel commits malpractice, there is nothing in the policy that precludes an insured from filing a malpractice action" and that "even if there were such a provision, it would likely be void for public policy reasons."

Although oral argument was eventually rescheduled and did take place, the Clinic's conduct resulted in substantial delay and interfered with MMIC's contractual right to direct the defense and select counsel.  The timing of these maneuvers—particularly the withdrawal of consent for Attorney Booher after fourteen months without objection—reveals a deliberate attempt to obstruct the appellate process rather than a legitimate concern about representation.

The Policy language and Iowa law are clear that this right belongs to MMIC.  As the Iowa Supreme Court has recognized, an attorney-client relationship exists when "[t]he insurance policy contractually obligated [the insured] to assent to the representation [of the insurer's selected counsel]." *Brandon v. W. Bend Mut. Ins. Co.*, 681 N.W.2d 633, 641 (Iowa 2004).  By withdrawing consent to Attorney Booher's representation, the Clinic breached this fundamental provision of the Policy.

Under Iowa law, when an insured rejects the insurer's selected counsel without justification, the insured "may reject such attorney and thus relieve the insurer from the obligation [to defend]." *Henke v. Iowa Home Mut. Cas. Co.*, 87 N.W.2d 920, 923 (Iowa 1958).  This principle has been consistently upheld in other jurisdictions as well.  *See, e.g., Flexi-Van Leasing, Inc. v. Travelers Indem. Co.*, 837 Fed. App'x 141, 147 (4th Cir. 2020) (holding that an insured who fires insurer's appointed counsel before an actual conflict arose is not entitled to indemnification).

-19-

The Clinic argues that it has since consented to Attorney Booher's representation, pointing to a motion to lift stay filed on February 2, 2024, in which Attorney Booher stated "The P.C., through its personal counsel, has agreed that undersigned counsel can represent the P.C. before this Court."  [ECF No. 27-3 at 12].  This belated acquiescence, however, does not remedy the prejudice caused by the Clinic's earlier actions.  The delay in the appellate process, the disclosure of appeal strategy through public filings, and the interference with MMIC's right to direct the litigation constitute material breaches that have caused actual prejudice to MMIC.

The Court finds that the Clinic's withdrawal of consent for Attorney Booher's representation, followed by its later reversal of this position after significant delay had occurred, constitutes a material breach of the Policy provision granting MMIC the right to select counsel and control the defense. [2]

### b.   *Ex parte* Settlement Negotiations

The Policy explicitly limits the Clinic's authority to engage in settlement negotiations independent of MMIC.  Section (M)(2) of the Policy's Common Conditions provides that "[t]he insured must not, except at the insured's own expense, make any payment, admit any liability or incur any obligation other than reasonable medical expenses."  [ECF No. 22-3 at 9].  Additionally, the Policy requires that the insured "fully cooperate with [MMIC] in the investigation of claims, the negotiation of settlements, and the conduct of litigation."  *Id.*

The record establishes that the Clinic, through Attorney Rowley, repeatedly engaged in unauthorized settlement negotiations with the underlying plaintiff S.K., without MMIC's involvement or consent.  This constitutes a clear material breach of the Policy.

---

[2] The Court does not reach the issue of whether the alleged "manufactured" conflict of interest for the defense attorneys violated the Policy.  The timing of the lawsuit, along with the totality of the Clinic's conduct in the Appeal process, is suspicious.

The evidence of these unauthorized negotiations is unequivocal. On June 1, 2023, Attorney Rowley explicitly informed MMIC's counsel that he had spent time "in the room with the Plaintiffs discussing how we could work together and dismiss the appeal and move forward with an action together against MMIC/Constellation/Defense Counsel." [ECF Nos. 22-2 ¶ 48; 22-3 at 92]. This communication plainly revealed the Clinic's intent to reach an agreement with S.K. that would prejudice MMIC's interests in the underlying appeal.

The Clinic's intent to pursue settlement negotiations without MMIC's participation continued throughout this litigation. In its Answer to MMIC's Complaint, the Clinic affirmed that it "wish[ed] to negotiate a resolution with S.K. and his lawyers" and acknowledged that "[t]he Clinic wants to have the freedom to explore settlement." [ECF Nos. 7 ¶¶ 25, 50; 22-2 ¶¶ 49–50]. This position was reiterated in the Clinic's November 28, 2023 motion to stay the appeal, where it stated that it "wishes to negotiate with Plaintiff-Appellee and get the underlying case resolved." [ECF No. 22-3 at 163].

Most significantly, in a December 30, 2023 communication, Attorney Rowley unambiguously confirmed ongoing settlement negotiations: "Let me be clear about your statement about a 'purported' negotiation of a settlement. There is no 'purported' negotiation of a settlement. It is actually in the works." [ECF Nos. 22-2 ¶ 56; 22-3 at 241]. This categorical admission leaves no doubt that the Clinic was actively pursuing settlement without MMIC's involvement.

S.K. disputes MMIC's characterization of these discussions, arguing that the Policy provisions do not clearly "prohibit the Clinic from talking with S.K. about a potential settlement" and that MMIC "cites no cases where a court voids the policy merely for talking to the injured party without the insurance company present." S.K. further contends that even if these discussions

technically violated the Policy, they do not constitute a material breach because "the Clinic has admitted to nothing, and has settled nothing."

S.K. maintains that a potential settlement agreement between S.K. and the Clinic, which MMIC characterized at the hearing as "fully executed," actually states that the "Clinic shall promptly seek approval of the settlement agreement from a Court of competent jurisdiction" and that "neither party is bound by the express or implied terms of this Agreement" until court approval is obtained. S.K. argues that "seeking this Court's blessing before obligating itself to a binding settlement agreement—cannot be a material breach of the policy, nor does it prejudice MMIC." [ECF No. 55 at 23].

MMIC, however, argues that the Clinic's attempts to downplay these negotiations as merely exploratory discussions are belied by Attorney Rowley's own statements, which indicate a concrete intent to settle the underlying case and then "jointly prosecute a landmark bad faith and punitive damages case against MMIC." [ECF No. 22-3 at 241–42]. Such actions reflect not just a technical violation of the Policy, but a deliberate strategy to undermine MMIC's contractual rights.

The purpose of these Policy provisions is clear: to prevent insureds from engaging in settlement negotiations that could prejudice the insurer's interests. As the Iowa Supreme Court has recognized, "when an insurer defends an insured, it has control over the defense and over settlement." *Kelly*, 620 N.W.2d at 643. By engaging in independent settlement negotiations expressly aimed at facilitating a subsequent bad faith action against MMIC, the Clinic has materially breached both the letter and spirit of these provisions.

S.K. argues that MMIC's breach of the duty to settle excuses the Clinic from complying with these provisions, citing *Kelly* for the proposition that "when an insurer breaches the duty to

settle, the insured is excused from complying with the policy's cooperation clause and may enter into a settlement without the insurer's permission." [ECF No. 55 at 6]. However, as MMIC points out, this argument misreads *Kelly*, which addressed circumstances where an insurer's refusal to settle was predicated on an erroneous coverage position.

The Court rejects the Clinic's and S.K.'s argument that they could merely "discuss" settlement without violating the Policy. The Policy language requiring cooperation in "the negotiation of settlements" is not limited to final settlement agreements but encompasses the entire settlement process. The Clinic's admitted conduct—negotiating a settlement that was "in the works" with the explicit aim of dismissing the appeal and pursuing litigation against MMIC—contravenes this requirement. Accordingly, the Court finds that the Clinic has materially breached the Policy provisions governing settlement negotiations.

### c. Duty to Cooperate

#### i. Violation of Cooperation Clause

The Policy unambiguously requires the Clinic to "fully cooperate with [MMIC] in the investigation of claims, the negotiation of settlements, and the conduct of litigation." [ECF No. 22-3 at 9]. This provision, commonly known as a cooperation clause, serves to "protect insurers and prevent collusion between insureds and injured parties." *Chandler Mfg.*, 467 N.W.2d at 229. The record establishes that the Clinic, through its actions and those of Attorney Rowley, has persistently and materially breached this obligation.

First, the Clinic sought to stay the appeal just weeks before oral argument was scheduled, disrupting the orderly resolution of the litigation. On November 28, 2023, Attorney Rowley filed a motion to stay the direct appeal, asserting that the Clinic "wishes to negotiate with Plaintiff-Appellee and get the underlying case resolved." [ECF No. 22-3 at 163]. This motion, filed two

weeks before the scheduled oral argument, represented a calculated departure from the litigation strategy MMIC had pursued for over a year.  The timing of this motion—after substantial resources had been devoted to briefing the appeal and preparing for oral argument—betrays its obligations under the contract and demonstrates a deliberate interference with MMIC's direction of the litigation rather than a good-faith effort to seek a favorable resolution.

Second, when MMIC attempted to protect its interests by moving to intervene in the appeal, the Clinic actively opposed this effort.  On November 30, 2023, MMIC filed a motion to intervene at the Iowa Supreme Court, seeking to reappoint Attorney Booher and lift the stay.  [ECF No. 22-2 ¶ 42].  The Clinic resisted this motion on December 21, 2023, explicitly stating that it sought a continuance of the stay to pursue settlement options with S.K.  *Id.* ¶ 43.  This resistance directly undermined MMIC's ability to fulfill its contractual right to control the defense and direct the litigation—the very rights the cooperation clause is designed to protect.

S.K. argues that the Clinic's request for a stay was reasonable and not a material breach, contending that "continuing oral argument and temporarily staying the case to sort out that representation is entirely reasonable and cannot be considered a material breach."  [ECF No. 55 at 23].  S.K. notes that the Iowa Supreme Court granted the stay despite being "firmly aware of MMIC's concerns," suggesting that the state court did not view the request as improper.  *Id*.  Similarly, S.K. characterizes the Clinic's resistance to MMIC's motion to intervene as a permissible litigation strategy, not a breach of the Policy.

Third, the Clinic disclosed privileged attorney work product in a public filing before the Court.  On December 8, 2023, the Clinic filed privileged email communications between Attorney Booher and the Clinic concerning appeal strategy and analysis.  [ECF No. 22-2 ¶¶ 44–46].  As the Court previously observed, this disclosure of "Booher's impression about the strength of the

specific issues in the Appeal" was "not appropriate for a public filing." [ECF No. 21, at 6 n.3]. This improper disclosure potentially compromised MMIC's litigation strategy and violated the fundamental obligation to protect confidential communications relating to the defense.

The improper disclosure of Attorney Booher's confidential appellate strategy has consequences extending beyond this litigation. By filing privileged communications in a public document, the Clinic exposed MMIC's detailed evaluation of the case's strengths and weaknesses. This disclosure may continue to prejudice the defense in the now-ordered retrial, as opposing counsel has gained unwarranted insight into which issues MMIC's selected counsel viewed as vulnerable. Such disclosures fundamentally undermine the attorney-client relationship and deprive MMIC of the confidentiality essential to effective representation. The disclosure is particularly troubling given that Attorney Booher's analysis included potential "concessions" about certain district court rulings that could be exploited by opposing counsel in subsequent proceedings. This strategic harm is neither speculative nor easily remedied, and it constitutes an independent material breach of the Policy's cooperation requirements.

Fourth, the Clinic, through Attorney Rowley, made material misrepresentations to law enforcement regarding the existence of potential claims against MMIC. When the Johnson County Sheriff's Office attempted to execute on the Clinic's assets on June 7, 2023, Attorney Rowley told law enforcement that "[t]here's no such thing as a bad faith claim that you can collect." [ECF No. 22-3 at 127]. This statement directly contradicted the Clinic's prior representations in bankruptcy proceedings that it possessed a bad faith claim against MMIC. *In re Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, No. 22-01174-als11 (Bankr. S.D. Iowa Dec. 13, 2022). These inconsistent positions evidence a pattern of tactical maneuvering rather than good-faith cooperation.

S.K. contends that MMIC has mischaracterized these statements, arguing that "under the policy, the timing of Clinic's lawsuit against MMIC—and thus its allegations of bad faith—are just fine" because the policy allows the Clinic to sue MMIC after a judgment is entered.  [ECF No. 55 at 25].  S.K. further argues that "a lawsuit for bad faith is going to allege 'bad' things about the insurer; that is the nature of the claim."  *Id*.

Fifth, Attorney Rowley has engaged in prejudicial extra-judicial statements that undermine the defense of the underlying claim.  In public statements, Attorney Rowley has characterized MMIC's defense of Dr. Goodman as "one of the worst cases of bad-faith conduct . . . in Iowa state history."  [ECF No. 22-3 at 234].  Such statements implicitly challenge the strength of the appeal and the legitimacy of the defense mounted by MMIC—a defense that Attorney Rowley, as the Clinic's current counsel, is obligated to support rather than undermine.

Sixth, the Clinic's dismissal of its bankruptcy appeal—which MMIC was funding and which protected the Clinic from execution—further evidences a breach of the cooperation clause. The bankruptcy appeal provided a stay against execution while the direct appeal proceeded.  By dismissing this appeal, the Clinic exposed itself to execution and created circumstances that it later attempted to use against MMIC, all while pursuing a strategy at odds with MMIC's direction of the litigation.

MMIC notes that in dismissing the bankruptcy as filed in bad faith, Judge Shodeen found that "it was obvious" that the Clinic's first major motion was primarily motivated "to protect MMIC and the proceeds in the pending state court action," rather than to protect the interests of the Clinic or the debtors.  In contrast, S.K. argues that "the choice of whether to file for bankruptcy—and thus whether to continue a bankruptcy proceeding—is the Clinic's and the

Clinic's alone" and that "MMIC does not even bother to cite a relevant policy provision that precludes dismissing a bankruptcy appeal, because there is none." [ECF No. 55 at 25].

The Clinic contends that its actions represent legitimate efforts to protect its own interests in the face of an excess judgment, rather than a failure to cooperate. This argument fails for two reasons. First, the Policy requires cooperation with MMIC in the conduct of litigation regardless of whether the potential judgment exceeds policy limits. Second, the Clinic's actions— particularly those taken through Attorney Rowley—reflect not merely a divergence of interests but a deliberate strategy to prioritize a prospective bad faith claim over the defense of the underlying lawsuit.

S.K. argues more broadly that because MMIC breached its duty to settle, the Clinic was excused from complying with the cooperation clause. Relying on *Kelly*, S.K. contends that "once one party to a contract breaches the agreement, the other party is no longer obligated to continue performing his or her own contractual obligations." [ECF No. 55 at 6]. However, MMIC disputes this reading of *Kelly*, arguing that it applies only when an insurer has denied coverage or is defending under a reservation of rights, neither of which occurred here.

Moreover, the Clinic's behavior must be viewed holistically rather than as isolated incidents. The pattern that emerges is one of systematic non-cooperation: withdrawing consent for selected counsel, engaging in unauthorized settlement negotiations, staying the appeal, opposing MMIC's intervention, and pursuing a strategy designed to facilitate a bad faith claim rather than a successful appeal. This pattern reveals not merely technical violations but a fundamental repudiation of the cooperation obligation.

The Court finds that these actions, individually and collectively, constitute material breaches of the cooperation clause. Cooperation clauses serve the essential function of protecting

Case 3:23-cv-00039-SMR-WPK    Document 89    Filed 03/31/25    Page 28 of 34


insurers from collusion between insureds and third-party claimants, while permitting insurers to adequately investigate and defend claims. The record demonstrates that the Clinic's actions directly undermined these purposes by aligning its interests with the plaintiff against its own insurer—a paradigmatic example of the very conduct cooperation clauses are designed to prevent.

The Eighth Circuit confronted similar circumstances in *Sargent v. Johnson*, where an insured and third-party claimant negotiated a settlement designed to target the insurer. 551 F.2d 221, 232 (8th Cir. 1977). There, the court recognized that such arrangements "represent[] the antithesis of mutual respect for rights" and held that they relieved the insurer of its obligations. The parallel to the present case is striking. The Clinic and S.K., through Attorney Rowley, did not merely disagree with MMIC's litigation strategy—they collaborated to circumvent it entirely, with Attorney Rowley explicitly seeking "a cut of the $12 million policy proceeds" despite contributing nothing to the defense and indeed actively undermining it. This arrangement epitomizes the collusive conduct that cooperation provisions are designed to prevent, and *Sargent* confirms that such conduct relieves insurers of their contractual duties.

The consequences of the Clinic's eleventh-hour delay extend well beyond procedural inconvenience. When parties have fully briefed an appeal and prepared for argument, a last-minute disruption of the appellate process imposes substantial burdens not contemplated in the ordinary course of litigation. Here, the delay created a cascade of prejudicial effects. First, it compromised the evidentiary integrity necessary for potential retrial, as witness recollections inevitably fade with the passage of time. Second, it manufactured a representation vacuum when the Clinic simultaneously objected to Attorney Booher while creating a conflict for Shuttleworth & Ingersoll—leaving MMIC temporarily without counsel despite its contractual right to direct the defense. Third, it required duplicative preparation and additional expenditures when new counsel

later needed to master the complex record. These concrete harms are particularly troubling when viewed against the backdrop of the Clinic's shifting representations about settlement discussions—discussions it previously disclaimed when questioned directly by MMIC. Taken together, these circumstances reflect not routine litigation tactics but a coordinated effort to undermine the insurer's contractual rights. When an insured's actions so fundamentally frustrate the insurer's ability to fulfill its defense obligations, the cooperation clause has not merely been technically breached but materially violated.

ii. MMIC's Diligence in Securing the Clinic's Cooperation

Under Iowa law, the obligations between an insurer and insured under a cooperation clause are reciprocal. Not only must an insured cooperate with the insurer, but "the insurer must use reasonable diligence in obtaining the insured's cooperation." *Chandler Mfg. Co*., 467 N.W.2d at 229–30. While the Court finds that this standard is amply satisfied in this case, it is important to note that the Clinic's breaches were so deliberate and systematic that they would likely have nullified coverage regardless of MMIC's diligence in seeking cooperation.

The record demonstrates that MMIC undertook extensive, persistent, and reasonable efforts to secure the Clinic's compliance with its Policy obligations. These efforts spanned multiple forums and continued even as the Clinic repeatedly rebuffed them.

First, when concerns about the Clinic's potential non-cooperation initially arose, MMIC proactively filed this declaratory judgment action on June 5, 2023, seeking to clarify the parties' rights and obligations under the Policy. This preventive measure was designed to avert potential breaches and establish clear expectations regarding cooperation. The filing itself constituted notice to the Clinic of MMIC's concerns and its insistence on compliance with Policy terms. Rather than taking this opportunity to reassure MMIC of its intent to cooperate, the Clinic responded with an

Answer that confirmed its intention to pursue settlement negotiations with S.K. without MMIC's involvement.  [ECF No. 7 ¶¶ 25, 50].

Second, when the Clinic interfered with the appellate process by filing a motion to stay on November 28, 2023, MMIC promptly responded the next day by filing a motion for temporary restraining order and preliminary injunction in this Court.  [ECF No. 16].  This motion explicitly articulated MMIC's position that the Clinic's actions violated its Policy obligations and sought judicial intervention to prevent further breaches.  Again, rather than taking corrective action, the Clinic opposed this motion and continued its course of non-cooperation.

Third, MMIC filed a motion to intervene in the Iowa Supreme Court on November 30, 2023, seeking to protect its right to direct the conduct of litigation and ensure that the appeal proceeded with its selected counsel.  [ECF No. 22-2 ¶ 42].  This motion represented another significant effort to secure the Clinic's cooperation and maintain the integrity of the appellate process.  The Clinic, however, actively resisted this motion as well.  *Id*. ¶ 43.

Fourth, MMIC submitted thorough reply briefs in both the Court and the Iowa Supreme Court, extensive legal authority regarding the Clinic's obligations and demonstrating its continued diligence in pursuing compliance.  These submissions constituted renewed demands for the Clinic's cooperation with its Policy obligations.  Despite these efforts, the Clinic took no remedial action.

Fifth, on December 29, 2023, MMIC counsel sent direct correspondence to Attorney Rowley explicitly stating that the Clinic's actions were in violation of the Policy.  [ECF Nos. 22-2 ¶ 55; 22-3 at 243].  This communication specifically addressed the unauthorized settlement negotiations and the Clinic's interference with MMIC's right to direct the litigation and select counsel.  Far from remedying its breaches, the Clinic, through Attorney Rowley, responded with

a dismissive and confrontational email that further confirmed its non-cooperative stance.  [ECF No. 22-2 ¶ 56].

Throughout this process, MMIC consistently maintained its willingness to defend the Clinic according to the Policy terms, even as the Clinic repeatedly undermined MMIC's efforts. MMIC did not prematurely abandon its defense obligations but rather sought to enforce the reciprocal nature of the Policy relationship through appropriate legal channels.

The Clinic contends in its brief that MMIC has not used reasonable diligence because it has "utterly refuse[d] to participate in settlement discussions."  [ECF No. 27-1 at 15].  S.K. argues that MMIC first breached the duty to settle, which excused the Clinic from further compliance with policy terms.  According to S.K., before trial "the Clinic clearly faced potential exposure that far exceeded policy limits" and "S.K. tried 'to resolve the pending dispute for policy limits of $12 million in exchange for a full release' of the Clinic and Dr. Goodman, but MMIC 'refused to negotiate or make any settlement offer to [S.K.], which was expressly contrary to the position taken by the [Clinic], its insured.'"  [ECF No. 55 at 6].

S.K. further argues that MMIC exacerbated its breach after the verdict by "failing to post a supersedeas bond that would have protected the Clinic from execution during the pendency of the underlying appeal."  S.K. cites *Farmers Insurance Exchange v. Henderson*, 313 P.2d 404 (Ariz. 1957), where the Arizona Supreme Court held that an insurer who refused to settle within policy limits had "wrongfully created the situation" and "must protect [the insured] if it desires to appeal."  *Id*. at 408.

This argument mischaracterizes both the Policy requirements and the nature of MMIC's obligations.  The Policy grants MMIC the right to control settlement negotiations, not an obligation to settle on terms advocated by the Clinic, particularly when those terms appear designed to

facilitate a bad faith claim against MMIC itself.  Moreover, as MMIC points out in its post-hearing brief, S.K.'s position misconstrues the holding in *Kelly*, which addressed an insurer's duty when defending under a reservation of rights.

MMIC's post-hearing brief emphasizes that *Kelly* stands for the proposition that only when the rejection of a settlement is premised on a breach of the policy (*i.e.*, the insurer's claim that there is no coverage) does the *Kelly* contractual rule play any role.  MMIC argues that what made the insurer's rejection "wrongful[]" in *Kelly* was the insurer's basis for rejecting the settlement— that there was no coverage.  According to MMIC, it is not that the "failure to settle" itself was the potential breach; rather, the "failure to settle" was ancillary to the insurer's breach of the Policy's plain, textual covering language.

The Court finds that MMIC's efforts to secure the Clinic's cooperation were reasonable, persistent, and proportional to the Clinic's escalating breaches.  Under the circumstances, MMIC's diligence exceeded what Iowa law requires.  The Clinic's repeated rebuffs of these efforts and continued course of non-cooperation establish that further attempts would have been futile.

6.   Requested Relief

The Clinic and S.K. contend that MMIC seeks relief beyond the scope of its Complaint, arguing that the original pleading sought declaratory judgment "sole[ly]" related to a potential dismissal of the Appeal.  This characterization misrepresents both the substance of the Complaint and the nature of declaratory relief available under federal law.

MMIC's Complaint broadly sought a declaration of "the rights of the parties, including interpreting the terms and conditions of the aforementioned Policy."  [ECF No. 1 at 10].  While the Complaint specifically identified potential dismissal of the appeal as one scenario that would violate the Policy, it was not limited to that circumstance.  Rather, the Complaint sought to

establish that any "interference with the opportunity or nature of the Iowa Supreme Court's decision on the merits, would violate the terms of the Policy." [ECF No. 1 at 10]. The Clinic's conduct—withdrawing consent for selected counsel, engaging in unauthorized settlement negotiations, publicly disclosing litigation strategy, and otherwise undermining the appeal process—clearly constitutes such interference.

The Declaratory Judgment Act affords courts considerable flexibility in fashioning appropriate relief. The statute provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). As the Eighth Circuit has recognized, district courts possess broad discretion in determining whether to entertain declaratory judgment actions. *Alsager v. Dist. Ct. of Polk Cnty.*, 518 F.2d 1160, 1163 (8th Cir. 1975).

The purpose of declaratory relief is "to define the legal rights and obligations of the parties in anticipation of some future conduct." *Justice Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 764 (8th Cir. 2019). Here, the Court's declaration appropriately addresses the legal consequences of the Clinic's established breaches—namely, that these breaches have voided the Policy and foreclosed any rights the Clinic might otherwise have under it.

One aspect of MMIC's requested relief—the return of the $12 million in policy proceeds—has been resolved since the completion of briefing. As noted in MMIC's Notice of Payment of Proceeds filed on November 22, 2024, S.K. has returned the full $12 million principal amount to MMIC following the Iowa Supreme Court's decision reversing the underlying judgment. This practical resolution eliminates the need for the Court to order restitution of these funds or to address the parties' arguments regarding the Court's authority to grant such relief.

The Court has carefully considered the Clinic's and S.K.'s remaining arguments regarding the scope of declaratory relief and finds them unpersuasive.  The declarations that (1) the Policy is void due to the Clinic's material breaches and (2) all causes of action on the Policy are foreclosed represent appropriate and necessary relief based on the undisputed facts and applicable law.  These declarations properly define the parties' legal relationships in light of the Clinic's established breaches of its contractual obligations.

### III.    CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment is GRANTED.  [ECF No. 22].  The Clinic's motion for judgment on the pleadings is DENIED.  [ECF No. 58].  The remaining pending motions are MOOT.  [ECF Nos. 56, 64, 68, 74, 81, 86].  The Court issues the following declaratory relief:

- The Clinic has materially breached the Policy, rendering the Policy void;

- Any and all causes of action on the Policy are now foreclosed.

IT IS SO ORDERED.

Dated this 31st day of March, 2025.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT